**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

In re Application of Alpene, Ltd.
for an Order Directing Discovery
from Elizabeth McCaul Pursuant
to 28 U.S.C. §1782

2021-mc-2547-MKB-RML

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO**
**VACATE ORDER GRANTING DISCOVERY PURSUANT TO**
**28 U.S.C. § 1782, AND FOR RELATED RELIEF**

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................ 3

    A. Alpene's Claims in the Arbitration ...................................................................... 4

    B. Respondent Was Involved in the Relevant Issues ................................................ 4

    C. Respondent Briefed and Directed Connell and Other Promontory Staff................. 5

    D. Promontory Invoiced Connell and the Bank for Work ........................................... 6

    E. Respondent Continued to Direct Work at the Bank................................................ 6

    F. Malta Continued to Freeze and Manage the Bank After Sadr's Charges Were Dismissed with Prejudice................................................................................... 8

    G. Malta's Positions and Statements Cannot Be Credited ......................................... 8

ARGUMENT ...................................................................................................................... 9

    A. The Discovery Sought Is Relevant to the Treaty Arbitration ................................. 9

    B. The Discovery Is Sought for a Proper Purpose for the Treaty Arbitration ........... 12

    C. The Factual Statements in the Application Are Supported.................................... 13

    D. Respondent's Assertions about the Treaty Arbitration Not Being Properly Filed Are False and Contrary to the Facts and Law....................................................... 15

II. RESPONDENT'S ARGUMENTS REGARDING PRIVILEGE ARE WRONG AS A MATTER OF FACT AND LAW ................................................................................... 17

    A. The Respondent Has Not Met Her Burden to Show That Such a Privilege Even Exists................................................................................................................. 17

    B. Respondent's Blanket Assertion of Privilege Is Improper and Contrary to the Law ........................................................................................................................ 19

    C. Even if a Privilege Did Exist, the Respondent Has Waived any Privilege with Respect to These Issues ..................................................................................... 20

III. THE INFORMATION SOUGHT BY ALPENE IS NOT AVAILABLE TO ALPENE THROUGH THE TREATY ARBITRATION ................................................................. 20

IV. THE SECOND CIRCUIT JURISPRUDENCE IS CLEAR THAT THE INVESTOR-STATE ARBITRATION IS A FOREIGN PROCEEDING............................................. 23

CONCLUSION................................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*,
No. 3:07-cv-929 (WWE), 2013 WL 6044333 (D. Conn. Nov. 14, 2013) .............................. 19

*BG Grp., PLC v. Republic of Argentina*,
572 U.S. 25 (2014) ......................................................................................................... 16

*Carter-Wallace, Inc. v. Otte*,
474 F.2d 529 (2d Cir. 1972) ........................................................................................... 21

*Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113, 120–21 (2d Cir. 2015) .............................................................................. 11

*Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*,
139 F.R.D. 295 (S.D.N.Y. 1991) .................................................................................... 19

*Doe v. Wesleyan Univ.*,
No. 3:19-CV-01519 (JBA), 2021 WL 2525427 (D. Conn. June 21, 2021) .......................... 19

*Fund for Protection of Investor Rights in Foreign States v. AlixPartners, LLP*,
5 F.4th 216 (2d Cir. 2021) ........................................................................................ 23, 24

*Inv. Vehicles v. KPMG, L.L.P.*,
798 F.3d 113 (2d Cir. 2015) ........................................................................................... 11

*in re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*,
121 F.3d 77, 80 (2d Cir. 1997) ....................................................................................... 23

*In re Application of Elvis Presley Enterprises LLC for an Ord. to Take Discovery*
*Pursuant to 28 U.S.C. § 1782*,
No. 15MC386 (DLC), 2016 WL 843380 (S.D.N.Y. Mar. 1, 2016) ....................................... 20

*In re Caterpillar, Inc.*,
2020 WL 1923227 (M.D. Tenn. Apr. 21, 2020) ................................................................. 17

*In re Chevron Corp.*,
709 F. Supp. 2d 283 (S.D.N.Y. 2010) .............................................................................. 24

*In re Eni S.p.A.*,
No. 20-MC-334-MN, 2021 WL 2985171 (D. Del. July 15, 2021) ........................................ 25

*In re Ex Parte Application of Eni S.p.A. for an Ord. Pursuant to 28 U.S.C. § 1782*
*Granting Leave to Obtain Discovery for Use in Foreign Proc..*,
No. 20-MC-334-MN, 2021 WL 1063390 (D. Del. Mar. 19, 2021) ...................................... 25

*In re financialright GmbH,*
    2017 WL 2879696 (S.D.N.Y. June 22, 2017) ........................................................................17

*In re Guo,*
    965 F.3d 96 (2d Cir. 2020) .................................................................................................24

*In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.*),
    348 F.3d 16 (1st Cir. 2003)................................................................................................20

*In re Oxus Gold PLC,*
    MISC No. 06-82-GEB, 2007 WL 1037387 (D.N.J. Apr. 2, 2007) ....................................25

*In re Petition of the Republic of Turkey,*
    Civil Action No. 19-20107 (ES) (SCM), 2020 WL 4035499 (D.N.J. July 17,
    2020) .............................................................................................................................17, 24

*In re RSM Prod. Corp.,*
    No. 17MC213 (DLC), 2018 WL 1229705 (S.D.N.Y. Mar. 9, 2018) ..................................20

*In re Veiga,*
    746 F. Supp. 2d 8, 22 (D.D.C. 2010) ...............................................................................25

*N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.,*
    325 F.R.D. 36 (E.D.N.Y. 2018)........................................................................................17

*OJSC Ukrnafta v. Carpatsky Petroleum Corp.,*
    No. 3:09 MC 265 (JBA), 2009 WL 2877156 (D. Conn. Aug. 27, 2009) ............................25

*Orbit One Commc'ns, Inc. v. Numerex Corp.,*
    255 F.R.D. 98 (S.D.N.Y. 2008) .......................................................................................19

*P&B Marina, Ltd. P'Ship v. Logrande,*
    136 F.R.D. 50 (E.D.N.Y. 1991).......................................................................................19

*P&B Marina, Ltd. v. LoGrande,*
    983 F.2d 1048 (2d Cir. 1992)...........................................................................................19

*Islamic Republic of Pakistan v. Arnold & Porter Kaye Scholer LLP,*
    Misc. Action No. 18-103 (RMC), 2019 WL 1559433 (D.D.C. Apr. 10, 2019) ...................24

*Pilatus Bank PLC v. Connell,*
    2021 U.S. Dist. LEXIS 89206 (D.N.H. 2021) ...................................................................12

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP.,*
    376 F.3d 79 (2d Cir. 2004)................................................................................................20

*United States v. Nejad,*
    487 F. Supp. 3d 206 (S.D.N.Y. 2020)..................................................................................8

**Statutes**

*28 U.S.C. § 1782* ................................................................................................................... *passim*

# I.    INTRODUCTION

Alpene Ltd ("Alpene"), the Applicant, seeks discovery from the Respondent, Elizabeth McCaul (McCaul" or "Respondent") for use in its foreign proceeding brought against the Republic of Malta pursuant to the Malta-Chinese bilateral investment treaty (the "Treaty"). As set out in Alpene's Application, Alpene is a qualified foreign investor seeking remedies in an arbitration proceeding against the Republic of Malta pursuant to the Treaty (the "Treaty Arbitration"). Alpene seeks limited discovery from Respondent for use in the Treaty Arbitration.

Rather than sitting for a limited deposition, Respondent submitted a carefully-crafted declaration in this case testifying about the very same topics about which Alpene seeks discovery. As discussed below, some of her sworn statements in the Declaration are contrary to contemporaneous documents. But the central question is why is Alpene seeking documents and information from Respondent and why is Respondent resisting relatively limited discovery requests. The answer, at least to the first part of the question, is that the discovery requested from Respondent is relevant to Alpene's claims in the Treaty Arbitration.

Alpene's claims in the Treaty Arbitration are that the Republic of Malta, and its agents, took wrongful measures that destroyed the value of Alpene's indirect investment, Pilatus Bank plc (the "Bank"). These wrongful measures include (i) dissipating the assets of the Bank, (ii) depriving Alpene of any indirect shareholding rights of ownership such as control, and (iii) the transfer of all the assets of the Bank to Maltese government. These wrongful measures were done directly by the Maltese government but also indirectly through its agents, such as Respondent and the person who first managed the Bank, Lawrence Connell ("Connell"). The facts behind the reason that Connell, a former U.S. banking regulator from New Hampshire, was selected to manage a bank in Malta seized by the government is relevant to whether such a selection was wrongful. In addition, as discussed below, the relationship between the Respondent and those

Maltese officials who deprived the Bank of its assets is also relevant to Alpene's claims, as Connell and the other Promontory staff were involved in the events that led to the deprivation of the Bank's assets.

In her declaration accompanying the Respondent's Motion, Respondent for the first time testified about her role in the selection of Connell for the role as the "Competent Person" for the Bank. She testifies, for example, that she suggested Connell and that she spoke to him regarding his acceptance of the position. Far from clarifying things, however, Respondent's declaration omits or mischaracterizes information about relevant facts that are known from Connell's testimony and contemporaneous documents.

Respondent's involvement was not limited to identifying Connell and requesting that he take the position, as she implies. McCaul was the primary point of contact at Promontory with Connell. She briefed him for several hours with respect to his work at the Bank before he began his assignment. She appears to have selected two other Promontory persons to work with Connell. She further appears to have directed Connell and the Promontory persons that were purportedly managing the Bank to, at least in one instance, undertake actions beyond the scope of Promontory's mandate for the Maltese government that were potentially wrongful at the Bank's expense. Connell and the Promontory persons working with him dissipated the working assets of the Bank, undertook wrongful actions apparently at the request of the Maltese government, harming the Bank's assets. These events started, as Respondent admits, with her identification of Connell and discussion with Connell about his position managing the Bank. These facts are central to Alpene's claims that the measures taken by the Maltese government, including the installation of Connell as the person managing the Bank, were wrongful.

In addition, and importantly, Respondent's testimony and the other evidence show that she is the only person who has the information that is relevant on these issues. She provided Connell's name to be the Competent Person. She spoke with Connell without the MFSA about this role. She participated in and likely led a multi-hour briefing for Connell regarding his role and the purported "issues" at the Bank. Respondent has information that the Maltese government does not have.

Respondent asserts without any evidence that Alpene is seeking this information for another purpose than the Treaty Arbitration. As set out in a declaration by Alpene's lawyer, Edward Baldwin, in the Treaty Arbitration, this is not the case. The information sought is for the facts at issue in the Treaty Arbitration and will be used for that purpose.

In addition, Respondent's reliance on the application that was denied as to Connell is unavailing and irrelevant – that was made in support of a different proceeding by a different applicant and was denied for reasons not relevant here. Respondent's final argument that this application should be denied due to the pending Supreme Court case on the applicability of 1782 applications to private arbitrations is utterly of no moment – the Second Circuit has made clear that 1782 applications are entirely appropriate in an investor-state arbitration like this one.

## FACTUAL BACKGROUND[1]

The primary factual background with respect to this action is set out in pages four to eight of Alpene's Memorandum of Law in support of its Application. ECF Doc. 5. Alpene incorporates those statements by reference here.

Alpene responds here to some of the several incorrect statements made by Respondent in her motion and sworn declaration. Far from being a bystander to the events at issue, as

---

[1] Accompanying this memorandum is the December 1, 2021 Declaration of Edward G. Baldwin with exhibits ("Baldwin Decl.")

Respondent portrays herself, Respondent was significantly involved in the issues in the Treaty Arbitration.

## A.    Alpene's Claims in the Arbitration

As a starting point, Alpene's claims in the Treaty Arbitration relate to a series of actions or measures taken by Maltese officials against Pilatus Bank. The Treaty allows for indirect owners, such as Alpene, to bring claims for wrongful actions taken against their investment. Baldwin Decl., at 8. In the Treaty Arbitration, Alpene seeks compensation for the loss in value of its indirect ownership that resulted from Malta's actions. *Id*. Thus, actions that affect the value of Pilatus Bank, including the loss of its assets, affects the value of Pilatus Bank and ultimately the shares of the Bank. *Id.*

In addition, the value of the indirect shares of the Bank are affected by a loss of control of the Bank. *Id*., at 9. In other words, the market value of a Bank controlled and operated by the government is much less than the value of a Bank operated by its board of directors and executives. *Id*. Thus, the actions of those operating the Bank, and the actions they took with respect to the assets of the Bank, are central issues in the Treaty Arbitration. *Id.*

## B.    Respondent Was Involved in the Relevant Issues

Despite her protestations, McCaul and Promontory were very much involved in the issues that form the factual case for Alpene's claims. McCaul asserts that Promontory's involvement with the Malta Financial Services Authority ("MFSA") began in 2012[2] and was not "instigated" by the indictment of Ali Sadr on March 18, 2019. McCaul Decl., at 4. This is a misleading assertion. The fact that McCaul may have been working with MFSA officials prior to the

---

[2] McCaul's assertion that she has been involved with the MFSA since at least 2012 is one of the topics listed in her subpoena *ad testificandum*. Alpene requests to inquire as to the extent of her previous relationship with the MFSA Chairman and his deputies and agents.

indictment is not the issue. The issue is that McCaul (on behalf of Promontory) entered into a new engagement agreement with the MFSA the very next day after Mr. Sadr's arrest became public. Baldwin Decl., Exh. 6. McCaul and Promontory were apparently engaged to take actions on behalf of MFSA with respect to Alpene's investment.

McCaul took many actions with respect to Alpene's investment. As an initial matter, as McCaul now admits, she provided Connell's name to be the Competent Person – *i.e.,* manage the Bank. McCaul Decl., at 4. McCaul testifies as to the MFSA's requirements for the Competent Person. *Id*. McCaul admits that Connell was a consultant for Promontory. *Id*.[3]

### C.       Respondent Briefed and Directed Connell and Other Promontory Staff

McCaul asserts in her Motion that she did not select Connell to be the Competent Person. Resp. Mem., at 2. But this is contrary to sworn testimony of Connell, in which he states that "they", referring to Promontory, "needed someone to come in and essentially manage the bank and preserve its assets under a regulatory order."[4] Baldwin Decl., Exh. 20. Connell further testifies that he was on the phone with McCaul when he agreed to take the position as the Competent Person. *Id*., at p. 8 et seq. The fact that the MFSA was the ultimate entity which sought a Competent Person does not change the implication from Connell's sworn testimony that Promontory was acting on behalf of the MFSA in selecting him. Government officials can direct their agents to act for them, as the MFSA apparently did here with McCaul.

In fact, contrary to McCaul's sworn declaration, Connell implies that Promontory and McCaul were the ones directing and briefing him regarding his role as the Competent Person. *Id*., at pps. 20-21. Connell states that he had "several hours [of] briefing" regarding the issues and his

---

[3] McCaul testifies about the same topics for which Alpene seeks to depose her.
[4] Transcript of the Hearing of the Financial Services Tribunal in Valletta, Malta on 4 July 2018 (emphasis added).

role as the Competent Person and that this briefing came from Promontory staff and MFSA officials. *Id*. Connell testified in this same discussion that McCaul was his main contact at Promontory. *Id*. It appears from Connell's limited testimony that Promontory and McCaul were engaged to select and direct Connell as the Competent Person.

Not only was Promontory involved in selecting, briefing, and directing Connell, Promontory staff worked with Connell in his role as the Competent Person. Connell testifies that Promontory identified two other persons to work with him at the Bank. *Id*. Connell says that Promontory communicated with these two persons regarding their position with the Bank. *Id*. Connell was not present when Promontory contacted these persons. *Id*. Connell had apparently turned over some of his responsibilities to Promontory.

### D. Promontory Invoiced Connell and the Bank for Work

It further appears that Connell – after having been picked by Promontory for this role – hired Promontory to work for the Bank. A letter from McCaul's then subordinate, Carlo Comporti, transmits an invoice from Promontory to Connell in his role as the Competent Person. *Id*., at Exh. 5. Comporti's letter states that Promontory has enjoyed working with Connell in his role as the Competent Person and that they "look forward to [their] continued and successful cooperation." *Id*.

### E. Respondent Continued to Direct Work at the Bank

More troubling, and contrary to McCaul's assertions, McCaul apparently continued to direct the activities of the Promontory persons working at the Bank. In an email written from his Promontory email account, Lucio Planera (who was supposed to be working for the Bank) states that he "promise[d]" McCaul that he would "finish the review of the customer's KYCs on the

end of my cooperation with you."[5] *Id.*, Exh. 7. Planero's email is dated September 2, 2018, almost seven months after Connell and the two Promontory staff started working purportedly for the Bank. *Id.* And yet Planero refers to a promise he made to McCaul, not to the MFSA, to complete KYCs for the Bank customers. Such a direction almost certainly came from McCaul months after her hour long briefing in March 2018. McCaul was instead directing Pilatus Bank employees to perform actions with respect to the Bank and its customers.

In fact, McCaul's direction to have Planera perform KYCs on all of the Bank's customer is one of the facts that will support Alpene's FET claim. Connell testified that his only role as the Competent Person at the Bank was to pay the bills and respond to legal inquiries. *Id.*, Exh. 20. He testified that the paying of bills primarily involved such bills as rent and electricity, as well as paying other agents of MFSA, including himself and the Promontory staff. *Id.* He testified that the Bank could not engage in any transactions with existing customers and could not accept new customers. *Id.* Although KYCs are certainly important and legitimate, there was no basis for McCaul to direct Planera to conduct KYCs on all the Bank's customers when no new customers could be accepted and no transactions could be conducted with the current customers. Although Malta ostensibly could have investigated each of the Bank's customers, such an investigation would need to be done in accordance with law. Instead, McCaul sought to have the Promontory person acting for the Bank investigate all of the Bank's customers. And her direction appears to have been so important that she had Planera promise he would complete it before he left, all at the expense of the Bank.

---

[5] KYC is understood to mean "Know Your Client," which involves doing due diligence on your clients with respect to compliance issues.

**F.  Malta Continued to Freeze and Manage the Bank After Sadr's Charges Were Dismissed with Prejudice**

The basis by which Promontory was engaged appears to have been because of the arrest and indictment of Ali Sadr on March 18, 2018. As testified by McCaul, Sadr's arrest was the basis upon which the MFSA took actions against the Bank. McCaul Decl., at 5. But, following the dismissal of the action against Sadr with prejudice on July 17, 2020, Malta did not allow the Bank's officials to resume their management roles and operate the Bank. ECF 4-1, at para. 14. The Bank continues to be managed under the control of Competent Person. *Id*. Moreover, the Bank's assets remained frozen, except for expenses for which the Competent Person decides to incur. *Id*.

To be clear, Sadr's charges were not only dismissed but were dismissed with prejudice. The basis for the dismissal was the federal prosecutors withholding of exculpatory evidence. Judge Nathan stated that the material withheld in the proceeding was not only exculpatory but material. Judge Nathan stated that the withheld document "suggested that the manner in which Mr. Sadr structured the charged transactions was neither intended to nor likely to obstruct OFAC enforcement". *See United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020). Judge Nathan further noted that the federal prosecutors knew that the document was exculpatory, noting that "[j]udged objectively, the potential exculpatory value of the document (GX 411) was not a particularly doubtful question. Its materiality was even less so." *Nejad*, at 438. Respondent's assertion that no court has exonerated Sadr conflicts with the dismissal. *See also* Baldwin Decl., Exh. 10.

**G.  Malta's Positions and Statements Cannot Be Credited**

Lastly, the assertions made by Malta, and by McCaul on behalf of Malta, should not be credited. Malta is the only country in the E.U. that has been grey listed by the Financial Action

Task Force ("FATF"). Baldwin Decl., Exh. 13. Malta sits alongside Haiti and South Sudan, along with only 20 other countries, as needed additional monitoring by the FATF. *Id*. As noted by a Minister of t: "It is embarrassing that it needs a global watchdog to call out a European Member State for severe money laundering and terrorist financing risks." *Id*., Exh. 14.

Contrary to other countries that are working to fight corruption, Malta seems to be embracing it. Malta has hit a new "all-time low" according to Transparency International, which considers Malta a "significant decliner" in the 2020 Corruption Perceptions Index ("CPI"). *Id*., Exh. 21. In fact, Malta has dropped seven points in the CPI since 2015 (*Id*.) since Respondent says that she has been working with Malta.

Respondent refers to a number of wrongful measures Malta has taken, such as the indictment of the Bank, as evidence of wrongful actions of the Bank. To the contrary, as Alpene will demonstrate in its briefing, Malta's actions were retaliations against Alpene's investment. The Bank's indictment postdated the filing of the Request for Arbitration and came right after the filing of this 1782 Application, which was sent to Maltese officials when filed with a demand not to engage in political retaliations such as they did anyway. *Id*., at 10.

Prior to the arrest of Sadr, the MFSA had repeatedly audited and investigated the Bank and found it to be in compliance. *Id*., Exh. 11. Even after the arrest of Sadr, and the investigation dictated by Respondent and the MFSA, Respondent did not indict the Bank for almost 3 years and only then ***after*** the filing of the Treaty Arbitration. *Id*. It is not uncommon for corrupt states like Malta to retaliate against foreign investors for bringing claims. *Id*.

## ARGUMENT

### A.     The Discovery Sought Is Relevant to the Treaty Arbitration

The Respondent is mistaken with respect to Alpene's claims and the evidentiary proof that Alpene is seeking to support those claims. As an initial matter, the Respondent asserts that

Alpene is only claiming for expropriation. Resp. Mem., at p. 2. Alpene's Request for Arbitration is clear that Alpene has four claims against Malta: (i) expropriation, (ii) unfair and inequitable treatment, including a lack of transparency, (iii) arbitrary and discriminatory treatment, and (iv) unreasonable or discriminatory measures. (ECF 4-1.)

As noted in the RFA, Alpene's claim for unfair and inequitable treatment includes whether the state's officials have acted with transparency, have acted arbitrarily, or have acted unreasonably among other things. In an often-cited investor-state arbitration case, *Rumeli v. Kazakhstan*, the tribunal held as follows:

> "The parties rightly agree that the fair and equitable treatment standard encompasses inter alia the following concrete principles:
>
> "- the State must act in a transparent manner;
>
> "- the State is obliged to act in good faith;
>
> "- the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process . . . ."

Baldwin Decl., Exh. 22, at ¶610 (internal citations and emphasis omitted). In addition:

> The concept 'fair and equitable treatment' is not precisely defined. . . . The precise scope of the standard is therefore left to the determination of the Tribunal which 'will have to decide whether in all the circumstances the conduct in issue is fair and equitable or unfair and inequitable.'"

*Id*., at ¶610. A fair and equitable treatment claim covers a "wide range of measures by the host state" that have had "inappropriately negative effects on the investor. . . ." *Id*., Exh. 23. Fair and equitable treatment is "at the heart of investment arbitration because of the vastness of factual situations pertaining to host state actions . . . ." *Id*., Exh. 23.

In addition to the fair and equitable treatment claim, the requested discovery is also relevant to Alpene's expropriation claim. Under international law, regulatory measures taken by the state can constitute an unlawful expropriation when those measures are in bad faith, discriminatory, or not for a public purpose, among other reasons. *Id*., Exh. 24. The factual

circumstances surrounding the measures that allegedly led to the expropriation need to be examined to determine whether the acts were lawful as "the context within which an impugned measure is adopted and applied is critical to the determination of its validity." *Id*., Exh. 29.

The facts surrounding Malta's measures taken against the Bank, in which Respondent has information not otherwise available to Alpene, are relevant for determining Alpene's claims. To be specific, each of the discovery requests is relevant to Alpene's claims:

- Deposition Topic 1: information regarding the reason and manner for the selection of Connell and the involvement of McCaul and Promontory are directly relevant to this case as Alpene asserts that his selection was wrongful and not transparent. In addition, the connections between McCaul, Connell, and the MFSA are at issue.

- Deposition Topic 2: Connell testifies that he did not negotiate his agreement with the MFSA and that he was presented the agreement to sign. Connell also used his Promontory email in his work for the Bank and took directions from McCaul. This topic is relevant in that the terms of his engagement, and the directions regarding this engagement, are part of the wrongful actions for which Alpene claims.

- Deposition Topics 3 and 4 have the same reasoning as Document Requests 1 and 2, discussed below.

- Deposition Topic 5 covers the allegations made in Alpene's Request for Arbitration. Those are naturally relevant.

- Document Request Number 1: documents related to McCaul's relationship and discussions with the former MFSA Chairman and his deputies. This request is relevant to Alpene's FET claim because, among other reasons, Alpene alleges that the hiring of Connell was not transparent and was wrongful. In addition, Alpene has concerns about the engagement of a politically-connected firm by Connell in which substantial fees were paid by the Bank at Connell's request.

- Document Request Number 2: documents related to McCaul's relationship and discussions with the current MFSA Chairman and his deputies. This request is relevant to Alpene's FET claim because, among other reasons, Alpene alleges that the management of the Bank by Connell and others was not transparent and was wrongful. In addition, Alpene has concerns about the engagement of a politically-connected firm by Connell in which substantial fees were paid by the Bank at Connell's request.

The case cited by Respondent sheds no light on this case. In *Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120–21 (2d Cir. 2015), the issue of relevance was

not a question directly considered by the court. Rather, the question was whether the parties seeking the relevant documents could actually use them in the foreign proceeding because the parties seeking the discovery were not the parties in the foreign proceeding.

### B.      The Discovery Is Sought for a Proper Purpose for the Treaty Arbitration

Respondent asserts without evidence in its Motion that Alpene is seeking discovery for some improper purpose. Respondent never states directly what the purported improper purpose is, implying that the evidence is not sought for use in the Treaty Arbitration. This is incorrect.

As stated in the Baldwin Declaration, the requested discovery is for use in the Treaty Arbitration and not for any other purpose. Baldwin Decl., at 6. Counsel for Alpene in the Treaty Arbitration is seeking discovery so that such discovery can be used in the Treaty Arbitration. *Id*. The evidence sought is evidence that can be used and will assist the tribunal in the Treaty Arbitration. *Id.*

The Respondent makes several statements about an earlier Section 1782 application brought by Pilatus Bank seeking discovery from Mr. Connell (the "Pilatus Application"). To be clear, Alpene's counsel was not involved in any way in the Pilatus Application. Baldwin Decl., at 6. Counsel for Alpene has not spoken with counsel for Pilatus Bank in the Pilatus Application about the Application or anything related to Pilatus Bank and was not involved in the Pilatus Application in any way. *Id*.

Reviewing the Pilatus Application, it is evident that it is separate and distinct (both legally and factually) from Alpene's Application here. The evidence sought is relevant to the Treaty Arbitration. In addition, the basis for the Court's dismissal of the Pilatus Bank 1782 Application has no bearing on Alpene's Application. In the Pilatus Application, the court determined that Pilatus had not satisfied the requirements of § 1782 and denied the petition without prejudice to serving an amended petition on Connell. *Pilatus Bank PLC v. Connell*, 2021

U.S. Dist. LEXIS 89206 (D.N.H. 2021). As an initial matter, the Court held that Pilatus Bank was unable to show that the discovery it seeks is for use in a proceeding in a foreign tribunal, and was unable to meet the requirements under § 1782(a). *Id*. The court further reasoned that Pilatus had failed to show that the information it sought was beyond the jurisdictional reach of the General Court in Malta. *Id*. The court further held that Pilatus did not demonstrate that the General Court would be receptive to the aid in discovery. Id. The court finally reasoned that Pilatus Bank did not show that the discovery was relevant to its case in Malta. *Id*.

Here, there is no doubt under Second Circuit precedence that the ICSID tribunal constituted under the Treaty is a foreign proceeding for the purposes of Section 1782, as explained further below. In addition, as explained below, the information sought cannot be obtained in the Treaty Arbitration as McCaul's testimony and documents cannot be compelled, despite her role in the relevant events in question. Further, as Respondent does not seriously challenge, this evidence can be used in the ICSID arbitration and the tribunal would be receptive to it. As stated above, the documents are relevant to Alpene's claims in the Treaty Arbitration.

### C.     The Factual Statements in the Application Are Supported

Respondent asserts incorrectly that Alpene's Applications contains two errors.[6] Without explaining why or providing any law, the Respondent indicates that this makes the Application

---

[6] Respondent's comments concerning the details of service (*see* Resp. MOL, 10) are not accurate. She was served multiple times with Alpene's papers and the subpoenas more specifically.  *See* September 1, 2021 Certificate of Supplemental Service, ECF 7 (confirming delivery of all papers including proposed subpoenas by overnight mail); September 13, 2021 Certificate of Second Supplemental Service, ECF 8 (confirming delivery of all papers including proposed subpoenas in person to an adult, Ms. Merle Travis, at Ms. McCaul's home); ECF 13, 13-1, September 28, 2021 Affidavit of Michael Keating (confirming service of the subpoenas on an adult, Ms. Merle Travis, at Ms. McCaul's home and by regular mail in accordance with New York service rules).

infirm. Putting aside that the facts set out in the Application are indeed correct, disputed or even incorrect allegations do not result in a dismissal of a 1782 application.

Here, however, the facts asserted in Alpene's 1782 application are supported. The first fact at issue is whether McCaul "selected" Connell. Resp. Mem., at 2. As set out in the Factual Statement, Connell stated that Promontory needed someone to come in and manage the bank: "They [Promontory] needed someone to come in and essentially manage the bank and preserve its assets under a regulatory order." Baldwin Decl., Exh. 20. Connell testified that McCaul called him and requested him to take the engagement. *Id*. The MFSA may have agreed to install Connell as the Competent Person for the Bank, but that does not mean that Connell was not selected by Respondent and Promontory to be the person for this role.

The Respondent further asserts that Promontory did not act as the Competent Person and, apparently, that Connell had nothing to do with Promontory. Respondent's assertion is incorrect. While acting as the Competent Person, Connell used his Promontory email to conduct Bank activities. *Id*., Exhs. 4, 7, 8, and 9. In addition, two other Promontory representatives were engaged to assist Connell as the Competent Person. *Id*., Exh. 20. These representatives likewise used their Promontory emails when carrying at their duties for the Competent Person. *Id*., Exhs. 4, 7, and 8. In other words, even though Connell and the others had Pilatus Bank email accounts, they chose to use their Promontory emails for the Bank's work.

As stated in Respondent's Motion, counsel for Alpene and Respondent had several calls to discuss the Application and Respondent's involvement. Respondent asserted without evidence that statements in Alpene's Application were incorrect. In response, and in an effort to assuage Respondent's concerns, Alpene sent a letter to Respondent detailing her significant involvement with the issues in the Treaty Arbitration. *Id*., Exh. 29. Respondent submitted no specific facts to

rebut the statements made in the letter. Respondent only submitted a general demurrer.

Respondent also refused to work with Alpene to discuss any accommodations she may have

wanted or needed with respect to the document requests or deposition.

### D. Respondent's Assertions about the Treaty Arbitration Not Being Properly Filed Are False and Contrary to the Facts and Law

Respondent asserts incorrectly that the Treaty Arbitration was not properly filed because

Alpene has not exhausted its local remedies. This statement is wrong in multiple ways, but more

importantly this Court is not the proper forum to adjudicate this issue and McCaul is not the

proper party to raise it.

As an initial matter, the Secretary General of the International Centre for the Settlement

of Investment Disputes has duly screened and registered Alpene's Request for Arbitration

("RFA"). Baldwin Decl., at 23. Unlike some other institutions, ICSID's Secretary General

screens requests to determine whether they are manifestly outside of the jurisdiction of ICSID.

*Id*., Exh. 12. Prior to registration, ICSID sends a copy of the RFA to the Respondent and invites

any comment from the Respondent. *Id*. ICSID sent Alpene's RFA to Maltese officials prior to

the registration of the RFA. *Id*. To our knowledge, Maltese officials never raised an objection

that local remedies were not exhausted or that the dispute was otherwise manifestly without

jurisdiction. *Id*. If it was clear that Alpene was not entitled to bring a claim for a jurisdictional

defect, the Secretary General of ICSID would have not registered the request.

The Respondent is wrong as a matter of international law with respect to its exhaustion of

local remedies argument. First, the Respondent has not explained **what remedies** in Malta that

Alpene has failed to exhaust. Alpene owns shares in an entity that owns shares in Pilatus Bank.

Alpene did not hold the banking license that was revoked. Alpene does not own the assets of the

Pilatus Bank that were taken and otherwise dissipated. Under U.S. law, it is certainly not clear

that a shareholder of a shareholder of a company could bring an action against the U.S. government for some alleged wrongdoing against that company. One cannot argue that a local remedy should have been exhausted while not stating what such a remedy is.

Second, even if Alpene had remedies to exhaust, which it does not, investor-state tribunals have regularly dismissed objections based on an alleged failure to exhaust local remedies. When evaluating a failure to exhaust local remedies objection, tribunals often consider the triple identity test. Baldwin Decl., at 42. This test is similar to *lis pendens* and states that an exhaustion only applies when you have the same parties, the same facts, and the same law. *Id*. The elements of the triple identity test are not met here. Alpene is not seeking directly to have the license returned or the assets of the Bank returned or reimbursed. *Id*. Rather, Alpene is seeking compensation for damages for the harm done to Alpene's investment, which is its indirect ownership of the Bank. Unlike Pilatus Bank, which may seek separate remedies under Maltese law, Alpene's claims arise under the Treaty and are based in international law. *Id*. Thus, an exhaustion requirement that might apply to a direct investor in certain circumstances, does not apply to Alpene and its claims.

In any event, as the U.S. Supreme Court has held, and as international law likewise provides, a tribunal is free to determine whether to apply an exhaustion of local remedies clause in a treaty. In *B.G. Group v. Argentina*, the Supreme Court held that an exhaustion of local remedies provision in a bilateral investment treaty was not a jurisdictional precondition such that it deprived the tribunal of hearing the dispute. *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25 (2014). In the underlying BG Group arbitration, Argentina had argued that the arbitrators lacked "jurisdiction" to hear the dispute because BG Group had not complied with that treaty's local litigation requirement. The arbitration tribunal concluded that it had jurisdiction, finding,

among other things, that Argentina's conduct (such as also enacting new laws that hindered recourse to its judiciary by firms in BG Group's situation) had excused BG Group's failure to comply with the treaty requirement. *Id*. Argentina sought to have the award vacated on the basis that the arbitrators could not have heard the dispute because they never had jurisdiction. *Id*. The Supreme Court rejected that argument, and stated that it was for the arbitrators to decide whether and how to apply the exhaustion provision. *Id*.

Tribunals in similar cases have excused or otherwise held an exhaustion requirement not to be applicable for several reasons. Tribunals have, for example, not required compliance with an exhaustion of local remedies requirement where such remedies were futile. *See*, *e.g.,* Baldwin Decl., Exh. 25, paras. 599-603; *id.*, Exh. 26, at paras. 582-584, 588. Futility can take many forms, but bringing an action is certainly futile where no viable cause of action exists or where a party would not have standing.

## II. RESPONDENT'S ARGUMENTS REGARDING PRIVILEGE ARE WRONG AS A MATTER OF FACT AND LAW

Respondent seeks to improperly invoke privilege to avoid **all** discovery obligations. To the extent that Respondent has claims of privilege, such privilege has to be proven and has to be shown with respect to the specific discovery asserted. Respondent has failed to do both.

### A. The Respondent Has Not Met Her Burden to Show That Such a Privilege Even Exists

Courts use the procedures provided by the Federal Rules of Civil Procedure, including procedures to address issues of privilege, when appropriate for purposes of a petition under § 1782(a). *See, e.g., In re Petition of the Republic of Turkey*, 2020 WL 4035499, at *9 (D.N.J. July 17, 2020); *In re Caterpillar, Inc.*, 2020 WL 1923227, at *15, n.14 (M.D. Tenn. Apr. 21, 2020); *In re financialright GmbH*, 2017 WL 2879696, at *6 (S.D.N.Y. June 22, 2017).

Under the Federal Rules, when privilege is asserted as a basis to refuse discovery, courts have held that the party invoking the privilege bears the burden to show that the privilege applies to protect against the requested discovery and that it has not been waived. *N. Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc*., 325 F.R.D. 36, 48 (E.D.N.Y. 2018) (quoting *Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York*, 284 F.R.D. 132, 134 (S.D.N.Y. 2012)). As Alpene has satisfied its burden to show that the discovery requests are relevant, the burden shifts to the Respondent to "justify curtailing discovery." *Id*.

Respondent has not shown that privilege exists in the present case. Although the letter from the MFSA refers to purported privileges, it refers in large part to confidentiality that do not appear to be privileged such that disclosure can be obstructed. To the extent that Malta or Respondent has concerns about confidentiality, those concerns can be addressed by the parties or the Court. To the extent Respondent properly claims that certain documents or information is privileged, Respondent can obtain a protective order with respect to the information.[7]

With respect to any regulatory privilege, that likewise has to be proven with respect to specific discovery demands. The MFSA letter does not state what information that McCaul has that is privileged. Certainly, business relationships outside of any purported regulatory order that McCaul has with former or current Maltese officials cannot be covered by a regulatory privilege. The events that led up to the engagement would not likewise not be subject to a privilege.

---

[7] The Respondent states that a purported ECB privilege should also prevent her from having to appear for a deposition. This cannot be the case. Presidents are ordered to sit for depositions. Being on the supervisory board of the ECB is not a license to evade all discovery requests. The document requests and discovery topics are not directed at Respondent's current work with the ECB but with respect to her actions while at Promontory, as well as her actions on her own accord. So, any reference to a purported ECB privilege is unavailing and unproven.

Two other facts show that Respondent has not met her burden regarding privilege. In the Pilatus Application, Pilatus Board of Directors' Lawyer submitted a declaration showing that the claims of privilege were not supported. Baldwin Decl., Exh. 28. The MFSA letter does not refute that declaration. The accuracy of Thompson's declaration is supported by the fact Connell was ordered to and did testify about his work as the Competent Person. *Id.*, at 20.

**B.** **Respondent's Blanket Assertion of Privilege Is Improper and Contrary to the Law**

Respondent has made blanket assertions of privilege as a basis to refuse all discovery. Courts in this District and in this Circuit have routinely held that blanket assertions of privilege are improper. *See*, *e.g.*, *Doe v. Wesleyan Univ.*, No. 3:19-CV-01519 (JBA), 2021 WL 2525427, at *2–3 (D. Conn. June 21, 2021). Instead, as held by several courts in the Second Circuit, a party "bears the burden of establishing that ***particular communications*** ... are privileged." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 255 F.R.D. 98, 109 (S.D.N.Y. 2008) (emphasis added). "The mere existence ... of an attorney-client relationship does not raise a presumption of confidentiality," and accordingly "[t]he party claiming the privilege has the burden of establishing the attorney-client relationship and the applicability of the privilege to the particular circumstances and discovery requests." *P&B Marina, Ltd. P'Ship v. Logrande*, 136 F.R.D. 50, 53 (E.D.N.Y. 1991). Put differently, a "general allegation or blanket assertion that the privilege should apply is insufficient to warrant protection." *Id.*; *see also A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07-cv-929 (WWE), 2013 WL 6044333, at *8 (D. Conn. Nov. 14, 2013) (holding that a "blanket assertion that the attorney-client privilege [applies] is insufficient to warrant protection"); *Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*, 139 F.R.D. 295, 300 (S.D.N.Y. 1991) ("Blanket claims asserting attorney client privileges are improper.").

The letter from the MFSA does not even assert that all the discovery is privileged or confidential. The letter asserts that "much of the information requested in Alpene's demand is covered by the applicable privilege," not all of it. (ECF 16-26.) Even Respondent must concede that some, if not all, discovery requested in Alpene's demand is not subject to privilege.

### C. Even if a Privilege Did Exist, the Respondent Has Waived any Privilege with Respect to These Issues

The Respondent has the burden to prove that any privileged has not been waived. *See In re Keeper of Records* (*Grand Jury Subpoena Addressed to XYZ Corp.*), 348 F.3d 16, 22 (1st Cir. 2003). Here, as to all of the topics of all the discovery requests made by Alpene, Respondent has waived any privileges, even if such privileges did exist. The Respondent asserts that she cannot answer even one question about her role in the selection of Mr. Connell and her involvement with Pilatus Bank. Yet she submitted a sworn declaration in this proceeding in which she testified about these very matters for which Alpene seeks discovery.

Her denials or disclosure of selected information in the Declaration while asserting privilege cannot stand. A party cannot be allowed to disclose carefully tailored declarations while simultaneously asserting that she cannot answer questions about those same issues, especially when those statements are contrary to other evidence.

### III. THE INFORMATION SOUGHT BY ALPENE IS NOT AVAILABLE TO ALPENE THROUGH THE TREATY ARBITRATION[8]

Respondent incorrectly asserts that some of the information requested by Alpene can be obtained through the Treaty Arbitration. With respect to testimony, Alpene cannot examine witnesses *for whom Malta has not submitted a witness statement*. Baldwin Decl., at 43.

---

[8] The cases cited by Respondent on this issue are inapposite. In *Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 85 (2d Cir. 2004), the court found that although the applicant was seeking information from Cravath, a law firm, the documents were of their adversary. In *in re*

Alpene does have the ability to request that the tribunal call a witness for examination. *Id*. But this ability has a significant limitation in that the tribunal is only empowered to call for witnesses who are under the direct control of Malta. *Id*. The tribunal does not have the ability to call witnesses who no longer work directly for the Maltese government. *Id*. The tribunal certainly does not have the ability to call McCaul as a witness. *Id*. In addition, because the tribunal does not have subpoena power, the tribunal does not have the ability to force the attendance of a witness, even when that witness is under the control of the party. *Id*. Thus, even if the tribunal were to call for a witness controlled by Malta, that witness' appearance and testimony could not be compelled.[9] *Id*.

To the extent that Respondent asserts that Alpene can obtain testimony from other persons and therefore does not need to depose McCaul, that would be incorrect for a number of reasons. **First**, as the Second Circuit has recognized, "[w]hen the ordinary witness is unavailable, his unique knowledge of the facts will be lost . . . ." *Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 536 (2d Cir. 1972).

**Second**, much of the information sought relates to discussions and actions that McCaul had with former Promontory staff or Promontory "consultants". McCaul testifies that she was the one who discussed Connell's appointment with him. McCaul provided his name to the MFSA, which resulted in him becoming the Competent Person. She certainly had other discussions with

*Application of Elvis Presley Enterprises LLC for an Ord. to Take Discovery Pursuant to 28 U.S.C. § 1782*, No. 15MC386 (DLC), 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016), the court concluded that the information was in the possession, custody, or control of the opponent. In *in re RSM Prod. Corp.*, No. 17MC213 (DLC), 2018 WL 1229705, at *4 (S.D.N.Y. Mar. 9, 2018), the court denied the discovery because the target of the discovery was Israeli and the foreign proceeding was in the Israeli court and subject to Israeli jurisdiction.

[9] This is different, of course, then the situation with a local court or court-empowered tribunal that had subpoena powers in that jurisdiction.

Connell regarding his agreement and his role. She was involved in the several hours long briefing regarding his duties and responsibilities. Although Connell states that MFSA officials were also at that briefing, he could not recall even one name of a person there other than McCaul. Baldwin Decl., Exh. 20. The evidence also shows that McCaul was directing and speaking to other persons regarding the Bank's operations, such as Lucio Planera. Id., Exh. 7. This testimony is not available from any current or former Maltese government officials.

**Third**, Deposition Topic 1 requests testimony regarding her relationship with Joseph Bannister, the former MFSA Chairman who resigned his position in April 2018. Baldwin Decl., Exh. 17. The tribunal in the Treaty Arbitration cannot obtain his testimony.

**Fourth**, with respect to Deposition Topics 1 and 2, many of the persons who used to work for the MFSA during the relevant time period no longer do. For example, Ray Vella was involved in many of these events while working for the MFSA. But according to news reports, Vella was "politely shown the door" in March 2019. Baldwin, Decl., Exh. 27. The MFSA's head of enforcement, Anton Bartolo, was reportedly told "in diplomatic terms" that he was not welcome any longer. Id. In fact, according to press reports, MFSA took actions in 2019 and considered others to "create more vacancies at its top echelons." *Id*. The CEO of MFSA, Joseph Cuschieri who was embroiled in many corruption scandals in Malta had to resign in November 2020. Thus, as a result of the Maltese government's own actions, most if not all of the MFSA witnesses are not able to be called by the tribunal.

It is also true that Alpene can seek documents from the Maltese government in the Treaty Arbitration through document requests. But Malta can only be ordered to produce documents in its possession, custody, or control. Malta cannot be ordered to produce documents in the possession of McCaul or in the possession of former Maltese officials. The limited document

requests in the McCaul Subpoena are documents that would not likely be in the possession of Malta. The requests seek documents relating to matters outside of Promontory's engagement with the MFSA and are thus not in Malta's possession.[10]

## IV. THE SECOND CIRCUIT JURISPRUDENCE IS CLEAR THAT THE INVESTOR-STATE ARBITRATION IS A FOREIGN PROCEEDING

Respondent makes a tack-on argument at the end of its brief, arguing that pending petitions for certiorari before the Supreme Court are grounds for a stay here. Of course, if Respondent believed there was legally controlling precedent stopping this Court from going forward, the argument would not have been made at the end of her brief. Moreover, Respondent seeks to confuse the relevant issues by conflating two separate and distinct cases and principles in an effort to mislead the Court. The Second Circuit has been clear that arbitration tribunals established under an investment treaty, like here, are "foreign proceedings" for the purposes of Section 1782.. The Second Circuit affirmed this precedent in its recent decision in *Fund for Protection of Investor Rights in Foreign States v. AlixPartners, LLP*, 5 F.4th 216 (2d Cir. 2021). This is established and binding Second Circuit precedent.

AlixPartners has filed a petition for certiorari with the Supreme Court. The Supreme Court has not granted certiorari. And the Supreme Court has not granted a stay of the enforcement of the Second Circuit's decision. So, Alix Partners' petition for certiorari pending is proof of nothing and is not grounds for a stay of this case. Indeed, even in the case the Supreme

---

[10] Lastly, to the extent that the Court finds that some of the information called for in the discovery requests may be obtained from Malta, the Courts should not dismiss the discovery demands but instead tailor those demands. See *in re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 80 (2d Cir. 1997) (internal citations and quotations omitted), "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright."

Court was scheduled to hear this term regarding 1782 – *Servotronics* – was recently dismissed and the issue to determine in that case was whether "foreign proceedings" pertain to ***private international arbitrations***, not investor-state arbitrations.[11]

The rest of Respondent's argument ignores the Second Circuit precedent with respect to investor-state arbitrations pursuant to treaties being foreign proceedings and instead focuses on private commercial arbitrations, not investor-state arbitrations. The Respondent almost entirely ignores the precedent in this Circuit and instead spends pages examining the commercial cases, such as *In re Guo*, 965 F.3d 96 (2d Cir. 2020). *Guo* deals with a private commercial arbitration brought pursuant to CIETAC, a Chinese arbitration administrative body. *Id.*, at 102. CIETAC handles commercial disputes between two private parties, as was the case in Guo. *Id.*

In contrast, in *Fund for Protection of Investor Rights in Foreign States v. AlixPartners, LLP*, 5 F.4th 216 (2d Cir. 2021), decided after Guo, the Second Circuit reaffirmed that arbitrations involving a state brought pursuant to a treaty are foreign proceedings under Section 1782. As the Second Circuit noted in that decision, an "arbitration between Lithuania and the Fund, taking place before an arbitral panel convened pursuant to the Treaty, a bilateral investment treaty to which Lithuania is a party, qualifies as a 'foreign or international tribunal' under § 1782." *Id.*, at 227. The Respondent does not explain why this tribunal, which arises from the same type of treaty in the Fund for Protection case, should be treated like a private commercial arbitration rather than an investor-state arbitration.

Indeed, courts in this District and elsewhere have found that treaty arbitrations, such as this one, are distinct from commercial arbitrations with respect to being foreign proceedings.

---

[11] *See* Order List: 592 U.S. (March 22, 2021); *see also Servotronics, Inc., Petitioner v. Rolls-Royce PLC*, et al., No. 20-794. Respondent's quote from the Solicitor General's brief in the now dismissed case is of no moment whatsoever.

District courts "have regularly found that arbitrations conducted pursuant to Bilateral Investment Treaties, and specifically by the ICSID, qualify as international tribunals under [§ 1782]" and are not private arbitrations. *Islamic Republic of Pakistan. v. Arnold & Porter Kaye Scholer LLP*, Misc. Action No. 18-103 (RMC), 2019 WL 1559433, at \*7 (D.D.C. Apr. 10, 2019). *see also In re Republic of Turk*., Civil Action No. 19-20107 (ES) (SCM), 2020 WL 4035499, at \*3 (D.N.J. July 17, 2020); *In re Chevron Corp*., 709 F. Supp. 2d 283, 291 (S.D.N.Y. 2010) ("[T]he arbitration here at issue is not pending in an arbitral tribunal established by private parties. It is pending in a tribunal established by an international treaty, the BIT between the United States and Ecuador, and pursuant to UNCITRAL [(United Nations Commission on International Trade Law)] rules."); *In re Veiga*, 746 F. Supp. 2d 8, 22 (D.D.C. 2010); *OJSC Ukrnafta v. Carpatsky Petroleum Corp*., No. 3:09 MC 265 (JBA), 2009 WL 2877156, at \*4 (D. Conn. Aug. 27, 2009) ("A reasoned distinction can be made between arbitrations such as those conducted by UNCITRAL, a body operating under the United Nations and established by its member states, and purely private arbitrations established by private contract." (internal quotation marks and citation omitted)); *In re Oxus Gold PLC*, MISC No. 06-82-GEB, 2007 WL 1037387, at \*5 (D.N.J. Apr. 2, 2007) (adopting magistrate judge's holding that arbitration panel constituted foreign tribunal because "[t]he Arbitration at issue in this case, between two admittedly private litigants, is ... being conducted within a framework defined by two nations and is governed by [UNCITRAL rules]."). See also *In re Ex Parte Application of Eni S.p.A. for an Ord. Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proc*.., No. 20-MC-334-MN, 2021 WL 1063390, at \*3 (D. Del. Mar. 19, 2021), reconsideration denied sub nom. *In re Eni S.p.A*., No. 20-MC-334-MN, 2021 WL 2985171 (D. Del. July 15, 2021) (outlining these cases).

## **CONCLUSION**

For all reasons set forth herein and in Alpene's initial submission, Respondent's requests

for relief should be denied in their entirety.


Dated: New York, New York
December 1, 2021

Respectfully submitted,

STEPTOE & JOHNSON LLP

By:   /s/ Edward G. Baldwin
Edward G. Baldwin
Steven K. Davidson
Admitted *Pro Hac Vice*
1330 Connecticut Avenue
Washington, D.C. 20036
(202) 429-3000

.

Evan Glassman
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900