# EXHIBIT 22

# International Centre for Settlement of Investment Disputes

---

## ICSID Case No. ARB/05/16

---

RUMELI TELEKOM A.S.
AND
TELSIM MOBIL TELEKOMIKASYON HIZMETLERI A.S.,
CLAIMANTS

v.

REPUBLIC OF KAZAKHSTAN,
RESPONDENT

---

# AWARD

---

RENDERED BY AN ARBITRAL TRIBUNAL COMPOSED OF

STEWART BOYD, ARBITRATOR
MARC LALONDE, ARBITRATOR
BERNARD HANOTIAU, PRESIDENT

Date of dispatch to the parties: July 29, 2008

# TABLE OF CONTENTS

PAGE

CHAPTER I.       THE PARTIES AND THE BACKGROUND OF THE DISPUTE ...........1

CHAPTER II.      THE PROCEDURE ................................................................5
I.    INSTITUTION OF THE PROCEEDINGS ................................................5
II.   PROCEDURAL RULES AND AGENDA: MINUTES OF THE FIRST SESSION.............................7
III.  FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 1 ...........8
IV.   CLAIMANTS' SUBSTANTIATED REQUESTS FOR PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 2 ..................................................9
V.    CLAIMANTS' REQUEST FOR FURTHER PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 3 ..................................................................10
VI.   SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 4 .............................................................................12
VII.  EXCHANGE OF WRITTEN PLEADINGS ..........................................12
VIII. ORAL PLEADINGS .................................................................14
IX.   POST HEARING SUBMISSIONS ..................................................17
X.    CLOSING OF THE PROCEEDINGS ...............................................17

CHAPTER III.     THE FACTS ......................................................................18
I.    UP TO THE TERMINATION OF THE INVESTMENT CONTRACT .........................18
   A.   The foundation of KaR-Tel............................................................18
   B.   The GSM license....................................................................20
   C.   The Motorola loan..................................................................21
   D.   The alteration of the participations in KaR-Tel .....................................23
   E.   The Investment Contract...........................................................23
   F.   The foundation of Telecom Invest and the introduction of Telsim .........................24
   G.   The development of KaR-Tel's Business ................................................25
II.   THE TERMINATION OF THE INVESTMENT CONTRACT AND ITS REPERCUSSIONS ...........26
   A.   The termination of the Investment Contract ..............................................26
   B.   The Extraordinary General Meeting of Shareholders of KaR-Tel...........................26
   C.   The proceedings issued in Almaty City Courts ...........................................28
      1. The Telecom Invest Claim..............................................................28
      2. The KaR-Tel Claim....................................................................29
      3. The Consolidation of Telecom and KaR-Tel cases .............................................30
      4. The forensic examination of KaR-Tel ......................................................30
   D.   The attempts to sell Telecom Invest's participation in KaR-Tel ..............................31
   E.   Mr. Seysembayev's offer to purchase Claimants' participation in KaR-Tel............32
   F.   Claimants' complaints to Respondent ....................................................32
   G.   The judgment of the Almaty City Court on June 6, 2003.........................33
   H.   The appointment of a Working Group.......................................................34
   I.   Criminal investigation.................................................................35
   J.   The judgment of the Supreme Court of July 23, 2003..............................36

K.  The judgment of the Supreme Court Presidium of October 30, 2003 - The following restructuring of KaR-Tel – and the purchase of KaR-Tel by VimpelCom........................................................................................36
    1. The judgment of the Supreme Court Presidium ...................................36
    2. The restructuring of KaR-Tel........................................................37
    3. The sale of KaR-Tel to VimpelCom................................................37
III.  CLAIMANTS SEIZED BY TSDIF ....................................................................37

CHAPTER IV.    THE JURISDICTION OF THE ARBITRAL TRIBUNAL ...................38
I.  CLAIMANTS' POSITION ...............................................................................38
    A.  Respondent consented to ICSID jurisdiction over this dispute ...............39
        1. Claimants' investments were fully legal..........................................39
        2. Claimants' investments did not violate the principle of good faith, the principle "*nemo auditur propriam turpitudinem allegans*," or international public policy .................................................................43
    B.  Claimants have standing to bring this arbitration ..................................44
        1. Rumeli and Telsim are the proper Claimants in this arbitration............44
        2. There was no assignment of Claimants' claim to the TSDIF ..............49
        3. The TSDIF was not subrogated to Claimants' claims ......................49
        4. There is no reason to pierce the corporate veil ...............................49
        5. Respondent's allegation that Article 25 of the Convention imposes a control test must fail ....................................................................50
        6. TSDIF would satisfy the jurisdictional requirements of ICSID in any event.......52
    C.  Claimants have gone far beyond establishing a *prima facie* case on the merits.......53
    D.  Respondent is a proper party to this dispute .........................................54
    E.  Claimants have standing to challenge the cancellation of the Investment Contract....................................................................................54
    F.  The Foreign Investment Law is a valid secondary basis for establishing jurisdiction................................................................................55
II.  RESPONDENT'S POSITION............................................................................56
    A.  Respondent did not consent to ICSID jurisdiction over this dispute .......56
        1. Claimants' investments were not legal...........................................57
        2. Claimants' investments violated the principle of good faith, the principle *nemo auditur propriam turpitudinem allegans* and international public policy ...............................................................59
    B.  Claimants do not have standing to bring this arbitration .........................61
        1. The Turkish State is the real party in interest in this arbitration............61
        2. The assignment of Claimants' cause of action ................................67
        3. The TSDIF was subrogated in Claimants' claim ............................67
        4. Alter ego and piercing the corporate veil.......................................69
        5. *"Control"* and *"incorporation"* ................................................69
        6. The claim brought by TSDIF does not satisfy the jurisdictional requirements of ICSID.............................................................72
    C.  No *prima facie* case ........................................................................76
    D.  Respondent is not a proper party to the dispute.....................................76

E. Claimants do not have standing to challenge the termination of the Investment Contract .......................................................................................77

F. The Foreign Investment Law is not applicable ...........................................77

G. Admissibility ..............................................................................................78

III. DECISION OF THE ARBITRAL TRIBUNAL ......................................................78

CHAPTER V.    THE CLAIMS .............................................................................86

I. OVERVIEW OF THE CLAIMS .......................................................................86

II. THE PARTIES' POSITION ON RESPONDENT'S PURPORTED SCHEME ..............87

A. Claimants' position ....................................................................................87

1. The general context .................................................................................87

a) Claimants' investment ........................................................................87

b) The Republic of Kazakhstan and the involvement of President Nazarbayev's family ...........................................................................91

2. The termination of the Investment Contract ...........................................94

3. Telecom Invest and Respondent colluded to effect the illegal compulsory sale of Claimants' interest in KaR-Tel .................................................98

a) The KaR-Tel EGM ..............................................................................98

b) The Injunctive relief proceedings .....................................................102

4. The actions of Respondent's police authorities ...................................103

5. The attempt to sell Telecom Invest's participation in KaR-Tel...........104

6. The actions of the Working Group ......................................................105

7. The actions of Respondent's Judiciary ...............................................107

8. The attempts to pay Claimants to go away .........................................111

9. The sale of KaR-Tel to VimpelCom ...................................................112

10. General observations on the hearing and on circumstantial evidence ...........113

a) Observations on the hearing..............................................................113

b) Circumstantial evidence ....................................................................116

B. Respondent's position ..............................................................................118

1. The general context ...............................................................................118

a) Claimants' investment ......................................................................118

b) The Republic of Kazakhstan and the involvement of President Nazarbayev's family .........................................................................120

2. The termination of the Investment Contract .........................................121

3. On the purported collusion between Telecom Invest and Respondent to effect the compulsory sale of Claimants' interest in KaR-Tel .......................126

a) The KaR-Tel EGMs............................................................................126

b) The Injunctive relief proceedings .....................................................129

4. The actions of Respondent's police authorities .................................131

5. The attempt to sell Telecom Invest's participation in KaR-Tel...........133

6. The actions of the Working Group .....................................................134

7. The actions of Respondent's Judiciary ...............................................138

8. The alleged attempts to pay Claimants to go away.............................144

9. The sale of KaR-Tel to VimpelCom...................................................146

10. The conspiracy theory.........................................................................147

III.  ON THE PURPORTED BREACHES BY RESPONDENT OF ITS
       OBLIGATIONS.................................................................................149
   A.  The legal framework .......................................................................149
       1. Claimants' position .....................................................................149
       2. Respondent's position .................................................................151
       3. The applicable standards: Decision of the Arbitral Tribunal............152
   B.  Fair and equitable treatment...........................................................154
       1. Claimants' position .....................................................................154
           a)  The Standard .......................................................................154
           b)  Application to the facts of the case ........................................156
       2. Respondent's position .................................................................157
           a)  The standard ........................................................................157
           b)  Application to the facts of the case ........................................161
       3. Decision of the Arbitral Tribunal.................................................161
           a)  The Standard .......................................................................161
           b)  Application to the facts of the case ........................................162
   C.  Denial of justice ............................................................................165
       1. Claimants' position .....................................................................165
           a)  The standard ........................................................................165
           b)  Application to the facts of the case ........................................167
       2. Respondent's position .................................................................169
           a)  The standard ........................................................................169
           b)  Application to the facts of the case ........................................170
       3. Decision of the Arbitral Tribunal.................................................172
           a)  The Standard .......................................................................172
           b)  Application to the facts of the case ........................................173
   D.  Full protection and security ...........................................................174
       1. Claimants' position .....................................................................174
           a)  The standard ........................................................................174
           b)  Application to the facts of the case ........................................175
       2. Respondent's position .................................................................176
           a)  The standard ........................................................................176
           b)  Application to the facts of the case ........................................177
       3. Decision of the Arbitral Tribunal.................................................177
           a)  The Standard .......................................................................177
           b)  Application to the facts of the case ........................................178
   E.  Unreasonable, arbitrary, or discriminatory measures ...........................178
       1. Claimants' position .....................................................................178
           a)  The standard ........................................................................178
           b)  Application to the facts of the case ........................................179
       2. Respondent's position .................................................................181
           a)  The standard ........................................................................181
           b)  Application to the facts of the case ........................................181
       3. Decision of the Arbitral Tribunal.................................................181

|  |  |  |
|---|---|---|
| a) | The Standard | 181 |
| b) | Application to the facts of the case | 182 |

F.   Expropriation ...................................................................................... 183
   1. Claimants' position .......................................................................... 183
      a)  The standard .............................................................................. 183
      b)  Application to the facts of the case ......................................... 184
   2. Respondent's position ..................................................................... 185
      a)  The standard .............................................................................. 185
      b)  Application to the facts of the case ......................................... 186
   3. Decision of the Arbitral Tribunal ................................................. 186
      a)  The Standard .............................................................................. 186
      b)  Application to the facts of this case. ....................................... 189

CHAPTER VI.   COMPENSATION AND DAMAGES ................................. 194
I.   PRELIMINARY REMARKS ON CLAIMANTS' CLAIM FOR DAMAGES ............ 194
   A.   Respondent's position ...................................................................... 194
   B.   Claimants' position ........................................................................... 194
II.   GENERAL PRINCIPLES ............................................................................ 195
   A.   The compensation in international law. ........................................... 195
      1. Claimants' position ....................................................................... 195
      2. Respondent's position ................................................................... 196
   B.   Valuation standards .......................................................................... 196
      1. Claimants' position ....................................................................... 196
      2. Respondent's position ................................................................... 198
   C.   The valuation date ........................................................................... 200
      1. Claimants' position ....................................................................... 200
      2. Respondent's position ................................................................... 202
   D.   Causation .......................................................................................... 203
III.   CALCULATION OF DAMAGES AND QUANTUM ........................................ 205
      1. Claimants' position ....................................................................... 205
         a)  The position developed in Claimants' Memorials ................... 205
         b)  The position developed in Claimants' Post-Hearing Memorial ... 207
      2. Respondent's position ................................................................... 209
IV.   DECISION OF THE ARBITRAL TRIBUNAL ............................................... 214
   A.   The principles of compensation ...................................................... 214
   B.   The calculation of the compensation and its amount ..................... 216
V.   COSTS ...................................................................................................... 226

AWARD ............................................................................................................ 227

# CHAPTER I. THE PARTIES AND THE BACKGROUND OF THE DISPUTE

1.  Claimants in this arbitration are Rumeli Telekom A.S. ("*Rumeli*") and Telsim Mobil Telekomunikasyon Hizmetleri A.S. ("*Telsim*"), (collectively "*Claimants*"). Both Rumeli and Telsim are telecommunications companies, incorporated in Turkey as an "*anonim sirket*" (joint stock company). Both companies' address is Mehmet Akif Mah/Inonu Cad., Star Sokak No. 2, Ikitelli 34540 Istanbul, Republic of Turkey. Claimants are represented in this arbitration by Mr. Hamid G. Gharavi and Ms. Brenda Horrigan, SALANS, 9 rue Boissy d'Anglas, 75008 Paris, France.

2.  Respondent in this arbitration is the Republic of Kazakhstan ("*Respondent*," or the "*Republic*"). It is represented in this arbitration by Mr. Timur Issabekov, Director of the Department of International Law, Ministry of Justice of the Republic of Kazakhstan, and by Mr. David Warne, Mr. Gautam Bhattacharyya and Ms. Chloe J. Carswell, Reed Smith, Beaufort House, 15 St Botolph Street, London EC3A 7EE, United Kingdom. Respondent was initially represented by Mr. John Emmott, Michael Wilson & Partners, Ltd, 5th floor, 36 Samal-1 Almaty 050059, Republic of Kazakhstan and Ms. Azhar Kuzubayeva, Almira & Co LLP, 50 Long Acre, London WC2E 9JR, UK.

3.  On May 16, 1998, Rumeli and Investel, a Kazakhstan closed joint stock company, entered into a Foundation Agreement for the creation of the joint venture KaR-Tel in the form of a Kazakhstan limited liability partnership, for the provision of mobile telecommunications services on the territory of the Republic.

4.  At the creation of KaR-Tel, Rumeli owned 70% of KaR-Tel and Investel owned 30%. The initial charter capital of KaR-Tel was 750,000 Tenge (equivalent to approximately USD 10,000 at the time).

5.  Immediately after the execution of the Foundation Agreement, KaR-Tel prepared to participate in the auction for the second GSM 900 license issued in Kazakhstan (the

*"License"*), held by the Ministry of Transportation and Telecommunications ("*MTT*") of the Republic.

6.      The auction for the License took place on July 31, 1998 and KaR-Tel won the License with a bid of USD 67,500,000.  The License Agreement between KaR-Tel and the MTT was signed on August 10, 1998.  It set forth the conditions for the sale by the MTT to KaR-Tel of "*the right to use the radio-frequency spectrum for the creation and operation of a GSM-standard communications network in the Republic of Kazakhstan*" for a period of 15 years.

7.      Around October 1998, KaR-Tel started to negotiate with the State Committee on Investment an agreement granting KaR-Tel investment incentives.  On May 20, 1999, KaR-Tel and the Investment Committee executed Contract N° 0123-05-99 (the "*Investment Contract*").  The Investment Contract characterized the object of the investment activity as *"the creation and exploration of digital cellular radiotelephone connection of the GSM (900) standard on the territory of the Republic of Kazakhstan.*"  It granted KaR-Tel tax and other benefits.  The term of the Investment Contract was set to expire on July 31, 2009.

8.      On December 31, 2000, Telsim acquired 15% of the partnership from Rumeli and was officially registered as a participant in KaR-Tel on July 27, 2001.  During this same period, Investel's participatory interest – which had increased from 30% to 40% in the spring of 1999 – was transferred to Telecom Invest, a separate Kazakhstan limited liability partnership.

9.      Claimants allege to have undertaken important "*investments*" on the territory of the Republic by means of establishment of KaR-Tel, by providing know-how and marketing services in the field of telecommunications, by establishing a national administrative and commercial network and by providing extensive financing and guarantees to KaR-Tel, with the consequence that KaR-Tel became one of the leading GSM operators in the Republic.

10. According to Claimants, once KaR-Tel's success was assured, the local partner's shareholders, themselves Kazakhstan officials and/or members of the empire of the President of Kazakhstan, devised a scheme to orchestrate Claimants' expulsion from KaR-Tel in a definitive manner and to keep all of KaR-Tel for their sole benefit. It is Claimants' allegation that:

- the local partners exploited their political and personal ties with Respondent to obtain from the Investment Committee the termination of the Investment Contract;

- the local partners then alleged that Claimants were responsible for this termination and that the latter caused significant damages to KaR-Tel;

- the local partners called a general meeting of the shareholders of KaR-Tel without sending a notice to Claimants;

- at this purported general meeting, where Claimants could not have been present, it was unilaterally decided by the local partners, that, because of the harm caused by Claimants to KaR-Tel, Claimants' shareholding had to be compulsorily transferred to KaR-Tel to the final benefit of its remaining shareholders, *i.e.,* the local partners;

- this decision to sell Claimants' 60% stake in KaR-Tel was taken in violation of Kazakh law and was irregularly confirmed by the Kazakh Judiciary;

- the Kazakh Judiciary set the value of the shares at a mere USD 3,000, whereas, less than a year later, the local partners (and other parties in interest) sold 100% of KaR-Tel to another investor (VimpelCom) for the sum of USD 350 million.

11. Therefore, Claimants invoke Respondent's collusion with the local partners and a violation of international law, encompassing, *inter alia*, Respondent's wrongful termination of the Investment Contract, its resulting denial of Claimants' right to challenge the termination, its eviction of Claimants from KaR-Tel through the Judiciary and its failure to grant Claimants adequate compensation.

12.    According to Claimants, these actions, together with further acts and omissions detailed below, constitute breaches of Respondent's obligations under international law, under the Agreement between the Republic of Kazakhstan and the Republic of Turkey concerning the Reciprocal Promotion and Protection of Investments, dated May 1, 1992 (the *"Bilateral Investment Treaty,"* or *"BIT"*), and under the Law of the Republic of Kazakhstan on Foreign Investments dated December 27, 1994 (the *"Foreign Investment Law"* or *"FIL"*).

13.    Claimants' allegations are strongly denied and disputed by Respondent.

# CHAPTER II.    THE PROCEDURE

## I.    INSTITUTION OF THE PROCEEDINGS

14.    On July 20, 2005, ICSID received a Request for the institution of arbitration proceedings under the ICSID Convention on behalf of Rumeli and Telsim against the Republic.

15.    On July 21, 2005, The ICSID Secretariat (the "Secretariat") transmitted copies of the Request and of its accompanying documentation to the Republic.

16.    On August 2, 2005, the Secretariat asked Claimants to provide their observations concerning the text of the three versions (English, Russian and Turkish) of Article VII(2) of the Bilateral Investment Treaty in relation to the issue whether the provision subjects the recourse to arbitration to the pre-condition of recourse to local courts.

17.    Claimants answered in a letter dated August 4, 2005, which was transmitted by the Secretariat to the Republic.

18.    In their letter, Claimants set forth that the Turkish language version of Article VII(2) of the Bilateral Investment Treaty was the only one subjecting the recourse to arbitration to the pre-condition of recourse to local courts and that the text of the other language versions (English, Russian) did not.  Claimants further alleged that even if recourse to local courts was required, Respondent had, through its unfair, inequitable, arbitrary, discriminatory and unlawful measures deprived Claimants of the possibility of meaningfully exercising any such action, and Respondent therefore could not rely on any such alleged obligation to resist jurisdiction.  Claimants further submitted that they additionally relied, through the Most Favorable Nation Clause contained in Article II of the Bilateral Investment Treaty, on the other bilateral treaties entered into by Kazakhstan that do not contain any such prerequisite to ICSID arbitration.  Claimants finally submitted that they relied on the Foreign Investment Law as an alternative basis for ICSID jurisdiction.

19.  By letter of August 30, 2005, in accordance with Article 36 of the ICSID Convention, the Secretary-General of ICSID registered the Request for Arbitration and, on the same day, notified the parties of the registration, inviting them to proceed to the constitution of the Arbitral Tribunal as soon as possible.

20.  By letter of September 6, 2005, Claimants proposed that the Tribunal consist of three arbitrators, one to be appointed by each party by September 30, 2005; if either party failed to appoint its arbitrator within this deadline, such arbitrator would be appointed by the Secretary-General of ICSID.  Claimants further proposed that the third arbitrator, who would be the President of the Tribunal, be appointed by agreement of the two party-appointed arbitrators.  If the two arbitrators failed to agree on the appointment of the third arbitrator within fifteen days of the date by which both arbitrators had accepted their appointment, the third presiding arbitrator would be appointed by the Secretary-General of ICSID.  Finally, Claimants proposed that the Secretary-General of ICSID be allowed to appoint arbitrators outside the ICSID Panel of Arbitrators but only arbitrators who would have experience in ICSID arbitration, whether as counsel or arbitrator.

21.  By letter of September 29, 2005, Respondent agreed to Claimants' proposal on the method and timetable for the constitution of the Tribunal and requested the postponement of the September 30, 2005 date proposed by Claimants for the appointment of the party-appointed arbitrators.

22.  By letter of September 30, 2005, Claimants agreed to postpone the date of the appointment of the party-appointed arbitrators until October 21, 2005, subject to an express confirmation of the method and timetable for the constitution of the Tribunal by Respondent by no later than October 7, 2005.

23.  By letter of October 6, 2005, Respondent expressly accepted Claimants' proposed method and timetable and requested the postponement to October 30, 2005 of the October 21, 2005 date proposed by Claimants for the appointment of the party-appointed arbitrators.

24.     By letter of October 7, 2005, Claimants agreed to postpone the date of the appointment of the party-appointed arbitrators until October 30, 2005.

25.     Thereafter, by letter of October 31, 2005, the Secretariat acknowledged receipt of a letter of September 29, 2005 from Respondent informing that it had appointed Mr. Stewart Boyd CBE Q.C., a national of the United Kingdom, as its arbitrator. In its letter, the Secretariat also acknowledged receipt of a letter of October 30, 2005 from Claimants informing that they had appointed Mr. Marc Lalonde P.C., O.C., Q.C., a national of Canada, as their arbitrator. Both arbitrators accepted their appointment on November 2, 2005.

26.     Following an extension of the time limit to appoint the third presiding arbitrator, on December 9, 2005, the Secretariat informed the parties that Messrs. Boyd and Lalonde had notified the Centre on December 8, 2005 of their appointment of Mr. Bernard Hanotiau, a national of Belgium, as the President of the Tribunal. The Secretariat, on behalf of the Secretary-General of ICSID, also informed the parties that, having received from each arbitrator the acceptance of his appointment, the Arbitral Tribunal was deemed to have been constituted, and the proceedings were deemed to have begun on December 9, 2005.

27.     In accordance with ICSID Arbitration Rule 6, Mrs. Martina Polasek, Counsel at ICSID, was designated to serve as Secretary of the Tribunal. On May 31, 2007, the Secretariat informed the Arbitral Tribunal and the parties that Mrs. Polasek would be temporarily replaced by Ms. Eloïse Obadia, Senior Counsel, from June 1, 2007. Mrs. Polasek returned to her functions in this case on November 26, 2007.

## II.     PROCEDURAL RULES AND AGENDA: MINUTES OF THE FIRST SESSION

28.     The first session of the Arbitral Tribunal concerning the procedural rules and the agenda of the arbitration was held on January 30, 2006, by telephone conference among the Members of the Tribunal and the Secretary of the Tribunal. The parties had agreed that the Tribunal hold the first session without the parties.

29. The first session considered matters listed on an agenda circulated to the parties by the Secretary on January 12, 2006, as well as the parties' joint proposals of January 27, 2006 regarding these matters (attached to the Minutes as Annex 1). Counsel for Respondent had by communication of January 29, 2006 added an observation to the parties' joint proposals which was equally taken into consideration.

30. Following the first session, by communications to the parties of January 31 and February 10, 2006, the Tribunal made certain proposals regarding items Nos. 2, 3, 4, 14 and 17 of the agenda. The parties responded to certain of the proposals by a joint communication of February 2, 2006 and individual communications of February 14, 2006 (from Claimants) and February 14, 15 and 23, 2006 (from Respondent). The above-mentioned communications were attached to the Minutes as Annex 2.

31. The Minutes of the first session, signed by the President and the Secretary of the Tribunal, were transmitted to the parties on March 20, 2006.

### III. FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 1

32. The agreed timetable of the arbitration provided for a first joint submission of requests for production of documents to be submitted by March 17, 2006. On that date, the parties filed a joint submission of their respective requests, including any objections to the other party's requests, in tabular form.

33. On March 17, 2006, Respondent informed the Arbitral Tribunal that it would file additional remarks by Friday, March 24, 2006; however, the Tribunal did not receive any remarks by that date.

34. On March 28, 2006, the Arbitral Tribunal granted Respondent until Friday, March 31, 2006 to file its additional remarks on Claimants' request for production of documents; Claimants were granted the possibility to comment on Respondent's remarks by April 4, 2006.

35. Also on March 28, 2006, Respondent supplied to the Arbitral Tribunal an English translation of article 518 of the Tax Code of the Republic of Kazakhstan, requested by the Arbitral Tribunal on March 27, 2006.

36. On March 31, 2006, Respondent filed with the Secretary-General of ICSID objections to the jurisdiction of the Tribunal.

37. On April 3, 2006, the Arbitral Tribunal informed the parties that in accordance with ICSID Arbitration Rule 41(3) and (4), the proceedings on the merits were suspended and the parties were requested to file observations on whether the objections to jurisdiction should be dealt with as a preliminary question or should be joined to the merits of the dispute. Claimants were invited to file their observations by April 7, 2006, Respondent was invited to file its reply observations by April 12, 2006 and Claimants their rejoinder by April 17, 2006. The parties filed submissions according to the calendar.

38. The parties also filed additional remarks on production of documents on April 24 and 25, 2006.

39. On April 26, 2006, the Tribunal decided, in accordance with Rule 41(4) of the ICSID Arbitration Rules, to join the objections on jurisdiction to the merits of the dispute.

40. In its Procedural Order No. 1 dated April 28, 2006, the Arbitral Tribunal allowed some of the requests for production of documents. The Tribunal also reserved its decision on other requests, considering that it was not sufficiently informed to make a reasoned decision. It therefore invited Claimants to make additional submissions by May 4, 2006, and Respondent to further comment on the issue by May 10, 2006.

IV. **CLAIMANTS' SUBSTANTIATED REQUESTS FOR PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 2**

41. In accordance with Procedural Order No. 1, Claimants further substantiated their request No. 11 for production of documents by letter dated May 4, 2006, and Respondent commented on it by letter dated May 10, 2006.

42. In accordance with Procedural Order No. 1, Respondent further substantiated its objections to Claimants' request No. 13 for production of documents by letter dated May 5, 2006 and Claimants commented on it by email of May 11, 2006.

43. In its Procedural Order No. 2 dated May 16, 2006, the Arbitral Tribunal ordered the production of certain requested documents.

## V. CLAIMANTS' REQUEST FOR FURTHER PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER NO. 3

44. In their letter dated July 24, 2006, Claimants requested a further production of documents. In their Request, they pointed out that on July 11, 2006, Respondent had submitted an initial first list of 249 documents ("List 1") representing the documents in *"its possession or custody or power"* and responsive to Procedural Order No. 1. On July 12, 2006, Respondent retracted this list to replace it with a second list of 229 responsive documents ("List 2"). When Respondent produced the documents responsive to Procedural Order No. 1, on July 20, 2006, it then enclosed a third list of 229 documents ("List 3") which Claimants considered identical to List 2.

45. Claimants submitted that the documents removed from List 1 were exchanges between various Ministries of Respondent as well as minutes of internal meetings of such ministries. Therefore, according to Claimants, the disputed documents clearly fell within the scope of the documents that Respondent was ordered to produce under Procedural Order No. 1. Claimants therefore requested the Arbitral Tribunal to order Respondent to immediately produce the disputed documents.

46. On July 28, 2006, in its letter in response to Claimants' request, Respondent submitted that the disputed documents were privileged by reason of the fact that they were confidential documents passing between Respondent's legal advisers (including internal legal advisers) and Respondent (including its Ministries) for the purpose of seeking or providing legal advice, and/or were created with the sole or dominant purpose of litigation arising out of the matters underlying this dispute.

47.    In its Order of July 31, 2006, the Arbitral Tribunal decided the following in relation to the disputed documents:

> *We are not satisfied from the description of the documents listed in Annex 3 attached to the Claimant's letter of 24 July 2006 that any of them are privileged, but are prepared to allow the Respondents until 4 August 2006 to provide any further material in support of their claim for privilege, e.g. by identifying in the case of each document the litigation (if any) for which the relevant communication was prepared, and the legal adviser (if any) by whom or to whom the communication was sent.*

48.    On August 5, 2006, the Arbitral Tribunal issued the following Direction:

> *1. With reference to paragraph 1 of the Tribunal's order of July 31, 2006, the August 4, 2006 deadline for the Respondent's response is extended until August 9, 2006. The Respondent should send its response directly to the Claimants, all Members of the Tribunal and the Secretariat on August 9. No further extension will be granted.*
>
> *2. The Tribunal will issue its decision on August 10, 2006.*
>
> *3. The Claimants should be prepared to file their memorial by close of business on August 11, 2006.*
>
> *4. If the Tribunal were to decide that all or part of the documents are not privileged and should be produced, it will order their immediate production and will consider granting a very short extension for the filing of the Claimants' memorial."*

49.    On August 9, 2006, Respondent sent to the ICSID Secretariat a letter containing the substantiation of its claim that the disputed documents were privileged.

50.    In its Procedural Order No. 3 dated August 10, 2006, the Arbitral Tribunal, taking into consideration the parties' observations and comments, considered that certain documents were privileged and ordered the production of certain other documents.

## VI.  SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS: PROCEDURAL ORDER No. 4

51.     The agreed timetable of the arbitration provided for a second joint submission of requests for production of documents to be submitted within three weeks of the filing of Respondent's Counter-Memorial.  This time period was subsequently extended.

52.     The parties exchanged correspondence on this matter on January 10 and 12, February 5, 7, 12, 13, 15 and 27, 2007.  On March 7, 2007, the parties filed a joint submission of their respective requests in tabular form.  Respondent filed an additional observation on March 7, 2007.

53.     The Tribunal, in a Procedural Order No. 4 dated March 22, 2007, took note of the parties' agreement on certain requests; it granted some of the parties' further requests, and dismissed others.

## VII.  EXCHANGE OF WRITTEN PLEADINGS

54.     The timetable contained in the Minutes of the first session of the Arbitral Tribunal was amended by letters dated March 28, 2006, April 26, 2006, August 10, 2006, September 12, 2006, December 6, 2006, May 7, 2007 and June 29, 2007.  Each party filed its written submissions pursuant to these amended directions.

55.     Claimants filed a Memorial dated August 21, 2006, together with exhibits and legal authorities.

56.     Respondent filed a Counter-Memorial dated December 14, 2006, together with exhibits and legal authorities.

57.     Claimants then filed a Reply dated February 27, 2007, together with exhibits and legal authorities.

58.     Respondent subsequently filed a Rejoinder dated May 23, 2007, together with:

-   exhibits;

- legal authorities;
- an expert report on Kazakh procedural law by Mr. Mukhamedshin;
- an expert report on Kazakh criminal law by Ms Suleimenova;
- an expert report on Kazakh civil law by Professor Kaudyrov and Professor Klimkin;
- an expert report on quantum by Mr. Kaczmarek of Navigant Consulting; and
- an expert report on Turkish law by Mr. Erkam.

59. On June 29, 2007, the Secretariat of ICSID informed the parties that, in respect to the letters from Claimants dated June 26, 2007 concerning the difficulty for Claimants to find a Kazakh law expert willing to testify, and the letters from Respondent dated June 26 and 27, 2007 concerning Claimants' response to Respondent's case on jurisdiction, the Arbitral Tribunal issued the following directions:

> *In relation to Kazakh law we invite counsel for the Claimants to appoint themselves a non-Kazakh law expert. The report should be filed by July 31, 2007.*

> *The Arbitral Tribunal also authorizes the Claimants to file an additional submission strictly limited to jurisdiction, including a rebuttal expert report on Turkish law limited to jurisdiction by July 31, 2007.*

60. On August 3, 2007, Claimants filed:

- a Rejoinder on jurisdiction;
- witness Statements of Mr. Bora Agilönü and Dr. Yasar Akgun;
- an expert report of Professor Ziya Akinci onTurkish law; and
- an expert report of Professor A. P. Sergeyev on Kazakh law.

61. On the same date, Respondent filed witness statements of Mr. Mirbulat Abuov, Mr. Aidan Karibjanov, Mr. Alexander Podporin, Mr. Imin Sabirov, Mr. Iskander Yerimbetov and Mr. Vadim Zverkov.

62. On September 19, 2007 Claimants filed a request on some procedural issues. On September 24, 2007, the Secretariat of ICSID informed the parties that, after careful

consideration of Claimants' request and Respondent's answer of September 21, 2007, the Arbitral Tribunal had decided as follows:

> *1. (…)*
>
> *2. The Arbitral tribunal takes note that the parties agree that Respondent may file a witness statement by Judge Begaliev limited to the question of bribery raised in Mr. Agilonu's statement. The Tribunal decides that the filing of this witness statement must take place no later than October 5 and that Claimants will have the right to file a rebuttal witness statement by Mr. Agilonu, limited to the points covered by Judge Begaliev, no later than October 16.*
>
> *3. Respondent's request No. 2 [permission to amend their Memorials to include new allegations found in a witness statement filed by the Claimants] is denied. Given the proximity of the hearings, the Arbitral Tribunal finds more appropriate that the issue raised by Respondent be dealt with in the course of the oral submissions and testimonies.*
>
> *4. The Arbitral Tribunal takes note that Respondent has not made any objection against the filing by Claimants of a witness statement by Mr. Koksaldi. The Tribunal decides that the filing of this witness statement must take place no later than October 5."*

63. On October 5, 2007, Respondent filed the witness statement of Judge Bakhytbek Adilkhanovich Begaliev. On the same date, Claimants filed the witness statement of Mr. Huseyin Koksaldi.

## VIII. ORAL PLEADINGS

64. On September 11, 2007, the Secretariat of ICSID informed the parties that, after careful consideration of the letters of August 21, September 7, and September 10, 2007 from Respondent and the letters of August 10 and September 6, 2007 from Claimants, the Tribunal had issued the following direction regarding the arrangements for the hearing scheduled for October 19 and from October 22 to 26, 2007:

> *The Arbitral Tribunal has noted the agreement of the parties on the following issues:*
>
> *1. The hearing will take place in Paris. The venue will be decided by ICSID.*

> *2. The parties will not use livenotes. There will be daily transcripts.*
>
> *3. There will be post-hearing submissions, the time limit and contents to be determined by the Tribunal after consultation with the parties.*
>
> *As far as the other disputed issues are concerned, the Arbitral Tribunal has taken the following decisions:*
>
> *1. The Arbitral Tribunal considers that written opening submissions are not necessary since the opening submissions will be transcribed by the court reporter.*
>
> *2. The Arbitral Tribunal would like the parties to prepare a common core bundle to be submitted to the Tribunal at the hearing.*
>
> *3. The Arbitral Tribunal has no objection to the submission of a bundle containing the Kazakh legislation. For its preparation, the parties should consult with each other as to its presentation and contents.*
>
> *4. The Arbitral Tribunal agrees that Mr. Prokofiev be retained as translator/interpreter. The parties may retain additional interpreters if they wish, in order to check the accuracy of Mr. Prokofiev's translations/interpretation.*
>
> *5. The Arbitral Tribunal also invites the parties to inform them whether there are at this moment other outstanding procedural issues to be decided and/or discussed during a telephone conference.*

65.    On September 19, 2007 Claimants filed a request on some procedural issues. On September 24, 2007, the Secretariat of ICSID informed the parties that, after careful consideration of Claimants' request and Respondent's answer of September 21, 2007, the Arbitral Tribunal had decided as follows:

> *Pursuant to article 34(2)(a) of the ICSID Arbitration Rules, the Arbitral Tribunal calls upon Respondent to produce as witness at the hearings, Mr. Kulibayev and Mr. Orazbekov. Respondent is invited to inform the persons concerned of the Tribunal's decision and to ask them to attend the hearings. On the other hand, the Arbitral Tribunal is also ready to send*

*itself a letter to these persons and, in that respect, requests their precise address in Kazakhstan by return fax.*

*(...)*

66. On September 24, 2007, the parties transmitted an agreed timetable and framework for the hearing to the Secretary of the Arbitral Tribunal.

67. On October 10, 2007, the Secretariat of ICSID sent a letter, on behalf of the Arbitral Tribunal, to Mr. Orazbekov inviting him to attend the hearing, in person or by video-link, to serve as a witness.

68. On October 21, 2007, Respondent informed the Arbitral Tribunal that Mr. Orazbekov was willing to give evidence to the Arbitral Tribunal by video link from Khazakstan.

69. The hearing took place at the World Bank's offices, Avenue d'Iena in Paris, as scheduled, on October 19 and from October 22 to 26, 2007. The hearing was audio recorded and transcribed by a court reporter, Ms. Emma White, Boscen Reporting Services.

70. The parties submitted an agreed core bundle at the hearing.

71. After opening statements by Counsel, the hearing was devoted to the examination and cross-examination of the parties' witnesses:

    - In the first place, Counsel for Respondent cross-examined the following factual witnesses of Claimants: Mr. Huseyin Koksaldi, Mr. Yasar Akgun and Mr. Bora Agilönü on October 22 and 23, 2007.
    - Subsequently the Turkish law expert, Mr. Coskan Erkam, was examined by Counsel for Respondent and cross-examined by Counsel for Claimants on October 23, 2007, and the Turkish law expert, Professor Ziya Akinci, was examined by Counsel for Claimants and cross-examined by Counsel for Respondent on the same date.

- Then, the hearing was devoted to the examination and cross-examination of the following factual witnesses of Respondent: Mr. Alexander Podporin and Mr. Karibjanov on October 23, 2007; Ambassador Vadim Zerkhov on October 23, 2007 and October 24, 2007; Mr. Kairat Orazbekov (by video conference), Mr. Iskander Yerembetov, Mr. Imin Sabirov and Judge Bakhytbek Begaliev on October 24, 2007 and finally, Mr. Mirbulat Abuov on October 25, 2007.
- The three Kazakh law experts were then cross-examined: Professor Aleksander Sergeyev and Professor Tolesh Kaudyrov on October 25, 2007 and Professor Rinat Mukhamedshin on October 25 and 26, 2007.
- Finally, on October 26, 2007, Professor Gulnar Z. Suleimenova, financial expert for Respondent, was cross-examined by Counsel for Claimants. This was followed by a presentation by Mr. Andrew Wright, financial expert for Claimants and a presentation by Mr. Brent Kaczmarek, financial expert for Respondent and their respective cross-examination.

## IX. Post Hearing Submissions

72. According to the directions of the Arbitral Tribunal given on October 26, 2007, and pursuant to the deadline extension which was agreed by the parties on December 12, 2007, the parties filed their post-hearing memorials on December 19, 2007.

73. With respect to costs, pursuant to the directions of the Tribunal given on October 26, 2007, and the deadline extension which was granted on January 14, 2008, the parties' post-hearing submissions on costs were filed on January 25, 2008.

## X. Closing of the proceedings

74. Pursuant to Arbitration Rule 38(1), the Arbitral Tribunal closed the proceedings on June 16, 2008.

# CHAPTER III.    THE FACTS

## I.    UP TO THE TERMINATION OF THE INVESTMENT CONTRACT

### A.    The foundation of KaR-Tel

75.    Rumeli Telefon, the holding company of Rumeli, was created by members of the Uzan family, namely: Kemal Uzan (20%), Hakan Uzan (24%), Cem Uzan (24%) and Aysegul Akay (22%), to operate a small number of mobile telephony operations in Central Asia.

76.    Telsim is Turkey's second largest mobile telephone operator.  It was created by Standart Telekom, a company owned by Hakan Uzan, Cem Uzan, Aysegul Akay and Rumeli Telefon.

77.    In the first half of 1998, Rumeli and Telsim began investigating the possibility of establishing a GSM network in Kazakhstan.  To this end, they established a business plan which covered the period from 1999 to 2008.  At that time, Kazakhstan had no GSM mobile telephony network on its territory.    Kazakhtelecom, the state-owned telecommunications operator, held a general license, according to which it had the status of "*the sole national operator ensuring [the] development, introduction, maintenance of the Public switched Telecommunications Network (PSTN), and performing its functions as the PSTN operator and exclusive operator of domestic long-distance and international services*" in Kazakhstan.

78.    Investel was incorporated on February 11, 1998 as a closed joint stock company under the laws of the Republic.  It was founded by two Limited Liability Partnerships ("LLPs") created under the laws of the Republic: Almex LLP ("*Almex*") and Giramat LLP ("*Giramat*"), which took respectively 51% and 49% of the shares in Investel.

79.    Investel was incorporated to act as a single purpose vehicle for the exploitation of opportunities in the telecommunications sector in Kazakhstan and, in particular for the proposed joint venture with Rumeli, to acquire and operate a mobile telephony licence in the Republic.

80.    On May 16, 1998, three months after the incorporation of Investel, Investel and Rumeli entered into an agreement in writing to found a new Kazakh limited liability partnership (LLP) to carry out their joint venture (the *"Foundation Agreement"*). This new LLP was to be called KaR-Tel LLP. Rumeli held 70% of the shares and Investel 30%. The Foundation Agreement was signed, on behalf of Investel, by Mr. Alexander Podporin.

81.    Article 4.3 of the Foundation Agreement set out the respective roles and obligations of Rumeli and Investel in respect of KaR-Tel. Rumeli was *"[t]o make a lump sum investment on incorporation of the company, and to make additional investments during first operation years of the company"* and *"[t]o carry out marketing, to provide assistance and know-how for operations of the company."* As for Investel, it was *"[t]o obtain necessary permissions and licenses from official bodies of Kazakhstan Republic (Governmental Investment Committee, Kazakhtelecom etc.)"* and *"[t]o provide office places and buildings for the company."*

82.    Pursuant to Article 5.1 of the Foundation Agreement, KaR-Tel had three organs of control: the General Meeting of Shareholders, the Board of Directors and the General Manager. The General Manager was to have full day-to-day operational control of KaR-Tel, but the General Meeting of Shareholders was the supreme organ of the partnership. It was empowered to determine acceptance or removal of partners in KaR-Tel, as well as appointing the Board of Directors.

83.    The Board of Directors was comprised of three persons: two were nominated by Rumeli and one, Mr. Podporin, was nominated by Investel. Although the General Manager was initially appointed by the Board of Directors, this responsibility was subsequently transferred to the General Meeting of Shareholders pursuant to an amendment to KaR-Tel's Charter on April 20, 2001 which included an abandonment of the Board of Directors as an organ of the Company.

84.    The position of General Manager was filled at all times until after the termination of the Investment Contract (see below) by an appointee of Claimants: from May to July 1998

Mr. Sabri Fedai, from July 1998 to August 17, 1999 Mr. Hussein Köksaldi; from August 17, 1999 to April 2002 Mr. Bora Agilönü.

## B. The GSM license

85.    In February 1998, the MTT announced that it proposed to issue the first GSM license which would be awarded following a competitive auction. On July 17, 1998, Rumeli advanced to KaR-Tel USD 1,650,000 to pay for the guarantee required from all participants in the auction for the License (the *"Tender Guarantee"*).

86.    The auction for the License took place on July 31, 1998 and KaR-Tel won the License with a bid of USD 67,500,000. KaR-Tel then turned to the negotiation of the terms of the License agreement required for the acquisition of the License from the MTT. Investel took the lead role on behalf of KaR-Tel in these negotiations.

87.    On August 10, 1998, KaR-Tel and the MTT executed a License agreement ("the *License"*) setting out, together with the annex to the License (the *"Annex"*), the conditions and rights and obligations of the parties in respect of the grant of the GSM 900 frequency license. It was signed on behalf of KaR-Tel by Mr. Podporin.

88.    The material clauses of the License were as follows:

- the License was granted for 15 years (clause 1.2);
- the cost of the License was USD 67,500,000, less the amount already advanced as Tender Guarantee, payment of which was to be made within ten days (clause 2.2.1);
- within three calendar days after such payment, the MTT was required to issue the License to KaR-Tel (clause 2.1.2);
- KaR-Tel was to ensure that the technical requirements laid out in Order No. 106 of the MTT dated May 22, 1998 were fulfilled (clause 2.2.2);
- the MTT was entitled to monitor the performance by KaR-Tel of its obligations (clause 3.1.1);

- the MTT was entitled to terminate the License Agreement unilaterally if KaR-Tel failed to fulfill its obligations set out in clause 2.2.2 (clause 3.1.2).

89. The Annex set out more specific details of the obligations of KaR-Tel:

- KaR-Tel had specific obligations for the extent of its network coverage at the end of each of the first five years of the License (clause 2.1 Annex);
- KaR-Tel was to take all measures to provide for the use within its network and the connection thereto only of terminal equipment which complied with the respective international standards (clause 4.1 Annex).

90. It was also announced at the time of the bidding for the License that once the first GSM license had been issued, the State telecommunications corporation, Kazakhtelecom, would be entitled to acquire a second GSM license on identical terms from Respondent. In September 1998, Kazakhtelecom did acquire such a license through a joint venture which it formed for this purpose with a Turkish telecommunications joint venture, FinTur. At the time, FinTur had two Turkish shareholders, Turkcell and Cukurova Group, and the Finnish telecommunications company, Sorena. Turkcell was Claimants' largest rival in the Turkish market and the joint venture brand name was K-Cell. K-Cell thus began operating in the Republic after KaR-Tel.

91. On August 20, 1998, thanks to the money obtained through the Motorola Loan (below C), the License fee was paid and the License was issued to KaR-Tel.

### C. The Motorola loan

92. In the course of the summer of 1998, KaR-Tel focused its efforts on obtaining the necessary financing to pay the License fee and to purchase telecommunications equipment. Rumeli was able to obtain a loan from Motorola. In this context, it procured a company subject to the same beneficial ownership and control, Telsim, to issue an irrevocable and unconditional guarantee (the *"Loan Guarantee"*) to Motorola. At that time, Telsim was not a participant in KaR-Tel.

93. By a loan facility agreement dated August 14, 1998, Motorola agreed to lend to KaR-Tel up to USD 160 million in a series of tranches for the purposes of acquiring the GSM license and then purchase equipment (the *"Motorola Loan Facility"*). It was clear at that time that there would not be sufficient time to finalise the Motorala Loan Facility in order to make the payment required of USD 65,850,000 by August 20, 1998. Consequently, Rumeli and Telsim entered into a Memorandum of Understanding and KaR-Tel, by its General Manager, Mr. Sabri Fedai, entered into a separate Bridging Loan Agreement with Motorola to secure the payment by Motorola of USD 65 million on August 19, 1998. By these agreements, Motorola agreed to lend KaR-Tel USD 65 million, secured by a Telsim guarantee for the same, to be used USD 60 million for the License fee and USD 5 million for the purchase of equipment by KaR-Tel from Motorola.

94. The Motorola Loan was originally repayable on or before November 16, 1998 (clause 3.1), but that 90 days period could be extended by a further 90 days to February 15, 1999 (clause 3.2). As KaR-Tel missed the February 15, 1999 payment deadline, amendments to the Motorola Loan were made starting on May 6, 1999, extending the repayment date but also increasing the size of the Loan.

95. The final Loan Extension and Amendment Agreement was entered into on September 29, 2000 and extended the deadline for repayment until April 30, 2001.

96. KaR-Tel did not make any payment and on May 22, 2001, Motorola issued a notice of failure to pay to KaR-Tel and demanded repayment in full within 10 days.

97. On August 15, 2002, Motorola served KaR-Tel with a final demand for immediate repayment of the amount outstanding under the Motorola Loan: USD 107,461,784.14. In the autumn of 2002, Motorola initiated proceedings in the Kazakh Courts to put KaR-Tel into liquidation and recover its debt.

98. On February 12, 2003, a Kazakhstan Court refused to declare KaR-Tel bankrupt considering that such an application was premature.

### D.    The alteration of the participations in KaR-Tel

99.    On April 14, 1999, a General Meeting of Shareholders of KaR-Tel was held.  At this meeting, it was agreed and resolved that Rumeli and Investel's participations in KaR-Tel would be altered from the existing respective participations of 70% and 30% to 60% for Rumeli and 40% for Investel.

### E.    The Investment Contract

100.    On February 28, 1997, the Republic passed Law number 75 on State Support of Direct Investment in the Republic of Kazakhstan ("*the Investment Support Law*").  Pursuant to the Investment Support Law, a State Committee on Investment was created at ministerial level under the office of the First Deputy Prime Minister to negotiate incentive contracts with "*investors contributing direct investments in the Republic of Kazakhstan.*"  These contracts were intended to provide financial incentives for investors to invest in the Republic, including reduction in, or exemption from, taxation.

101.    It was in KaR-Tel's interest to obtain the benefit of such an investment contract with the Investment Committee.  On May 20, 1999, KaR-Tel and the Investment Committee executed Contract No. 0123-05-99 ("*the Investment Contract*") pursuant to the aforementioned legislation.

102.    Clause 2 of the Investment Contract set out the reasons for its granting: "*for the purpose of providing different measures of stimulation and state support in the course of investment activity in the sphere of wireless and cellular communications in rural areas.*"  The incentives were granted by the Investment Committee in order to encourage KaR-Tel to progress the development of its network quickly and to ensure that it provided its network equally in the less profitable rural areas of Kazakhstan, as well as in the highly profitable main cities.   This was further particularized in the 5-year "*Working Programme*" annexed to the Investment Contract wich set out the respective population centres and areas of the Republic to which KaR-Tel's network coverage had to extend over the course of the five-year period.

103. The Investment Contract obliged KaR-Tel to make investments, to apply advanced technology and to provide the Investment Committee with regular and detailed information on the progress of the investment programme. In return, KaR-Tel was granted tax and other benefits, including a five-year total exemption from corporate and property tax, and reduced rates for the five years thereafter. The Investment Contract was to expire on July 31, 2009.

### F. The foundation of Telecom Invest and the introduction of Telsim

104. On September 29, 2000, Almex and a Mrs. Elena Petrovna Gutova entered into an agreement to found a new Kazakh LLP called Telecom Invest LLP ("*Telecom Invest*") with a minimum charter capital of 100,000 Tenge. The participatory interests were divided as follows: 87.5% to Almex and 12.5% to Mrs. Gutova.

105. At a General Meeting of Shareholders of KaR-Tel held on October 10, 2000, the founders of KaR-Tel resolved that:

- Investel be permitted to sell its participation in KaR-Tel to a third party for 300,000 Tenge;
- Rumeli be permitted to sell a part of its participation equivalent to 15% of the total participation rights in KaR-Tel to a third party.

106. In late 2000, Investel transferred its participation interest in KaR-Tel to Telecom Invest for 300,000 Tenge. On December 31, 2000, Rumeli sold a 15% participation in KaR-Tel to Telsim. Pursuant to Articles 22(2) and 12 of the Kazakh Law on Limited and Additional Liability Partnerships, Telsim became successor to Rumeli's obligations under the Foundation Agreement.

107. These changes necessitated the amendment of KaR-Tel's Charter, which was approved at a General Meeting of Shareholders on April 20, 2001. Further amendments were made the same day:

- the registered capital was reallocated as follows: Telecom Invest (40%), Rumeli (45%) and Telsim (15%);
- the Board of Directors was removed as an organ;
- as a result of the removal of the Board of Directors, the former powers of that organ, and in particular the power to appoint or remove the General Manager of KaR-Tel, was transferred to the General Meeting of Shareholders.

108. On September 9, 2001, Mr. Podporin was officially appointed the General Manager of Telecom Invest.

### G.   The development of KaR-Tel's Business

109. Claimants' and Respondent's position on the business development of KaR-Tel and on the investments allegedly made by Claimants differ substantially.

110. In a nutshell, Claimants allege that by the end of the year 2001, KaR-Tel had a work force of approximately 193 well-qualified employees, the number of subscribers and revenues reached almost 160,000 and USD 60 million respectively; and that the number of subscribers reached 380,000 by April 2002. Claimants further allege that this success was the result of their very important efforts and investments.

111. According to Claimants, Respondent itself recognized and praised KaR-Tel's achievement in a letter of the Ministry of Transportation and Telecommunications of the Republic of Kazakhstan dated May 11, 2000. Moreover, KaR-Tel was generating positive EBITDA margins – *i.e.* generating a positive operating cash flow – in both 2001 and early 2002, when Claimants were suddenly evicted from KaR-Tel.

112. On the contrary, Respondent alleges that the level of subscribers and revenues was grossly overstated and that there is no evidence that Claimants really invested in KaR-Tel.

## II. THE TERMINATION OF THE INVESTMENT CONTRACT AND ITS REPERCUSSIONS

### A. The termination of the Investment Contract

113. On February 21, 2002, the Investment Committee took the decision to terminate the Investment Contract. By a letter dated February 21, 2002, it gave KaR-Tel notice in writing that, as a result of its repeated breaches of said Contract and more specifically on the basis that KaR-Tel had not complied with its reporting obligations pursuant to the Investment Contract, the Investment Contract would terminate 30 days later.

114. By letter dated March 27, 2002, the Investment Committee recorded the Formal Order of Termination of the Investment Contract at a meeting on March 25, 2002 on the basis that KaR-Tel had failed to comply in a timely manner with a requirement in the Investment Contract to submit reports on the economic activities of the partnership and on the implementation of the investment project.

### B. The Extraordinary General Meeting of Shareholders of KaR-Tel

115. In view of this development, an Extraordinary General Meeting of the Shareholders of KaR-Tel ("EGM") was called by Telecom Invest. According to Respondent, Mr. Podporin sent to Rumeli and to Telsim formal notices calling this EGM. These notices set out that:

- an EGM of KaR-Tel would be held on April 11, 2002 at 18.00 at an address in Almaty;
- in case Claimants' representatives did not attend the EGM on April 11, the EGM would then be adjourned to April 15 at 18.00 at the same address;
- if Claimants' representatives failed again to attend the adjourned EGM on April 15, 2002, decisions on the proposed agenda for the meeting would be taken in their absence.

116. The three points on the agenda for this meeting were: (1) consideration of the damage caused to KaR-Tel by Rumeli and Telsim; (2) consideration of the compulsory

redemption of the participations of Rumeli and Telsim and their removal from the partnership; (3) the temporary change of the General Manager of KaR-Tel.

117. With respect to the compulsory redemption of Claimants' shareholding, Article 34 of the Limited and Additional Liability Partnership Law (the "*LLP Law*") provides that :

> *"1. When a participant of a limited liability partnership causes harm to a partnership or its participants, they shall have the right to claim for compensation of damages from such person.*
>
> *2. In the event when material harm is caused, the limited liability partnership aside from its claim to compensate damages and raising the issue on forced purchase by the partnership of the participating interest of the guilty participant who has caused the harm shall also have the right to require his retirement from the participants.*
>
> *3. The forced purchase of a participating interest shall be carried out in a judicial procedure."*

118. In addition, Article 82 of the Kazakh Civil Code provides that:

> *"In the event a participant of the limited liability partnership fails to fulfill its obligation towards the partnership, as established by legislative acts or foundation documents, the partnership, in compliance with a decision of the general meeting, may demand in Court the forced buy-out of the participating interests owned by such participant at a price determined by an agreement between the partnership and the participant. In the event an agreement is not reached, the price for the share being forcedly bought out shall be established by the court."*

119. Claimants, however, allege that they were not notified of these meetings, and that this is why they were not present at the first meeting which took place on April 11, 2002 and at the adjourned meeting which subsequently took place on April 15, 2002.

120. On April 15, 2002, Telecom Invest proceeded to consider the matters on the agenda in Claimants' absence. The following resolutions were passed:

- to prepare all necessary documents, including financial analyses, demonstrating the damage caused to KaR-Tel by the activity and/or inactivity of Rumeli and Telsim;

- to issue proceedings in the Almaty City Court for the compulsory redemption of Claimants' participation in KaR-Tel;
- to dismiss Mr. Agilönü as General Manager of KaR-Tel and to replace him temporarily by Mr. Iskander Yerimbetov and to seek the Court's approval of this amendment.

## C.    The proceedings issued in Almaty City Courts

### 1.    The Telecom Invest Claim

121. On April 19, 2002, Telecom Invest issued proceedings against Claimants in the Almaty City Court ("*the Telecom Invest Claim*") for the compulsory redemption of Claimants' participation in KaR-Tel.  Telecom Invest also sought an injunction to freeze the assets and records of KaR-Tel.

122. On April 23, 2002, Mrs. S. G. Ivanovna, sitting as the presiding judge of the Almaty City Court, considered Telecom Invest's application for an injunction.  Judge Ivanovna held that in accordance with the Law on National Security, it was necessary to grant the injunction freezing the partnership's assets, property and records in order to ensure that the performance of KaR-Tel's network continued uninterrupted.  At the time, the Republic had only two mobile telephony networks and these were considered to be critical strategic interests.

123. Judge Ivanovna ordered that, pending a decision on the merits of the case:

- all property of KaR-Tel be frozen to secure the claim;
- access to objects which ensured the uninterrupted operation of KaR-Tel's cellular network and to financial, technical and other documents and computer databases was to be restricted to those with written permission of the temporary General Manager Mr. Yerimbetov.

124. On the same day, April 23, 2002, the Court bailiffs took steps to ensure compliance with the order of the Court. The bailiffs did this by attending at KaR-Tel's premises with a representative of Telecom Invest, Mr. Aidan Karibjanov, and with a security escort.

125. This first decision on injunctive relief was made *ex parte*. It was thus decided on the basis of the application and without any hearing. Claimants appealed the decision to the Supreme Court on May 2, 2002. On June 11, 2002, the Supreme Court set aside the second part of Judge Ivanovna's Order, requiring access to KaR-Tel to be restricted to those with written permission from Mr. Yerimbetov.

## 2. The KaR-Tel Claim

126. In late May 2002, whilst Claimants' appeal of the injunction to the Supreme Court was still pending, KaR-Tel, acting through its new temporary General Manager, Mr. Yerimbetov, commenced proceedings against Claimants in identical terms to those brought by Telecom Invest.

127. On May 22, 2002, Mr. Agilönü called an EGM of the partnership. As soon as he was notified of this, Mr. Yerimbetov, on behalf of KaR-Tel, applied to the Almaty City Court for a further injunction preventing the holding of the intended EGM.

128. On June 3, 2002, the Almaty City Court granted the injunction and:

- suspended the EGM called by Mr. Agilönü for June 7, 2002;
- enjoined Mr. Agilönü from exercising the rights and performing the functions of General Manager of KaR-Tel pending a decision on the merits of the case;
- enjoined Claimants from calling or holding any general meetings of KaR-Tel pending a decision on the merits of the case.

129. Court bailiffs enforced the injunction by entering the conference room in which the General Meeting of Shareholders was held at the AnKaRa Hotel on June 7, 2002 and asked Mr. Agilönü and Claimants to stop the meeting.

130. Claimants appealed this second injunction before the Supreme Court of the Republic. On or about August 1, 2002, the Supreme Court allowed Claimants' appeal in part and set aside part of Judge Ivanovna's order insofar as it related to constraints on the action of Mr. Agilönü, on the grounds that he was not a party to the proceedings. The Supreme Court also dismissed as entirely without foundation Claimants' allegation that the grant of the injunction demonstrated bias and partiality on the part of the Almaty City Court.

### 3. The Consolidation of Telecom and KaR-Tel cases

131. One month before, by an order dated July 1, 2002, Judge Ivanovna of the Almaty City Court had ruled that the proceedings brought by Telecom Invest and the proceedings brought by KaR-Tel should be consolidated into a single proceeding, on the basis that the claims were very similar and against the same defendants.

### 4. The forensic examination of KaR-Tel

132. On July 31, 2002, Judge Begaliev of the Almaty City Court issued a ruling appointing the Forensic Examination Centre of the Kazakh Ministry of Justice to prepare an integrated accounting and commercial forensic examination. The examination was to address the issue of whether Claimants had caused significant damage to KaR-Tel by their actions, and to assess the value of KaR-Tel as at April 2002. In this respect, Judge Begaliev posed 6 specific questions to the Forensic Examination Centre:

- what is the annual turnover of KaR-Tel?;
- did KaR-Tel sustain a loss as a result of the cancellation of the Investment Contract; if so, in what amount?;
- what was the average market value at the time of purchase of the equipment purchased by KaR-Tel from Telsim; what price did KaR-Tel in fact pay to Telsim; what is the difference, if any, between these two figures?;
- what was the average market value at the time of purchase of the telephone handsets purchased by KaR-Tel from Telsim; what price did KaR-Tel in fact pay to Telsim?;

- what is the total value of investments made by Rumeli and Telsim in the context of their obligations under the Foundation Agreement; how were these investments used?; and

- what is the balance sheet value of KaR-Tel and the shareholdings of Rumeli and Telsim therein?

133. On or about August 9, 2002, Claimants appealed Judge Begaliev's order. The Supreme Court dismissed the appeal regarding the appointment of the Forensic Examination Centre on September 19, 2002. It held that:

- it was normal and proper for Judge Begaliev to have appointed the Centre to review those matters prior to holding a hearing on the merits;

- it was incorrect to allege that the claim was stayed due to the appeal of the injunction;

- Judge Begaliev's order did not go beyond the scope of the claims.

### D. The attempts to sell Telecom Invest's participation in KaR-Tel

134. In August 2002, Telecom Invest and Claimants entered into discussions concerning the sale of Telecom Invest's 40% in KaR-Tel to Claimants. A Stock Purchase Agreement was negotiated and initialed by the parties on October 13, 2002, subject to the signature of their highest executives.

135. The purchase price for Telecom Invest's 40% stake was set at USD 12 million. Ultimately, however, the agreement was not finalized.

136. In late autumn 2002, KaR-Tel's General Manager, Mr. Yerimbetov, and a Kazakh businessman, Mr. Margulan Seysembayev, approached Almex and Mrs. Gutova with an offer to acquire KaR-Tel. The parties entered into discussions, and it was eventually agreed to sell Telecom Invest itself to Mr. Seysembayev.

137. The purchase, effected through 6 companies which were beneficially owned and controlled by Mr. Seysembayev, was concluded informally by amendment of Telecom

Invest's Charter at a shareholders meeting on December 19, 2002. This amendment was registered on January 17, 2003 and was for nominal consideration.

### E. Mr. Seysembayev's offer to purchase Claimants' participation in KaR-Tel

138. In or about April 2003, Mr. Seysembayev, the owner of Telecom Invest, attempted to purchase Claimants' 60% interest in KaR-Tel. He indicated to Claimants that he was prepared to offer them USD 12 million to USD 15 million for their participation. Claimants refused this offer.

### F. Claimants' complaints to Respondent

139. On April 2, 2003, Rumeli wrote to the Prime Minister of the Republic and sent further copies of the letter to the President, the Minister of Foreign Affairs, the Minister of Transport and Communications, the Minister of Industry and Trade, the Minister of Finance, the Chairman of the Investment Committee and the Turkish Ambassador to Kazakhstan. On April 3, 2003, Telsim sent an identical letter to the same recipients.

140. These letters were complaints by Claimants that the termination of the Investment Contract had been wrong because:

- KaR-Tel had complied with all of its investment obligations under the Investment Contract;
- KaR-Tel had complied with all of its reporting obligations under the Investment Contract;
- the Investment Committee had violated the contractual procedure for termination "*in that any termination could take place only if the Contract had been suspended first and the investor failed to remedy the situation.*"

141. Claimants also threatened to launch ICSID proceedings if their dispute with the Investment Committee was not resolved to their satisfaction.

## G.  The judgment of the Almaty City Court on June 6, 2003

142.  As explained above, on July 1, 2002, the Almaty City Court had ordered that the proceedings brought by Telecom Invest and those brought by KaR-Tel be consolidated. The claim was for the Court to order that Claimants' participation in KaR-Tel be compulsory redeemed. Claimants defended these proceedings with the assistance of local counsel and engaged three Kazakh academics to provide expert evidence on the disputed issues.

143.  There were two central issues for the Almaty City Court to determine:

- the validity of KaR-Tel's EGM resolution to bring the claim;
- whether the claim for compulsory redemption was made out.

144.  With respect to the first issue, the Court:

- held that pursuant to Article 45(2) of the LLP Law, "if, despite requests by members, the executive body does not convene a general meeting, it may be convened by the members themselves," where they hold more than 10% of the total voting equity in the partnership;
- found as a fact that on the balance of the evidence Mr. Agilönü had indeed received the requests in the form of letters dated March 4, 2002 and March 20, 2002; and therefore,
- held that the EGMs on April 11 and 15 were properly convened by Telecom Invest;
- determined that the meeting on April 15, 2002 was quorate and that the resolutions had been passed in a procedurally correct manner and with the requisite quorums and majorities. The resolution was therefore valid and was upheld.

145.  With respect to the second issue, *i.e.* KaR-Tel's claim for compulsory redemption of Claimants' shares, the Court found that Claimants had caused KaR-Tel to suffer harm in the amount of USD 40,662,765, being the loss caused to KaR-Tel by the termination of

the Investment Contract and trough transactions with related companies. The Court decided that this was indeed material harm entitling KaR-Tel compulsorily to redeem Claimants' shareholdings, which the Court then ordered.

146. It was recorded in the Court's judgment that, pursuant to Article 32(3) of the LLP Law, the value of the interest to be purchased was to be established by the parties in the first place and that the Court would only make such determination in circumstances where the parties would be unable to agree. The Court thus left the issue of the value of Claimants' shareholding to be determined by agreement between Claimants and Telecom Invest.

## H.     The appointment of a Working Group

147. On June 9, 2003, the Investment Committee wrote to Claimants to inform them that Respondent's Government's decision to establish an inter-departmental Working Group to "*conduct an audit on KaR-Tel LLP on the execution of the terms of the contract by KaR-Tel LLP, including investments obligations.*"

148. The Working Group reached a decision on July 17, 2003. Its findings were the following:

- in breach of clause 6.2 of the Investment Contract, KaR-Tel had failed to use advanced technologies in implementing the investment project. Instead, KaR-Tel had imported second hand and outdated BTS base sections;
- in breach of clause 3 of the Investment Contract, between May 1999 and March 2002, KaR-Tel made direct investments of only USD 13,308,749. This equated to only 11.7% of the pro-rated direct investment of USD 113,643,000 required under clause 3;
- in breach of the Work Programme at Annex 1 to the Investment Contract and in breach of clause 2.1 of the same, between 1999 and 2002, KaR-Tel had achieved only 56% of the progress required under the Work Programme. In particular, the rural areas of Kazakhstan had been largely without coverage;

- Article 13 of the Law on State Support for Direct Investments permits the Investment Committee to terminate an investment contract where the investor fails to comply with its obligations or breaches terms of the contract. There is no provision in the Law for suspension of an investment contract prior to its termination. Additionally, even under the terms of the Investment Contract, a prior suspension of the Contract is a right rather than an obligation of the Investment Committee;

- although the Investment Contract was terminated for KaR-Tel's failure to submit reports, the only reason why it was not terminated for the breaches set out above was that the failures to report prevented the Investment Committee from having information from which it could have identified the breaches;

- KaR-Tel itself had expressed to the Working Group that it did not dispute the termination of the Investment Contract.

## I.    Criminal investigation

149.  On June 24, 2003, Mr. Yerimbetov filed a criminal complaint against five former KaR-Tel employees who would have signed expenses authorization forms in order to take money directly from KaR-Tel's petty cash reserve. The total sum so transferred was 27,053,748 Tenge, which at the time equated approximately USD 192,663. The executives and employees concerned were:

- Bora Agilönü, KaR-Tel's General Manager;
- Mustafa Bash, KaR-Tel's Director of Sales;
- Erdal Osornec, KaR-Tel's Finance Director;
- Bulent Gurel, KaR-Tel's Chief Accountant; and
- Zhuldys Kaden, a secretary.

150.  On July 1, 2003, Major Yun, a senior investigator in the Almaty police force, decided to issue a criminal indictment against these employees. They fled the country. The proceedings were suspended on September 1, 2003.

**J.**     **The judgment of the Supreme Court of July 23, 2003**

151. On June 20, 2003, Claimants appealed the Almaty City Court's judgment to the Supreme Court of Kazakhstan.  Claimants repeated the points on which they had relied before the first Court, and requested the Supreme Court to:

- overturn the decision of the Almaty City Court;
- refuse KaR-Tel's claim for compulsory redemption;
- invalidate the calling of the EGM on April 15, 2002 and all decisions adopted at that meeting;
- discharge the injunctions dated April 23, 2002 and June 2, 2002.

152. KaR-Tel also filed an application to the Supreme Court to have the valuation exercise conducted on Claimants' participation in KaR-Tel.

153. The Supreme Court reviewed the Almaty City Court decision and left it unchanged.  It dismissed all of the appeals and the application filed by KaR-Tel to have the valuation exercise conducted.  It therefore remained for the parties to agree on a price for the compulsory redemption of Claimants' shareholding.

**K.**     **The judgment of the Supreme Court Presidium of October 30, 2003 - The following restructuring of KaR-Tel – and the purchase of KaR-Tel by VimpelCom**

**1.**     **The judgment of the Supreme Court Presidium**

154. On September 15, 2003, KaR-Tel appealed the Supreme Court's decision to the Presidium of the Supreme Court ("*the Presidium*"), the highest instance for civil cases in the Kazakh legal system.  The purpose of KaR-Tel's appeal was to ask the Presidium to determine the valuation of Claimants' participation in KaR-Tel.

155. The Presidium considered that it had jurisdiction to determine the price since it was established that the parties, *i.e.* KaR-Tel on the one hand and Claimants on the other hand, were not able to reach agreement.   The Presidium then valued Claimants'

participation in KaR-Tel at 337,500 Tenge for Rumeli (approximately USD 2,281) and 112,500 Tenge for Telsim (approximately USD 760.43).

## 2. The restructuring of KaR-Tel

156.  Shortly thereafter, on November 10, 2003, KaR-Tel's Charter was amended to reflect that the founders were Telecom Invest (40%) and Steiner and Zingermann JV LLP, a law firm (60%). Steiner and Zingermann had purchased their shareholding from KaR-Tel following Telecom Invest's waiver of its right of pre-emption. They subsequently transferred their shareholding to another of Mr. Seysembayev's companies, Kertean LLP, in January 2004.

157.  Under its management, Mr. Yerembetov restructured the company. He made new investments and started negotiations with Motorola to restructure the loan. In April 2004, Mr. Yerembetov was finally able to reach a deal with Motorola whereby the loan would be discounted to USD 35 million and repaid in full in the short term.

158.  Mr. Yerembetov managed to persuade KazKommertz Bank to lend it the USD 35 million required to repay Motorola.

## 3. The sale of KaR-Tel to VimpelCom

159.  On August 27, 2004, VimpelCom announced that it had won a public tender to purchase KaR-Tel for USD 350 million.

## III.  CLAIMANTS SEIZED BY TSDIF

160.  In February 2004, the Turkish Savings Deposit Insurance Fund (the "*TSDIF*"), seized control of over two hundred companies allegedly belonging to, or controlled by, the Uzan family, among which Rumeli and Telsim.

# CHAPTER IV. THE JURISDICTION OF THE ARBITRAL TRIBUNAL

161. The first issue to be decided in this arbitration is the jurisdiction of this Arbitral Tribunal. It is indeed disputed by Respondent, as is further explained below.

## I. CLAIMANTS' POSITION

162. According to Claimants, the requirements of Article 25 of the ICSID Convention and ICSID Rule 2(1)(c) are fulfilled. Claimants have consented to the jurisdiction of ICSID by virtue of their Request for Arbitration and the ICSID arbitration clause contained in the BIT. Respondent has consented to ICSID jurisdiction on the date of entry into force of the BIT, namely August 10, 1995 and/or on the date of entry into force of the FIL, namely on December 28, 1994.

163. According to Claimants, the BIT states that two authentic copies (in four different languages) of the BIT have been executed, "*each in Turkish, Kazak [sic], English and Russian.*" There does not appear, however, to exist any Kazakh language version. There is no requirement under the English or Russian versions of a prior submission of the dispute to local Courts before initiation of arbitration proceedings before ICSID. On the other hand, Article VII of the Turkish version contains such a requirement. According to Claimants:

- no requirement of prior initiation and completion of local proceedings as a prerequisite to ICSID arbitration should be imposed, as two of the three official versions of the BIT do not provide for such a requirement;
- such a requirement would constitute a violation of the Most Favorable Clause contained in the BIT, since it would create a barrier to arbitration not found in the dispute resolution clauses of other BITs entered into by the Republic of Kazakhstan;
- in any case, Respondent, through its behavior, has deprived Claimants of the possibility of meaningfully exercising any such action.

164.　It is finally Claimants' position that none of Respondent's objections to the jurisdiction of this Tribunal has any merit.

### A.　Respondent consented to ICSID jurisdiction over this dispute

165.　According to Claimants, Respondent's consent to ICSID jurisdiction is contained in both the BIT and the FIL.　As far as Claimants are concerned, they first expressed their intention to initiate arbitration in April 2003, when they wrote letters to Respondent indicating that they had "*the right to submit the dispute for final resolution to the International Center for Settlement of Investment Disputes (ICSID) and have firm intentions to do so if no agreement is reached with the Republic of Kazakhstan in the nearest future*."　Claimants completed their consent by filing their ICSID Request for Arbitration on July 15, 2005.　Thus, all parties have consented to ICSID jurisdiction over this dispute by no later than July 15, 2005.

166.　Nevertheless, nearly two years after the Request for Arbitration was filed, Respondent alleges that it did not consent to ICSID jurisdiction over this dispute on the ground that Claimants' investments violated the laws and regulations of Kazakhstan.　Claimants consider that Respondent's allegations are wholly without merit and should be dismissed accordingly.

### 1.　Claimants' investments were fully legal

167.　Claimants deny that their investments did not comply with Kazakhstan's laws and regulations.　In any event, the standards that would need to be satisfied in this regard for ICSID jurisdiction to be defeated are very high.　Respondent, which bears the burden of proof, has not advanced, let alone provided, evidence of any factual and legal support for its allegations.

168.　To defeat the Tribunal's jurisdiction based on a BIT's requirement that the disputed investments be in conformity with the host State's laws and regulations, a certain level of

violation is required. As determined by the Arbitral Tribunal in the *LESI*[1] case, such a provision will exclude the protection of investments only if they have been made in breach of fundamental legal principles of the host country ("*en violation des principes fondamentaux en vigueur*").

169. Moreover, mere allegations are not enough. According to Claimants, Respondent does not substantiate its allegations with any factual evidence of fraud. Nor does it invoke any laws or regulations of Kazakhstan that Claimants' investments would have supposedly violated. Rather, Respondent relies upon an unrelated New York Court judgment applying American law and refers to that Court's assessment of acts and omissions that took place in Turkey regarding separate transactions, to reach the conclusion that *"[i]n circumstances where the entire basis of the Claimants' alleged investment in KaR-Tel was to further their worldwide fraud, the investment was not in conformity with the laws of Kazakhstan."*

170. Claimants submit that the Tribunal should rather follow the holding of *Tokios Tokelés*,[2] where the registration of Claimants' investments indicated that they had been made in accordance with the laws and regulations of the host State. Similarly here, it is not in dispute that Respondent registered KaR-Tel, granted KaR-Tel Kazakhstan's second GSM license through a free and transparent bidding process, and willingly registered all corporate changes to KaR-Tel.

171. According to Claimants, Respondent's attempt to try to link to KaR-Tel acts and omissions in Turkey of the Uzan family, relating to third party transactions, is irrelevant. The manner in which the Uzans conducted their business outside of Kazakhstan has no relation to the case at hand. According to Claimants, the Uzans' alleged fraud was related to the T. Imar Bankasi TAS (the "*ImarBank*") banking practices in Turkey. They had nothing to do with Claimants' investments in Kazakhstan. Similarly, Respondent's

---

[1] *LESI, S.p.A. and Astaldi S.p.A. v. People's Democratic Republic of Algeria* (ICSID Case No. ARB/05/3), Decision on Jurisdiction of July 12, 2006 [hereinafter *LESI v. Algeria*].

[2] *Tokios Tokelés v. Ukraine* (ICSID Case No. ARB/02/18), Decision on Jurisdiction of April 29, 2004 [hereinafter *Tokios Tokelés*].

justification for depriving Claimants of their majority stake in KaR-Tel, which was based on an alleged failure to file reporting documents, was unrelated to the Uzans' fraud.

172. The only evidence put forward by Respondent in support of the proposition that Claimants' investments were fraudulent is a July 13, 2003 judgment rendered in the United States against the Uzans. A judgment of a Court of first instance in New York applying American law does not bind an arbitral tribunal dealing with claims under international law. In any event, that judgment did not rule on the legality of Claimants' investment in Kazakhstan.

173. The New York judgment could not have found evidence that KaR-Tel played a role in an illegal scheme with respect to the Motorola loans as Respondent alleges. As noted in Judge Rakoff's findings of fact, two Motorola loans were made in relation to KaR-Tel:

- the largest loan was the USD 60,000,000 loan made on August 19, 1998. As it did not cover the total price of the GSM License, Claimants paid the remaining USD 5,850,000. Therefore, the Uzans obviously could not have used this loan for illegal purposes;

- the second Motorola loan was for USD 13,723,00.99. But Judge Rakoff's findings of fact did not specifically conclude that this loan was used improperly and not for the purchase of equipment from Motorola. Respondent has failed to prove any fraud whatsoever in connection with this loan.

174. Claimants further allege that, with respect to Respondent's allegation that Claimants defrauded KaR-Tel itself by causing it to enter into transactions with Telsim at excessive prices, no neutral expert has ever determined that these transactions with Telsim were in fact at excessive prices. Rather, Bülent Yağci, a professor of the Istanbul Technical University, reviewed the prices at which Telsim sold KaR-Tel equipment and found that the "*cost [was] reasonable*." He moreover determined that the prices were lower than those of the market. In any case, sales at a high price do not constitute a violation that

would rise to the "*violation of fundamental principles*" standard needed to defeat jurisdiction.

175. According to Claimants, contrary to Respondent's allegations, the entire basis of their investments in KaR-Tel was obviously not to further a worldwide fraud. They had only one purpose: to create a profitable cellular telecommunications business in Kazakhstan. In this respect, Rumeli and Telsim expended significant financial and human resources to create and develop KaR-Tel's operations and GSM network:

- they made significant investments in KaR-Tel. The bid process by which KaR-Tel received Kazakhstan's second GSM License was wholly legal. The License was legally paid for;

- the telecommunications network that Claimants built was in compliance with the local laws and technical regulations of Kazakhstan;

- in or around July 1998, Claimants' managers flew to Kazakhstan with a team of six or seven Turkish specialists from the Rumeli/Telsim group for the purpose of developing KaR-Tel's operations and GSM network;

- Rumeli conducted in-depth market research and analyses and established a ten-year business plan for KaR-Tel;

- KaR-Tel's success increased under Claimants' management due to their continued investments;

- Rumeli and Telsim made significant investments in KaR-Tel during the period of 1998-2002;

- in 2000, Claimants further invested approximately USD 13,000,000, and KaR-Tel revenues reached approximately USD 11,000,000, with the number of subscribers reaching over 57,000.

176. Therefore, Claimants allege that KaR-Tel was a legitimate business and a success story. It was not a company set up to further a worldwide fraud, but rather a legitimate, growing and dynamic telecommunications company in Kazakhstan. It was also a company of significant value as its sale to VimpelCom in 2004 for USD 350,000,000 attests.

2. **Claimants' investments did not violate the principle of good faith, the principle "*nemo auditur propriam turpitudinem allegans*," or international public policy**

177. Claimants allege that their investments did not violate the principle of good faith. Respondent's argument in this respect is based on Respondent's repetitive allegation that the investment was part of a worldwide fraud, which is untrue and which Respondent has failed to substantiate.

178. According to Claimants the *Inceysa* case[3] relied upon by Respondent must be distinguished from the present case. Indeed, the circumstances were very different in *Inceysa*. *Inceysa's* violations of the principle of good faith were shockingly clear: *Inceysa's* investment was the result of winning a bid, which *Inceysa* won only by presenting wholly falsified information. On the contrary, no false information was ever presented to Respondent with respect to Claimants' investments in Kazakhstan.

179. Claimants' investment did not violate the principle *nemo auditur propriam turpitudinem allegans*. Once again, the *Inceysa* decision relied upon by Respondent is irrelevant since the current arbitration does not remotely resemble the facts of the *Inceysa* case.

180. Claimants' investment did not violate international public policy. Respondent again invokes *Inceysa*, whereas *Inceysa's* very investment was secured by fraudulent misrepresentations. Again, Claimants allege that no false information was ever presented to Respondent with regard to Claimants' investments in Kazakhstan.

181. The *World Duty Free* decision[4] invoked by Respondent to stand for the principle that no jurisdiction is permissible where an investment violates public policy is also irrelevant to the present case. Indeed, according to Claimants, in *World Duty Free,* Kenya alleged that the agreement on which the claims in the arbitration were based was obtained through a

---

[3]  *Inceysa Vallisoletana S.L. v. Republic of El Salvador* (ICSID Case No. ARB/03/26), Award of August 2, 2006 [hereinafter *Inceysa v. El Salvador*].

[4]  *World Duty Free Company Limited v. The Republic of Kenya* (ICSID Case No. ARB/00/7), Award of October 4, 2006 [hereinafter *World Duty Free v. Kenya*].

bribe. The tribunal agreed, and went on to hold that, since bribery is contrary to international public policy, claims based on contracts obtained by corruption could not be upheld by the tribunal. Here, by way of contrast, Respondent has made no case against Claimants of any bribe.

182. Claimants finally point out that a mere presumption of fraud is insufficient. It has to be positively proved. Moreover, the fraud must be particularized and must directly relate to the precise issue at hand, namely Claimants' investment in Kazakhstan.

## B. **Claimants have standing to bring this arbitration**

### 1. **Rumeli and Telsim are the proper Claimants in this arbitration**

183. ICSID's arbitration mechanism was designed to protect investments of foreign nationals, like Telsim and Rumeli. They are legal entities registered in Turkey and as such are nationals of another Contracting State. Article 25 of the ICSID Convention defines a "*National of another Contracting State*" as "*any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such a dispute to conciliation or arbitration.*" Rumeli and Telsim qualify as such because they were incorporated and headquartered in Turkey both at the time the dispute arose and at the time of their consent to ICSID arbitration.

184. According to Claimants, today, Rumeli and Telsim:

- remain legal entities incorporated in Turkey;
- remain commercially registered legal entities;
- have employees and own assets;
- have full legal capacity;
- pay social charges and taxes and are not immune from enforcement;
- are not owned, but merely managed by TSDIF.

185. Claimants further allege that they were never created for treaty-shopping purposes. Nor did they become controlled by TSDIF for this purpose. At the time of Respondent's wrongful actions, Claimants were actively engaged in telecommunications operations both in Turkey and abroad. When Telsim and Rumeli indicated that they would initiate ICSID proceedings in April 2003, they were fully-operational telecommunications companies. This was still the case when they perfected their consent to initiate proceedings by filing their Request for Arbitration on July 15, 2005.

186. Claimants dispute Respondent's allegation that Claimants are mere shell companies. In any event, even if Rumeli and Telsim were indeed "*shell*" companies, this would not constitute a bar to this Tribunal's jurisdiction under either the ICSID Convention or the BIT. Indeed, nowhere in Article 25 – nor in the ICSID Convention – is there a basis for denying ICSID jurisdiction to a shell company. This has been confirmed by a recent ICSID decision on jurisdiction. In *Aguas del Tunari*,[5] Respondent, Bolivia, argued that the claimant – a local company – could not claim that it was an entity "*controlled directly or indirectly*" by "*nationals*" of the Netherlands because, *inter alia*, the ultimate Dutch controlling corporation was a shell company actually controlled by an American company. As is clear from the decision, the tribunal rejected Respondent's position on the basis that the Dutch corporation was not a corporate shell specifically set up to gain ICSID jurisdiction over the dispute.

187. In the present case, even if Rumeli and Telsim are deemed today to be "*shell*" companies, it cannot be seriously argued that they were created in 1993 for "*treaty-shopping*" purposes, *i.e.* to gain ICSID jurisdiction.

188. Therefore:

- the fact that Telsim may or may not have substantial activities following the sale of Telsim assets to Vodafone is irrelevant for jurisdictional purposes. If Kazakhstan

---

[5] *Aguas del Tunari S.A. v. Republic of Bolivia* (ICSID Case No. ARB/02/3)*,* Decision on Respondent's Objections to Jurisdiction of October 21, 2005 [hereinafter *Aguas del Tunari v. Bolivia*].

had wanted, as a condition for the BIT protection, that the Turkish corporate investors have substantial activities in Turkey, from the first day of their investment to the date of the rendering of an ICSID award, it could have included such an exceptional condition in the definition of "*investor*" in the BIT. It did not do so;

- Rumeli which owned a larger stake than Telsim in KaR-Tel – has not sold its assets. Consequently, the "*shell*" argument is not in any case relevant with respect to Rumeli;

- finally, to allege, as Respondent does, that once an arbitration has legitimately started, a company cannot sell its assets to another company, is simply wrong.

189. Moreover, according to Claimants, the BIT does not provide a basis for looking beyond Rumeli and Telsim on the alleged basis that they are shell companies. Article I(1)(b) of the BIT defines the term "*investor*" as "*corporations…incorporated under the law in force of either of the parties and having their headquarters in the territory of that party*." Accordingly, the BIT adopts the State of incorporation and the State of the seat as criteria for determining the nationality of a claimant. It does not exclude shell companies from its scope of application nor requires a search beyond the designated claimant whenever it is a shell company.

190. In this context, it is neither for Respondent nor for an arbitral tribunal to substitute its views of the definition of the term "*investor*" to that of the Contracting Parties to a BIT. This is the position recently adopted in *Saluka*.[6] In that case, the arbitral tribunal decided that the applicable BIT expressly gave standing to a legal person constituted under the laws of the Netherlands and did not expressly empower the tribunal to add any other criteria in this respect, irrespective of whether such a legal person was a shell company.

191. In addition, according to Claimants, the TSDIF's appointment of managers at Telsim and Rumeli did not in any way put an end to the corporate existence of Claimants or to Claimants' ownership of their claims against Kazakhstan. This is supported by decisions

---

[6]    *Saluka Investments BV (The Netherlands) v. The Czech Republic* (UNCITRAL), Partial Award of March 17, 2006 [hereinafter *Saluka*].

such as in the *Autopista* case,[7] where the respondent argued that, even if the parties to the applicable agreement had agreed to treat the local company as a United States national because of the majority shareholding, "*the pervasive control by Mexican nationals over, and involvement in the affairs of*" the local company should lead the tribunal to decline jurisdiction under Article 25 of the ICSID Convention. The tribunal rejected respondent's argument.

192. Claimants further allege that given the fact that Claimants brought the claim in their names, the issue of what would have happened had TSDIF brought the claims itself is purely academic.

193. Claimants also submit that Respondent's attempts to imply that TSDIF already would have brought a claim in its own name against Respondent and that this would confirm that the real parties in interest would be TSDIF and the Turkish Treasury, is also incorrect. In fact, the "*proceedings*" to which Respondent refers is merely a Payment Order which was addressed to KaR-Tel and was issued by the TSDIF on October 7, 2004, shortly following the sale of KaR-Tel to Vimpelcom. Such USD 5.5 billion payment order was sent to over 200 Uzan-associated companies in October 2004. This was just an unsuccessful payment request by the TSDIF, not the institution of proceedings in the name of Telsim or Rumeli against Respondent.

194. Likewise, Claimants submit that Respondent's assertion that "*it is telling that Motorola brought its proceedings against the Republic of Turkey and the TMSF (TSDIF) and even more telling that the Republic of Turkey and the TMSF settled those proceedings*" is irrelevant to the dispute at hand. Moreover, it is factually wrong. The settlement agreement was entered into by Telsim, Rumeli, Bayindirbank A.S., Motorola Inc., Motorola Credit Corporation, Motorola Limited, and Motorola Komunikasyon Ticaret Ve Servis Ltd. STI. Neither the Republic of Turkey nor TSDIF were signatories. Therefore, according to Claimants, the fact that an arbitration initiated by Motorola against the

---

[7] *Autopista Concesionada de Venezuela, C.A. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/00/5), Decision on Jurisdiction of September 27, 2001, para. 52 [hereinafter *Autopista*].

Republic of Turkey and TSDIF was settled in an agreement to which the Republic of Turkey and the TSDIF were third parties, and which they did not even sign, cannot be evidence that Claimants lack standing to bring this claim.

195. As for the letter of Dr. Yaşar Akgün, Deputy Chairman of Rumeli, to VimpelCom stating that Rumeli was now a "*state concern*," it is by no means an admission of the assimilation of Claimants' Rumeli and Telsim to the Turkish State for purposes of jurisdiction. Rather, it is a mere declaration that the TSDIF was naturally concerned as the managing authority of Claimants.

196. Furthermore, according to Claimants, the issue of who is the beneficial owner of the Rumeli and Telsim's claim is also largely irrelevant. Not only would Claimants directly benefit from any award, but the only ICSID decision to closely examine the question of the beneficial owner of a claim, the *CSOB* decision,[8] held quite clearly that beneficial ownership of a claim was irrelevant to the issue of standing. This position is supported by the expert witness statement of Professor Ziya Akinci, who confirms that the possible ultimate transfer of proceeds of any resulting award to third parties, be they State entities or private entities, would not in any event deprive Claimants of their commercial status.

197. Finally, Claimants allege that, with respect to ownership of the companies, neither Claimant is owned by the TSDIF or the Republic of Turkey. Claimants' shareholders remain private individuals. In any event, even ownership of a claimant by a State does not warrant examining the standing of the public entity that owns that claimant. The task of an ICSID tribunal in such a case is, as decided in *CSOB,* limited to reviewing the nature of the activities of the named claimant.

198. In sum, Claimants point out that they are neither the Turkish State nor the TSDIF, and that Article 25 of the ICSID Convention and the BIT plainly grant this Tribunal jurisdiction *rationae personae* to rule on the dispute.

---

[8] *Československá obchodní banka, a.s. v. Slovak Republic* (ICSID Case No. ARB/97/4), Decision on Objections to Jurisdiction of May 24, 1999 [hereinafter *CSOB*].

### 2. There was no assignment of Claimants' claim to the TSDIF

199. According to Claimants, they never assigned their claim to the TSDIF. The TSDIF was granted the authority pursuant to Turkish laws to appoint Claimants' management following the ImarBank banking violations. While TSDIF did appoint Claimants' management and played an instrumental role in the sale of the Uzans' assets, it never became the owner of Claimants' claim against Respondent.

200. Therefore, Claimants retained ownership of their claim. As noted in Professor Ziya Akinci's expert witness statement, Rumeli and Telsim had and retain standing to sue under Turkish law.

### 3. The TSDIF was not subrogated to Claimants' claims

201. According to Claimants, Respondent's allegation that the relationship between the TSDIF and Claimants should be viewed as one of subrogation is equally artificial. There was no subrogation and the economic consequences are entirely different from those of a subrogation. Indeed, as noted by Professor Schreuer, in the case of subrogation, "*the insurer succeeds to all the rights of the beneficiary who has received compensation under the insurance contract.*" Here, however, there was no insurance contract between Rumeli and Telsim and a national insurance agency, and Rumeli and Telsim received no compensation under such an imaginary insurance contract. There has also been no transfer of economic risk as in *CSOB*. In other words, nobody has compensated Claimants for their losses.

### 4. There is no reason to pierce the corporate veil

202. According to Claimants, the Arbitral Tribunal should also dismiss Respondent's claim that Claimants' corporate veils should be pierced.

203. In support of this position, Respondent relies on two cases, namely *Barcelona Traction*[9] and *Tokios Tokelés*.[10] It is true that in *Barcelona Traction*, the International Court of

---

9    *Case Concerning The Barcelona Traction, Light and Power Company, Limited (Belgium v. Spain)*, Judgment of February 5, 1970, I.C.J. Reports, p. 3 [hereinafter *Barcelona Traction*].

Justice held that piercing the corporate veil might be justified to prevent the misuse of the relevant company's legal personality in the case of fraud or malfeasance, to protect creditors or purchasers, or to prevent the evasion of legal requirements or obligations. However, none of these conditions is present here.

204. In *Tokios Tokelés*, the Tribunal rejected respondent's arguments to pierce the corporate veil on the basis that the claimant had made no attempt to conceal its national identity from the respondent and had not created the claimant companies to gain access to ICSID jurisdiction. Similarly, Claimants did not conceal their Turkish juridical identity from Respondent and were clearly not created for the purpose of gaining access to ICSID arbitration.

205. Moreover, nowhere in the ICSID Convention is there a basis for piercing the corporate veil of a designated claimant. This has been confirmed in the *ADC* ICSID award[11] where the arbitral tribunal confirmed that the principle of piercing the corporate veil "*only applies to situations where the real beneficiary of the business misused corporate formalities in order to disguise its true identity and therefore to avoid liability*."

206. In the present case, it cannot be seriously argued that the Turkish State or the TSDIF "*misused corporate formalities*." Rumeli and Telsim were incorporated in 1993, long before the start of these proceedings, and conducted substantial activities in the telecommunications sector for many years, both in Turkey and abroad.

### 5. Respondent's allegation that Article 25 of the Convention imposes a control test must fail

207. According to Claimants, the rule as to standing is clearly set forth in Article 25(1) of the ICSID Convention: "*The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State…and a national of another Contracting State…*" The general rule as to the meaning of "*national of another*

---

[10]     *Tokios Tokelés*, Decision on Jurisdiction of April 29, 2004.

[11]     *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary* (ICSID Case No. ARB/03/16), Award of October 2, 2006, para. 335 et seq. [hereinafter *ADC v. Hungary*].

*Contracting State*" for legal entities, is set forth in the first clause of Article 25(2)(b), which provides that a national of another Contracting State means "*any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration.*" However, for legal entities, Article 25(2)(b) provides an exception. It states that a national of another Contracting State also means "*any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.*"

208. Therefore, according to Claimants, the control test provided under the second clause of Article 25(2)(b), was specifically inserted to broaden the scope of ICSID jurisdiction, not to limit it. It is precisely to fulfill this purpose in favor of jurisdiction that it has been applied by ICSID tribunals, such as in *SOABI*.[12]

209. In this respect, Claimants allege that all the cases cited by Respondent, *i.e. Vacuum Salt v. Ghana, Letco v. Liberia*,[13] and others relate to the second clause of Article 25(2)(b) and focus on the situation where the investor was an entity incorporated in the respondent State, and where control in the context of the second clause of Article 25(2)(b) was therefore relevant, which is not the case here.

210. Claimants finally allege that Respondent misstates the legal doctrine relating to the second clause of Article 25(2)(b). Respondent misreads Mr. Amerasinghe's article and Mr. Broches' statements to stand for the proposition that a flexible approach is taken under the Convention to determine standing. In the *Tokios Tokelés* Decision on

---

[12] *Société Ouest Africaine des Bétons Industriels [SOABI] v. State of Senegal* (ICSID Case No. ARB/82/1), Decision on Jurisdiction of August 1, 1984, 2 ICSID Reports 175 [hereinafter *SOABI v. Senegal*].

[13] *Vacuum Salt Products Ltd. v. Republic of Ghana* (ICSID Case No. ARB/92/1), Award of February 16, 1994, 4 ICSID Reports 345 [hereinafter *Vacuum Salt*]; *Liberian Eastern Timber Corporation v. Republic of Liberia* (ICSID Case No. ARB/83/2), Interim Award of October 24, 1984, 2 ICSID Reports, pp. 349 -351 [hereinafter *LETCO*].

Jurisdiction,[14] the arbitral tribunal strongly criticized that incorrect reading and highlighted the limited circumstances where the use of a control-test is justified: "*[t]he second clause of Article 25(2)(b) limits the use of the control-test to the circumstances it describes, i.e., when Contracting Parties agree to treat a national of the host State as a national of another Contracting Party because of foreign control… ICSID Tribunals ... have interpreted the second clause of Article 25(2)(b) to expand, not restrict jurisdiction ....*"

### 6. TSDIF would satisfy the jurisdictional requirements of ICSID in any event

211. According to Claimants, even if TSDIF were somehow the "*real party*" to this dispute, the tribunal would in all likelihood still have jurisdiction to hear it. Indeed, as stated by Mr. Broches in his article, a state-owned entity qualifies as a national of another Contracting State unless it acts as an agent for the government or discharges an essentially governmental function.

212. In the only ICSID case were this situation was addressed, *i.e.* the *CSOB* case,[15] it was decided that the sole determining factor is the nature of the activities of the relevant entity: "*While it cannot be doubted that in performing the above-mentioned activities, CSOB was promoting the governmental policies or purposes of the State, the activities themselves were essentially commercial rather than governmental in nature.*" Furthermore, the *CSOB* tribunal went even further and reasoned that the standing of a state-owned entity under Article 25 of the ICSID Convention should be reviewed not on the basis of the acts and function of the state-owned entity in general, but rather on the basis of its acts and function in connection with the actual dispute under review.

213. In this respect, Claimants point out that Respondent mischaracterized their position by stating that "*the test formulated by Broches and applied by the CSOB tribunal would be quite meaningless if the question was whether it was an essentially governmental function*

---

[14]  *Tokios Tokelés*, Decision on Jurisdiction of April 29, 2004, paras. 45-47.

[15]  *CSOB*, Decision on Objections to Jurisdiction of May 24, 1999, para. 20.

*to bring litigation*." Indeed Claimants do not argue that the Broches test as applied by the *CSOB* tribunal would grant the tribunal jurisdiction whenever a State agency brings litigation. Rather, the point is that, following the ImarBank banking violations, the TSDIF appointed managers to Rumeli and Telsim. These new managers continued to run Rumeli and Telsim as telecommunications companies. In April 2003, as any commercial entity would do when faced with the expropriation of a valuable asset, the previous managers of Rumeli and Telsim wrote to Respondent stressing that they intended to submit the dispute to the International Centre for Settlement of Investment Disputes. When Rumeli and Telsim's previous management was replaced by TSDIF appointed management, the new managers simply carried out the previous managements' commercial plans to submit Rumeli and Telsim dispute with Kazakhstan for final resolution to ICSID. The TSDIF-appointed managers did not exercise any special prerogatives in fulfilling the previous managements' "*firm intentions*."

214. According to Claimants, the Cayman Islands case *TMSF v. Wisteria Bay* cited by Respondent in this context is totally irrelevant for the following reasons:

- in that case, the TSDIF was a party to the proceedings; and
- the TSDIF was exercising special privileges to confiscate assets.

215. Finally, and in any event, even if the TSDIF was acting in this arbitration pursuant to public prerogatives, the closest analogy to its role would be that of a receiver. Bringing a claim in such a circumstance is perfectly legitimate in all developed municipal legal systems. To deny a receiver the right to bring such a claim would undermine any possibility of protecting the rights of the insolvent company's creditors through an arbitration procedure.

### C. Claimants have gone far beyond establishing a *prima facie* case on the merits

216. According to Claimants, the Arbitral Tribunal cannot follow Respondent's allegation that Rumeli and Telsim have failed to establish a *prima facie* case on the merits so as to satisfy the jurisdictional requirements for their claim. Indeed, according to Claimants, all

the measures that were implemented by the Republic of Kazakhstan and led to the expropriation of Claimants' property as well as their multiple violations of international law are fully documented by Claimants and firmly establish their claim.

## D. Respondent is a proper party to this dispute

217. Contrary to Respondent's allegation, this dispute is not a dispute between two private parties or related to contractual claims. Neither is it a dispute limited to the ownership of KaR-Tel. Rather, Claimants' claims are premised on Respondent's collusion with the local partner and violation of the BIT and international law, encompassing, *inter alia*, Respondent's wrongful termination of the Investment Contract, its resulting denial of Claimants right to challenge the termination of said Contract, its eviction of Claimants from KaR-Tel, its intimidation measures against Claimants' executives, and its failure to grant Claimants adequate compensation for what amounted to the expropriation of their shares.

## E. Claimants have standing to challenge the cancellation of the Investment Contract

218. Claimants dispute Respondent's allegation that:

- Claimants do not have standing to challenge the termination of the Investment Contract because they were not parties thereto;
- even if Claimants had standing, such a claim would fall outside the scope of this Tribunal's jurisdiction since it would amount to a contractual claim which is not encompassed by the jurisdictional provisions of the Investment Contract.

219. According to Claimants, none of these arguments are founded:

- this arbitration is not based on the Investment Contract;
- it is not solely related to the termination of the Contract;
- the wrongful termination of the Investment Contract is but one element of Respondent's wrongful conduct, and in fact is the catalyst and pretext for

Respondent's ultimate expropriation of Claimants' investment without adequate compensation;

- this arbitration arises out of Respondent's violation of the BIT and international law.

## F. The Foreign Investment Law is a valid secondary basis for establishing jurisdiction

220. According to Claimants, the Foreign Investment Law of the Republic of Kazakhstan constitutes an alternative basis for the jurisdiction of this tribunal. Indeed, under Article 27(2) of the Law, a foreign investor is expressly permitted to choose ICSID arbitration as the means for solving disputes with the Republic relating to its investments and, once that choice has been made, the consent of the Republic of Kazakhstan is "*presumed to have been granted*."

221. Claimants also submit, contrary to Respondent's allegation, that the fact that the Foreign Investment Law was repealed as of January 8, 2003 does not have any impact on ICSID jurisdiction as it was valid and effective at all times relevant to this dispute. Moreover, Article 6(1) of the Law specifically grants foreign investors protection against adverse changes in legislation for a period of ten years from the date they made their investment, or for the entire duration of a contract exceeding ten years entered into with authorized State bodies. Claimants meet both of these two alternative conditions. The relevant investments were made by Claimants from 1998 to 2002, and the Investment Contract dated May 20, 1999 between Claimants and Respondent was valid until July 31, 2009, *i.e.* for a period of more than ten years.

222. Respondent consented to ICSID arbitration on December 28, 1994, the date of the entry into force of the Foreign Investment Law, which remains applicable to the dispute pursuant to its Article 6(1). As for Claimants, they have completed their consent to ICSID jurisdiction by filing their Request for Arbitration.

## II.    RESPONDENT'S POSITION

223. According to Respondent, there are a number of grounds which demonstrate that this Tribunal does not have jurisdiction to entertain or determine Claimants' claims. In substance, Respondent alleges that this case is an attempt by a foreign State, the Republic of Turkey, through one of its agencies, to use the ICSID arbitration facility to render a host State, Respondent, responsible for decisions made by its Courts in proceedings between a private foreign investor and a privately-owned company incorporated in the Republic of Kazakhstan and owned, controlled and operated at all material times by private Kazakh citizens.

### A.    Respondent did not consent to ICSID jurisdiction over this dispute

224. It is Respondent's case that its consent, as expressed either in the Turkey-Kazakhstan BIT or the Foreign Investment Law, does not extend to this dispute because it was limited to investments made in conformity with Kazakh law. The Tribunal must therefore analyze the scope of Respondent's consent and determine whether or not this dispute arises out of an investment that falls within the scope of that consent.

225. In this respect, in the ICSID case *Inceysa v. El Salvador*,[16] the arbitral tribunal found that arbitral jurisprudence had developed three fundamental principles :

- absence of a presumption in favor of or against jurisdiction;
- the need for the identification of the will of the Contracting States; and
- an interpretation according to the principle of good faith.

226. Taking into consideration the above elements, Respondent alleges that both the BIT and the FIL contain clear limitations in relation to Respondent's consent. Article 1 of the BIT limits the protection afforded by the BIT only to those investments made in conformity with the laws and regulations of the Republic of Kazakhstan. The effect of this type of clause was recognized by the *Inceysa* tribunal. The will of the parties to the BIT was to

---

[16]    *Inceysa v. El Salvador*, Award of August 2, 2006.

exclude from its scope of application and protection disputes arising from investments which were not made in conformity with the laws of the host State.

227. In the same vein, the FIL refers in its Article 4(1) to: "*any form of foreign investments and activities which are associated therewith, which are not prohibited by the current legislation of the Republic of Kazakhstan,….*"  This language has the same effect as the language in the BIT.  Consequently, investments which are contrary to Kazakh law are outside Respondent's consent and the Tribunal's jurisdiction.

### 1.      Claimants' investments were not legal

228. Respondent alleges that its consent to arbitration has only been given to cases involving legal investments.  That is the reason why the context in which the "*investments*" of Claimants took place in the Republic of Kazakhstan is highly material and more specifically the Uzans' fraud.  Indeed, the Uzans' actions constituted a systematic attempt to commit a worldwide and wholesale fraud both on Motorola and Nokia, as well as on the Uzans' own companies around the world, including KaR-Tel.

229. On January 28, 2002, Motorola, together with Nokia Corporation, initiated legal proceedings in the United States District Court for the Southern District of New York against the Uzan family members and certain of their corporations.  The claim alleged acts of racketeering in breach of the US Racketeer Influenced and Corrupt Organizations Act (RICO).

230. On July 31, 2003, the United States District Court for the Southern District of New York gave judgment in favor of Motorola and Nokia for over USD 4 billion.  The judgment provides valuable insights into the *modus operandi* of the Uzan family and their corporations which are relevant to the present proceeding.  Amongst the findings of the Court which are of relevance, the following points are highlighted by Respondent:

-      the Uzans failed to disclose to Motorola that they intended to divert some of the proceeds of the Motorola loan to KaR-Tel for non KaR-Tel purposes;

- Telsim was given a final repayment deadline of April 2001 in respect of USD 700 million of loans which had been granted to it;

- on May 22, 2001, Motorola issued a notice of default in respect of the USD 700 million that remained unpaid from April;

- the Uzans saw Motorola's loans as a great opportunity to funnel vast sums into their control and then divert them wherever they chose, whether to prop up other companies in their far-flung enterprise or to simply launder monies into their own pockets;

- at least USD 552 million was laundered into the control of Uzan-controlled companies by the device of reimbursing them for fraudulently overstated expenses.

231. Respondent further points out that whereas providing funding was one of Rumeli's principal obligation under the Foundation Agreement, Rumeli did not in fact make any investment at all, electing instead to burden KaR-Tel with huge debts.

232. In this context, the funds advanced under the Motorola loan, for which KaR-Tel had assumed an obligation to repay, were never received by KaR-Tel. Rather, they were paid directly to Rumeli, which paid the balance of USD 60 million to the Ministry of Finance for the License. The remaining USD 5 million, which was subsequently increased to over USD 17 million, was never received by KaR-Tel at all. Respondent understands that these sums were retained and used by Telsim and/or Rumeli, despite KaR-Tel being liable for the debt created thereby.

233. In the same vein, pursuant to clause 6 of the Investment Contract, KaR-Tel was obliged to use advanced technology in developing its network in Kazakhstan. It emerges from various audits and the Court-appointed forensic merchandising examination of KaR-Tel by the Forensic Examination Centre of the Ministry of Justice during the course of the Kazakh Courts proceedings, that Telsim had been selling obsolete second-hand equipment to KaR-Tel at inflated prices. Indeed:

- between February 1, 2001 and April 25, 2002, Mr. Agilönü caused KaR-Tel to enter into contracts with Telsim for the purchase of handsets for a total of USD 9,270,970. An average market value for the handsets was approximately USD 4,395,556;

- by contract IEPA 29 dated May 10, 2000, KaR-Tel purchased from Telsim telecommunications equipment for a total price of USD 5,840,797.74. These products were available at the time from a different supplier for USD 1,898,728.

234. Therefore, according to Respondent, the reality of the situation appears to have been that Claimants were pursuing with KaR-Tel precisely the same strategy that they had adopted in relation to other mobile telecommunications ventures around the world. KaR-Tel was merely a small part of the overall project. What made Claimants' action towards KaR-Tel worse was that they deliberately indebted it twice. Indeed, KaR-Tel was liable for its borrowing from Motorola of USD 17 million, which it never received and which appears to have been retained or used by Telsim and, in addition, was caused or procured by Claimants' executives who operated KaR-Tel to enter into further loan agreements with Telsim for the provision of overpriced and obsolete equipment.

235. Therefore, it is Respondent's allegation that in circumstances where the entire basis of Claimants' alleged investment in KaR-Tel was to further their worldwide fraud, the investment was not in conformity with the laws of Kazakhstan. Respondent submits that the Tribunal should adopt the same approach as the *Inceysa* tribunal, which identified three general principles of international law against which the conduct of the claimant must be compared: good faith, *nemo auditur propriam turpitudinem allegans*, and international public policy.

## 2. Claimants' investments violated the principle of good faith, the principle *nemo auditur propriam turpitudinem allegans* and international public policy

236. According to Respondent, being part of a worldwide fraudulent scheme, Claimants' investment was made in violation of the principle of good faith. Therefore, Claimants did not make their investment in conformity with Kazakh law.

237. Moreover, no legal system based on rational grounds would allow a party which has committed an illegal act to benefit from it. Therefore, Claimants cannot enjoy the protection granted by Respondent, such as access to international arbitration under the ICSID system.

238. In the same vein, the *Inceysa* tribunal found that international public policy consists of a series of fundamental principles that constitute the very essence of the State and the essential function of which is to preserve the values of the international legal system against actions contrary to it. One of those values is respect for the law. If the Tribunal were to assume jurisdiction to resolve the dispute brought before it by Claimants, it would recognize the existence of rights for Claimants arising out of their illegal conduct. That would violate the respect for the law which is a principle of international public policy.

239. Respondent finally sets forth that violation of international public policy was held to be a self-standing ground for refusing to accept jurisdiction over a claim by the tribunal in the *World Duty Free* case.[17] There, the tribunal found that the contracts which formed the basis of the investor's claim had been procured by bribes. The tribunal then cited a passage from the decision of Judge Lagergren in ICC Case No. 1110: "*Jurisdiction must be declined in this case… Parties who ally themselves in an enterprise of the present nature must realize that they have forfeited any right to ask for the assistance of the machinery of justice (national courts or arbitral tribunals) in settling their disputes.*"[18]

240. Fraud is contrary to the international public policy of most, if not all, States. It follows that claims based upon investments which were part of a fraud, cannot be admitted by the ICSID mechanism.

---

[17]  *World Duty Free v. Kenya*, Award of October 4, 2006.

[18]  *Id.*, para. 148, citing *ICC Case No. 1110*, Award of 1963, [1994] International Arbitration at 277.

**B. Claimants do not have standing to bring this arbitration**

    **1. The Turkish State is the real party in interest in this arbitration**

241. According to Respondent, the nominal Claimants to these proceedings are not the real claimants or the real parties in interest in this arbitration. The true claimant is in fact the TSDIF, which is indisputably an agency of the Turkish State and does not itself have standing to bring these proceedings.

242. Respondent points out that, on February 14, 2004, the TSDIF seized Claimants. Since then, it cannot be argued that Claimants have existed as independent commercial entities in any meaningful sense.

243. According to Respondent, this seizure of Rumeli and Telsim is part of the consequences of the worldwide fraud committed by the Uzans and the collapse of their bank. The TSDIF is an agency of the Turkish Government. Its Board of Directors is appointed by the Turkish Council of Ministers. It is obliged to report its activities and financial position to the Turkish Parliament and its budget is approved by the Turkish Treasury. Membership of the TSDIF is mandatory for all banks operating in Turkey. The TSIDF's purpose is to guarantee deposits held in both domestic and foreign banks operating in Turkey as to 100%.

244. If a Turkish bank collapses, the TSDIF's function is to reimburse depositors for the full amount of their deposits held by the bank. Prior to 1999, this role was undertaken directly by the Turkish Government.

245. On June 12, 2003, the Turkish Ministry of Energy annulled the Concession Agreements under which Çukurova Elektrik ("*ÇEAS*") and Kepez Elektrik, the two most profitable companies owned and managed by the Uzan family, supplied electricity in Turkey's Mediterranean region.

246. At the same time, the Turkish Banking Regulatory and Supervisory Board (the "*BDDK*") was becoming concerned about the activities of ImarBank, also owned by the Uzans.

The loss of ÇEAS and Kepez Elektik caused concern in the Turkish market and led a significant number of depositors to remove their deposits from ImarBank. On July 3, 2003, the BDDK revoked ImarBank's license and began an investigation into its activities. Control over ImarBank then passed to the TSDIF.

247. According to Respondent, the ensuing investigation into the management of ImarBank by the Uzan family revealed that the bank had under-declared its true level of deposits. ImarBank had declared its deposits at around USD 600 million. It quickly became clear that more than USD 5 billion had been deposited and concealed using a sophisticated double accounting system. Consequently, in August 2003, warrants for the arrest of Kemal Uzan and Hakan Uzan were issued, the two individuals having fled the country shortly before the takeover of ImarBank.

248. The scale of the Uzans' fraud on Imarbank meant that the TSDIF was unable to meet the full extent of the bank's liabilities so that the Turkish Treasury was forced, for the first time since the TSDIF was established, to settle the depositors' claims on ImarBank.

249. According to Respondent, this meant that action was taken by the Turkish Government to seize every Uzan-related asset they could locate. At the end of July 2003, Law 4969 was passed by the Turkish Government which extended the scope of assets that could be frozen and therefore conserved to settle the debts owed by ImarBank and ultimately borne by the Turkish State. Some 259 companies controlled by the Uzan family were affected. In late 2003, a further law, Law 5020, was passed by the Turkish Government, which provided for the transfer of management and control of companies owned by affiliates and shareholders of ImarBank to the TSDIF. The TSDIF, on behalf of the Turkish State, began reimbursing ImarBank depositors on January 23, 2004.

250. On February 14, 2004, the TSDIF exercised its powers under Law 5020 in respect of Claimants in this Arbitration, Rumeli and Telsim. Within two days, the TSDIF had appointed a new executive board of directors headed by Mehmet Tasaltin, a former

executive of Turkish Telecom, to administer all communication companies within the Uzan group of companies.

251. Following Telsim's seizure by the TSDIF in February 2004, Motorola and Nokia demanded the TSDIF to settle their US judgment debt of over USD 2 billion.

252. During the course of 2004 and 2005, the TSDIF restructured Telsim in preparation for a sale. On December 13, 2005, the Telsim brand, its assets and business were auctioned with Vodafone successfully bidding a reported USD 4.55 billion to acquire them.

253. In October 2005, under the agreement reached with the TSDIF, Motorola was to receive 20% and Nokia 7.5% of the proceeds of the Vodafone sale, in settlement of their judgment debt. The remaining 72.5% of the sale proceeds passed to the Turkish State to reduce the loss it had suffered in paying back depositors of ImarBank.

254. Consequently, according to Respondent, since February 14, 2004, the TSDIF has been the only entity with any real interest in Claimants. It is misleading to suggest that there are genuine private shareholders of Claimants who exercise any function at all in relation to Claimants. In this respect, the documents reluctantly disclosed by Claimants show that the nominal shareholders continue to be the members of the Uzan family who are fugitives from Turkish justice since 2003, two years before this arbitration was initiated.

255. Respondent further points out that TSDIF, with the assistance of the Turkish Treasury, had already paid Motorola USD 500 million as an initial payment prior to the sale of Telsim. This payment, together with the agreement to make further payments following Telsim's sale, was the settlement agreed in the ICSID proceedings Motorola brought against the Republic of Turkey and the TSDIF, not Telsim or Rumeli. In that arbitration, Motorola alleged that the TSDIF's seizure of Telsim had expropriated Motorola's "*investment*" in Telsim, in the form of several billion dollars of loans that remained owing to Motorola.

256. According to Respondent, it is telling that Motorola brought its proceedings against the Republic of Turkey and the TSDIF and even more telling that the Republic of Turkey and the TSDIF settled those proceedings. If the TSDIF's assertions in this arbitration that Rumeli and Telsim are the only and the true parties in interest were genuine, it is surprising, to say the least, that the TSDIF and the Turkish State adopted the view that they needed to settle the ICSID claim brought against them in respect of Rumeli and Telsim by paying well over USD 1 billion to Motorola and Nokia.

257. According to Respondent, it is established by the above that:

- TSDIF is in total control of both Claimants;

- Telsim's assets and business have been sold;

- Telsim, without any assets or business, is a mere shell;

- no part of the sums received in respect of the sale of Telsim's business and assets has been retained by Claimants themselves;

- nor has any part of the sums so received been paid to the official "*shareholders*" or "*owners*" of Claimants;

- it is disingenuous for Claimants to attempt to perpetuate the fiction of private ownership by the Uzans, who are reportedly fugitives from Turkish justice;

- the sole power over Claimants not held by the TSDIF, namely the right to receive dividends, did not prevent it from removing all of the proceeds of sale of Telsim from Claimants;

- in fact, the sums received by Telsim have been used by the TSDIF to satisfy settlement terms agreed by the Republic of Turkey with Motorola and Nokia arising out of their ICSID proceedings;

- the real parties in interest in this claim are not Claimants, but the TSDIF and the Turkish Treasury.

258. The fact that the real parties in interest are the TSDIF and the Turkish Treasury is further confirmed by the existence of proceedings brought by the TSDIF in its own name against

KaR-Tel in Turkey seeking to recover USD 5.5 billion in relation to the same subject matter as this arbitration.

259. According to Respondent, none of the arguments set forth by Claimants to support the allegation that Claimants are the proper parties to this arbitration, has any merit. In this respect, Claimants point out that they are "*commercially registered legal entities*." However, Respondent does not dispute that Claimants continue to be in existence. Rather, it disputes that they are in existence in anything other than a shell form and for any other purpose than attempting to maintain standing for the purposes of this arbitration. This is confirmed by:

- Respondent's Expert Report on Turkish Law;
- the announcement by Mr. Yusuf Adigüzel after the sale of Telsim's assets and business that: "*the aim of TSDIF is to sell the assets of the companies managed by it to reduce the amount of public debt and to liquidate the companies. Telsim A.S. will be liquidated in the near future.*"

260. According to Respondent, Claimants' argument that they have a number of employees and own a number of assets including immovable property, credits and receivables, also does not support Claimants' position. Indeed, the fact that TSDIF may not yet have laid-off absolutely all of Claimants' employees or sold off all of their office buildings is irrelevant to the issue of whether or not they are mere shell companies. Claimants' reliance on *Saluka* and *Aguas del Tunari* misses the point. Both of those cases concerned genuine commercial entities, with no hint of unusual conduct sufficient to justify piercing the corporate veil. More importantly, in neither case was there any issue of State involvement.

261. In the same vein, according to Respondent, Claimants' allegation that they "*have full legal capacity and can thus commence legal proceedings or be sued before the courts*" is curious. Indeed, it is strange that other Court cases relating to Rumeli and Telsim are brought by the TSDIF in its own name. It is also strange, in such circumstances, that

Motorola and Nokia issued ICSID proceedings against TSDIF and the Republic of Turkey rather than commercial arbitration or Court cases against Claimants.

262. Respondent further submits that Claimants' allegation that "*the fact that Claimants may or may not have substantial activity at this time neither bars them from taking up such activity at a later stage, nor renders them shell companies*" says everything. The important point is that at the time of instituting these proceedings, the TSDIF had agreed to sell the Telsim brand name, its business and all of its assets for USD 4.55 billion; both Rumeli and Telsim had been completely under TSDIF control for well over a year and neither Claimant had any material ongoing commercial activity.

263. As expressed by Dr. Yasar Akgün, a TSDIF appointee to Claimants' boards, in two letters to VimpelCom dated August 27, 2004, "*our company is now a state concern*." Accordingly, Respondent alleges that the reality is that Claimants' existence is perpetuated as vehicles for the TSDIF and the Turkish State to abuse the ICSID arbitration mechanism and evade its clear jurisdictional requirements.

264. With respect to the *CSOB* case invoked by Claimants, Respondent submits that it is substantially different from the present case. In *CSOB*, the tribunal considered that standing in an international forum was determined by reference to the date on which proceedings are instituted and noted that the assignments of the claims had taken place over a year after the registration of the Request for Arbitration.

265. Respondent finally alleges that one of the strange features of this case is that Claimants have failed to give any explanations about what was going on within their companies. They know the facts, but they have declined to go into them on the basis that the Uzan fraud has nothing to do with Kazakhstan. In this context, Respondent points out that in his evidence before the Tribunal, Mr. Akgün admitted that the TSDIF had recently decided to file a law suit in Turkey against Claimants' former directors and auditors. Mr. Akgün also stated that Claimants did not investigate the allegations made against the Uzans in the US proceedings in relation to what was there termed the "*KaR-Tel Scheme.*"

## 2.    The assignment of Claimants' cause of action

266.  Respondent submits that the TSDIF's seizure is identical in legal and economic effect to an assignment of Claimants' cause of action.

267.  It is a question of fact for determination by the Tribunal whether or not the terms of the host State's consent to ICSID arbitration extend to the assignee and/or permit assignment of rights and obligations arising out of an investment relationship.  As underlined by Schreuer, where the host State is unaware of, or has resisted, an assignment, "*it is unlikely that a tribunal will decide that party status under the Convention has been transferred.*"

268.  According to Respondent, even if it were possible to construe Respondent's consent to ICSID arbitration as extending to an assignee (which is not accepted), such consent could not be deemed to extend to a State or State agency.

269.  The legal and economic effect of the TSDIF's seizure of Claimants is identical to an assignment.  Had the TSDIF received such a voluntary assignment, this Tribunal would be bound to reject jurisdiction over this claim.  According to Respondent, the TSDIF cannot be placed in a better position because it seized Claimants and thereby forcibly took over the alleged causes of action than if it had taken a voluntary assignment.

## 3.    The TSDIF was subrogated in Claimants' claim

270.  According to Respondent, another way of viewing the relationship between the TSDIF and Claimants is one of subrogation.  Indeed, the economic consequences of the TSDIF's seizure of Claimants is the same as if it had been subrogated to their rights.  On this additional or alternative basis, Respondent submits that this Tribunal does not have jurisdiction under Article 25 of the ICSID Convention.

271.  During the negotiation of the ICSID Convention, the situation in relation to State-operated investment insurance funds was considered.  The possibility was explicitly discussed of ICSID's arbitration facilities being made available to a governmental

subrogee under such an insurance fund by virtue of an ICSID clause between the investor and the host State. Ultimately, however, this possibility was removed as it was felt that it might well lead to the Centre becoming a forum for inter-State confrontations.

272. On the other hand, if the subrogee were a private insurer and, like the investor, a "*national of another Contracting State*," there would appear to be no difficulty in it appearing as a party in ICSID proceedings in place of the investor, assuming the host State had consented to the subrogation. The position is markedly different where the subrogee is a governmental or inter-governmental entity. Such an entity cannot avail itself of the investor's right to ICSID arbitration against the host State.

273. Professor Schreuer cites three main reasons for the denial of party status to a State-owned investment insurance agency, each of which applies in this arbitration:

- the Convention provides for the settlement of disputes between States and nationals of other States. The clear wording of Article 25(1) cannot be reinterpreted to cover disputes involving States, State agencies or international organizations on the investor's side;
- one of the Convention's objectives is to depoliticize disputes;
- the Convention's '*travaux préparatoires*' show that a conscious decision was made to exclude States, State agencies or international organizations from access to ICSID proceedings on the investor's side.

274. Therefore, according to Respondent, an indemnifying State fund cannot take advantage of the right the investor may have had under an appropriate ICSID clause. Further more, the State Fund does not have the right to bring such proceedings in the investor's name.

275. It is true that according to Broches, this general exclusion of a State fund would not prevent that fund requiring an indemnified investor to pursue its remedies under the Convention to offset the insurer's net payments under the insurance scheme. However, in such circumstances, a plea of non-admissibility might be invoked against the claim on the basis that the investor has been indemnified. In this respect, Respondent points out

that Claimants have no interest whatsoever in the outcome of this arbitration. They are not trading entities and they will not see the benefit of any sums recovered, which will instead go directly to the Turkish Treasury.

276. Respondent finally submits that, under Turkish law, the TSDIF is much more than a subrogate. It is granted the right to seize all assets of the shareholders of a collapsed bank and pursuant to Article 12 of the Turkish Regulation Relating to Liquidation of Companies Controlled by TSDIF, it is the legal successor in title to any of the companies it seizes.

### 4. Alter ego and piercing the corporate veil

277. According to Respondent, there is another way of viewing the TSDIF's undoubted absolute control over and operation of the remaining shells of Claimants. The TSDIF is effectively the *alter ego* of Claimants.

278. Another view would be to consider the bringing of this claim through the doctrine of piercing the corporate veil: the filing of the claim by the nominal Claimants is a sham designed to conceal the reality of a claimant which fails to satisfy the ICSID jurisdictional requirements. These doctrines have been expressly held to be applicable in the international law context by the International Court of Justice in the *Barcelona Traction* case and by an ICSID tribunal in the *Tokios Tokelés* case.

279. If the corporate veil is pierced, what remains is a claim brought by, and on behalf of the Turkish State. Such a case does not fall within the bounds of ICSID jurisdiction pursuant to Article 25 of the Convention as a result and the claim should be rejected.

### 5. *"Control"* and *"incorporation"*

280. Respondent disputes that Claimants' contention that Article 25 of the ICSID Convention only requires the claimant to have the nationality of another Contracting State and that the management of a designated claimant is irrelevant to the analysis under Article 25.

281.  Respondent submits that under the ICSID Convention, a broad approach is taken which looks at the reality of the position and is not based solely upon the outdated notion of share ownership relied on in the pre-*Barcelona Traction* jurisprudence.  In this sense, Mr. Amerasinghe has stated that "*[a] tribunal may regard any criterion based upon management, voting rights, shareholding or any other reasonable theory as being reasonable for the purpose.  The point is that the concept of 'control' is broad and flexible….*"  Mr. Broches, too, has written that, whilst the Convention begins from the premise that incorporation determines nationality, an ICSID tribunal should take account not only of formal criteria such as incorporation, but also of economic realities such as ownership and control.

282.  In contrast to the general principle that Claimants seek to derive erroneously from the *Autopista* decision on jurisdiction, the tribunal in the *Vacuum Salt* case came to the opposite conclusion.  In *Vacuum Salt*,[19] only 20% of the shares of *Vacuum Salt* were in foreign hands.  The tribunal proceeded to examine the other possible elements of control over the company, and especially its management, but found that there was nothing which dispelled the overall impression of Ghanaian control.  The tribunal held that to assume jurisdiction under those circumstances would have been contrary to the purpose of the Convention.

283.  In *LETCO*,[20] the question of control did not raise any factual problem as there was 100% share ownership by a juridical national of another Contracting State.  Nonetheless, the tribunal still found it appropriate to also base its finding on the company's decision-making structure and management.

284.  In reality, there are a number of examples of ICSID tribunals having looked beyond the signatories to an investment agreement to take account of the true parties in interest.  In

---

[19]  *Vacuum Salt*, Award of February 16, 1994.

[20]  *LETCO*, Interim Award of October 24, 1984.

the *Holiday Inns*[21] decision on jurisdiction, in order to find that the parent companies of the investor, which were not themselves parties to the investment agreement, were proper parties to the proceedings, the tribunal looked specifically to their actual participation in the carrying out of that investment agreement.  By the same token, in the *Klöckner v. Cameroon* case,[22] the tribunal found that it had jurisdiction over Klöckner for the purposes of the government's counterclaim even in relation to an investment agreement which had been concluded between a company which was not Klöckner but in which Klöckner had a majority interest, and the government.  The basis for this finding was that Klöckner had negotiated the investment agreement and was the real party in interest.

285.  According to Respondent, and as suggested by Schreuer, the better approach would be "*a realistic look at the true controllers, thereby blocking access to the Centre for juridical persons that are controlled directly or indirectly by nationals of non-Contracting States or nationals of the host State.*"[23]  This is the prevailing view adopted by ICSID tribunals.

286.  According to Respondent, if such an approach is adopted in order to block claims which can be qualified as abusive of the ICSID mechanism – because they are in reality brought by nationals of non Contracting States or of the host State – the same approach must be followed where claims are brought by another State.

287.  It is true that in many of the cases cited, the issue arose because the investor was an entity incorporated in the respondent State.  However, according to Respondent, the principle is of more general application.  It is in ICSID's interest to guarantee the continued depoliticization of its system by blocking claims brought by one Contracting State against another.

---

[21]   *Holiday Inns S.A. and others v. Morocco* (ICSID Case No. ARB/72/1), Decision on Jurisdiction of May 12, 1974 [hereinafter *Holiday Inns*].

[22]   *Klöckner Industrie-Anlagen GmbH and others v. United Republic of Cameroon and Société Camerounaise des Engrais* (ICSID Case No. ARB/81/2), Award of October 21, 1983, 2 ICSID Reports 9, at 17 [hereinafter *Klöckner*].

[23]   Christoph H. Schreuer, *The ICSID Convention: A Commentary*, 2001, p. 318, para. 563 [hereinafter *Schreuer*, The ICSID Convention].

288. It is also true that in the *AMCO* case,[24] the tribunal held in general terms that it did not consider an enquiry into the indirect controllers of an investor to be the correct approach. However, the tribunal nonetheless accepted that the true nationality of the controller would have to be taken into account where, for political or economic reasons, it matters for the host State to know the nationality of the controller and where the host State, had it known this nationality, would not have agreed to the arbitration clause.

289. Respondent alleges that in the present arbitration, it matters for Respondent and for the Tribunal to know the true identity of the controller of Rumeli and Telsim. Had Respondent known that Rumeli and Telsim had been seized by the TSDIF, it would not have agreed to arbitrate a dispute arising between them before an ICSID tribunal. It is for this reason that a distinct mechanism for the determination of disputes between the Republic of Turkey and the Republic of Kazakhstan is provided for in Article VII of the BIT.

290. According to Respondent, the facts lead therefore to the conclusion that control of Claimants is relevant, and the circumstance that in the present case such control is exercised exclusively by the Turkish State and its agencies for their sole benefit, means that the case brought by Claimants is an action which seeks to abuse the ICSID mechanism and should be blocked by this Tribunal.

### 6. The claim brought by TSDIF does not satisfy the jurisdictional requirements of ICSID

291. According to Respondent, if it is accepted that the TSDIF is the true claimant in this arbitration, it becomes necessary to address Claimants' argument that the TSDIF would satisfy the jurisdictional requirements of ICSID as a State-owned entity. Equally, if Rumeli and Telsim are found to be the true claimants, it becomes necessary to consider whether they are effectively State-owned corporations and whether, in consequence, they themselves fall within the boundaries of ICSID jurisdiction.

---

[24]     *Amco Asia Corporation and others v. Republic of Indonesia* (ICSID Case No. ARB/81/1), Decision on Jurisdiction of September 25, 1983, 1 ICSID Reports 396 [hereinafter *Amco I*].

292. In the Commentary to the Preliminary Draft of Convention, it was acknowledged that State-owned corporations could be party to proceedings brought under the Convention. This was not, however, repeated in the Executive Directors' Report on the final Convention text. Schreuer states that the best guidance on this issue is still that formulated by Mr. Broches in his 1972 Hague Academy Course: "*[I]n today's world, the classical distinction, between private and public investment, based on the source of the capital, is no longer meaningful, if not outdated…for the purposes of the Convention a mixed economy company or government-owned corporation should not be disqualified as a 'national of another Contracting State' unless it is acting as an agent for the government or is discharging an essentially governmental function.*"

293. However, according to Respondent, Mr. Broches was writing during the cold war, when, for a multilateral treaty to be effective, he needed to address the peculiarities of genuinely commercial enterprises which happened to be State-owned for political reasons. He did not have in mind the situation in which a State party seized a private company. Respondent therefore submits that the test formulated by Broches has no application in this arbitration. Even if it was applicable, Claimants and/or the TSDIF should still be excluded from ICSID jurisdiction since they are agents of the Turkish government discharging an essentially governmental function.

294. According to Respondent, the TSDIF is indeed an agency of the Turkish government. This conclusion is supported by the following considerations:

- two letters dated August 27, 2004 which expressly refer to the TSDIF as a State agency (Exhibits RM98 and RM99);
- the findings of the Court of Appeals of the Cayman Islands on the basis of submissions made last year by the TSDIF itself in proceedings before that Court. The TSDIF had seized a yacht which the plaintiff had purchased from the Uzan family prior to the seizure of their assets by the TSDIF. An injunction was granted by the Cayman Grand Court ordering the TSDIF not to sell the yacht. The TSDIF relied upon the defense of sovereign immunity in relation to the plaintiff's challenge

to its actions. The TSDIF argued that it was an agency of the Turkish State performing governmental and sovereign acts. And, precisely, the Court of Appeals of the Cayman Islands began its judgment by referring in the very first line thereof to the TSDIF as "*an agency of the Turkish government.*"

295. The second, and alternative, ground formulated by Mr. Broches on the basis of which a State-owned corporation or entity would be disentitled from using the ICSID mechanism is where it discharges an essentially governmental function. Respondent emphasizes the fact that Mr. Broches considered either ground to be sufficient alone to exclude an entity from bringing a claim under the Convention mechanism. Respondent accepts that in relation to the second ground, State-ownership, whilst important, is not determinative. What matters is the nature of the functions carried out. According to Respondent, there is no question that TSDIF's activities in general, and in particular in seizing and selling off the assets of shareholders of banks, are governmental functions:

- they are not functions that can be performed by any private person or organization;
- as Mr. Erkam states in his Expert Report on Turkish Law, property seized by the TSDIF is regarded under Turkish law as State-property;
- this is confirmed by the statements made by the Mr. Akgün where he states: "*our company is now a state concern.*"

296. According to Respondent, the test is thus whether the entity discharges in general a governmental function and not as suggested by Claimants, whether the particular act in question is of a governmental nature. To support their position, Claimants rely on a passage from the *CSOB*[25] decision on jurisdiction which states that: "*Respondent has failed to sustain its contention that the Centre lacks jurisdiction and the Tribunal competence to hear this case on the ground that Claimant was acting as an agent of the State or discharging essentially governmental activities <u>as far as this dispute is concerned</u>*" (emphasis added).

---

[25] *CSOB*, Decision on Objections to Jurisdiction of May 24, 1999, para. 27.

297.  According to Respondent, Claimants' interpretation is untenable.  The test would indeed be meaningless if the question was whether it was an essentially governmental function to bring litigation.  The answer would, naturally, be the same in every case.  Therefore, the meaning of the phrase in *CSOB* is to reflect that tribunal's previous observation that the dispute in that arbitration related to investment banking transactions which it found to be of a corporate nature.  In the present arbitration, on the contrary, the function being performed by the TSDIF is the attempted realization of funds from the seized property of Turkish nationals charged with criminal offences.

298.  Alternatively, Respondent submits that if it is not accepted that the TSDIF is the real claimant in this case, and one takes into consideration the nominal Claimants, Respondent's case continues to be that in pursuing this claim, they are exercising a governmental function.  The claim is being funded by the Turkish State, directed by officials of the Turkish State and is designed to recoup a large amount of foreign currency for the Turkish Treasury.  None of those things is a function carried out by a private party.  The recovery of State debts through litigation or any other means is plainly not an act *jure gestionis*.

299.  Respondent further alleges that there is a manifest difference between *CSOB* invoked by Claimants and the present arbitration in that there is a difference between a State-owned investment bank like in *CSOB*, and a defunct shell corporation seized by the State pursuant to domestic criminal laws and operated for the purpose of recovering State debts.

300.  Ultimately, irrespective of whether the correct approach is to examine the nature and function of the TSDIF or to take into consideration the nominal Claimants themselves, it is clear that this claim is brought and driven by the TSDIF in an attempt to recover the losses suffered by the Turkish State as a result of the Uzan family's massive-scale worldwide frauds.  It is a claim which is brought by the TSDIF pursuant to its statutory and sovereign powers and, as such, falls outside the requirements for jurisdiction set forth by Article 25 of the Convention.

## C.    No *prima facie* case

301. According to Respondent, the fact that Claimants do not even have a *prima facie* case is another obstacle to the jurisdiction of this Tribunal.

302. The *onus* is indeed on Claimants to demonstrate that they have such a case. They have not discharged this burden. Indeed, they have not demonstrated a *prima facie* case of any of the internationally wrongful acts that they allege against Respondent.

303. According to Respondent, Claimants' case is only a string of unspecific and generalized allegations that many diverse Kazakh parties and entities, with no apparent communality of interest, conspired together – for no apparent reason – to mistreat them.

304. Furthermore, Claimants' position that the Kazakh Courts grossly misapplied Kazakh law is unfounded. The evidence on Kazakh law upon which Claimants rely is of limited value. They indeed rely on opinions of Kazakh law professors, in particular those of Professor Suleimenov and Professor Didenko, which the latter wrote in support of Claimants' position before the Kazakh Courts. However, neither of these experts has provided a new expert report on these matters for the purposes of this arbitration. The opinions they have given in the context of the Kazakh proceedings have no status in this arbitration. Moreover, while having provided an expert opinion before the Kazakh proceedings in favor of Claimants, Professor Didenko, shortly after the conclusion of the proceedings, produced an academic article in which he expressly referred to those proceedings and changed his position in relation to a number of important issues.

## D.    Respondent is not a proper party to the dispute

305. Respondent also alleges that it is not a proper party to these proceedings, as it is not involved in the underlying dispute, which, in reality, is a dispute between private parties as to the ownership of KaR-Tel.

### E. Claimants do not have standing to challenge the termination of the Investment Contract

306. It is moreover Respondent's contention that Claimants were not parties to the Investment Contract and therefore have no standing to challenge its termination. In addition, even if they did have standing, such a claim would not fall within the jurisdiction of ICSID by reason of:

- the fact that it is contractual claim and not a treaty claim;
- the express jurisdiction provisions of the Investment Contract.

307. According to Respondent, the Investment Contract does not permit ICSID arbitration as a forum for disputes unless there have been written objections to consideration of the dispute by the Courts of Kazakhstan. Furthermore, the Investment Contract expressly restricts the right of action to the "*investor*" which is a term defined in Article 1.3 as KaR-Tel LLP. Finally, if shareholders of an investor company have standing to bring arbitration proceedings in respect of their investment, the specific contractual wording of the Investment Contract does not permit Claimants to bring a treaty claim under it.

### F. The Foreign Investment Law is not applicable

308. According to Respondent, Claimants' purported reliance on the FIL as founding jurisdiction for this Arbitral Tribunal is also misplaced. Indeed, the consent to arbitrate disputes relating to foreign investment under the FIL was no longer effective at the time of the commencement of these proceedings, as the FIL had been repealed. Claimants' contention that the consent to ICSID arbitration survives this repeal by reason of Article 6 (1) FIL is misconceived. This is only true in the case where the investor has accepted the offer of ICSID jurisdiction in writing whilst the legislation was still in force. In the present case, the FIL had been repealed prior to the registration of the Request for Arbitration, and cannot found jurisdiction for this arbitration.

### G. **Admissibility**

309. If the Tribunal finds that it has jurisdiction in this arbitration, Respondent submits that it should deny the admissibility of Claimants' claims on the ground that they constitute an attempt by a Contracting State to abuse the ICSID arbitration mechanism.

### III. DECISION OF THE ARBITRAL TRIBUNAL

310. Respondent challenges the jurisdiction of this Arbitral Tribunal on various grounds. First, it contends that Respondent did not consent to ICSID jurisdiction over this dispute because Claimants' investments were not legal, violated the principle of good faith, the principle *nemo auditur propriam turpitudinem allegans* and international public policy. Respondent further alleges that Claimants do not have standing to bring this arbitration because the Turkish State is the real party in interest, Claimants' cause of action has been assigned to TSDIF or TSDIF was subrogated in Claimants' claim or at least can be considered the *alter ego* of Claimants. They also allege that Claimants do not satisfy the conditions of Article 25 of the ICSID Convention to the extent that they are controlled by the Turkish State and its agencies for their sole benefit. Finally, Respondent submits that Claimants were not parties to the Investment Contract and therefore have no standing to challenge its termination, that in any case Respondent is not a proper party to the dispute, which is a dispute between private parties as to the ownership of KaR-Tel. Moreover, Claimants would not have a *prima facie* case.

311. As to the Foreign Investment Law, Respondent alleges that this Arbitral Tribunal has no jurisdiction on the basis of the FIL since it was no longer effective at the time of the commencement of these proceedings.

312. The jurisdiction of the Centre is based on the conditions set forth in Article 25 of the ICSID Convention which provides:

> *"(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which*

*the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*

*(2) "National of another Contracting State" means:*

*(a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and*

*(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention."*

313. In this case, Claimants are companies incorporated and existing under the laws of Turkey. Turkey has ratified the ICSID Convention on March 3, 1989. Claimants appear therefore *prima facie* as nationals of a Contracting State in the meaning of Article 25.

314. Respondent is the State of Kazakhstan which has also ratified the ICSID Convention on September 21, 2000 and therefore also qualifies as a Contracting State within the meaning of Article 25 of the ICSID Convention.

315. On the other hand, the parties gave their consent to ICSID Arbitration in Article VII of the Agreement between the Republic of Turkey and the Republic of Kazakhstan concerning the Reciprocal Promotion and Protection of Investments of May 1, 1992. Article VII entitled "Settlement of Disputes Between One Party and Investors of the Other Party" indeed provides :

*1. Disputes between one of the Parties and one investor of the other Party, in connection with his investment, shall be notified in writing,*

*including a detailed information, by the investor to the recipient Party of the investment. As far as possible, the investor and the concerned Party shall endeavour to settle these disputes by consultations and negotiations in good faith.*

*2. If these disputes cannot be settled in this way within six months following the date of the written notification mentioned in paragraph I, the dispute can be submitted, as the investor may choose, to:*

> *(a) the International Centre for Settlement of Investment Disputes (ICSID) set up by the "Convention on Settlement of Investment Disputes Between States and Nationals of Other States," (in case both Parties become signatories of this Convention)*

> *(b) an ad hoc court of arbitration laid down under the Arbitration Rules of Procedure of the United Nations Commission for International Trade Law (UNCITRAL), (in case both parties are members of U.N.)*

> *(c) the Court of Arbitration of the Paris International Chamber of Commerce, provided that, if the investor concerned has brought the dispute before the courts of justice of the Party that is a party to the dispute and final award has not been rendered within one year.*

*3. The arbitration awards shall be final and binding for all parties in dispute. Each Party commits itself to execute the award according to its national law.*

316. Claimants completed their consent by filing their ICSID Request for Arbitration on July 15, 2005.

317. By contrast with the Turkish version, the English and Russian versions of the Treaty do not require a prior submission of the dispute to local courts before initiation of arbitration proceedings before ICSID. The Arbitral Tribunal considers therefore that no such requirement had to be fulfilled by Claimants before starting this arbitration.

318. Notwithstanding the above, Respondent alleges that it did not consent to ICSID jurisdiction over this dispute on the ground that Claimants' investment violated the laws and regulations of Kazakhstan.

319. Indeed, in order to receive the protection of a bilateral investment treaty, the disputed investments have to be in conformity with the host State laws and regulations. On the other hand, as was determined by the arbitral tribunal in the *Lesi* case, investments in the host State will only be excluded from the protection of the treaty if they have been made in breach of fundamental legal principles of the host country.

320. After careful examination of Respondent's submissions, the Arbitral Tribunal has reached the conclusion that Respondent did not prove that Claimants' investment would have been fraudulent or would have violated any laws or regulations of Kazakhstan. The allegations of fraud perpetrated by the Uzan Family in Turkey and the judgment rendered on July 13, 2003, in the United States against the Uzans in relation to Motorola loans, are not evidence that the investment made by Claimants in Kazakhstan were themselves fraudulent or illegal. As noted by Claimants (see above para. 173), the New York judgment does not bring any evidence that the two Motorola loans made in relation to KaR-Tel were used improperly or for illegal purposes.

321. Moreover, notwithstanding Respondent's allegations, the record does not contain conclusive evidence that Claimants defrauded KaR-Tel by causing it to enter into transactions with Telsim at excessive prices.

322. From the record, it appears that Claimants made significant investments in KaR-Tel during the period 1998-2002. They legally obtained the second GSM license and paid for it; they developed a telecommunications network in compliance with the local laws and technical regulations of Kazakhstan. Respondent's allegation that Claimants' investment was fraudulent does not find any foundation in the record.

323. The Tribunal has also not found in the record any conclusive evidence that Claimants' investment would have violated the principle of good faith, the principle of *nemo auditur propriam turpitudinem allegans* or international public policy.

324. Respondent further challenges the jurisdiction of this Arbitral Tribunal arguing that Rumeli and Telsim are not the real parties to this arbitration, that the real party in interest

is TSDIF, that Rumeli and Telsim are just empty shells and that the benefit of this award, if any, will go to the Turkish State.

325. We have noted that following the problems encountered by Imar Bank in Turkey, owned by the Uzan family, the Turkish Parliament enacted various laws which empowered the TSDIF, a State agency, to take over the control of companies previously controlled directly or indirectly by the Uzan family and in particular, to take over the management of these companies. It is on this basis that the TSDIF appointed managers to Rumeli and Telsim. These new managers continued to run Claimants as telecommunications companies. In April 2003, the previous managers of Rumeli and Telsim wrote to Respondent stressing that they had intended to submit the dispute to ICSID. The new managers carried out the previous management commercial plans and started ICSID arbitration. The TSDIF is not however Claimant in this arbitral procedure. The case was initiated by Rumeli and Telsim. They are the real Claimants in this arbitration.

326. Even if it is correct that Telsim's assets have been sold to Vodaphone and that Telsim may or may not have substantial activities since that sale, it is still a company incorporated and existing under the laws of Turkey. So also is Rumeli which has not sold its assets. Moreover, the companies have existed since 1993 and have certainly not been created for treaty shopping purposes. The fact that Telsim is no longer an active company in the field of telecommunications is no bar to ICSID jurisdiction. The BIT does not provide a basis for looking beyond a company on the alleged basis that it would be a shell company and does not exclude such companies from its scope of application from the moment it is incorporated in another contracting State. The TSDIF's appointment of managers for Telsim and Rumeli did not in any way put an end to their corporate existence or to Claimants' ownership of their claims against Kazakhstan.

327. The record also confirms that the TSDIF is not the owner of Claimants' shares. It is also incorrect to state that if Claimants are successful, the Turkish State will be the only beneficiary of the moneys allocated to Claimants by the award. The moneys will be used to pay all Claimants' creditors, according to the relevant rules of Turkish law. The role

of the TSDIF may be compared to some extent to the role of a receiver or liquidator or judicial manager. The presence of such an entity as manager of the company in accordance with the law is no bar to the jurisdiction of the Centre. The Arbitral Tribunal does not have to anticipate what would be the status of Claimants in case the two companies would be put into liquidation, since so far no such decision of liquidation has been taken.

328. The record also does not support Respondent's allegation that Claimants' claim was assigned to the TSDIF or that the TSDIF was subrogated to Claimants' claims. Moreover, the Tribunal does not see any reason to "pierce the corporate veil" as requested by Respondent. As pointed out by the *ADC* award, the principle of piercing the corporate veil only applies to situations where the real beneficiary of the business misused corporate formalities in order to disguise its true identity and therefore to avoid liability. This is not the case here.

329. Finally, the Arbitral Tribunal also considers that Article 25(2)(b) stating that a national of another contracting State also means "*any juridical person which had the nationality of the Contracting State party to the dispute on "the date on which the parties submitted the dispute to arbitration" and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention*" was inserted to broaden the scope of ICSID jurisdiction and not to limit it, as evidenced by the awards invoked by Respondent, such as the *SOABI*, the *Vacuum Salt* and *LETCO* cases.

330. Respondent's final allegation that Claimants would not have standing to challenge the termination of the Investment Contract because they were not parties thereto and that in any case such a claim would fall outside the scope of this Tribunal's jurisdiction since it would amount to a contractual claim, which is not encompassed by the jurisdictional provisions of the Investment Contract, are unfounded. Claimants' request is not based on the Investment Contract. It is not solely related to the termination of the Contract. The wrongful termination of the Investment Contract is but one element of Respondent's

alleged wrongful conduct. Claimants' Request for Arbitration and subsequent memorials clearly establish that this arbitration arises out of Respondent's alleged violation of the BIT and international law.

331. The Arbitral Tribunal therefore considers that Claimants have standing to bring this arbitration and that this Tribunal has jurisdiction to hear the dispute under Article 25 of the ICSID Convention and Article 7 of the BIT.

332. The Arbitral Tribunal also considers that it has jurisdiction on the basis of the Foreign Investment Law.

333. Under Article 27 of the FIL, a foreign investor is expressly permitted to choose ICSID arbitration as the means for solving disputes with the Republic relating to investments and, once that choice has been made, the consent of the Republic of Kazakhstan "*shall be presumed to have been granted*" (Article 27(3)). The fact that the Foreign Investment Law was repealed as of January 8, 2003, does not have an impact on ICSID jurisdiction. The FIL was indeed valid and effective at all times relevant to this dispute. Article 6(1) of the Law provides that "*[i]n the case of a deterioration of the position of a foreign investor, which is a result of changes in the legislation and (or) entering into force and (or) changes in the provisions of international treaties, to foreign investments during ten years the legislation shall be applied which had been current at the moment of making the investment, and with respect to the investments which are carried out in accordance with the long-term (more than ten years) contracts with the authorized State bodies, until the expiry of the effect of the contract, unless the contract stipulates otherwise.*" In other words, Article 6(1) grants foreign investors protection against adverse changes in legislation for a period of ten years from the date they made their investment, or for the entire duration of the contract exceeding ten years entered into with authorized State bodies. This is the case here. The relevant investments were made by Claimants from 1998 to 2002, and the Investment Contract entered into between Claimants and Respondent on May 20, 1999, was valid until June 31, 2009, i.e., for a period of more than ten years.

334. Respondent has expressed its consent to ICSID arbitration on December 28, 1994, the date of the entry into force of the FIL, and it remains applicable to the dispute pursuant to Article 6(1). On the other hand, Claimants have consented to ICSID jurisdiction by filing their Request for Arbitration. The Arbitral Tribunal has therefore jurisdiction under the FIL.

335. Besides Article 6(1), it is also well established in international law that a State may not take away accrued rights of a foreign investor by domestic legislation abrogating the law granting these rights. This is an application of the principles of good faith, estoppel and *venire factum proprium*.

336. The Arbitral Tribunal has therefore jurisdiction under the FIL. It notes however that the FIL is invoked by Claimants only as an alternative basis for the jurisdiction of this Tribunal. In this respect, the Tribunal has reached the conclusion that since the protection granted to foreign investors by the FIL is fully covered by the provisions of the BIT, it needs not refer to it to decide the claims submitted by the parties in this arbitration.

# CHAPTER V.    THE CLAIMS

## I.    OVERVIEW OF THE CLAIMS

337. According to Claimants, Respondent took the following actions, which were in breach of its obligations under the BIT, international law and the Kazakh Foreign Investment Law:

- Respondent's Investment Committee unlawfully terminated the Investment Contract in breach of the suspension and early termination mechanism set forth therein;

- Respondent's Courts colluded with Telecom Invest by granting its request for injunctive relief and thus ratifying Telecom Invest's choice of General Manager;

- Respondent's police authorities enforced the foregoing injunctive relief and ousted Claimants' representatives from KaR-Tel's premises;

- Respondent's Courts ratified Telecom Invest's actions by ordering the compulsory redemption of Claimants' stake in KaR-Tel, in clear contravention of Kazakhstan law;

- Respondent set up a Working Group over a year after the termination of the Investment Contract to examine alternative grounds for the termination of the Contract rather than to examine the legality of the grounds on which the Contract was actually terminated in March 2002.  Furthermore, Claimants were *de facto* excluded from the meetings of the Working Group;

- Respondent initiated, under false pretenses and/or in a discriminatory/arbitrary manner, criminal proceedings against Claimants' executives, thereby forcing them to leave the country;

- the decision of the Working Group validated the termination of the Contract on entirely different grounds than those forming the basis for the termination;

- Respondent's Courts ordered the compulsory redemption of Claimants' 60% stake in KaR-Tel for a mere USD 3,000.

338. According to Claimants, Article 4 of the Articles on the Responsibility of States for Internationally Wrongful Acts (the "*ILC Articles*") attributes to the State the conduct of

"*any State organ…whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State….*" Therefore, Claimants allege that each of the above acts and omissions, individually and collectively, constitutes a breach of each of Respondent's international obligations, namely, its obligations:

- to afford fair and equitable treatment;
- not to deny justice;
- to ensure full protection and security;
- not to impose unreasonable, arbitrary and/or discriminatory measures;
- not to expropriate absent certain specific conditions.

## II. THE PARTIES' POSITION ON RESPONDENT'S PURPORTED SCHEME

339. As pointed out above, Claimants allege that each of the acts and omissions allegedly wrongfully committed by Respondent, individually and collectively constitute a breach of Respondent's international obligations. Before analyzing the various legal grounds invoked by Claimants, the parties' positions are hereinafter summarized.

### A. CLAIMANTS' POSITION

#### 1. The general context

##### a) Claimants' investment

340. Contrary to Respondent's allegation, Claimants submit that they have made considerable investments in Kazakhstan as per the terms of the BIT and of the FIL. Indeed, the BIT provides that: "*the term 'investment'…shall include every kind of asset in particular, but not exclusively: i) shares, stocks or any other form of participation in companies, ii) returns reinvested, claims to money or any other rights to legitimate performance having financial value related to an investment.*" The FIL defines "*investment*" as "*all types of proprietary and intellectual values invested into objects of entrepreneurial activity with the purpose of obtaining profit….*" The FIL further specifies that "*foreign investments*" are "*investments made in the form of participation into an authorized capital of legal*

*entities of the Republic of Kazakhstan, as well as granting of loans (advances) to legal entities of the Republic of Kazakstan, in which the foreign investors have the right to control decisions adopted by such legal entities."*

341. According to Claimants, their combined 60% stake in KaR-Tel thus constitutes an "*investment*" under the BIT and the FIL. Moreover, Claimants paid the entire initial charter capital contribution of approximately USD 10,000 when they acquired a 70% stake in KaR-Tel in May 1998 (which was subsequently reduced to 60%).

342. Claimants also granted lines of credit to KaR-Tel totaling up to USD 40 million and, pursuant thereto, extended loans to KaR-Tel of USD 16,953,455.88 and USD 16,285,835 (by Rumeli and Telsim respectively). According to Claimants, although these loans initially were to be subject to interest rate, this was immediately changed. In any event, Claimants allege that even if the loans had been subject to interest, this would have no bearing on the fact that the law considers such loans to constitute investments.

343. Claimants further allege that Rumeli pledged its own funds as security under loan agreements between KaR-Tel and Bank Turan Alem. After Bank Turan Alem collected USD 2,580,000 pledged by Rumeli, this latter became a creditor of KaR-Tel for this amount, and this constitutes another investment.

344. Furthermore, according to Claimants, in light of Respondent's forensic expert reports that concluded that Claimants indeed provided more than USD 33 million to KaR-Tel, Respondent's allegation that there is "*no evidence of alleged investment of USD 33 million"* is no more than a misrepresentation of the facts.

345. Claimants allege that they were forced to structure their investments as loans and commodity credits since the parties-in-interest behind Investel/Telecom Invest refused to participate to capital increases. Claimants' willingness to make investments in the form of increased capital contributions is evidenced by article 2.7 of both Contracts on Temporary Financial Support which provided that, after expiration of the repayment

term, the loans extended by Rumeli could be considered as additional capital contribution by Rumeli to KaR-Tel upon a decision of KaR-Tel's board of directors.

346. Claimants' financial obligations pursuant to KaR-Tel's Foundation Agreement were limited to an obligation "*to ensure provision of the investments,*" *i.e.,* to assist KaR-Tel in negotiations with third parties to obtain financing. According to Claimants, given the significant amount of the Motorola Loan and the Bank Turam Alem loan – the first guaranteed by Telsim, the other pledged by Rumeli – Claimants obviously fulfilled their obligations under the Foundation Agreement. In this context, it is Claimants' position that the circumstances surrounding the Motorola Loan are irrelevant to the question of their investment.

347. Claimants further allege that Telsim, which guaranteed the Motorola Loan, was a highly valuable company, with a value higher than its borrowings. This is confirmed by the fact that Telsim ultimately honored its payment obligations towards Motorola and was sold for USD 4.55 billion in December 2005.

348. Claimants also submit that Respondent's attempt to challenge the existence of Claimants' investments is absurd in light of the fact that the local partner in KaR-Tel – which did not provide any monetary, management, or know-how assistance, nor the necessary office space to KaR-Tel – was able to sell a 100% stake in KaR-Tel for USD 350 million.

349. Claimants further point out that:

- the Working Group established by Respondent itself recognized that Claimants made millions of dollars of direct capital investment in KaR-Tel;
- they had no obligation under the Investment Contract, which was concluded between the Investment Committee and KaR-Tel;
- KaR-Tel had no obligation to achieve any specific portion of the USD 184,405,000 investment mentioned in article 3 of the Investment Contract;
- in any case, the Investment Contract was terminated exclusively for the failure to file reports and not for the alleged unsatisfactory level of investment.

350. Moreover, Respondent's allegation that KaR-Tel overpaid Telsim by over USD 8 million for "*obsolete*" second-hand equipment and handsets does not withstand scrutiny:

- the equipment was advanced and fully met KaR-Tel's operational and technical needs;
- the expert, Mr. Bulent Yagci, testified in the Kazakhstan Court proceedings that the second-hand base stations worked properly and satisfied KaR-Tel's objectives and were provided on favorable terms;
- Telsim provided guarantee services, spare parts, and training of KaR-Tel employees to use the equipment.

351. By the same token, according to Claimants, Respondent's allegation that Telsim sold telephone sets to KaR-Tel at a price higher than the market is also unfounded. Respondent's Courts made such a finding solely on the basis of the conclusions drawn by Respondent's own forensic experts and wholly ignored the evidence adduced by Claimants.

352. Finally, Claimants dispute Respondent's challenge of the quality of the support, know-how and training provided by Claimants on the basis that KaR-Tel was allegedly insolvent at the time that Claimants were ousted from Kazakhstan:

- Claimants did provide a great deal of this support, know-how and training, which constitutes an investment;
- Respondent provides no evidence that such training or support was somewhat inadequate;
- KaR-Tel – at the time that Claimants were ousted – was far from being insolvent.

353. In any case, Respondent's conduct and various acts and omissions, in collusion with the influential local partner, deprived Claimants of their investment for a derisory sum. Even if the alleged wrongdoings of Claimants were somehow true, they could not justify the expropriation of Claimants' majority shares without compensation.

354. It is therefore Claimants' position that they made investments within the meaning of Article 25 of the ICSID Convention and ICSID jurisprudence, their investments being long term (the GSM License was granted for a renewable 15-year period and the Investment Contract's duration exceeded 10 years); they involved regularity of profit and return; they were substantial, risky and strategic for the development of the Republic of Kazakhstan.

### b) The Republic of Kazakhstan and the involvement of President Nazarbayev's family

355. According to Claimants, Kazakhstan has not yet succeeded in breaking with the vestiges of Soviet bureaucracy. Since 1989, the country is governed by President Nursultan Nazarbayev, whose last election, with a purported 91.15% of the votes, failed to meet OSCE and international standards for democratic elections. The Judiciary has limited judicial independence. Moreover, corruption is prevalent at every stage and level of the judicial process. The regime is hard with any kind of opposition and with the media.

356. According to Claimants, President Nazarbayev succeeded in concentrating most of the powers in his own hands, but he also successfully established direct and indirect (through his family and/or executives) control over the most important sectors of the Kazakhstan economy.

357. According to Claimants, in this context, once KaR-Tel's success was assured thanks to Claimants' considerable efforts and investments, the local partner's shareholders devised a scheme to orchestrate Claimants' expulsion from KaR-Tel with the unconditional support of Respondent. The local partners' shareholders exploited their close personal and political ties with Respondent to oust Claimants from their investments. In this framework, Claimants allege that the following elements demonstrate that some members' of the President Nazarbayev's empire were the real parties in interest behind Investel/Telecom Invest.

358. *First*, Claimants' initial local partner, Investel, was co-founded by Almex, a company that was itself founded by President Nazarbayev's brother, Mr. Bulat Nazarbayev. Other

shareholders in Almex included President Nazarbayev's second daughter, Ms. Dinar Nazarbayeva, and her husband, Mr. Timur Kulibayev. During the course of their investment, Claimants were also told that, in addition to Almex, the Minister of Transportation and Telecommunications of the Republic of Kazakhstan, at the time Mr. Serik Burkitbaev, was also a shareholder in Investel. By November 2000, Mr. Kulibayev held 50% in Almex, with his wife holding a 20% stake therein and Mr. Abuov (Mr. Kulibayev's 'right-hand man') holding the remaining 30%. When Telecom Invest replaced Investel, Almex remained the majority 87.5% shareholder of Telecom Invest until the end of 2002.

359. *Second,* irrespective of whether he formally held an official position in Investel/Telecom Invest, Mr. Kulibayev acted as executive director of Investel and later Telecom Invest:

   - KaR-Tel's successive General Managers met in person with him in that capacity on many occasions;
   - Mr. Agilönü sent monthly reports of KaR-Tel's financial data to Mr. Kulibayev.

360. *Third,* the amendment to KaR-Tel's charter with respect to the replacing of Claimants on November 10, 2003 was registered by the Almaty District Division of the Ministry of Justice the very next day. According to Claimants, this is not feasible for such a re-registration to take merely one day, absent some extra influence such as Respondent's interest in the re-registration.

361. According to Claimants, Respondent's allegation that there is no basis upon which a State can bear legal responsibility for the actions of the President's son-in-law oversimplifies the present case. Indeed, Mr. Kulibayev is not only the son-in-law of the President, he has also held, at various times, governmental functions both as a member of the Investment Committee and as top executive of various State-owned energy companies. According to Claimants, it is undisputed that Mr. Kulibayev maintained ties with the Investment Committee and knew Mr. Zverkov, the Chairman of the Investment Committee who terminated the Investment Contract. Therefore, his actions cannot be

viewed in a vacuum and cannot be dissociated from his privileged relationship with Respondent.

362. It is also undisputed that the primary obligation of Telecom Invest/Investel in KaR-Tel was precisely lobbying before the organs of Kazakhstan. The local partner did use that influence at the outset and during the course of the project to secure and obtain, from organs of the Republic of Kazakhstan, the License, the Investment Contract, the easy-to-remember '333' prefix and favorable treatment from Kazakhstan Customs Authorities. It is also Claimants' case that the local partner and Mr. Kulibayev could do and undo things at the Investment Committee.

363. In this context, it is Claimants' allegation that the fact that, by late 2002/early 2003, Mr. Seysembayev, through some companies, and not Almex, was *de jure* the controlling shareholder of Telecom Invest has no bearing on Claimants' case. Indeed, a subsequent change in ownership of Telecom Invest, does not somehow undo Respondent's prior collusion with the previous shareholders. Nor does such a change preclude Respondent from continuing to collude even with the new owners.

364. Moreover, this change of ownership was for "*nominal consideration*," which does not at all exclude the likelihood that an arrangement may have been reached between Telecom Invest's prior owners and Mr. Seysembayev. Indeed, it is still unknown who received the USD 350 million paid by VimpelCom.

365. Claimants further allege that even if Telecom Invest's shareholders could be deemed to be independent and private third parties, Respondent would still be liable for breaching its international obligations. Indeed, collusion between the State, judicial authorities, and the local party-in-interest can amount to a denial of justice, and a State can expropriate an investment for the benefit of a third party.

366. Finally, even if there is no such a collusion, Respondent would still be liable for its acts and omissions, namely the wrongful termination of the Investment Contract, the eviction

of Claimants from KaR-Tel by the police, the Courts' decision that grossly misapplied Kazakhstan law and the derisory compensation paid to Claimants.

## 2.    The termination of the Investment Contract

367.    According to Claimants, by mid-2001, the local partner took the decision to oust Claimants from KaR-Tel.  This is confirmed by Mr. Abuov.  The task of identifying the options to carry out this decision was entrusted to Mr. Karibjanov from Visor Investment Solutions, who declared that his "*involvement in KaR-Tel commenced at some point between August and December 2001.*"  In the fall of 2001, Respondent set in motion the impetus that would eventually result in the total expropriation of Claimants' investment in favor of President Nazarbayev's family and empire.

368.    On September 10, 2001, the Investment Committee, which was under the influence of Mr. Kulibayev sent KaR-Tel a warning letter, requesting that KaR-Tel submit various financial statements and information that it had not previously requested.  Indeed, prior to September 10, 2001, there had been no Investment Committee investigations or warnings on this issue.  Ambassador Zverkov's testimony to the contrary is not supported by any documentary evidence.  From this point, Telecom Invest, Mr. Kulibayev and Mr. Abuov suddenly became unreachable.

369.    On February 21, 2002, Respondent's Investment Committee sent KaR-Tel a notification letter purporting to terminate the Investment Contract within thirty days on the alleged basis that KaR-Tel had not complied with its reporting obligations pursuant to the Contract.  During this period, KaR-Tel challenged this abrupt termination, continued its best efforts with the assistance of its auditors to comply with the filing requirements and sought an extension of time.  This extension was granted, at the very least, according to Mr. Zverkov's own admission, until March 23, 2002.

370.    However, contrary to Respondent's allegations, the Investment Committee Members were not waiting at the Investment Committee premises on March 23, 2002 to receive Claimants' reports.  Mr. Zverkov's declarations in this respect are not credible since

March 23, 2002 was a Saturday, which is a day off in Kazakhstan. Moreover, the Investment Committee was also closed on Friday, March 22, 2002 since it was Norouz, a public holiday in Kazakhstan. It is therefore obvious that on March 23, a Saturday immediately following a public holiday, the Investment Committee was also closed.

371. According to Claimants, it cannot therefore be disputed that, even assuming for the sake of argument that Respondent granted Claimants an extension only until Saturday, March 23, 2002 for the filing of the requested reports, such extension extended automatically until Monday, March 25, 2002, the very first working day after Norouz. Furthermore, as confirmed by the documents and by Respondent's own Ministry of Economy and Budget Planning, KaR-Tel submitted the materials requested on March 25, 2002.

372. Claimants point out that the Investment Contract was terminated by the Investment Committee on March 25, 2002 on the only basis of the alleged failure to submit reports. Respondent seeks today to justify the termination of the Contract on the basis that, in any event, it was justified on substantive grounds since KaR-Tel allegedly did not comply with its investment obligations. However, as emphasized by the *Amco I*[26] and *II*[27] decisions, regardless of the examination of the substantive grounds relied upon by a State agency in the framework of the revocation of a license, "*the mere lack of due process would have been an insuperable obstacle to the lawfulness of the revocation.*" Respondent's attempt to justify *ex post* the termination of the Investment Contract is unconvincing.

373. The Investment Contract was wrongfully terminated. It was terminated prior to the expiration of the deadline for submitting the reports, which were filed on March 25, 2002, *i.e.* within the deadline. Moreover, even assuming, *arguendo*, that certain reports were not submitted in a timely manner, the Investment Committee could only suspend the Contract and not terminate it.

---

[26] *Amco I v. Indonesia*, Decision on Jurisdiction of September 25, 1983.

[27] *Amco Asia Corporation and others v. Republic of Indonesia* (ICSID Case No. ARB/81/1), Award in the Resubmitted Case of June 5, 1990, 1 ICSID Reports 569, para. 70 [hereinafter *Amco II*].

374. Indeed, the early termination mechanism of the Investment Contract explicitly set forth in the Contract provided that early termination could only occur on the basis of specific grounds listed at article 19.3 ("*refusal of the Investor to cure the reasons which have caused the decision on the suspension of the Contract, or a failure to cure these reasons during the term established by the Agency*").  This basis presupposed that:

- there had been a suspension of the Contract in accordance with the terms of article 19.2; and
- the reasons for such suspension were notified.

375. According to Claimants, none of these conditions was satisfied, a fact which has been recognized by Respondent itself in two letters dated May 14, 2003 from the Ministry of Finance and from the Ministry of Economy and Budget Planning.  Respondent tries to downplay the significance of these letters.  However, they were executed by vice-ministers and are unequivocal in several respects.

376. As recognized by Respondent itself, the Investment Committee did not suspend the Contract.  Respondent alleges that the lack of formal suspension was in the interest of KaR-Tel since the suspension of the Contract would have required KaR-Tel to make ordinary tax payments until the suspension was lifted.  However, according to Claimants:

- it is not for Respondent to decide what was in the interest of KaR-Tel; and
- in any event, had the investment Committee suspended the Contract, KaR-Tel could have remedied any alleged breaches and the suspension would have been lifted.

377. According to Claimants, Respondent's further attempt to justify its failure to suspend the Contract by relying on article 13 of the Investment Support Law is also unconvincing.  Indeed, although this Law grants the Investment Committee the right to terminate a contract without first suspending the same, the express terms of each individual contract can supplement this right.  In the present case, the parties, as they were entitled,

specifically conditioned in their Contract the right of the Investment Committee to terminate a contract to the mandatory prerequisite of its prior suspension.

378. Even assuming, for the sake of argument, that article 13 of the Investment Support Law does support Respondent's position, a State cannot rely on its internal law to invalidate its own undertakings. Moreover, Respondent's position was discredited at the hearing by its own expert, professor Kaudyrov, who agreed that a foreign investor in Kazakhstan would have had a reasonable expectation that the terms of the Investment Contract, and specifically the provisions calling for suspension, were valid.

379. Claimants further allege that Exhibit RM32 invoked by Respondent as another example of a telecom company whose investment was terminated in the same conditions than Claimants, is, on the contrary, clear evidence that some contracts must be suspended prior to termination.

380. Finally, contrary to Respondent's allegation, it was only KaR-Tel and not Claimants, who had legal standing to challenge the termination of the Investment Contract. This was confirmed at the hearing by Respondent's own law expert, Professor Kaudyrov. In addition, on April 22, 2002, KaR-Tel's General Manager, Mr. Agilönü, indeed contested the unlawful termination of the Contract. However, he was unable to pursue his recourse since he was ousted from KaR-Tel. In this respect, even after the Supreme Court amendment to the April 23, 2002 injunction requiring a written permission of Mr. Yerimbetov to access KaR-Tel's documents, Claimant continued *in fact* to be denied access to KaR-Tel's premises and documents.

381. Claimants finally point out that the local partner did not engage in any effort to assist Kar-Tel in the Investment Contract control process. On the contrary, the local partner vanished during the investigation process. In this respect, Mr. Abuov disingenuously suggested that he might have disappeared during these key months because he was gone on a particularly long business trip and was therefore unreachable. This was clearly false. There can be no doubt that the local partner "strategically" disappeared.

382. The reality is that, in February and March 2002, the local partner, with the help of lawyers and of Mr. Karibjanov from Visor Investment Solutions, was trying to implement its decision to get rid of Claimants.

383. In this context, the local partner colluded with the Investment Committee to terminate the Investment Contract. That collusion was established by the testimony of Mr. Abuov and by the evidence that Mr. Kulibayev had the power to cause the Investment Committee to implement the local partner's decision to get rid of the majority shareholders in KaR-Tel through the cancellation of the Investment Contract.

384. According to Claimants, Mr. Abuov's argument that the local partner had no reason to terminate the Investment Contract simply does not stand. The local partner had two very strong incentives to terminate this Contract. The first was the implementation of his plan to get rid of Claimants. The second was to minimize the necessity of payment by KaR-Tel for Claimants' 60% shares.

### 3. Telecom Invest and Respondent colluded to effect the illegal compulsory sale of Claimants' interest in KaR-Tel

#### a) The KaR-Tel EGM

385. According to Claimants, Telecom Invest used the cancellation of the Investment Contract as the pretext for calling an extraordinary meeting of KaR-Tel shareholders (EGM) to remove Claimants from KaR-Tel. In this respect, Mr. Podorin of Telecom Invest claims to have sent two letters to Mr. Agilönü on March 4, 2002 and March 20, 2002 requesting Mr. Agilönü, as General Director of KaR-Tel, to call an EGM to discuss the cancellation of the Investment Contract.

386. Mr. Agilönü testified that he never received these letters. Mr. Podporin, who was in direct contact with Mr. Agilönü on a daily basis, admitted that he never followed up with Mr. Agilönü, whether in person, telephone or other means, to determine whether the letters were in fact received.

387. On March 26, 2002 – the day after the Investment Committee issued its order terminating the Investment Contract, but one day before such order was even sent to KaR-Tel – Mr. Podporin allegedly sent notices to Claimants in Turkey to convene an EGM of KaR-Tel for April 11, 2002. Therefore, according to Claimants, given the timing of this "*notice*," it is clear that Telecom Invest and its shareholders were, at the very least, privy to the termination decision. Claimants did not receive these notices.

388. An EGM was then held on April 11, 2002. It is not disputed between the parties that the April 11, 2002 meeting could not proceed and take decision without a quorum being present. Otherwise, there would have had no need for the alleged follow-up meeting on April 15, 2002. At the hearing, Mr. Podporin indicated that no decisions were taken at this meeting because of the lack of quorum, in the absence of Claimants. This testimony is contradicted by the evidence. Indeed, the resolution of the meeting dated April 11, 2002, which was signed by Mr. Podporin, indicates that the meeting did in fact proceed on that date in the absence of a quorum. The resolution records that Telecom Invest, the sole attendee and minority shareholder of KaR-Tel, voted at the April 11, 2002 meeting:

- to prepare all necessary documents, including financial analyzes, demonstrating the damage caused to KaR-Tel by the activity and/or inactivity of Rumeli and Telsim;
- to issue proceedings in the Almaty City Court for the compulsory redemption of Claimants' participation in KaR-Tel;
- to dismiss Mr. Agilönü as General Manager of KaR-Tel and to replace him temporarily by Mr. Iskander Yerimbetov and to seek the Court's approval of this amendment.

389. According to Claimants, the resolution is thus invalid on its face since a non-quorate meeting cannot take decisions. Nevertheless, on April 19, 2002, Telecom Invest filed a claim based solely on the April 11, 2002 resolution, seeking a Court decision on the forced buyout of Telsim and Rumeli's interest in KaR-Tel. Neither the claim filed, nor the Court's April 23, 2002 decision granting injunctive relief mention anything about any

postponement of the April 11 meeting or about any follow-up meeting on April 15 or any other date.

390. According to Claimants, following an attempt by Mr. Agilönü to call a general meeting of KaR-Tel shareholders for June 7, 2002 to discuss, *inter alia*, "*the wrongfulness and illegality of the April 11, 2002 KaR-Tel general shareholders' meeting and resolutions,*" KaR-Tel separately petitioned the Court for an injunction prohibiting this meeting. Claimants allege that, unlike the earlier Telecom Invest petition – which had been made prior to any challenge by Claimants to the validity of the April 11, 2002 resolution – this second KaR-Tel petition referred only to the resolution of a purported April 15, 2002 meeting. This meeting had not even been mentioned before. The resolution purportedly adopted at this alleged follow-on meeting was virtually identical (other than the date) to that of the April 11 meeting.

391. Claimants further point out that neither the purported resolution of April 15, nor the petition to the Court based on that resolution, mentioned the fact that the April 15 meeting would have been called as a "*follow-on*" meeting after the failure of Claimants to attend the April 11 meeting. Therefore, the April 15 resolution was also invalid.

392. In any case, according to Claimants, both April 2002 meetings were not validly constituted and held, for the following reasons:

- Claimants were not notified of the meetings, contrary to article 46 (1) of the LLP;
- moreover, with respect to the notice issue, if there is no quorum at the original meeting, a new general meeting is to be convened at least 15 days prior to the repeated meeting. This is to ensure that there will be a second attempt by the partnership to notify the participants. This was not the case since the notice of the repeated meeting was included in the notice of the original meeting. As confirmed by Professor Sergeev, the Kazakh Courts made a serious mistake when considering that it is possible to notify the participants about two meetings in one notice. Respondent's experts' position to the contrary: the allegation that a

follow-up meeting could be held as little as two hours after the original non-quorate meeting, is simply not credible. It violates the basic principle of the provision related to notices, which is to ensure that the partners have the opportunity to participate in the activity of the company;

- pursuant to the LLP Law, article 46, the 15-day notice period is triggered when the participants have been notified rather than when the notice has been issued. Therefore, even assuming that Claimants received the notices of the meeting on April 1, 2002, the notice period for the original meeting (April 11, 2002) was insufficient as the 15-day time period began on the date following receipt (April 2, 2002). Neither was the repeated meeting properly notified since there were only 14 days between the alleged notice and the day of such meeting;

- article 47 (4) of the LLP Law provides that a general meeting can adopt decisions only if there is a quorum, *i.e.* more than 50% of the total votes are present. If less than 50% of the total votes are present, a general meeting can be convened again, which is deemed to have a quorum regardless of the votes present (art. 47(5)). If less than 50% of the votes are present, the meeting has the right to adopt decisions only on questions which do not require a qualified majority vote or unanimity (art. 47(5)). As confirmed by Professor Suleimenov before the Kazakhstan Courts, article 48(2) and 43(2)(9) of the LLP law provide that the compulsory redemption of a shareholder's interest requires a qualified majority of votes of three quarters of the votes present and a quorum of two-thirds of the total number of votes. Claimants' presence – holding 60% of the votes – was thus required;

- pursuant to article 47(9) of the LLP Law, it is necessary to certify that there is a quorum immediately prior to voting;

- in violation of article 34 of the LLP Law, the minutes of the April 15, 2002 did not indicate that any evidence was presented of any significant damage to KaR-Tel presumably caused by Claimants;

- although a shareholder whose shares are being redeemed may not participate in the voting of its own compulsory redemption (art. 48(2) of the LLP Law), if a general meeting contemplates the compulsory redemption of two of its

shareholders, the presence of at least one shareholder whose interest is subject to the redemption is required at the meeting. Even assuming that Respondent's Judiciary properly applied the LLP and that the presence of the participant whose interest is being forcefully bought out is not necessary, there were here two participants whose interests were bought out. Therefore, separate decisions should have been taken. When the question of whether to buy out the interest of the first participant is put to a vote, even if such participant cannot vote on this decision, the second participant can vote, and vice versa;

-   more generally, as stated by Professor Suleimenov, "on no conditions the sharer which possesses the small interest of shares in the company may not bring up the question about compulsory redemption of shares of the sharer which possesses the majority interest in the share capital of the company. Otherwise the situation may be carried to an absurdity: several sharers holding 10% of shares may determine on the question about compulsory redemption of the share of sharers holding 90% of shares in the share capital. It may be very suitable mechanism for usurpation of companies." Professor Sergeev reached identical conclusions.

### b) *The Injunctive relief proceedings*

393. According to Claimants, Telecom Invest and its shareholders then sought the assistance of Respondent's judiciary to ratify their illegal conduct. In this context, they obtained, *ex parte*, the injunctive relief of April 23, 2002 to secure the forced removal of Rumeli and Telsim.

394. According to Claimants, the injunction was granted whereas the resolutions of the shareholders meetings were blatantly in violation of the LLP law. In this respect, Claimants emphasize, *inter alia*, that neither the claim filed, nor the Court's decision granting injunctive relief, mention anything about the April 15 meeting. It is undisputed that there was no quorum at the April 11 meeting to take decisions so that the *ex parte* decision rendered on April 23, 2002 was based on a resolution which was procedurally and patently invalid on its face. Moreover, by appointing Mr. Yerimbetov, the very same

General Manager that had been unilaterally appointed by Telecom Invest in the course of the April meetings, and not an independent administrator – pending a decision on the merits of the case – the Court effectively prejudged the merits while denying Claimants the right to manage and benefit from their investment as well as to access data necessary for the defense of their interests in KaR-Tel.

395. According to Claimants, the defects in the Court's April 23 decision are so egregious as to permit no other conclusion than one of bias and discrimination by the Court in favor of Telecom Invest.

396. Finally, even if Claimants recognize that the April 23, 2002 injunction was subsequently amended by the Supreme Court so as to remove the requirement of a prior written permission of Mr. Yerimbetov for Claimants to access KaR-Tel's premises and documents, they *in fact* continued to be denied access, as evidenced by Claimants' numerous requests to KaR-Tel and to the Court that remained unanswered.

### 4.    The actions of Respondent's police authorities

397. According to Claimants, by the end of the business day on April 23, 2002, the Kazakhstan armed police – led by Mr. Aidan Karibjanov, a senior executive of the firm Visor Investment Solution (consultant to Telecom Invest) – seized all of KaR-Tel' offices.  The police physically barred from access only KaR-Tel's Turkish management executives.  Even after the amendment of the injunction in June 2002, they continued to be denied access to the KaR-Tel premises.

398. According to Claimants, even if Respondent tries to make a distinction between its unarmed Court bailiffs that enforced the April Injunction, and its armed police, its remains that the seizure of KaR-Tel premises and the ousting of the Turkish employees was executed by Court bailiffs who are State officials, a real organ of the State, and were accompanied by a police escort.  The mere presence of private security forces in KaR-Tel was insufficient to give rise to a case of necessity justifying the presence of the police.

399. Claimants also point out that they were not informed of the Court's injunction or its enforcement and were thus not invited to be present when Respondent's Court bailiffs and police seized KaR-Tel, in stark contrast to Telecom Invest who was represented on the ground by Mr. Karibjanov.

400. In their Post-Hearing Memorial, Claimants further point out that, at the hearing, Respondent's witnesses confirmed that the Court bailiffs were accompanied by officers from Kuzet Security Services ("*Kuzet*"), which is a specialized security subdivision of internal affairs bodies of the Republic of Kazakhstan. Their guards wore uniforms and carried weapons. Kuzet was acting pursuant to a contract with Telecom Invest. As this contract could only have been formed on or before the April 23, 2002 injunction of Judge Ivanovna, this means that Claimants' local partner was privy to Judge Ivanovna's decision before it was made public.

### 5. The attempt to sell Telecom Invest's participation in KaR-Tel

401. According to Claimants, after they were forcibly removed from KaR-Tel's premises on April 2002, Telecom Invest continued to exploit its privileged relationship with Respondent to capitalize on its influence on Respondent's various organs.

402. Indeed, the local partner and/or associated individuals sought to extract cash from the partnership and its stake therein and asked Claimants to purchase its 40% stake in KaR-Tel.

403. A Stock Purchase Agreement was negotiated. In this context, it appeared that the Investment Committee continued to be under the influence of Telecom Invest which was in a position to instruct the Committee to reinstate the Contract. However, Claimants decided not to sign because:

- there was no guarantee that once the USD 12 million stipulated in the agreement would have been paid, Telecom Invest would not further collude with Respondent to extract more money from Claimants;

- there was a risk that KaR-Tel had entered into transactions that were not in its interest as a result of having been managed by Telecom Invest.

### 6.     The actions of the Working Group

404.   On June 9, 2003, Claimants were informed of the constitution of a Working Group in charge of the examination of the termination of the Investment Contract.  It was tasked with seeing if there existed any grounds on which the Investment Committee could have terminated the Contract.  According to Professor Sergeev, this expansion of the scope of its review was illegal: "*the Working Group should have cancelled the order of termination of the Contract.  The question of compliance by the Investor with the terms of the Contract and existence of grounds for its termination should have been determined by the Committee in compliance with procedures established by the Contract.*"

405.   Claimants allege that several circumstances resulted in the *de facto* exclusion by Respondent of Claimants from the meetings of this Group, preventing Claimants from defending their position:

- they were only verbally invited to a meeting just two days before this meeting;
- the meeting was not to take place at a neutral place but at KaR-Tel's offices which were under the control of Telecom Invest;
- rumors circulated that Respondent had initiated wholly unfounded criminal proceedings against Claimants executives on July 1, 2003 - *i.e.*, the very same day that it extended an informal invitation to attend the meeting.

406.   With respect to these criminal charges, Claimants allege that:

- contrary to Respondent's assertions, Mr. Ozonerk did not admit that the charges were founded.  He merely stated that the amounts at issue consisted of "*working advance payments*" and had been approved by Rumeli's management;
- the investigation related to mere cash advances totaling less than USD 200,000, which are customary in emerging countries in a major business operation;

- the fact that the charges were also brought against Ms. Kaden, a Kazakhstan national, only serves to support Claimants' argument that the charges were brought only against Turkish executives and for an ulterior purpose. Indeed, Ms. Kaden was the assistant of KaR-Tel's General Manager. The police thus wanted to hold someone close to Claimants accountable in the event it would not be able to sanction the Turkish nationals;

- the farcical nature of these criminal proceedings is obvious: Mr. Agilönü was charged with "*grand theft*" on the basis that he was in arrears for 74,435 Tenge in petty cash used for business expenses (approximately USD 580). The potential sanctions for such charges, however, were very real. As acknowledged by Respondent's expert on Kazakh Criminal Law, the penalty for such charges could "*go up to 12 years in prison.*"

407. The Working Group then validated the termination of the Contract, but it did it on entirely different grounds than those forming the basis for the initial decision. Moreover, it relied on the fact that KaR-Tel had not challenged the termination, which is ludicrous given the fact that Respondent had placed KaR-Tel under the control of Telecom Invest, which had no interest to challenge the termination.

408. Claimants further allege that Respondent's attempt to validate the investigation of the Working Group by asserting that it ultimately found that KaR-Tel had not complied with its investment obligations is hopeless. Indeed, nowhere in the Investment Contract was it required that KaR-Tel invest specific amounts on a yearly basis. The Contract only sets forth a lump sum objective as investment obligation over ten years.

409. According to Mr. Sabirov, Chairman of the Working Group, a primary ground for the termination of the Investment Contract was that KaR-Tel did not comply with the timetable set out in the Working Program and had failed to make the required amount of investments. Yet, the Investment Contract provides no timetable for making monetary investments. When asked how the Working Committee found that Claimants had not been making the requisite investments, Mr. Sabirov had no answer. When the Tribunal

questioned whether a timing requirement for investments under the Investment Contract was imposed by article 278 of the Civil Code - on equal allocation of obligations over time - Mr. Sabirov again had no answer. On the contrary, Professor Sergeev addressed this question and established that article 278 would apply only where nothing is stipulated by the Contract. Since the Contract attached a Working Program setting out dates by which certain actions (rather than investments of amounts) had to be taken, Professor Sergeev concluded that the requirement of article 278 did not apply.

410. In any event, irrespective of whether there may have been legitimate grounds for the revocation of the Contract, the whole approach leading to its termination and the confirmation thereof by the Working Group lacked in transparency and in due process.

411. Claimants finally allege that if the unlawful termination of the Investment Contract had presumably caused enough damage to KaR-Tel to justify the compulsory redemption of Claimants' shareholding, it is surprising, to say the least, that Telecom Invest (through KaR-Tel) did not seek to challenge the termination or to reinstate the Contract.

### 7.     The actions of Respondent's Judiciary

412. According to Claimants, Respondent's Courts then continued to further the goals of the local partner's shareholders by rendering decisions in contravention of Kazakhstan law. They culminated in a decision of the Supreme Court of October 30, 2003 which set the value of the shares to approximately USD 2,281 for Rumeli's 45% stake and to USD 760.43 for Telsim's 15% stake, granting Telecom Invest (with only 40% interest in KaR-Tel) the necessary official judicial blessing to acquire Claimants' 60% interest at virtually no cost.

413. According to Claimants, the decisions of Respondent's Judiciary were so grossly unjust that no competent judge could have reasonably issued such decisions. This clearly demonstrates the collusion between the Kazakh Courts and the individuals controlling Telecom Invest.

414. According to Claimants, the first outrageous misapplication of Kazakh law lies in the Courts' decision that *the April 2002 resolutions* of the Extraordinary General Meeting were valid, whereas they were *prima facie* invalid.

415. Claimants submit that Respondent's Judiciary misapplied the law in collusion with the local partner through the delivery of the *April 23, 2002 ex parte injunction*.

416. According to Claimants, the next legal concept grossly misapplied by Respondent's Judiciary relates to the appreciation of the facts that allegedly gave rise to Telecom Invest's right to buy out Claimants' shareholding. Indeed, the LLP Law allows the forceful buy out of a participant only if such participant caused significant harm to the partnership.

417. At the April 15, 2002 meeting, Telecom Invest discussed the potential harm that KaR-Tel might suffer. At that time, no real harm existed. Respondent's Judiciary ignored that rule, concluding that there was a future loss.

418. The law also requires that there exist a causal link between the action or inaction of a participant and the harm. The Courts ignored this requirement. Indeed:

- such link was not established since Claimants were neither a party to the Investment Contract nor responsible for its termination, which resulted from KaR-Tel's alleged failure to file reports with the Investment Committee;

- rather, it is the local partner that failed to comply with its contractual obligations in this respect. Pursuant to article 4.3 of the Foundation Agreement, Investel/Telecom Invest – and not Claimants – assumed the obligation to assure the relations with the Investment Committee;

- in any event, the local partner had equal access to all of KaR-Tel's financial information so that it cannot be said that Claimants were solely responsible for the wrongful termination of the Investment Contract.

419. The LLP and the Civil Code also require that all of *the reasons* to buy out a participant be discussed at the General Meeting and does not allow the partnership to raise new reasons during subsequent Court hearings. Indeed, it is the partnership, and not its participants, that may bring a claim to forcefully buy out a participant. Therefore, the partnership's claim before the Courts must be based on a decision taken by the General Meeting. If the partnership advances arguments that were not discussed, such arguments are *ultra vires* and may not be reviewed and accepted by the competent Court. However, this clear principle was ignored. The Courts based their decisions on the alleged lack of investment by Claimants and the alleged overpricing of the equipment they supplied, neither of which were the basis for the resolution purportedly adopted by the General Meeting.

420. According to Claimants, those outrageous violations of Kazakh law culminated in Judge Begaliev's decision dated June 6, 2003 ruling on Telecom Invest's claim for expulsion of Claimants from KaR-Tel and on the compulsory redemption of their shares.

421. In this respect, Claimants point out, *inter alia,* that, in his decision, and in total contradiction with the documentary evidence, Judge Begaliev wrongfully concluded that the termination of the Investment Contract was the result of Claimants' non-performance of their purported obligation to secure investments for KaR-Tel.

422. Judge Begaliev's decision rejected Claimants' counterclaim challenging the validity of the April 11 and April 15 resolutions despite their glaring deficiencies. In this respect, Claimants underline that it was not until this decision by Judge Begaliev on June 6, 2003, *i.e.* more than one year after the April 23, 2002 injunction was first issued, that there was mention in the Court's decisions of the idea that the April 15 meeting was held as a "*follow-on"* meeting arising from the lack of presence of a quorum at the April 11 meeting.

423. Similarly, Judge Begaliev's decision that a secretive EGM called by minority shareholders, calling for the compulsory redemption of Claimants' majority stake, was valid, was manifestly wrong as a matter of law.

424. Claimants further stress as an example of the behavior of Judge Begaliev, his approach to expert evidence, such as the legal opinion of Professor Suleimenov and others, which were rejected on the basis that "*the indicated individuals do not possess the right to interpret the law."*

425. According to Claimants, the above mentioned defects in the Court's decision are so glaring that they can only be the result of bias, corruption and/or bad faith on the part of Judge Begaliev. In this respect, Claimants submit the testimony of Mr. Agilönü, who testified that Judge Begaliev had requested from him EUR 400,000 to rule in Claimants' favor, but then had informed Mr. Agilönü that "*he had received instructions from the highest authorities to rule against us, and that ruling in [Claimants] favor would jeopardize his and his family's life."* Judge Begaliev denied that allegation in his testimony. However, he had a clear personal interest in such denial, as he could be imprisoned or lose his job if he admitted this discussion, whereas Mr. Agilönü had no such personal interest.

426. Claimants finally submit that the decision of the Presidium of the Supreme Court constituted the final step in the State-sponsored scheme to expropriate their investment in KaR-Tel. Indeed:

- they were not given notice of the Presidium hearing and were thereby prevented from making any submissions as to the valuation of their shareholdings in KaR-Tel;

- the Presidium acted *ultra vires* even in considering the appeal since Telecom Invest did not request in its claim or in any of the Court proceedings prior to the June 6, 2003 decision of the Almaty City Court, that the Court decide on the valuation of Claimants' shares;

- the Presidium's valuation of their shareholdings in KaR-Tel was "*unjust and outrageous*," particularly in light of the true value of the entire KaR-Tel company, as evidenced by its resale price of USD 350 million. Moreover, the Court grossly

misapplied Kazakh law establishing a price by reference to the concept of "*equity interest*" and not by taking into account "*market price*;"

- finally, Claimants allege that the conclusion of forensic experts that Claimants made *no investment* is so grossly incorrect that no reasonable judge should have accepted it.

### 8.    The attempts to pay Claimants to go away

427.  According to Claimants, several attempts were made by Respondent and/or various members of President Nazarbayev's empire to pay Claimants to go away.

428.  KaR-Tel was first to offer to purchase Claimants' combined 60% for approximately USD 3,000 only.  Claimants obviously refused.

429.  Then, in April 2003, Mr. Seysembayev offered to purchase Claimants' stake for USD 12 to 15 million.  In the context of these discussions, he informed Claimants of the criminal charges that had been raised against their personnel.  Claimants refused the offer which they considered too low.

430.  In August 2004, as Claimants were preparing to commence the present arbitration, they were contacted by the President of Altel, Mr. Zhanarbek Umirzhanov, to discuss the purchase of Claimants' 60% interest and the resolution of the difficulties faced by Claimants in Kazakhstan.  According to Claimants, Altel is ultimately owned and controlled by the Republic.  In this context, Claimants also met Mr. Kairat Orazbekov, the Vice Chairman of Arlan (also referred to as Orlon by Respondent) Holding Company, a company which was controlled by one of the daughters of President Nazarbayev.  Mr. Orazbekov stated that the Arlan/Altel Group was willing to purchase Claimants' 60% interest in KaR-Tel for USD 20 million.

431.  According to Claimants, Respondent's offer to purchase Claimants' shares at USD 20 million is an admission that Respondent violated its international obligations.  Indeed, by making such an offer, Respondent implicitly recognized that the decisions of its Courts would not stand international scrutiny and that Claimants still held a combined

shareholding interest with significant value. Indeed, in light of the fact that KaR-Tel's charter had already been amended to remove Claimants as shareholders by early November 2003, such a proposal from Respondent nearly a year later can only be viewed as an admission of liability.

### 9. The sale of KaR-Tel to VimpelCom

432. On August 27, 2004, just three days after Claimants had answered negatively to the USD 20 million proposal to purchase their stake, they learned that VimpelCom had purchased 100% of KaR-Tel for USD 350 million.

433. In this respect, Claimants further point out that:

- in its Annual Report for the year ended December 31, 2004, VimpelCom seemed to attach great importance to having a local partner with "*local knowledge*" in connection with its investment in KaR-Tel;

- VimpelCom noted that it had "*heard assertions regarding possible questionable payments to government authorities in connection with certain legal proceedings in which KaR-Tel was involved prior to our acquisition.*"

434. Claimants submit that the USD 350 million price is in marked contrast with the Supreme Court's valuation of Claimants' 60% stake at USD 3,000, less than a year before. In this respect, Claimants dispute the arguments set forth by Respondent to support the idea of a subsequent improvement of KaR-Tel's situation that would have justified a much higher valuation of the company:

- Claimants dispute Respondent's allegation that Mr. Yerimbetov entered into negotiations with Motorola and was able to reduce KaR-Tel's debts by USD 72 million. Respondent produces no documents to support this statement;

- Claimants also dispute Respondent's allegation that the reasons why Mr. Yerimbetov was able to negotiate a reduction of the amount to be repaid to Motorola were that the 3-year limitation period for bringing a claim was to expire and Mr. Yerimbetov understood that Motorola had already written off KaR-Tel's

debt from its accounts. According to Claimants, the statute of limitations stops and runs anew if a creditor files a claim, and the writing-off of a debt in one's books cannot constitute a waiver of its rights. Therefore, these reasons cannot explain the purported reduction of the debt towards Motorola.

435. Claimants further point out that, as explained by Andrew Wright from Analysys, an expert in the telecom business with nearly 20 years of experience, "*it is inconceivable to me that a company could go from zero value to an enterprise value of USD 450 million in around about two years. It was never zero in the first place.*"

436. In the same vein, Claimants make several comments on the argument raised by Respondent that the USD 3,000 valuation of KaR-Tel by the Kazakh Courts was based on the reports of independent experts and in particular PWC:

- those reports simply took information and assumptions presented by KaR-Tel's new management;
- in its report, PWC cautioned that "it did not verify the credibility" of the information provided and that "a more detailed analysis is required to express an opinion on the price";
- it is clear from the PWC report that there were issues with the management assumptions provided to PWC;
- PWC indicated in its report that it could not "*make any guarantees or warranties (direct or indirect) with respect to the accuracy, fullness or admissibility of this report for any purposes.*"

### 10. General observations on the hearing and on circumstantial evidence

#### a) Observations on the hearing

437. Claimants make three general remarks on the developments that occurred at the hearing. First, Respondent continued its pattern of obstruction of justice by refusing to produce as a witness Mr. Kulibayev, despite the Arbitral Tribunal's order dated September 24, 2007.

Mr. Kulibayev and his wife, the daughter of President of Kazakhstan, owned a controlling stake in Claimants' local partner. He has exercised a variety of key, high-level State functions and is one of the leaders of a group of individuals that exercises significant control and/or influence over the organs of the Republic of Kazakhstan. According to Claimants, had Mr. Kulibayev come to the hearing, he:

- could have explained the precise role he played in the local partner's decision of mid-2001 to dissociate itself from Claimants;
- could have answered Claimants' allegations of collusion with the Investment Committee;
- could have explained why the Investment Committee, under Ambassador Zverkov's leadership, abruptly terminated KaR-Tel's Investment Contract;
- could have explained why he did not satisfy his and his subordinates' lobbying obligations or good faith obligations as shareholders and partners to provide assistance;
- could have explained how and why Visor Investment Solutions, a company that he had tasked with getting rid of Claimants, promised Claimants in October 2002 to "*cancel*" the termination of the Investment Contract in order to facilitate the sale of his company's minority shares in KaR-Tel to Claimants; and
- could have explained whether the Republic of Kazakhstan ever contacted him to provide testimony.

438. Second, Respondent did everything possible to avoid producing Mr. Orazbekov for examination at the hearing. On September 24, 2007, the Arbitral Tribunal ordered Respondent to produce Mr. Orazbekov as witness. Respondent did not comply, but, instead, sent on October 5, 2007, a letter providing the Tribunal with an address of Mr. Orazbekov. On October 10, 2007, the Tribunal wrote to Mr. Orazbekov asking him to be present to give witness testimony. On October 12, 2007, Respondent produced a very short letter from Mr. Orazbekov denying that he had ever discussed with anyone the matter of purchasing Claimants' stake in KaR-Tel and stating that he would not appear to testify. Yet, Respondent suddenly shifted its position, after Claimants' counsel protested

against this obstruction of justice, indicated the questions that he would have put to Mr. Orazbekov, and requested that adverse inferences be drawn from his absence.

439. Respondent then wrote a letter on October 22, 2007 stating that it had "*obtained a business address for him*" (which made no sense as Mr. Orazbekov's address had already been provided) and that he would be available for cross-examination. At the hearing, Mr. Orazbekov conceded that he had never been informed of these ICSID proceedings prior to October 12, 2007. However, Respondent has denied, since the time of its Counter-Memorial dated December 14, 2006 that any offers had been made to purchase Claimants' shares in August 2004. According to Claimants, it is simply unacceptable for Respondent to have strongly denied such important facts without having contacted Mr. Orazbekov beforehand.

440. Third, it is Claimants' position that Respondent's witnesses lied at the hearing:

- for instance, nearly all of Respondent's witnesses and experts, including those that did not have any direct knowledge of the facts alleged, included in their statements the magic words – (Motorola) "*loan*," (Uzan) "*fraud*," "*obsolete equipment*" and "*amount supposed to be invested*" in a clear attempt to bias the Tribunal against Claimants and to find belated justifications for the wrongful termination of the Investment Contract;

- Ambassador Zverkov refused at the hearing to even confirm what he said in his own letter, namely that the Investment Committee granted an extension to file the requested reports, at the very least until March 23, 2002. He also engaged in conflicting justifications when confronted with the fact that March 23, 2002, the day he claimed the Investment Committee members were waiting at the Investment Committee to receive Claimants' reports, was a Saturday, and that the previous day was Norouz, a public holiday;

- Mr. Orazbekov admitted that Mr. Akgün and Mr. Salih Oktar, representatives of Claimants, were invited by the State company Altel to attend a meeting with him on March 24, 2004. Yet, Mr. Orazbekov claimed that these two gentlemen were

not invited to be extended any offer for the settlement of their KaR-Tel claims, but rather to discuss further business opportunities in Kazakstan. According to Claimants, this is unconvincing: Mr. Orazbekov failed to describe, even in any general fashion, much less to provide any specifics, the alleged business opportunities the parties discussed at the meeting he attended. In any case, these companies were undergoing crises in Turkey and had had their investment expropriated in Kazakhstan. Therefore, the likelihood is slim that they would have attended a meeting to discuss further business opportunities in Kazakhstan.

441. Claimants request that the Arbitral Tribunal draw adverse inferences as a result of these multiple obstructions of justice, misrepresentations and improper conduct.

### b) *Circumstantial evidence*

442. The Arbitral Tribunal asked Claimants to explain the weight that the Tribunal should give to circumstantial evidence. In this connection, Claimants note that they rely primarily on Respondent's admissions in this arbitration and on the direct evidence that has been produced to demonstrate Respondent's breaches of the Bilateral Investment Treaty. Some circumstantial evidence has also been advanced, however, particularly with regard to the collusion between the powerful local partner and organs of Respondent. Claimants request that the Arbitral Tribunal give full weight to the circumstantial evidence that has been presented for the following reasons.

443. Article 34(1) of the ICSID Arbitration Rules provides that the Arbitral "*Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value.*" Therefore, the Tribunal is not bound by any legal system of procedure. It is free to determine the probative value of any evidence that has been produced, be it circumstantial or otherwise.

444. In general, international tribunals have given full weight to circumstantial evidence. Two independent factors are considered by Arbitral Tribunals when assessing the weight that should be given to such evidence:

- the first factor is the party's attitude in the proceedings. If a party, as was the case with Respondent, does not comply with its obligations, for instance by refusing to produce the requested documents and witnesses, the Arbitral Tribunal is authorized to draw adverse conclusions from the party's behavior. The same applies when witnesses manifestly lack independence, as was the case with those produced by Respondent;

- the second factor is whether direct evidence of fact is unavailable. In this respect, the International Court of Justice decided in the *Corfu Channel* case that "*[T]he other State [the claimant], the victim of a breach of international law, is often unable to furnish direct proof of facts giving rise to responsibility. Such a State should be allowed a more liberal recourse to inferences of facts and circumstantial evidence. This indirect evidence is admitted in all systems of law, and its use is recognized by international decisions.*"[28] In *AAPL v. Sri Lanka*, an ICSID Arbitral Tribunal listed the international rules regarding evidence and concluded: "*Finally, in cases where proof of a fact presents extreme difficulty, a tribunal may thus be satisfied with less conclusive proof, i.e. prima facie evidence.*"[29]

445. In this arbitration, Claimants rely on circumstantial evidence primarily to show collusion between the powerful local partner and the organs of the Republic of Kazakhstan. It is undisputable that submission of direct evidence on these points is very difficult, and even more so given that the Republic of Kazakhstan is a party to this dispute and has in general not been cooperative in the fact finding procedure.

446. Furthermore, in some circumstances, the endemic nature of a fact alleged in certain countries has been considered to be circumstantial evidence of the facts alleged. For instance, in ICC arbitration No. 3916, the widespread nature of corruption in Iran was

---

[28] *Corfu Channel (United Kingdom of Great Britain and Northern Ireland v. Albania),* Judgment of April 9, 1949, [1949] ICJ Report Rep. 4, para. 18 [hereinafter *Corfu Channel v.Albania*].

[29] *Asian Agricultural Products Ltd. v. Republic of Sri Lanka* (ICSID Case No. ARB/87/3), Final Award of June 27, 1990, (1991) 30 ILM 580, paras. 37-45 [hereinafter *AAPL v. Sri Lanka*].

considered to be circumstantial evidence for the existence of corrupt practices.[30] Similarly, in the case at hand, the international reports and widely published articles submitted prove the two points on which circumstantial evidence is most relevant, namely general lack of impartiality of the organs of Respondent and collusion between powerful groups of the ruling family in Kazakhstan.

447.    According to Claimants, there is no doubt that the two independent and alternative factors described above for the use of circumstantial evidence are present.  Additionally, admissions have been secured and direct evidence submitted on related subjects that reinforce the circumstantial evidence submitted in support of Claimants' position on collusion.  Claimants also produced the witness statement of Mr. Agilönü who confirmed that Respondent's judiciary was not only corrupt in this matter, but also under the influence of the powerful local partner against the interest of which it could not possibly rule.

448.    Therefore, Claimants allege that they have satisfied their burden of proof on collusion. They finally allege that, in the event that the Arbitral Tribunal were to find otherwise, that would have no impact on Respondent's liability for breaches of the Bilateral Investment Treaty since Respondent, independently of the issue of collusion, breached multiple obligations under the Treaty, as proven by the admissions made by Respondent and the direct evidence submitted in this arbitration.

### B.    RESPONDENT'S POSITION

#### 1.    The general context

##### a)    Claimants' investment

449.    According to Respondent, there was nothing to expropriate since Claimants did not make any investment.  The highest Claimants are able to put their case is that they granted KaR-Tel lines of credit or procured for KaR-Tel loans from third parties, and particularly from Motorola.  Respondent alleges that the only capital contribution not in the form of

---

[30]    *ICC Case No. 3916* (1982), Collection of ICC Arbitral Awards 1974-1985, at 507.

an interest-bearing loan is Rumeli's partial contribution towards the charter capital of KaR-Tel.

450. According to Respondent, it is not clear on what basis Claimants can allege that the loans made to KaR-Tel constitute the investment they were obliged to make under the Foundation Agreement and/or the Investment Contract. In any event, they were anything but interest-free: they were subject to interest at LIBOR +2%.

451. Moreover, it appears that Rumeli deposited a sum in a bank account at Bank TuranAlem in order to permit KaR-Tel to borrow further funds. Once again, rather than actually investing in KaR-Tel, Rumeli further indebted the company.

452. It is also Respondent's allegation that Claimants did not transfer equipment on very favorable terms to KaR-Tel. On the contrary, they sold obsolete equipment to KaR-Tel at a significant overvalue, in breach of the requirements of the Invetsment Contract to use advanced technology.

453. Respondent accepts that Telsim guaranteed the Motorola Loan for KaR-Tel, but this cannot be termed an investment by Claimants: it simply created further indebtness on KaR-Tel and was done at a time when Telsim was not a shareholder of KaR-Tel. When Motorola demanded repayment of the Motorola Loan from Telsim, that demand was not met in whole or in part.

454. Respondent further submits that there is no evidence of the additional investment of USD 33 million allegedly made by Claimants between 1999 and 2001 and, indeed, none was provided to the Kazakh Courts nor found by the independent forensic experts appointed by the Kazakh Courts or the leading auditors appointed by Telecom Invest or KaR-Tel during the course of the proceedings in 2002 and 2003.

455. Finally, Respondent submits that the quality of the support know-how and training provided by Claimants was not very good and that in the opinion of several leading

auditors KaR-Tel was insolvent and unable to continue trading without significant restructuring.

### b) The Republic of Kazakhstan and the involvement of President Nazarbayev's family

456. According to Respondent, despite the repeated references to collusion and conspiracy and acting in concert, Claimants do not provide any evidence of even a suspicion of collusion or conspiracy.

457. Respondent further submits that no attempt is made by Claimants to link its generalized allegations of corruption and dishonesty to the matters in dispute in this arbitration. For instance, it is unclear which members of the President Nazarbayev's family or "*empire*" are said to have played a purported "*active role.*" The best Claimants are able to allege is that two of the persons they mention, Mr. Kulibayev and his wife, might be participants of a Limited Partnership called Almex that was itself a shareholder of Investel/Telecom Invest, which were themselves participants in KaR-Tel.

458. Contrary to Claimants' allegations, Mr. Kulibayev had no role whatsoever in the negotiations with the Investment Committee and was at no time a director of Investel or Telecom Invest.

459. On that extraordinarily tenuous basis, Claimants seek to allege that the Republic bears responsibility for the dispute that arose between three private entities. However, there is no basis on which a State can bear legal responsibility for the actions of its President's son-in-law.

460. Claimants are alleging that the conspiracy was between all of:

- Mr. Kulibayev, Mrs. Kulibayeva, Mr. Abuov and President Nazarbayev;
- numerous members of the Investment Committee;
- two judges of the Almaty Court;
- numerous Court bailiffs;

- numerous members of the criminal prosecution office;

- all the members of the Working Group;

- Deloitte & Touche, PricewaterhouseCoopers and the other experts who produced reports before the Kazakh Courts;

- three judges of the Supreme Court of Kazakhstan;

- nine judges of the Presidium of the Supreme Court of Kazakhstan.

461. According to Respondent, when viewed in that context alone, Claimants' allegations seem extraordinary. When one realizes that these allegations are unsupported by evidence, Claimants' case becomes offensive.

462. In particular, Claimants' allegation that Respondent's Judiciary acted improperly because it was corrupted is wholly unparticularised. Moreover, Claimants fail to mention that they filed appeals that resulted in first instance decisions being reversed.

463. According to Respondent, Claimants' case theory was always flawed by one incontrovertible fact. After January 2003, Mr. Kulibayev, Mr. Abuov and Mr. Karijbanov had no role or interest in Telecom Invest or KaR-Tel. They had sold Telecom Invest to Mr. Seysembayev. Therefore, any tenuous connection that might have existed with Respondent prior to that sale extinguished six months before the first judgment in the legal proceedings.

## 2. The termination of the Investment Contract

464. Respondent points out that clause 13 of the Investment Contract required KaR-Tel to provide the Investment Committee with detailed information on the progress of the investment programme on a quarterly and annual basis. This was to allow the Committee, which does not have the power to carry out inspections or audits, to monitor KaR-Tel's compliance with the terms of the Investment Contract. In the period when it was under the control of Claimants, KaR-Tel conspicuously failed to comply with these obligations:

- no annual reports were filed at all during the entire period of the Investment Contract. Only one report was submitted, after the Investment Contract had been terminated and it related to the year 2000;

- the deadlines for filing the quarterly reports were repeatedly missed. By way of example, the reports for the first and second quarters of 2000 were filed together at the end of August 2000 and the report for the third quarter of 2000 was not filed until November 2000. The reports for the third and fourth quarters of 2001 were not filed until after the Investment Contract had been terminated.

465. According to Respondent, it subsequently became clear why KaR-Tel had failed to file any annual reports: the reports had to be certified by an auditor and Mr. Agilönü could not find an auditor who would certify them. For example, in July 2002, Deloitte & Touche provided KaR-Tel with the results of an audit in the course of which they had discovered material discrepancies between the information recorded on the partnership's balance sheet and its actual financial status. It is obvious that the reason why Claimants did not file reports was to prevent the Committee from seeing that in reality KaR-Tel was insolvent and heavily in default on the Motorola Loan.

466. The official notice dated September 10, 2001 sent by the Investment Committee set a deadline of November 1, 2001 for KaR-Tel to cure its breaches. KaR-Tel did not comply with this notice and asked for several extensions, which were granted. In any case, KaR-Tel failed to file either of the requested annual reports or any other information at all. The Committee then sent a letter dated February 21, 2002. There followed a meeting between Claimants' executives and members of the Investment Committee. These later accepted that if the reports were filed within 30 days, it would be possible to stop the cancellation of the Investment Contract. The formal order of cancellation was sent on March 27, 2002. Given the multiple breaches of the Investment Contract in terms of reporting, the Investment Committee clearly had the right to terminate the Contract.

467. According to Respondent, Mr. Agilönü's evidence on the cancellation of the Investment Contract was limited in scope and unreliable. The most incredible part of his evidence on

this issue turned on the new allegations he made at the hearing that the filing of the reports had always been the responsibility of Investel/Telecom and more specifically of Mr. Podporin. This, the latter denied. And, upon closer examination, Mr. Agilönü's new allegations disintegrated. He was asked how Mr. Podporin, who was only the logistics manager, could prepare the detailed financial reports required. Mr.Agilönü's response was telling. He replied that his team was responsible for preparing the reports, which Mr. Podporin was then responsible for filing. However, in view of the fact that Mr. Agilönü accepted that the 1999 and 2001 annual reports for KaR-Tel had never been prepared, it is difficult to see what blame could possibly attach to Mr. Podporin, even if Mr. Agilönü were correct. It is also to note that Mr. Agilönü's acceptance of the failure to file the reports for 1999 to 2000 is contrary to Claimants' position as set out in their Memorials.

468. Mr. Agilönü went even further in his evidence and stated that in September 2001, on receipt of the Investment Committee's warning letter, he had specifically asked Mr. Podporin to resolve the problem. This is clearly a further lie. Mr. Podporin denied this alleged conversation. Further, this allegation, together with Mr. Agilönü's admission that he spoke to Mr. Abuov in January 2002, contradicts the statement in Mr. Agilönü's witness statement that Mr. Abuov and Mr. Podporin disappeared after the letter of 10 September 2001 was received. In the same vein, Mr. Agilönü confirmed that he had not attempted to contact Mr. Kulibayev at any stage in relation to the problem KaR-Tel was facing with the Investment Committee, which contradicts Claimants' allegation that they knew that Mr. Kulibayev was a man of great influence in Kazakhstan.

469. According to Respondent, Claimants admitted that several extensions of time have been given to file the reports. And, in any case, no reports for 1999 or 2001 were ever filed. Therefore, even if the 2000 report was filed on time – which it was not – KaR-Tel would still have been in significant breach of its reporting obligations.

470. With respect to the timing, Mr. Agilönü's evidence was that he filed the 2000 annual report with the Investment Committee by facsimile on March 25, 2002. This conflicts

with Claimants' case in their Request for Arbitration which states that on March 25, 2002, they filed two quarterly reports and only on March 31, 2002 did they file the remaining documents. In any event, this was after the deadline of March 23, 2002, which was the end of the 30-day notice period granted by the letter of termination dated February 21, 2002.

471. On the allegation of collusion that would have led to the cancellation of the Investment Contract, Respondent points out that Ambassador Zverkov, Chairman of the Investment Committee, denies having been under any pressure to cancel the Contract. With respect to Mr. Abuov, who was accused of having failed to assist KaR-Tel when it needed him, he answered that he had never been asked to assist and that whenever he had given his advice to Claimants and their appointees, it had been routinely ignored.

472. Mr. Abuov further testified that it was nonsensical for Telecom Invest to cause the cancellation of the Investment Contract as it would have caused significant harm to KaR-Tel and thus to Telecom Invet's investment. In any case, Almex sold Telecom Invest in January 2003 and thereafter had nothing to do with it.

473. Respondent further submits that Claimants' complaint of unfair procedure, i.e., that the Investment Committee cancelled the Investment Contract on a statutory basis rather than on the contractual basis of clause 19, which would have required a prior suspension of the Contract, is unfounded.

474. Indeed, article 13 of the Investment Support Law gives the Investment Committee the right to cancel the Investment Contract without prior suspension. The evidence given by Mr. Sabirov, who was himself Chairman of the Investment Committee after Amabassador Zverkov, shows that during his tenure on the Committee, the Committee cancelled 30 to 40 investment contracts without prior suspension. Around a quarter of those cancellations were based on the investor's failure to file their reports.

475. Moreover, as confirmed by Professor Kaudyrov, article 13 of the Investment Support Law is mandatory. Consequently, the Investment Contract could not deviate from, or

condition, its application. Therefore, Claimants could not have had a "*legitimate expectation*" that suspension was a prerequisite.

476. In any event, Respondent alleges that Claimants' failure to challenge the cancellation of the Investment Contract debars them from bringing a claim that Respondent has denied them justice or fair and equitable treatment.

477. Respondent further alleges that:

- although the Investment Committee did not cancel the Investment Contract on the basis of clause 19 thereof, and did not formally suspend the Contract, it could have been validly cancelled pursuant to clause 19.3 on February 21 in any event. Indeed, the notice sent on September 10, 2001 constituted a suspension of the Contract in accordance with the spirit of clause 19. If that notice alone did not constitute a suspension, the repeated further extensions of time granted did. The only difference from the strict position under clause 19.2 is that the Investment Committee refrained from formally suspending the Investment Contract, as that would have obliged KaR-Tel to make ordinary payments of tax until the suspension was lifted: it therefore benefited KaR-Tel;

- the May 14, 2003 letters invoked by Claimants in support of their position have been written by junior administrators in Respondent's Ministry of Finance and Ministry of Economy. They are not based on a review of the events. They take as given the incorrect assertions made by Claimants in their April 2003 letters that they had fully complied with all of their reporting obligations. Moreover, Respondent points out that it is difficult to see how these letters match with Claimants' case theory of collusion;

- the cancellation was not abrupt since KaR-Tel had been granted 6 months of extensions from the initial demand to file the reports;

- Exhibit RM32 constitutes another example of a telecommunications company whose investment contract was terminated according to the same procedure;

- had the Investment Committee been presented at the time with the information it ought to have received from KaR-Tel, it would have been entitled to cancel the Investment Contract and would have done so for breach of KaR-Tel's obligations to make direct investments under clause 3.

478. Respondent finally points out that Claimants did not request KaR-Tel to challenge the termination of the Investment Contract.

### 3. On the purported collusion between Telecom Invest and Respondent to effect the compulsory sale of Claimants' interest in KaR-Tel

#### a) The KaR-Tel EGMs

479. According to Respondent, it is incorrect to allege, as Claimants do, that the April 2002 EGMs were invalidly held.

480. First, contrary to Claimants' allegation, they received notice of the EGMs. The default rule of Kazakh law is that extraordinary general meetings of LLPs are to be convened by the central executive body of an LLP, in the case of KaR-Tel the General Manager. However, article 45(2) also provides that if, despite a request, the executive body does not call an EGM, any shareholder with at least 10% of the equity may also do it.

481. By letters dated March 4 and March 20, 2002, Telecom Invest's Mr. Podporin requested KaR-Tel's General Manager to call an EGM as soon as possible to discuss the cancellation of the Investment Contract. Mr. Agilönü ignored these requests. He denied having received these letters. However, evidence from the Kazakh postal service and from two of KaR-Tel's secretaries proved this statement to be false. Therefore, on March 26, 2002, in view of Mr. Agilönü's failure to respond, Mr. Podporin sent to Rumeli and Telsim formal notices calling an EGM of KaR-Tel.

482. According to Respondent, the Turkish postal service confirmed that the EGM notices were delivered and signed for by named individuals at Rumeli and Telsim. Therefore,

unless Claimants also implicate the Turkish postal service in the alleged conspiracy to expropriate their investment, they cannot challenge this evidence.

483. Respondent further submits that contrary to Claimants' allegation, article 46 of the LLP Law does not state that it is not possible to provide notice of two EGMs in a single document. On the contrary:

- the Office of the Public Prosecutor stated that it was for the Court to decide;
- the Supreme Court, having heard the evidence of Professor Suleimenov for Claimants, rejected the view that it was impermissible to have notice for two EGMs in one document;
- the Civil Expert Report of Respondent concludes that the Court was correct;
- Professor Sergeev, Claimants' expert, accepted that this issue was not clear cut in Kazakh law.

484. It is also Respondent's allegation, supported by their legal experts, that pursuant to article 176 of the Kazakh Civil Code, notices sent by post before midnight on the last day of a period set by law are deemed to be made on time. In any case, this issue was not raised by Claimants before the Kazakh Courts. They cannot therefore be criticized for not having decided an issue that they were not submitted. Moreover, in these circumstances, it is not open to the Tribunal to find that the decision of the Almaty City Court was so egregiously wrong that no competent and honest judge could have determined the issues in that way

485. With respect to the issue of quorum, Respondent sets forth that, pursuant to article 47(5) of the LLP Law, an adjourned or reconvened EGM is quorate irrespective of the number of voting rights present. This is confirmed by their Civil Expert Report and even by Professor Didenko, Claimants' expert before the Kazakh Courts, who indeed changed his views in an article subsequent to his testimony.

486. Article 47(5) of the LLP Law provides that where fewer than half of the total votes are present at a reconvened EGM, it is not competent to adopt resolutions requiring a

qualified majority.  Claimants allege that the decision on compulsory redemption is one requiring qualified majority voting and, thus, that as Telecom Invest held only 40% of the total votes, it could not legally adopt a decision on compulsory redemption at the April 15, 2002 EGM.

487.  Article 48(2) of the LLP Law provides that a motion for the compulsory redemption of a participant's shareholding in a LLP requires: "*a qualified majority of three fourth of votes of the partnership present and represented at the meeting.  When adopting a decision under sub-paragraph (9) of paragraph 2 of article 43 of this Law the participant whose participating interest is to be purchased into a forced procedure shall not take part in voting and the number of votes he has shall not be considered.*"

488.  The Almaty City Court dismissed Claimants' contention holding that article 48(2) is clear that it is only the votes present or represented at the meeting that count for the purpose of assessing whether or not the 75% threshold has been achieved.  The Court added that the final part of article 48(2) made the position even more clear: had Claimants been present at the meeting on April 15, 2002, they would not have been entitled to vote on the question of compulsory redemption, and Telecom Invest would still have held 100% of the votes eligible to be exercised in passing that resolution.

489.  Professors Kaudyrov's and Klimkin's expert evidence, which was unchallenged, was that there is an ambiguity between article 47(5) and article 48(2): the former refers to "*qualified majority of vote*" and the latter to "*a qualified majority of three quarters of the votes present and represented at the meeting.*"  Respondent's experts opined that, faced with such ambiguity, the better approach is to adopt the narrower standard of article 48(2), which is also more directly relevant to the issue to be determined.  In their view, the Almaty City Court's determination of this issue was correct.  Moreover, one of Claimants' expert witnesses in the Kazakh proceedings, Professor Didenko, has subsequently revised his view and now considers that the Kazakh Courts determined this issue correctly.

490. In this framework, Respondent alleges that, pursuant to article 48(2) of the LLP Law, even if Claimants had been present at the meeting on April 15, 2002, they would not have been entitled to vote on the issue of compulsory redemption, and thus Telecom Invest would still have held 100% of the votes eligible to be exercised in passing that resolution. In this context, the Almaty City Court rightly held that Claimants were to be treated as a single entity in view of their mutual ownership and behavior. Professor Didenko confirmed this point of view.

491. With respect to the certification of the quorum, Claimants allege that article 47(9) of the LLP Law requires that the quorum be certified anew immediately prior to the vote. However, according to Respondent, whether or not it was done is irrelevant since there was only one shareholder present.

492. With respect to the minutes of the EGM, Respondent further points out that Claimants, which initially argued that the minutes of the meeting did not record the evidence which had been presented relating to the significant damage suffered by KaR-Tel, now appear to accept that the harm suffered by KaR-Tel as a result of the cancellation of the Investment Contract was discussed at the EGM.

493. Respondent finally submits that, as confirmed by its Procedural Expert Report, and now also by Professor Didenko, the LLP Law contains no formal limits on the size of the shareholding which may be the subject of an order for compulsory redemption. In any case, even if it were otherwise, this limit would have been inapplicable in the present case since there was no majority shareholder, unless Claimants' shareholdings are taken together, which they dispute in relation to the voting on compulsory redemption.

### b) The Injunctive relief proceedings

494. According to Respondent, there were good reasons for Telecom Invest to seek an injunction in March 2002. Indeed, Claimants had not participated at all in the EGMs, and, in addition, Telecom Invest had recently discovered falsified minutes of a purported EGM at which it had been falsely recorded that Telecom Invest had consented to Rumeli

transferring a further 10% of its shares in KaR-Tel to Telsim. There was a risk that, once Claimants would have learned of KaR-Tel's resolution for compulsory redemption of their shareholding, they might have attempted to disrupt KaR-Tel's network and destroy critical documents.

495. Indeed, notwithstanding the injunction, Claimants managed to delete KaR-Tel's website. Claimants did not challenge that point. Nor do they dispute Mr. Yerimbetov's evidence that Claimants' representatives attempted to obtain the remote access details for KaR-Tel's switch, which would have permitted them to switch off the entire KaR-Tel network. Claimants, rather than deny this outright, simply suggested to Mr. Yerimbetov that there might be other reasons for them to have sought the switch remote access details, but Mr. Yerimbetov was clear in his recollection.

496. Respondent submits that the application for the injunction was, by necessity, filed *ex parte*. Article 158 of the Kazakh Civil Procedure Code provides that Courts may take steps to secure a claim on a motion by a participant in the relevant case. As explained by Respondent's Procedural Expert Report, applications for such injunctions are determined *ex parte*. The evidence of Professor Mukhamedshin that this *ex parte* procedure is normal and regularly used in Kazakhstan and that the Court acted entirely properly was unchallenged. Claimants did not adduce any expert evidence on this issue. Nor was there any challenge to Professor Mukhamedshin's evidence. The judge must simply evaluate whether the applicant has submitted a *prima facie* case that in the absence of an injunction the Court's orders may be difficult to enforce. According to Respondent, in view of the application, the Court's decision was sensible.

497. Respondent also submits that it is not true to say that the Court ratified the appointment of Mr. Yerimbetov and prejudged the merits of the pending claim. The appointment of the General Manager is for the General Meeting of the Shareholders to decide. During the meeting held in April 2002, it was decided to appoint Mr. Yerimbetov, in replacement of Mr. Agilönü. Therefore, the Court had no basis to doubt the validity of this

appointment and no legal basis to appoint a third party. Professor Mukhamedshin's evidence confirms that point.

498. Respondent further points out that Claimants filed an appeal against the injunction and the Supreme Court set aside the second part thereof (related to the limits of access to KaR-Tel's premises, etc.), which is hardly the conduct of a Judiciary that is said to be denying justice to Claimants.

499. Finally, it is not true that in fact Claimants continued to be denied access despite the Supreme Court decision and that their requests to the Courts remained unanswered. They made a single application on July 25, 2002 to challenge Mr. Yerimbetov's control over the access to KaR-Tel of employees engaged by Claimants. The decision on this point is at the discretion of the Court. The request was rejected. In fact, the Court found that as the only attempts made to access KaR-Tel were prior to the alteration of the injunction by the Court of Appeal decision of June 11, 2002, it could not be said at that stage that Claimants had been denied access to KaR-Tel, such as to justify a Court order. It was always open to Claimants to return to Court if they still were not given access. Respondent's Procedural Expert Report finds that the Court's decision was valid. His opinion was not challenged by Claimants.

500. In this context, Respondent finally points out that, when almost one year later, on May 22, 2003, Claimants attempted to access documents at KaR-Tel once more and were unable to contact Mr. Yerimbetov, they immediately went to the Almaty City Court which granted their application for an order.

### 4. The actions of Respondent's police authorities

501. According to Respondent, Claimants attempt to give the impression that the Kazakhstan armed police seized KaR-Tel's premises and evicted Claimants whereas, in fact, the Kazakh police was not present. During the enforcement of the injunction by Court bailiffs, there were guards from the Kuzet Security Service. Respondent does not know whether they were armed, but, in any event, they were not present to assist in the

enforcement of the injunction but rather to take over from the existing KaR-Tel security guards, who had been dismissed by Mr. Yerimbetov.

502. According to Respondent, in the course of the hearing, the allegations relating to the enforcement of the injunction were disavowed or undermined by Mr. Agilönü. Indeed, he admitted that:

- he did not know if it was in fact the Kazakh police, it could have been Kuzet security guards;
- he could not recall whether or not they were armed, let alone whether or not they had machine guns;
- he had a conversation with Mr. Karijbanov at the switch and agreed to meet Mr. Karijbanov in the following days to discuss the situation.

503. Mr. Karijbanov confirmed his evidence that he saw Kuzet security guards at the premises of KaR-Tel during the enforcement of the injunction, but no police and no-one armed. According to Respondent, this is a radically different picture than that previously painted by Claimants and casts significant doubt on the reliability of their case and evidence.

504. The police was thus not there but even if it had been otherwise, it is a matter within the discretion of the enforcing bailiff whether to call for assistance. Contrary to Claimants' suggestion, the bailiff is not required to attempt first to enforce the injunction without police assistance.

505. Respondent finally alleges that:

- KaR-Tel's premises were not simultaneously seized;
- Mr. Karibjanov was not present to lead the allegedly armed force but merely to protect Telecom Invest's interest;
- the Court's bailiffs did not bar Turkish executives from entering the premises. The Turkish executives simply failed to appear for work;

- there is no obligation in Kazakh law to notify the respondent to an ex parte procedure that the injunction has been obtained prior to enforcing its terms.

### 5. The attempt to sell Telecom Invest's participation in KaR-Tel

506. Respondent disputes Claimants' position on Telecom Invest's attempt to sell its participation in KaR-Tel. This was not at all a purported way of extracting money from the partnership. On the contrary, in late summer 2002, Almex and Telecom Invest took the position that it would be sensible for them to sell their interest in KaR-Tel as quickly as possible in view of the real danger of KaR-Tel being made insolvent and losing its principal valuable asset.

507. Their first option was to discuss with Claimants. Mr. Karibjanov, appointed by Telecom Invest, flew to Corfu and had a meeting with Hakan Uzan. Initially, Mr. Uzan offered to sell Claimants' shares to Telecom Invest for USD 20 million. Mr. Karibjanov refused. Mr. Uzan then offered to purchase Telecom Invest's shareholding for USD 12 million.

508. There followed further discussions. Claimants wanted to retain 30% of the purchase price on completion and that Telecom Invest obtain a new investment contract. A Stock Purchase Agreement was drafted but, ultimately, Rumeli did not transfer the funds and the agreement lapsed.

509. According to Respondent, the price offer made does not reveal anything. It is just the price that Mr. Uzan offered, which Respondent considered to be a considerable overvalue. In any case, the fact that Telecom Invest was ready to sell its stake for USD 12 million is irrelevant to the issue of its true value.

510. Moreover, Claimants' allegation that the Stock Purchase Agreement would demonstrate that the Investment Committee was under the influence of the local partner, is simply wrong. It is true that the Agreement provided that Telecom Invest had to procure either a new investment contract or to persuade the Investment Committee to overturn its cancellation of the previous Contract. However, this clause was simply a best endeavors clause and Mr. Karibjanov took the view that even if Telecom Invest were not successful

in securing the reinstatement of the Investment Contract, or in obtaining a new one, it would still have obtained USD 10.2 million for its 40% shareholding which he himself considered to be worthless.

511.  Respondent finally submits that:

- the ultimate proof of the absence of influence of Telecom Invest on the Investment Committee is the fact that the Investment Contract was never reinstated;

- the Stock Purchase Agreement contained a contractual mechanism in the form of a retention of 15% of the purchase price to deal with the risk that KaR-Tel could have entered into transactions that were not in its interest during the time it was managed by Telecom Invest.  Contrary to Claimants' allegation, this risk was not at the origin of the non execution of the Agreement.  In reality, Claimants were unable to complete the transactions because external events left them without funds.

## 6.  The actions of the Working Group

512.  The next entity criticized by Claimants is the Working Group established by Respondent's Government.  According to Respondent, the only evidence adduced by Claimants in relation to the Working Group was a short section of Professor Sergeev's report.  The only question asked to Professor Sergeev – whether the Working Group could validate the cancellation of the Investment Contract – was not in issue between the parties, and so is irrelevant.  On the other hand, Respondent provided a witness statement from Mr. Imin Sabirov, who as well as being a former Chairman of the Investment Committee, was the Chairman of the Working Group.  Mr. Sabirov gave evidence to the Tribunal at the hearing.

513.  Claimants were not *de facto* excluded by Respondent from the Working Group investigation.  Instead:

- there was no legal obligation for Respondent to establish such a Working Group. It was an informal group before which there was no formal procedure. There was thus no requirement to hear representations from Claimants, nor to involve them in any way. However, the Working Group did offer Claimants the opportunity to participate;

- as evidenced by Mr. Sabirov, the Working Group wanted Claimants to participate as they were the complainants. Claimants were notified of the creation of the Group. On July 1, 2003, Claimants' attorney was informed by telephone of the new start date of the work on July 4, 2003;

- since the Group was to conduct an audit on KaR-Tel, including on its investment obligations, it was logical to hold the meetings of the Working Group at KaR-Tel's offices. In this respect, Respondent points out that, in the light of Mr. Agilönü's evidence that he sought access to KaR-Tel's premises, no credence can be given to the affirmation that those premises were hostile to Claimants;

- at no stage did Claimants display any interest in participating in the Working Group's investigation. There were no letters from Claimants indicating willingness to participate or seeking information on the process.

514. With respect to the criminal proceedings, Respondent disputes Claimants' allegation that they were wholly unfounded and begun at the same time as the Working Group's examination precisely to dissuade Claimants' appointees from participating in the Working Group's work:

- in 2002, Mr. Yerimbetov had discovered that approximately USD 200,000 had been taken from KaR-Tel by its senior management without appropriate paperwork. During the spring of 2003, Mr. Yerimbetov was warned by the tax authorities that if he did not report this as a criminal offence, he could render himself personally liable. After an audit of the relevant transactions, Mr. Yerimbetov and KaR-Tel's chief accountant made a report to the Almaty police on June 24, 2003. Mr. Yerimbetov confirmed that once he had discovered that the money was missing, he had contacted the individuals involved on a

number of occasions and asked them to repay the debt, but they had refused. He was not asked a single question at the hearing, so that his evidence is unchallenged;

- a criminal indictment was issued on July 1, 2003. However, on September 1, 2003, the Almaty police was forced to suspend the proceedings as they had been unable to interview any of the persons indicted, who had fled Kazakhstan;

- Claimants' appointees did not challenge the decision to indict them as it was their right to do so;

- on the contrary, Mr. Ozornek wrote to KaR-Tel, admitting having taken the sums alleged;

- one of the persons indicted is a Kazakh national, which undermines Claimants' suggestion that the criminal charges were brought only against Turkish executives and for an ulterior purpose;

- these indictments were far from being unfounded;

- Respondent's Expert on Criminal Procedure in Kazakhstan confirms that there was nothing unusual from a procedural point of view. Claimants did not adduce any expert on this issue and Respondent's expert evidence remained unchallenged;

- Claimants' continued reliance on the fact that Mr. Seysembayev knew of the criminal proceedings is misconceived. The indictment was a document of public record and Mr. Seysembayev was the ultimate beneficial owner of Telecom Invest at the time, and therefore the person to whom Mr. Yerimbetov was answerable. It was therefore perfectly legitimate to make him aware of the complaint filed by Mr. Yerimbetov.

515. According to Respondent, Mr. Agilönü's witness statement, which is the only evidence adduced by Claimants in relation to the criminal investigation says almost nothing. Furthermore, in cross-examination, Mr. Agilönü admitted that:

- none of Claimants' appointees had contested the criminal investigation;

- Mr. Ozornek admitted to having taken the sums alleged and Rumeli offered to offset the sums against its claims against KaR-Tel.

516. In re-examination, Mr. Agilönü alleged for the first time that he had in fact repaid the money it was alleged he took, implicitly accepting that he had taken the sums alleged.

517. Contrary to Claimants' allegation, the Working Group was not in any sense established to review the legality of the Investment Committee's decision to cancel the Investment Contract or to find alternative grounds for its cancellation. After the Government had received Claimants' complaints dated April 2 and 3, 2003, various Ministries suggested that, in the interest of preserving a good relationship with Claimants and to avoid the costs of an arbitration procedure they were threatening to initiate, an attempt should be made to settle the dispute amicably through negotiation. In this perspective, the Working Group was created by the Kazakh Government to provide information to the Government concerning whether or not KaR-Tel had fulfilled its obligations under the Investment Contract. The purpose was therefore not at all improper. This was confirmed by Mr. Sabirov.

518. The Working Group found that, contrary to Claimants' allegations, KaR-Tel had not complied either with its reporting obligations or with its investment obligations, and that, consequently, the Investment Committee was right in cancelling the Investment Contract. According to Respondent, it is crucial for the Tribunal to recognize that Claimants did not challenge in evidence any of the findings of the Working Group.

519. Mr. Sabirov was cross-examined on his views on the legitimacy of the cancellation of the Investment Contract. He confirmed his witness statement and provided further explanation:

- suspension was only the right, not the obligation of the Investment Committee;
- it was normal practice for the Investment Committee to cancel investment contracts unilaterally, without a Court decision, and without suspending first pursuant to article 13 of the Investment Law;

- he was in fact only surprised that the Investment Committee had granted KaR-Tel so long to remedy its breaches;

- the most common grounds for which investment contracts were cancelled under article 13 of the Investment Law were failure to file reports and non-compliance with the working program;

- no member of the Working Group had any idea that KaR-Tel was in any way related to the President's family or the Government.

520. Respondent finally alleges that, even if Claimants were correct about the Working Group process being procedurally or substantively wrongful, they failed to challenge that process, or its findings, in Kazakhstan, even by writing to the Working Group itself to protest its conclusions. Claimants thereby denied the Kazakh system the opportunity to correct the alleged errors on which they now seek to rely.

## 7. The actions of Respondent's Judiciary

521. According to Respondent, Claimants' position that Respondent's Judiciary grossly misapplied the law is totally unfounded. Respondent adduced expert evidence from Professors Kaudyrov and Klimkin and from Professor Mukhamedshin in relation to the principles of Kazakh law on each issue raised by Claimants.

522. Claimants submitted the testimony of Professor Sergeev, who admitted that he had not published on the areas of investment law, corporate law in Kazakhstan or Kazakh LLP Law, whereas Professors Kaudyrov and Mukhamedshin have a significant experience in those fields. In addition, in the course of his evidence, Professor Sergeev accepted that the issue of whether the notice for the EGMs was in compliance with Kazakh law was open to debate. He also accepted that the opinions of Professors Kaudyrov, Klimkin and Mukhamedshin submitted to the Tribunal, and which support the Almaty City Court's reasoning, were their honest opinions.

523. In this respect, it is Respondent's position that the Courts correctly applied the law by deciding that the April 2002 EGM was valid.

524. Respondent further submits that the delivery of the April 2002 injunction was perfectly legitimate and in accordance with Kazakh law with the consequence that the Court's decision to validate it was correct.

525. Respondent further disputes Claimants' allegation that the Court violated the law with respect to the issue of the harm to the partnership discussed at the EGMs, following the cancellation of the Investment Contract. Claimants indeed allege that the judge ignored the rule of article 34 of the LLP Law that only actual and incurred harm can justify a compulsory redemption, not purely potential harm.

526. According to Respondent, and as confirmed by their Civil Expert Report, there is no requirement in the LLP Law for evidence of "*harm*" or "*damage*" to be presented at the EGM. It cannot therefore be a requirement for a valid resolution of compulsory redemption.

527. Respondent further alleges that Claimants are unable to demonstrate that the Court decision on the compulsory redemption was incorrect. Indeed, the cancellation of the Investment Contract had caused KaR-Tel losses in two ways. First KaR-Tel had to pay back 34,500,000 Tenge, as well as fines and default interest bringing the total amount to be paid to approximately USD 389,000. Second, KaR-Tel lost the benefit of the Investment Contract for the future.

528. Respondent further alleges that Claimants caused KaR-Tel to purchase outdated equipment and mobile telephone handsets at inflated prices and that this also generated damage for KaR-Tel, as evidenced by the Court-appointed forensic merchandising experts. The only complaint that Claimants expressed on this report is that it only established probable prices, not certain prices. According to Respondent, it is notable in relation to the issue of the transactions with Telsim that Mr. Agilönü gave evidence to the Tribunal in which he accepted that he had not conducted any tenders for equipment whilst General Director of KaR-Tel.

529. In this framework, it is also Respondent's contention that the Court rightly rejected the argument put forward by Claimants that they could not be blamed for these transactions since they were entered into with Telsim and not Rumeli, at a time when Telsim was not a shareholder. Indeed, each of the transactions had been made conditional upon Rumeli's approval.

530. Respondent further points out that for its Procedural Law Expert, it is beyond dispute that the multi-million dollars of harm caused to KaR-Tel are to be qualified as significant.

531. Respondent finally disputes Claimants' allegation that the Court violated the law to the extent that the harm caused to KaR-Tel was not attributable to Claimants or could also have been attributed to the local partner. Claimants' position is indeed that they did not owe any obligations to the Investment Committee, such obligations being only owed by KaR-Tel; a member of an LLP is not responsible for the obligations of the LLP by virtue of article 44 of the LLP Law. Respondent disputes this and submits that the Kazakh Courts correctly decided that the obligations of KaR-Tel to make investments under the Investment Contract were directly related to Claimants' obligations to invest under the Foundation Agreement. The Courts held that the reason for the failure to file the reports was that the companies controlling KaR-Tel recognized that KaR-Tel had not complied with its obligations. Thus, the Investment Contract could validly be cancelled for failure to invest.

532. The Courts further found that KaR-Tel's General Manager was at all times a person controlled by Rumeli and Telsim. Therefore, the failure to file the reports was attributable to Claimants. This is confirmed by Respondent's Procedural Expert Report.

533. On the other hand, Telecom Invest being a silent partner, it could not be considered equally responsible for the failure of KaR-Tel to comply with its obligations.

534. With respect to the issue of the reasons to buy out a participant, Respondent submits that their Civil Law Expert dismissed as being without any basis in the LLP Law, Claimants' contention that any allegation of harm or damage caused to the LLP, which was not

explicitly discussed at the EGM at which the resolution was passed, is *ultra vires* and may not be entertained by the Court. Indeed, as the compulsory redemption is a judicial procedure, the proper place to bring and consider evidence of harm or damage caused to the partnership is before the Court.

535. Respondent further contends that the Court's approach to the expert evidence was appropriate. It is correct that Judge Begaliev said that opinions of Professor Suleimenov and the other professors were not accepted, and that "*the indicated individuals do not have the right to interpret the law*." This is conform to Kazakh law, according to which legal opinions are considered as evidence, which judges are entitled to reject.

536. According to Respondent, the only real allegation of denial of justice by Claimants precisely concerns Judge Begaliev who would have been corrupted. The allegation against Judge Begaliev is based only on the evidence of Mr. Agilönü. Respondent makes the following submissions on this issue:

- this is a very serious allegation, which requires the Tribunal to look at the matter very carefully. In addition, Mr. Agilönü is the leading factual witness for Claimants. If the Tribunal concludes that he lied to the Tribunal with respect to Judge Begaliev, then this should have an adverse effect on the remainder of his evidence;

- the allegations were raised very late in the proceedings;

- there is not a single contemporary document supporting the allegations. Mr. Agilönü reported back to Claimants' management located in Turkey. It is reasonable to suppose, if his evidence was truthful, that the discussions would have been documented particularly since he says he was following management's instructions;

- had Judge Begaliev done any of the acts complained of, Claimants would have asked for his removal from the case or raised his conduct by way of an appeal from the decision of June 6 , 2003. None of this happened;

- Mr. Agilönü was an unsatisfactory witness. Indeed, his evidence was incredible:

- for the first time he introduced the suggestion that another judge had asked for a bribe but he was not prepared to name him;

- for the first time, once he had admitted he spoke limited Russian at the time, he alleged that all his dealings with Judge Begaliev had been through an interpreter, whom he also refused to name;

- it is inconsistent for Judge Begaliev to have told Mr. Agilönü on one day that he would decide the case in Claimants' favor for money, and the next to have told Mr. Agilönü that he had been ordered by the highest authorities to decide in the other way;

- although his witness statement speaks of Judge Begaliev receiving instructions from the highest authorities, implying the Presidential family, in cross-examination, Mr. Agilönü admitted that he had understood merely that it was someone more senior than Judge Begaliev at Almaty City Court;

- Judge Begaliev gave his evidence in a calm and measured manner;

- Judge Begaliev's evidence was entirely consistent with the expert evidence given on Kazakhstan law. Claimants did not identify a single aspect of Judge Begaliev's judgment that was only explicable on the basis that he was corrupt and rendered a dishonest judgment;

- finally, the pantomime with the non-existent photograph of Judge Begaliev wearing a dark suit and sitting behind a table with sandwiches on it did no more than highlight the hopelessness of Claimants' case and the inappropriate lack of seriousness with which they treat making such grave allegations against a serving judge.

537. Respondent further notes that, in their Memorials, Claimants did not make any direct criticism of the Supreme Court's judgment, though it was to be inferred that they applied the same criticisms to it as those they applied to the judgment of the Almaty City Court.

538. In the course of his evidence before the Tribunal, however, Mr. Agilönü, for the first time in this arbitration, alleged that a Justice of the Supreme Court had also solicited a bribe from him in order to determine the appeal in Claimants' favor. However, Mr. Agilönü refused to give the name of the judge and further details. Therefore, the Tribunal is invited to draw the inference that Mr. Agilönü is not telling the truth on this issue. The nature of the allegation makes it inherently improbable, the circumstances and timing in which it was first raised and the conduct of Claimants' counsel in respect of it only heighten the sense that it is a further lie.

539. Respondent finally alleges that none of the critics made by Claimants against the decision of the Presidium of the Supreme Court has any merit:

- Claimants were notified of the hearing. It is notable that they made no attempt to protest against this alleged further failure of the Kazakh postal service;
- pursuant to article 82 of the Kazakh Civil Code, it was within the Presidium's power to determine the price for the compulsory redemption since there had been no agreement between the parties. Claimants have not adduced any expert evidence on this issue and the expert evidence of Professor Mukhamedshin and Professors Kaudyrov and Klimkin was unchallenged in cross-examination;
- the valuation of the Presidium was correct. It based its valuation decision on several expert reports prepared by a number of different entities, including international audit firms and the independent and Court-appointed Forensic Examination Center of the Ministry of Justice of the Republic. Moreover, the Expert Valuation prepared by Navigant Consulting also confirms the valuation provided to the Kazakh Courts. He demonstrated also that, despite the superficial attraction of Claimants' attempts to draw a comparison between the Presidium's valuation and the price paid by VimpelCom, the two are reconcilable.

540. Respondent finally alleges that, even if the Presidium's decision could be potentially expropriatory, which is denied, it is plain that Claimants received fair compensation for

their shareholdings, such that one of the key requirements for expropriation is not present, or they would not have suffered any loss as a result.

### 8.    The alleged attempts to pay Claimants to go away

541. It is true that in April 2003, Mr. Seysembayev attempted to purchase Claimants' 60% interest in KaR-Tel for USD 12 to 15 million.  Claimants refused the offer.  However, Claimants misstate the chronological sequence of the events.  The offer made by KaR-Tel in the amount of USD 3,000 was not made before but after Mr. Seysembayev.  Indeed, KaR-Tel's offer was after the judgment of the Almaty City Court and Claimants failed to appeal to the Supreme Court.  KaR-Tel's offer was thus made at a time when Telecom Invest knew that KaR-Tel was insolvent.

542. Respondent further points out that both these offers were made considerably after the sale of Telecom Invest to Mr. Seysembayev.  There is therefore no basis for alleging that these offers were in any way made by either Respondent or "*members of President Nazarbayev's empire."*

543. According to Respondent, a final link to the President's family, and supposedly therefore, to Respondent's liability, was the alleged offer by Arlan/Altel in August 2004 to purchase Claimants' shares in KaR-Tel for USD 20 million.  Claimants allege that this was made on behalf of Respondent since one of the President's daughters has an interest in Altel and that Kazakhtelecom does too.

544. Respondent disputes that allegation :

- Altel is only partially owned by Kazakhtelecom;
- the documents invoked by Claimants in support of their allegation are irrelevant;
- even if Claimants were correct that an offer was made at the meeting held on August 24, 2004, it is a significant step to further allege that it was in some way made on behalf of Respondent and that it would constitute an admission of a violation of Respondent's obligations under international law.

545. According to Respondent, it was alleged that Mr. Orazbekov had made this offer at a meeting with Mr. Akgün in Kazakhstan. However, Mr. Akgün's evidence before the Tribunal on this issue was riddled with inconsistencies:

- he accepted that there was no mention in the letter from Mr. Umirzhanov, the President of Altel, to Mr. Tasalin, to anything relating to KaR-Tel, only to opportunities for collaboration in the telecommunications sector;

- his explanation of the letter was not credible. Mr. Akgün stated that the first contact had been by telephone. He said" This letter just makes for us possible to visit" but he then accepted that he did not need a visa to travel to Kazakhstan;

- he accepted that his own letter in response equally made no mention of KaR-Tel, though his explanation for it being written in English was that this was company policy;

- in contrast to this, Mr. Akgün then suggested that the memorandum from him to TSDIF was originally in Turkish, not English. No Turkish version of this document has ever been provided by Claimants, unlike in relation to all other Turkish documents in this arbitration, and it is curious that the supposed translation is radically different from all other translations provided by Claimants;

- he accepted that the offer he alleges he received from Mr. Orazbekov was never put into writing;

- Mr. Akgün then alleged for the first time that Mr. Umirzhanov had also made the same offer to purchase Claimants' shareholding for USD 20 million. This was not alleged in Claimants' Memorials or in Mr. Akgün's witness statement.

546. On the contrary, Mr. Orazbekov gave evidence to the Tribunal that he had been asked to have a meeting with some Turkish people to discuss investment opportunities, but that they had not wanted to discuss this at all and had instead just complained of the problems they were having in Kazakhstan. He was also clear that he did not have the authority to commit Arlan to pay USD 20 million on any contract.

547. According to Respondent, the Arbitral Tribunal should accept Mr. Orazbekov's evidence as being inherently more credible than Mr. Akgün's inconsistent and shifting account. The Tribunal is also invited by Respondent to find that Claimants have not established how any such offer, even if made, could possibly be attributable to Respondent as a matter of international law.

### 9. The sale of KaR-Tel to VimpelCom

548. According to Respondent, Claimants' attempt to contrast the figure paid by VimpelCom with the valuation of the Presidium is not proper for the following reasons:

- no account can be taken of what a private company wishes to pay to acquire an asset in an open tender process;

- VimpelCom was bidding in an open tender for a business that might well have a significant specific value for VimpelCom, but which could not be realized by any other entity;

- the Presidium's valuation was for 60% of KaR-Tel in April 2002. VimpelCom's bid was for 100% of KaR-Tel in late August 2004;

- VimpelCom bid for a completely different entity than the insolvent KaR-Tel of April 2002. Indeed, KaR-Tel had been operated and restructured by Mr. Yerimbetov.

549. According to Respondent, thanks to the efforts of Mr. Yerimbetov:

- KaR-Tel overall debt had been reduced by over USD 101 million, whilst at the same time significant investments had been made in new technology;

- the network had been expanded considerably;

- KaR-Tel had over 600,000 real subscribers, as opposed to 150,000 alleged subscribers;

- KaR-Tel had a market share in Kazakhstan of 31%, compared to less than 20% in 2002;

- KaR-Tel had a fast growing and very successful prepay product;

-   KaR-Tel had a modern billing platform.

550.   With respect to KaR-Tel's debt, Respondent alleges that Mr. Yerimbetov was able to negotiate very hard with Motorola and to obtain a restructuring deal whereby the Loan would be discounted to USD 35 million  because:

-   he could demonstrate to Motorola that the Uzans had nothing to do any more with KaR-Tel;
-   he had realized that the 3-year limitation period for bringing a claim would expire; and
-   he had seen that Motorola had already written off from its accounts the debt owed by KaR-Tel.

551.   Mr. Yerimbetov further persuaded KazKommertz Bank to lend KaR-Tel the USD 35 million required to repay Motorola.

552.   Respondent finally points out that KaR-Tel filed a claim for the losses suffered as a result of Claimants' actions related to the un-commercial transactions with Telsim.  On 6 July 2004, the Almaty City Court awarded KaR-Tel damages of USD 41.8 million.  Claimants did not appeal the judgment but have so far failed to pay any part of the sum.  However, this enabled Mr. Yerimbetov to set-off the alleged debts towards Rumeli and Telsim.

### 10.   The conspiracy theory

553.   According to Respondent, the first element of Claimants' case was a conspiracy to expropriate their investments in Kazakhstan.  However, this conspiracy case was, and remains, a fiction.

554.   In this respect, Respondent points out that it presented a number of witnesses who, on Claimants' case, either knew of the purported conspiracy or even participated in it.  It was pointed out in Respondent's opening submissions and twice subsequently, that fairness required that the conspiracy case be put to any witness who, it was said, was involved in the alleged wrongful acts.  However, Claimants studiously declined to put

their allegations, or the facts underlying those allegations to Respondent's witness. The reason for this failure is clear: there is no discernible factual basis for any of the allegations made by Claimants.

555. According to Respondent, faced with the prospect that their case was lost, Claimants resorted to bizarre tactics:

- they concocted a dishonesty case against a serving judge, Jugde Begaliev, without any ground;

- they alleged that Respondent had taken steps to prevent Claimants from obtaining legal advice on Kazakhstan law, whereas the truth was that Claimants were unable to find anyone who was prepared to support their case;

- they alleged that Professor Didenko had been forced to write his academic article "*contradicting in violation of the most fundamental rules of ethics, his own position in the previous litigation against the local partner in Kazakhstan*," whereas this article is a balanced opinion in which Professor Didenko alters some, but by no means all, of his views. He still stands by certain of his criticisms of the approach taken by the Almaty City Court. Moreover, his article was published in 2003, over two years before these arbitral proceedings were commenced;

- they allege that Respondent was seeking to "intimidate" Claimants by copying correspondence to someone in Salans' offices in Kazakhstan: again this was a groundless allegation.

556. With respect to Claimants' allegation that an adverse inference should be drawn by the fact that Respondent did not call Mr. Kulibayev, Respondent points out that there is nothing in this point:

- no prima facie case has been disclosed which requires a response from Mr. Kulibayev;

- Respondent does not have the power to compel Mr. Kulibayev; he holds no position in the Republic of Kazakhstan Government;

- Respondent did call as witnesses a number of persons who had contact with Mr. Kulibayev. In particular, they called Mr. Abuov, who was alleged by Claimants to be the "right hand man" of Mr. Kulibayev. He testified that Mr. Kulibayev did not cause the Investment Committee to cancel the Investment Contract.

## III. ON THE PURPORTED BREACHES BY RESPONDENT OF ITS OBLIGATIONS

### A. <u>The legal framework</u>

#### 1. Claimants' position

557. According to Claimants, their investment is protected by the BIT between Turkey and the Republic, more specifically by virtue of its Articles II and III.

558. Article II provides that:

> *"(1) Each Party shall permit in its territory investments, and activities associated therewith, on a basis no less favorable than that accorded in similar situations to investments of investors of any third country, within the framework of its laws and regulations.*
>
> *(2) Each Party shall accord to these investments, once established, treatment no less favorable than that accorded in similar situations to investments of its investors ('National Treatment clause') or to investments of investors of any third country, whichever is the most favorable ('MFN clause')."*

559. Article III provides that:

> *"(1) Investments shall not be expropriated, nationalized or subject directly or indirectly, to measures of similar effect except for a public purpose, in a non-discriminatory manner, upon payment of prompt, adequate and effective compensation, and in accordance with due process of law and the general principles of treatment provided for in Article II of this Agreement.*
>
> *(2) Compensation shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known. Compensation shall be paid without delay and be freely transferable."*

560. According to Claimants, in view of the MFN clause contained in the BIT, Respondent's international obligations assumed in other bilateral treaties are applicable to the instant case. Such obligations include:

- the obligation to ensure the fair and equitable treatment of the investments of investors of the other Contracting Party;
- the obligation to accord full protection and security to such investments;
- the obligation not to impair by unreasonable, arbitrary, or discriminatory measures the management, maintenance, use, enjoyment, or disposal of such investments.

561. Claimants also consider that their investment is protected by the FIL, and more specifically its Articles 7 and 9.

562. Article 7 provides that:

*"1. Foreign investments may not be nationalized, expropriated or subjected to any measures which have the same consequences as nationalization and expropriation (henceforth, expropriation), except for the cases where such expropriation is carried out for public interests in compliance with the appropriate legal procedures and carried out without discrimination with the payment of immediate, adequate and efficient compensation.*

*2. The compensation must be equal to the fair market value of the expropriated investments at the moment when the investor learnt of the expropriation."*

563. Article 9(2) provides that:

*"[l]osses inflicted by any illegal suspension, restriction or termination of the business activities of a foreign investor by the actions of the bodies and persons named in Article 8 of this Law, shall be compensated to the foreign investor."* The persons named in article 8 include, inter alia, state executive bodies, law enforcement bodies, and state officials at any level.

564. Finally, according to Claimants, Respondent is also obliged to act in accordance with "*such rules of international law as may be applicable*," which includes customary international law.

565. Given the foregoing, it is Claimants' position that the acts and omissions of Respondent, individually and collectively, constitute breaches of its obligations:

- to afford fair and equitable treatment;
- not to deny justice;
- to ensure full protection and security;
- not to impose unreasonable, arbitrary and/or discriminatory measures;
- not to expropriate absent certain specific conditions.

### 2. Respondent's position

566. Respondent submits that pursuant to Article 42(1) of the ICSID Convention, the law applicable to this arbitration is Kazakh law, supplemented by certain principles of international law.

567. Referring to the five international standards invoked by Claimants in their memorial (fair and equitable treatment, denial of justice, full protection and security, no unreasonable, arbitrary or discriminatory measures and expropriation), Respondent submits that there is very little substantive dispute between the parties on the test for each of them, except that these standards are probably less onerous than Claimants suggest.

568. More precisely, Respondent does not dispute that its actions are to be measured against international standards and broadly accepts the applicability of the particular standards set out by Claimants. Rather, it is Respondent's case that, when applied to the real facts, none of the above legal grounds for complaint is even close to being made out.

569. Respondent accepts that it owed Claimants a duty to accord them fair and equitable treatment with respect to their investments and a duty not to unlawfully expropriate such investments. It denies that it breached either of those duties.

570. Respondent considers that, on a proper interpretation, the duty to accord fair and equitable treatment includes the other duties set out by Claimants. According to Respondent, in dividing the various duties, Claimants have unreasonably sought to create the impression that Respondent owed Claimants substantially greater duties than did it in fact. Therefore, Respondent does not accept that each such duty is a separate obligation.

571. Respondent further accepts that under customary international law, Claimants were entitled to the minimum customary standard, and that this includes the denial of justice. However, according to Respondent, the obligations stated by Claimants exceed that minimum international standard.

572. Respondent also accepts that the Turkey-Kazakhstan BIT imposes certain obligations upon it and that the provisions this case is concerned with are Articles II and III. It also accepts that, under the MFN clause, it was obliged to treat Claimants in accordance with any more favourable treatment afforded to nationals of other countries.

573. However, for Claimants to be afforded that treatment, they had to meet the conditions required of those other nationals. In this respect, Respondent alleges that Claimants have not identified the specific BITs upon which they rely to found their claims to the various obligations. The BITs to which Kazakhstan is not a party are not relevant.

574. Finally, each of the obligations asserted by Claimants must be interpreted by reference to the specific terms, context and aims of each individual BIT. To interpret the obligations claimed by Claimants that are not in the Turkey-Kazakhstan itself, Respondent will refer only to the United Kingdom-Kazakhstan BIT. This contains all of the obligations Claimants allege they were owed and Respondent accepts that, were Claimants United Kingdom companies, the standards of that treaty would be applicable to them.

### 3. The applicable standards: Decision of the Arbitral Tribunal

575. The parties agree that in view of the MFN clause contained in the BIT, Respondent's international obligations assumed in other bilateral treaties, and in particular the United Kingdom-Kazakhstan BIT, are applicable to this case, such obligations including:

- the obligation to ensure the fair and equitable treatment of the investments of investors of the other Contracting Party;

- the duty not to deny justice;

- the obligation to accord full protection and security to such investments; and

- the obligation not to impair by unreasonable, arbitrary, or discriminatory measures the management, maintenance, use, enjoyment, or disposal of such investments.

The parties also agree to a large extent on the test applicable for each of these obligations, as we will see below.

576. Whether a breach of one of the above standards can be attributed to the State will be determined on the basis of the principles laid down in the ILC Articles. According to Article 2 of the ILC Articles:

> *"there is an internationally wrongful act of a State when conduct consisting of an action or omission : a) is attributable to the State under international law; and b) constitutes a breach of an international obligation of that State."*

577. According to Article 4:

> *"1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central government or of a territorial unit of the State.*
>
> *2. An organ includes any person or entity which has that status in accordance with the internal law of the State."*

578. Article 5 further provides that:

> *"[t]he conduct of a person or entity which is not an organ of the State under Article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance."*

579. According to Article 12:

> *"[t]here is a breach of an international obligation by a State when an act of that State is not in conformity with what is required of it by that obligation, regardless of its origin or character."*

580. Finally, according to Article 13:

> *"[a]n act of State does not constitute a breach of an international obligation unless the State is bound by the obligation in question at the time the act occurs."*

## B.    Fair and equitable treatment

### 1.    Claimants' position

#### a)    The Standard

581. According to Claimants, Respondent's obligation to afford "*fair and equitable treatment*" is imposed not only by customary international law but also by virtue of the MFN clause of the BIT.

582. The standard can indeed have two meanings. It can be given its plain meaning, i.e., fairness and equity of treatment as these terms are generally understood in non-technical terms. Accordingly, tribunals would determine whether "*in all the circumstances [of the case] the conduct in issue is fair and equitable or unfair and inequitable.*"[31] Alternatively, this standard can mean that beneficiaries are assured treatment commensurate to the international minimum standard for investors.

583. The standard is intentionally vague in order to give arbitrators the possibility to articulate the range of principles to achieve the treaty's purpose in particular disputes. As it emerges from the arbitral case law, the principle encompasses, *inter alia*, the following concrete principles:

- the State must act in a transparent manner (Metalclad, Tecmed);

- the State is obliged to act in good faith (Tecmed, Waste Management);

---

[31] F.A. Mann, *British Treaties for the Promotion and Protection of Investment*, 52 British Y.B. Int'l L, 1981, pp. 241, 244 [hereinafter F.A. Mann, *British Treaties*].

- State conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process (Waste Management);

- the State must respect procedural propriety and due process (Amco, Azinian, Fabiani, Brown).

584. Fair and equitable treatment thus requires that the State act in a transparent manner, namely that there is no ambiguity in the legal framework relating to the investor's operations and that the decision affecting the latter be traceable to that legal framework.

585. As confirmed by *Metalclad*,[32] transparency requires that the investor be informed about the laws and administrative or other binding decisions before they are imposed. In the same vein, the tribunal in *Tecmed*[33] stated that the fair and equitable treatment provision requires that the investor's basic expectations should not be affected by a State's conduct, which must be consistent, free from ambiguity, and completely transparent in its relation to the foreign investor. According to the tribunal in *Tecmed*, the foreign investor "*also expects the host State to act consistently, i.e. without arbitrarily revoking any preexisting decisions or permits issued by the State that were relied upon by the investor to assume its commitments as well as to plan and launch its commercial and business activities.*"[34]

586. According to Claimants, arbitral tribunals – including *Tecmed* and *Waste Management* – also have confirmed that good faith is inherent in fair and equitable treatment.

587. Taking together the arbitral jurisprudence, Claimants allege that the *Waste Management*[35] tribunal best summarized the standard requiring that a State act in a manner affording fair and equitable treatment to foreign investment:

---

[32] *Metalclad Corporation v. United Mexican States* (ICSID Case No. ARB (AF)/97/1), Award of August 30, 2000 [hereinafter *Metalclad*].

[33] *Técnicas Medioambientales Tecmed S.A. v. United Mexican States* (ICSID Case No. ARB(AF)/00/2), Award of May 29, 2003, para. 154 [hereinafter *Tecmed*].

[34] *Id.*, para. 154.

[35] *Waste Management, Inc. v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award of April 30, 2004, para. 98 [hereinafter *Waste Management v. Mexico*].

*"[the] minimum standard of treatment of fair and equitable treatment is infringed by conduct attributable to the State and harmful to the claimant if the conduct is arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process leading to an outcome which offends judicial propriety – as might be the case with a manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candor in an administrative process. In applying this standard it is relevant that the treatment is in breach of representations made by the host State which were reasonably relied on by the Claimant."*

### b) Application to the facts of the case

588.  According to Claimants, the facts of the case clearly demonstrate that Respondent has not treated Claimants' investment fairly or equitably:

-  the Investment Committee did not even wait until its own extended deadline for the filing of the reports before terminating the Investment Contract on March 25, 2002;

-  the Investment Contract was terminated despite the fact that Claimants submitted the requested reports on March 25, 2002;

-  the Investment Committee had the obligation to first suspend the Investment Contract;

-  the Investment Committee terminated the Investment Contract with the utmost lack of good faith and in clear violation of the international obligations of Respondent contained in the Bilateral Investment Treaty. The termination was unreasonable, arbitrary, grossly unfair, unjust, idiosyncratic and violated the legitimate expectation of Claimants.

589.  According to Claimants, the above undisputable breaches of the Bilateral Investment Treaty are alone sufficient to justify a ruling against Respondent, irrespective of the subsequent breaches committed by Respondent and irrespective of the collusion between Respondent and powerful local partner.

590.  Claimants further point out the following breaches of the Bilateral Investment Treaty by Respondent:

- the process that led to the termination of the Investment Contract and to the decision of the Working Group was anything but transparent;

- Claimants were not granted an opportunity to present their position either before the Investment Committee or the Working Group;

- Respondent's Courts and enforcement authorities ousted Claimants from KaR-Tel prior to a determination of the merits of the dispute;

- Respondent's Courts favored the local partner by confirming the appointment of the new General Manager;

- the decision ordering the compulsory sale of Claimants' shareholding for USD 3,000 is particularly outrageous;

- Respondent initiated criminal proceedings in total bad faith;

- Respondent recognized that it had treated Claimants unfairly and inequitably when it offered Claimants, through a controlled entity, USD 20 million to acquire its interest in KaR-Tel.

### 2. Respondent's position

#### a) The standard

591. Respondent accepts that the duty of fair and equitable treatment was owed to Claimants under the most favored nation clause of the Turkey-Kazakhstan BIT in conjunction with the UK-Kazakhstan BIT. The substance of that obligation, however, is different from that stated by Claimants.

592. Respondent accepts that in accordance with this principle, it was required to act in good faith and in a transparent manner, and that its conduct could not be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory or lacking in due process. However, Respondent does not accept Claimants' standard, which is too high. For Respondent, the fair and equitable treatment standard is a minimal one and moreover, for a breach of the standard to occur, Respondent's conduct should have fallen below that minimal standard in a manner that "*shocks, or at least surprises, a sense of juridical propriety*" (*ELSI*).

593. In this respect, Respondent alleges that the interpretation must follow the standard rules. Awards based on NAFTA are in principle inapplicable since not only is the wording of Article 1105 NAFTA different to Article II of the UK-Kazakhstan BIT but moreover, as Schreuer stated, it does not follow that the result reached in the NAFTA context should also necessarily be applied to other treaties, notably to BIT's because of the special features of Article 1105(1). Respondent will therefore rely upon elements of awards under NAFTA only insofar as they are also applicable to the relevant BIT.

594. Respondent further alleges that to determine the extent of the fair and equitable treatment obligation in this case, it is necessary to construe the specific part of Article II(2) of the UK-Kazakhstan BIT. This should be done in accordance with the accepted rules of treaty interpretation, as applied in the *Saluka* decision.

595. As stated in *Saluka*, the ordinary meaning of fair and equitable treatment "*can only be defined by terms of almost equal vagueness.*" It includes "*just, even-handed, unbiased, legitimate.*"[36]

596. Moreover, its context in an international legal instrument must indicate that it refers to international standards. In order for the standard to be breached, the investor must therefore have been "*treated in such an unjust or arbitrary manner that [it] rises to the level that is unacceptable from the international perspective*" (*S.D. Meyers*[37]). Its context in an international legal instrument also indicates that it should not, without express indication, overrule fundamental principles of international law. Any determination of breach of the provision "*must be made in the light of the high measure of deference that international law generally extends to the right of domestic authorities to regulate matters within their own borders.*"[38]

---

[36]   *Saluka v. Czech Republic,* Partial Award of March 17, 2006, paras. 296 to 309.

[37]   *S.D. Myers v. Canada* (UNCITRAL), First Partial Award of November 13, 2000, para. 263 [hereinafter *S.D. Myers v. Canada*].

[38]   *Id.,* para. 263.

597. The context of the fair and equitable treatment provision does not, therefore, raise the obligation upon Respondent beyond the international minimum standard of protection.

598. As in *Saluka*, one of the principal aims of BITs is to encourage international investment. There is therefore a need for a balanced approach: if the protection of the foreign investors were exaggerated, the host State might be dissuaded from admitting all foreign investors.

599. Furthermore, the stated goals of the UK-Kazakhstan BIT are not to ensure extending and intensifying economic relations like in *Saluka*. Its object and purpose is therefore relevant only to the extent that Respondent is required to do no more than that which does not deter foreign capital by providing disincentives to investment. It therefore only sets a floor of minimum treatment that must be accorded to foreign investors, regardless of the treatment accorded to nationals.

600. Respondent also alleges that a fair and equitable treatment standard that does no more than not to deter foreign investment is related to the expectations of the investors. For Respondent to be bound to respect those expectations, they must be legitimate and reasonable in the light of the circumstances. They should be limited to a base level and should not in any case include an expectation to be able to act contrary to public interest.

601. According to Respondent, the reasonable and legitimate expectations of an investor, determined in accordance with the above interpretation, would always include that the State "*implements its policies bona fide by conduct that is, as far as it affects the investors' investment, reasonably justifiable by public policies and that such conduct does not manifestly violate requirements of consistency, transparency, even-handedness and non-discrimination. In particular, any differential treatment of a foreign investor must not be based on unreasonable distinctions and demands, and must be justified by*

*showing that it bears reasonable relationship to rational policies not motivated by a preference for other investments over the foreign-owned investment.*"[39]

602. They will also include that the State will not commit the delict of denial of justice by disregarding the principles of procedural propriety and due process. The State must not, therefore, act in an arbitrary or discriminatory manner. In this respect, Respondent submits that it accepts the definitions of arbitrary, unreasonable and discriminatory conduct as set out in the authorities cited by Claimants.

603. Respondent concludes that in accordance with the above, in order to succeed that Respondent breached its obligations of fair and equitable treatment, Claimants must demonstrate that its actions were "*evidently arbitrary, unjust or idiosyncratic*" or prove that they were directly or indirectly discriminated against on the grounds of their nationality. The burden of proof is on Claimants and is a high one.

604. In this context, the Tribunal should not engage in a complex review of the decisions of the State's Courts. The conduct and decisions of Respondent's Courts should only be held to fall below the minimum standard if their conduct amounted to a denial of justice.

605. Finally, Respondent alleges that:

- the various requirements of the standard are closely interrelated. For example, if the State acts in good faith and in a non-discriminatory manner, without any procedural impropriety, it follows that it is exceptionally unlikely to have acted arbitrarily;
- if the actions of the State complained of were justified, and proportionate to that justification, it cannot have acted in an unfair and inequitable manner. The only exception would be if the justification was in fact a sham.

---

[39] *Saluka v. Czech Republic,* Partial Award of March 17, 2006, para. 307.

606. According to Respondent, when viewed against the facts of the case, it is clear that the Republic has not in any way breached its obligations under the fair and equitable treatment principle.

607. Claimants' allegation that the Kazakhstan Supreme Court exceeded its jurisdiction and thereby breached international law is denied by Respondent. Moreover, even if there had been a misapplication of Kazakh law by the Kazakh Courts, that would not automatically rise to the level of an international wrong.

608. With respect to the criminal proceedings, Respondent alleges that they were not initiated by the Republic, that they were justified, they were not arbitrary and that in any case, they have not prevented Claimants from pursuing their rights.

### 3.      Decision of the Arbitral Tribunal

#### a)      *The Standard*

609. The parties rightly agree that the fair and equitable treatment standard encompasses *inter alia* the following concrete principles:

- the State must act in a transparent manner;
- the State is obliged to act in good faith;
- the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process;
- the State must respect procedural propriety and due process.

The case law also confirms that to comply with the standard, the State must respect the investor's reasonable and legitimate expectations.

610. The concept "fair and equitable treatment" is not precisely defined. *"It offers a general point of departure in formulating an argument that the foreign investor has not been well treated by reason of discriminatory or other unfair measures being taken against its interest. It is therefore a concept that depends on the interpretation of specific facts for*

*its content.*"[40]  The precise scope of the standard is therefore left to the determination of the Tribunal which "*will have to decide whether in all the circumstances the conduct in issue is fair and equitable or unfair and inequitable.*"[41]

611.  The only aspect on which the parties differ is that for Respondent, the concept does not raise the obligation upon Respondent beyond the international minimum standard of protection.  The Arbitral Tribunal considers that this precision is more theoretical than real.  It shares the view of several ICSID tribunals that the treaty standard of fair and equitable treatment is not materially different from the minimum standard of treatment in customary international law.[42]

### b)  Application to the facts of the case

612.  Claimants complain that the Investment Committee did not even wait until its own extended deadline for the filing of the reports before terminating the Investment Contract on March 25, 2002.  The initial deadline of one month mentioned in the Committee's letter of February 21, 2002 was indeed extended until March 23, 2002, as was confirmed by Mr. Zverkov during his testimony.  Claimants point out that March 23 was a Saturday and that since the 22nd of March was Noruz, a public holiday in Kazakhstan, the Investment Committee was certainly closed on the 23rd; and in any case, since the 23rd was a Saturday, the extension extended automatically until Monday, March 25, 2002, the first following working day.  The record confirms that the reports on the implementation of the investment project for the third and fourth quarters of 2001 were faxed by Claimants on the 25th of March and subsequently delivered to the Committee on March 27.

---

[40]  Peter Muchlinski, *Multinational enterprises and the law*, 1995, p. 625 [hereinafter *Muchlinski*].

[41]  F.A. Mann, *British Treaties*, pp. 241-244.

[42]  *Azurix Corp. v. Argentine Republic* (ICSID Case No. ARB/01/12), Award of July 14, 2006, para. 361 [hereinafter *Azurix*]; and *CMS Gas Transmission Company v. Argentine Republic* (ICSID Case No. ARB/01/8), Award of May 12, 2005, para. 284 [hereinafter *CMS*].

613.	The Arbitral Tribunal notes however that even if Claimants are right that the deadline for the delivery of the reports was March 25, it remains that the filing by Claimants was only partial in that it only concerned the report for the third and fourth quarters of 2001. Claimants did not therefore comply with the requirement of the Investment Committee.

614.	On the other hand, in accordance with Article 19.3 of the Investment Contract, the Investment Committee had the right to terminate the Contract in case of "*[r]efusal of the Investor to cure the reasons which have caused the decision on suspension of the Contract, or a failure to cure these reasons during the term established by Agency.*" This presupposes that there had been a suspension of the Contract in accordance with the terms of Article 19.2 and the reasons for such suspension were notified.

615.	The Arbitral Tribunal considers that in deciding to terminate the Contract without prior suspension, the Republic breached the Investment Contract. This was admitted by the Republic in two letters sent to the Ministry of Industry and Trade on May 14, 2003 by officials of the Ministry of Finance and the Ministry of Economy and Budget planning. Since the Investment Committee is an organ of the State, and in the particular circumstances of this case discussed above, this breach amounts to a breach of the BIT by the Republic. The decision was arbitrary, unfair, unjust, lacked in due process and did not respect the investor's reasonable and legitimate expectations.

616.	Respondent's attempt to justify its failure to suspend the Contract by relying on Article 13 of the Investment Support Law is unconvincing. Although the Law grants the Investment Committee the right to terminate a Contract without first suspending the same, this provision can be supplemented by the express terms of each individual contract. Moreover, it is a general principle of international law that a State cannot rely on its internal law to invalidate its own undertakings.

617.	The Arbitral Tribunal is also of the opinion that the process that led to the decision of the Working Group appointed by the Ministry of Industry and Trade on June 9, 2003 lacked transparency and due process. The Working Group was appointed in relation to the

termination of the Investment Contract, to perform the verification of the fulfillment by Kar-Tel of the terms and conditions of the Contract, including investment obligations, "*for the purpose of settlement of this issue prior to the arbitration*." The Working Group issued a three and a half pages decision, summarily reasoned, and concluded that the Contract was lawfully terminated and that there were no grounds for its restauration. The Working Group founded its decision of validation not only on Kar-Tel's non-compliance with its reporting obligations but also on various entirely different grounds than those forming the basis for the initial decision. The decision was made without Claimants having a real possibility to present their position. They were only verbally invited to a meeting just two days before the meeting of the Working Group. The meeting was to take place at Kar-Tel's offices which were under the control of Telecom Invest and from which Claimants had been previously ousted. Moreover, Claimants had been informed that criminal proceedings against Claimants' executives had been initiated on July 1, 2003, the very same day that the invitation had been extended.

618. The Arbitral Tribunal therefore considers that the process that led to the decision of the Working Group lacked transparency and due process and was unfair, in contradiction with the requirements of the fair and equitable treatment principle. Since the Working Group acted as an organ of the State, the violation amounts to a breach of the BIT by the Republic.

619. On the other hand, the Arbitral Tribunal considers that it does not have any clear evidence that the decisions of the various Kazakh Courts which have been reviewed above were wrong procedurally or substantially, or were so egregiously wrong as to be inexplicable other than by a denial of justice. As was evidenced by the legal experts who testified during the hearing, the issues that the Courts had to decide were sometimes highly disputed issues. The Tribunal has also noted that when the decisions were appealed, they were carefully reviewed by the appellate courts and sometimes partially reversed by them.

### C.    Denial of justice

#### 1.    Claimants' position

##### a)    The standard

620.  According to Claimants, the duty not to deny justice arises from customary international law and is a subset of the international minimum standard of treatment, *i.e.* the standard below which a nation could not fall without violating international law.  It can also be considered to fall within the scope of treaty provisions providing for "*fair and equitable treatment.*"

621.  It is Claimants' position that although denial of justice is "*always procedural,*" it encompasses instances of politically-dictated judgments, corruption, and intimidation. Moreover, it includes cases where "*the proof of the failed process is that the substance of a decision is so egregiously wrong that no honest or competent court could possibly have given it.*"[43]

622.  Tribunals have identified four types of factual circumstances where a State's conduct amounted or could amount to a denial of justice.

623.  First, Courts are not the only State organs the conduct of which can amount to a denial of justice.  Administrative organs can also engage the State's international responsibility by denying justice.  This was confirmed in the *Amco I*[44] decision where the tribunal found that "*the mere lack of due process would have been an insuperable obstacle to the lawfulness of the revocation.*"  The *Amco II* tribunal also found that "*the whole approach to the issue of revocation of the license was tainted by bad faith, reflected in events and procedures*"[45] and that therefore, even if substantive grounds existed for the revocation of the licence, the circumstances surrounding the decision made it unlawful.[46]  It pointed out

---

[43]  Citing Don Wallace Jr., *Fair and Equitable Treatment and Denial of Justice*, International Investment Law and Arbitration, 2005, pp. 669, 672 [hereinafter Wallace, *Fair and Equitable Treatment*].

[44]  *Amco I v. Indonesia*, Award of November 20, 1984, para. 242.

[45]  *Amco II v. Indonesia*, Award in the Resubmitted Case of June 5, 1990, para. 98.

[46]  *Id.,* para. 99.

that there is "*no provision of international law that makes impossible a denial of justice by an administrative body.*"[47]

624. Second, as the *Azinian* tribunal stated, a denial of justice can be pleaded "*if the relevant courts refuse to entertain a suit, if they subject it to undue delay, or if they administer justice in a seriously inadequate way*"or if there is a "*clear and malicious misapplication of the law.*"[48] The latter form of denial of justice likely overlaps with the notion of "*pretense of form*" to mask an international law violation or cloak the pursuit of hidden wrongful objectives.

625. Third, tribunals have found that collusion between the State judicial authorities, and the local party-in-interest can amount to a denial of justice. In *France v. Venezuela*,[49] Mr. Fabiani was unable to enforce an arbitral award in Venezuela due to a number of judicial and political obstacles resulting from collusion between a private citizen and governmental authorities. The tribunal found that the government of Venezuela was under an obligation to "*ensure the administration of justice*" and adopted the view that a State is "*liable for the denial of justice committed by the judiciary, at least when, duly informed of the denial, the state has not undertaken any action to prevent its effect.*"

626. Fourth, tribunals have also found that collusion among branches of government can result in a denial of justice. Specifically, in *U.S. v. Great Britain*,[50] the tribunal concluded that "*[a]ll three branches of the Government conspired to ruin [an] enterprise*"; that based on the whole case, the cumulative steps taken by the State amounted to a denial of justice.

---

[47] *Id.,* para. 137.

[48] *Robert Azinian and others v. United Mexican States* (ICSID Case No. ARB(AF)/97/2), Award of November 1, 1999, paras.102-103 [hereinafter *Azinian*].

[49] *France v. Venezuela* (Antoine Fabiani case No. 1), Award of 1898, V Moore's International Arbitrations, p. 4878 [hereinafter *Fabiani*].

[50] *U.S. v. Great Britain* (*Robert E. Brown* case), Award of November 23, 1923, VI Reports of International Arbitral Awards (United Nations), p. 120 [hereinafter *Robert E. Brown*].

### b) *Application to the facts of the case*

627. According to Claimants, the following elements constitute a denial of justice:

- the Investment Committee did not even wait until its own extended deadline for the filing of the reports before terminating the Investment Contract on March 25, 2002;
- the Investment Contract was terminated despite the fact that Claimants submitted the required reports on March 25, 2002;
- the Investment Committee had the obligation to first suspend the Investment Contract;
- the Investment Committee terminated the Investment Contract with the utmost lack of good faith and in clear violation of the international obligations of Respondent contained in the Bilateral Investment Treaty. The termination was unreasonable, arbitrary, grossly unfair, unjust, idiosyncratic and violated the legitimate expectation of Claimants.

628. According to Claimants, the above undisputable breaches of the Bilateral Investment Treaty are alone sufficient to justify a ruling against Respondent, irrespective of the subsequent breaches committed by Respondent and irrespective of the collusion between Respondent and powerful local partner.

629. Claimants further allege that, in the present case, the Investment Committee's termination of the Investment Contract was unlawful and improper for the same reasons as those enumerated by the *Amco* tribunals. Indeed, the Committee unilaterally terminated the Contract abruptly and without warning and in breach of the suspension mechanism. Furthermore, the Working Group confirmed the termination on completely different grounds without an input from Claimants who were *de facto* excluded from the process. Consequently, irrespective of whether there may have been legitimate grounds for the revocation of the Contract – which Claimants deny – the whole approach leading to its termination lacked in due process. Moreover, in light of Respondent's collusion among

its various organs and with the various shareholders of the local partner, Respondent's unlawful termination of the Contract is tainted by bad faith.

630. Claimants also allege that even if Respondent's Courts decisions could be deemed to have been proper procedurally and substantially – which Claimants vigorously deny – such decisions only served to cloak Respondent's violation of international law. The substance of the Courts' decisions is so egregiously wrong as to be inexplicable other than by a denial of justice.

631. Moreover, the real parties in interest behind Claimants' local partner were various Kazakhstan officials and/or members of President Nazarbayev's family and empire. Clearly, Telecom Invest and the Investment Committee were working in tandem so as to put in place the mechanism by which Telecom Invest's parties-in-interest would maximize their financial interest, *i.e.* by forcing out Claimants.

632. Subsequently, Respondent continued to give Telecom Invest and its shareholders the necessary active support to accomplish their objectives. Respondent's Judiciary rubber stamped the improperly-convened general meeting of KaR-Tel shareholders and sanctioned the resolutions adopted thereat, notwithstanding the clear *prima facie* evidence to the contrary. Respondent's police authorities and public prosecutor's office then assisted Telecom Invest in physically ousting Claimants and their executives from KaR-Tel and eventually from Kazakhstan. Finally, by putting a USD 3,000 price tag on Claimants' 60% stake in KaR-Tel, the Kazakhstan Supreme Court assisted Telecom Invest in acquiring 100% of KaR-Tel for a derisory price, which Telecom Invest's shareholders subsequently sold to VimpelCom for the sum of USD 350 million.

633. Finally, Claimants allege that Respondent's various organs acted in concert to achieve the same end (the expropriation of Claimant's investment), in collusion with the shareholders of the local partner. Indeed, Respondent offered Telecom Invest a package of coordinated State actions, from the termination of the Investment Contract to the fixing of the price for the compulsory redemption of Claimants' stake in KaR-Tel. In a nutshell,

the investment committee terminated the Contract unlawfully, which gave Telecom Invest a pretext to adopt illegal shareholder resolutions. In turn, Respondent's Judiciary not only ratified these illegal resolutions but also the Kazakhstan Courts even went a step further by ascribing a value of a mere USD 3,000 to Claimants' multi-million dollar investment, thereby sealing the expropriation. Moreover, Respondent initiated criminal proceedings against Claimants' executives with a view to intimidate them and to force them to flee Kazakhstan and thereby abandon the defense of Claimants' interests.

### 2. Respondent's position

#### a) *The standard*

634. According to Respondent, denial of justice is an element of the overarching fair and equitable treatment standard of the BIT. It does not extend or further the legal basis for Claimants' claims.

635. Contrary to Claimants' allegation, Respondent points out that '*denial of justice*' has only one meaning: it refers to the failure of the administration of justice in a State to meet a certain procedural standard. It is always procedural and the substantive outcome of a proceeding is only of relevance when it demonstrates irregularities in the procedure.

636. Respondent further alleges that the four types of factual circumstances raised by Claimants are no more than examples of attribution of various actions to a State that were in denial of justice. However, for each of the methods of attribution, Claimants must meet a high standard of proof. Simply stating that it is possible that a conspiracy between the State and others can, in certain circumstances, lead to a denial of justice is not probative of that denial.

637. Respondent also alleges that Claimants' claim is based to a large extent upon a substantive denial of justice in the sense that Claimants submit that the outcome of the decisions was unfair. However, there is no concept of substantive denial of justice: "*the mere violation of internal law may never justify an international claim based on denial of*

*justice.*"[51]   The substance is only relevant where there have been "*exceptionally outrageous or monstrously grave breaches of municipal law.  In such cases, ... it must be shown that "one can no longer explain the sentence rendered by any factual consideration or valid legal reason.*"[52]

638.   Respondent further alleges that a claim in denial of justice does not relate to a single Court, but to a Court system.  It also submits that litigants are required to give the Court system every opportunity to correct a challenged decision before resorting to international tribunals.  Therefore, even if Claimants were correct about the cancellation of the Investment Contract, the Working Group process, or the decisions of the Kazakh Courts, their failure to challenge at all or to exhaust the system bars them from succeeding on their claims because they have denied the Kazakh legal system the opportunity to correct the alleged errors on which they now seek to rely.

### b)      Application to the facts of the case

639.   Denial of justice is thus only concerned with procedure.  However, Claimants do not allege that they were prevented from access to the Kazakh legal system, nor that the determination of the Kazakh legal system was subject to ruinous delay amounting in effect to an exclusion from its use.  Claimants could not allege this, as they have, and for the most part made use of access to all three instances of the Kazakh civil Courts.

640.   Instead, what Claimants allege is that the decisions of the Kazakh Courts were wrong as a matter of Kazakh law.  However, substantive outcomes are not generally relevant.  In any case, it is Respondent's position that Claimants have not even demonstrated that the decisions of the Kazakh Courts misapplied Kazakh law.

641.   With respect to the cancellation of the Investment Contract, it was substantially justified on the grounds given as a matter of Kazakh law.  But even if Claimants were able to

---

[51]    Charles de Visscher, *Le déni de justice en droit international*, (1935), 54 Recueil des cours 370 at 376.

[52]    Jan Paulsson, *Denial of Justice in International Law*, 2005, p. 83.

establish that the termination breached Kazakh law, this would not be sufficient to amount to a denial of justice. Indeed, in order to amount to such a breach, Claimants would have to demonstrate that the Investment Committee's misapplication of Kazakh law was patently arbitrary, unjust or idiosyncratic such that it would demonstrate bad faith, which they have not done.

642. According to Respondent, Claimants must prove a procedural denial of justice and Claimants do not provide this proof. They have not even begun to establish any misapplication of Kazakh law. Their sole evidence in relation to Kazakh law comes from one of the reports submitted in the proceedings in Kazakhstan in 2003, which were all rejected by the Courts. In any case, those reports have no status in this arbitration.

643. Moreover, Professor Didenko, on whose expert report (produced before the Kazakh Courts) Claimants rely, published an article a short time after the end of the Courts' proceedings in which he expressed a different view on a number of matters at issue in this case.

644. Respondent further alleges that:

  - Claimants' allegation that the Republic Judiciary was bribed is not particularized;
  - with respect to the decision of the Presidium, Respondent disputes that Claimants were not notified of the hearing.

645. Moreover, it is Respondent's position that, even if Claimants would be correct about the cancellation of the Investment Contract, the Working Group process, or decisions of the Kazakh Courts being procedurally or substantively wrong, they failed to challenge those decisions in Kazakhstan, which debars them from bringing a claim for denial of justice.

646. In particular, between the cancellation of the Contract and the registration of this arbitration, Claimants made no serious attempt to challenge the cancellation, with the exception of two letters of protest. These are not sufficient to comply with the preconditions of a claim for denial of justice.

647. Respondent disputes Claimants' allegation that they were prevented from contesting the termination of the Contract by the injunction restricting access to KaR-Tel's premises and documents. This restriction was amended by the Supreme Court. It is not true that Claimants were thereafter *de facto* denied access to the premises or documents. In any case, even if they were, that did not prevent them from challenging the cancellation of the Investment Contract.

648. Likewise, Respondent points out that Claimants never challenged the findings of the Working Group.

649. In the same vein, Respondent submits that with respect to the validation of the deliberation of the April 2002 EGM, Claimants did not appeal their case to the Presidium of the Supreme Court, as was their right. Moreover, several of the contentions now advanced by Claimants were not even put in issue before the Kazakh Courts.

650. According to Respondent, the result of Claimants' failures to pursue their right to challenge the disputed decisions before the appropriate Kazakh authorities and Courts is that Claimants denied the Kazakh system the opportunity to correct any errors that there may have been. Therefore, their claim for denial of justice, and thus for breach of fair and equitable treatment, is inadmissible before this Tribunal and alternatively fails.

### 3. Decision of the Arbitral Tribunal

#### a) The Standard

651. The parties agree that the duty not to deny justice arises from customary international law and can also be considered to fall within the scope of treaty provisions provided for "*fair and equitable treatment*."

652. The parties also agree that denial of justice is always procedural. However, for Claimants, it also encompasses instances of politically-dictated judgments, corruption and intimidation and extends to cases where there is a "*clear and malicious*

*misapplication of the law*."[53]   On the other hand, Respondent considers that denial of justice only refers to the failure of the administration of justice in a State to meet a certain procedural standard.  The substantive outcome is only of relevance when it demonstrates irregularities in the procedure.  In other words, a court decision will be considered a denial of justice if it was patently arbitrary, unjust or idiosyncratic such that it would demonstrate bad faith.

653.  The Arbitral Tribunal does not think that there is a major difference in the parties' understanding of the concept.  The standard is indeed of a procedural nature.  In that sense, a court procedure which does not comply with due process is in breach of the duty.  On the other hand, as pointed out by Respondent, the substance of a decision may be relevant in the sense that a breach of the standard can also be found when the decision is so patently arbitrary, unjust or idiosyncratic that it demonstrates bad faith.

### b)   Application to the facts of the case

654.  The Arbitral Tribunal notes that the violations alleged by Claimants and allegedly constituting a denial of justice, have also been invoked by Claimants as constituting a violation of the fair and equitable treatment principle.  The Arbitral Tribunal considers that these violations are better qualified and dealt with as issues falling under the fair and equitable treatment standard which also includes in its generality the standard of denial of justice.  Reference is therefore made to the Tribunal's decisions at paragraphs 609 to 619, above.  Consequently, the alleged violations will not be separately dealt with under the denial of justice standard.

655.  The Arbitral Tribunal would like however to add that Claimants' allegation of an attempt at bribery by Judge Begaliev has been contradicted by Respondent and Judge Begaliev himself and is not supported by the record.

656.  On the other hand, Respondent's allegation that Claimants have made no serious attempt to challenge the cancellation of the Investment Contract or the decision of the Working

---

[53]   *Azinian*, Award of November 1, 1999, paras. 102-103.

Group, is unfounded as these procedures could only have been initiated by Kar-Tel. Claimants filed appeals of the court decisions each time they could, at the sole exception of the decision relating to the validation of the deliberation of the April 2002 EGM which they could have further appealed to the Presidium of the Supreme Court.

657. Claimants have argued that they were not given notice of the Presidium hearing which took place on October 30, 2003, upon Kar-Tel's appeal of September 15, 2003, to determine the sum to be paid on the compulsory redemption. Respondent challenges that statement and has produced copies of the notice of appeal, apparently also addressed to Claimants, as well as copies of notices allegedly sent by Mr. D. Shamshiev, the Manager, Secretariat of the Presidium, to counsel for Rumeli and Telsim, on October 17, 2003, advising them that a meeting of the supervisory collegium was scheduled for October 30, 2003 in connection with the court orders in the civil case on the claim by Telekom Invest and KaR-Tel against Rumeli and Telsim. No evidence of actual delivery has been submitted to the Tribunal but the Tribunal does not conclude from this that it did not take place. The Arbitral Tribunal notes in this respect that Claimants disputed for the first time in their Reply Memorial (page 52) the fact that they were given notice. There was no mention of this important and obvious point in their first memorial.

### D. Full protection and security

#### 1. Claimants' position

##### a) The standard

658. According to Claimants, a treatment that is not fair and equitable "*automatically entails an absence of full protection and security.*" The obligation to accord full protection and security requires the host State to exercise due diligence in the protection of foreign investments. It imposes an objective standard of vigilance and thus requires the State to afford the degree of protection and security that should be legitimately expected from a reasonably well-organized modern State.

659. According to the United Nations Conference on Trade and Development, the full protection and security standard:

> "*connotes the assurance of full protection and security for foreign investors as contemplated or required by customary international law. At the same time, the clause on full protection and security is unusual in that it contemplates protecting investment against private as well as public action, that is, the clause requires that the host country should exercise reasonable care to protect investment against injury by private parties.*"

660. It is inconsequential whether the damage is caused by a member of the State forces or by a private party. In either case, the State has a "*primary obligation*" to exercise due diligence to provide adequate protection. The State's failure to comply with this objective obligation due to the mere lack of diligence is sufficient, without any need to establish malice or negligence.[54]

661. The question was addressed in the *Wena Hotels*[55] arbitration where a dispute arose out of agreements concluded between Wena Hotels and Egyptian Hotels Company ("EHC"), a State-owned Egyptian company. The tribunal found that, although it was unclear whether Egyptian officials directly participated in the seizure of the hotel, Egypt was aware of EHC's intentions in this connection and took no actions to prevent EHC from doing so. Egypt did nothing to protect Wena Hotels' investment after the illegal seizures, made no attempts to return the hotel, refused to compensate the claimant and failed to prosecute the EHC or its senior officials.

### b) Application to the facts of the case

662. It is Claimants' allegation that in the present case, Respondent failed to afford Claimants' investment full protection and security. Rather, Respondent colluded with and actively supported Telecom Invest, to the detriment of Claimants. Among other actions:

---

[54] *American Manufacturing & Trading, Inc. v. Republic of Zaire* (ICSID Case No. ARB/93/1), Award of February 21, 1997, 36 ILM 1534, paras. 6.05 – 6.06 and 6.13 [hereinafter *AMT*]; and *Asian Agricultural Products Ltd. v. Republic of Sri Lanka* (ICSID Case No ARB/87/3), Final Award of June 27, 1990, paras. 76-77 [hereinafter *AAP*].

[55] *Wena Hotels Limited v. Arab Republic of Egypt* (ICSID Case No. ARB/98/4), Award of December 8, 2000, para. 84 [hereinafter *Wena*].

- Respondent's Courts ratified Telecom Invest's illegitimate resolutions adopted at an improperly-convened meeting granting its request for injunctive relief;

- the Almaty City Court validated Mr. Yerimbetov's illegitimate appointment as General Manager pending a decision on the merits;

- with the help of the Kuzet security service, Respondent enjoined Claimants from accessing the premises or data of KaR-Tel without Mr. Yerimbetov's permission;

- Claimants were not able to enforce the judgment ruling that Claimants should have access to KaR-Tel documents;

- Respondent instituted criminal proceedings against Claimants' executives as a means of exerting pressure on such individuals.

## 2. Respondent's position

### a) The standard

663. According to Respondent, the full protection and security standard in Article II(2) of the UK-Kazakhstan BIT must be construed in accordance with the accepted rules of treaty interpretation. It is closely related to the fair and equitable standard. Previous tribunals have held that it obliges the State to provide a certain level of protection to foreign investments from physical damage and even not all physical damage. Arbitral tribunals have also held that the full protection and security obligation is one of due diligence and no more. The key criterion is that the State knows of the unlawful act and takes no action to prevent or remedy it, according to the case.

664. In *Lauder v. Czech Republic*,[56] the tribunal stated that it considered this principle to oblige the parties to:

> "*exercise such due diligence in the protection of foreign investment as reasonable under the circumstances. However, the treaty does not oblige the parties to protect foreign investment against any possible loss of value caused by persons whose acts could not be attributed to the State. Such*

---

[56] *Ronald S. Lauder v. Czech Republic* (UNCITRAL), Final Award of September 3, 2001, paras. 318 et seq. [hereinafter *Lauder*].

*protection would amount to strict liability, which cannot be imposed to a State absent any specific provision in the Treaty.*"

665.   The tribunal went on to state that:

> "*the investment treaty created no duty of due diligence on the part of the Czech Republic to intervene in the dispute between the two companies over the nature of their legal relationships. The Respondent's only duty under the treaty was to keep its judicial system available for the Claimant and any entities he controls to bring their claims, and for such claims to be properly examined and decided in accordance with domestic and international law....*"

### b)      Application to the facts of the case

666.   According to Respondent, Claimants have not alleged any physical damage and have not therefore alleged a breach of the obligation of full protection and security.  The allegation of favoring one shareholder over another is an allegation of unfair and inequitable treatment; and the allegation that "*in effect, Respondent took KaR-Tel away from Claimants*" is an allegation of expropriation.  Claimants therefore have no proper claim that Respondent did not accord their investment full protection and security.

667.   With respect to the criminal proceedings, Respondent alleges that they were not initiated by Respondent, that they were justified, that they were not arbitrary and in any case, that they have not prevented Claimants from pursuing their rights.

### 3.      Decision of the Arbitral Tribunal

### a)      The Standard

668.   The Arbitral Tribunal agrees with Respondent that the full protection and security standard in Article II(2) of the UK-Kazakhstan BIT must be construed in accordance with the accepted rules of treaty interpretation.  It obliges the State to provide a certain level of protection to foreign investment from physical damage.  In *AMT v. Zaire*[57] and in the *Wena* case,[58] ICSID tribunals have recognized that in international law, the full protection

---

[57]   *AMT v. Zaire,* Award of  February 21, 1997, 36 ILM p. 1534.

[58]   *Wena v. Egypt*, Award of December 8, 2000.

and security obligation is one of "due diligence" and no more. More recently, in *Saluka*,[59] the Tribunal also decided that "*the "full security and protection" clause is not meant to cover just any kind of impairment of an investor's investment, but to protect more specifically the physical integrity of an investment against interference by use of force*."

### b) Application to the facts of the case

669. Given the limited scope of the full security and protection standard, the Arbitral Tribunal considers that the violations alleged by Claimants cannot fall under it, except in respect of the allegation that with the help of the Kuzet Security Services, Respondent enjoined Claimants from accessing the premises or data of Kar-Tel without Mr. Yerimbetov's permission. The Tribunal considers however that given the factual circumstances of the case, there was no such violation.

670. Indeed, at the hearing, Respondent's witnesses confirmed that Kuzet Security Services were not acting upon instructions of the State authorities but pursuant to a contract they had concluded with Telecom Invest and therefore, upon instructions of the latter. Moreover, the record does not support Claimants' allegation that police officers were present during the enforcement procedure conducted by a bailiff.

### E. Unreasonable, arbitrary, or discriminatory measures

#### 1. Claimants' position

##### a) The standard

671. According to Claimants, Respondent also violated the BIT by impairing the operation of Claimants' investment by unreasonable, arbitrary, and/or discriminatory measures. The standard of "*reasonableness*" has no different meaning than the "*fair and equitable treatment*" standard with which it is associated. Therefore, it requires that the State's conduct bears a reasonable relationship to some rational policy, whereas the standard of

---

[59] *Saluka v. Czech Republic,* Partial Award of March 17, 2006, para. 483.

non discriminatory measures requires a rational justification of any differential treatment of a foreign investor.

672. Arbitrariness is a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of judicial propriety.[60] A measure is discriminatory when it provides the foreign investment with a treatment less favorable than the domestic investment or than other foreign investment.

673. According to Claimants, the award rendered in *CME*[61] is highly persuasive for the purpose of this arbitration.

### b)    *Application to the facts of the case*

674. According to Claimants, Respondent violated its obligations by unreasonable, arbitrary, and/or discriminatory measures in that:

- the Investment Committee did not even wait until its own extended deadline for the filing of the reports before terminating the Investment Contract on March 25, 2002;

- the Investment Contract was terminated despite the fact that Claimants submitted the required reports on March 25, 2002;

- the Investment Committee had the obligation to first suspend the Investment Contract;

- the Investment Committee terminated the Investment Contract with the utmost lack of good faith and in clear violation of the international obligations of Respondent contained in the Bilateral Investment Treaty. The termination was unreasonable, arbitrary, grossly unfair, unjust, idiosyncratic and violated the legitimate expectation of Claimants.

---

[60]    *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, Judgment of July 20, 1989, 1989 ICJ Reports 15,  para. 128 [hereinafter *ELSI*].

[61]    *CME Czech Republic B.V. v. The Czech Republic* (UNCITRAL), Partial Award of September 13, 2001, para. 612 [hereinafter *CME*].

675. According to Claimants, the above undisputable breaches of the Bilateral Investment Treaty are alone sufficient to justify a ruling against Respondent, irrespective of the subsequent breaches committed by Respondent and irrespective of the collusion between Respondent and powerful local partner.

676. Claimants further invoke the following elements as unreasonable, arbitrary, and/or discriminatory measures:

- Respondent's judiciary took decisions and actions in support of Telecom Invest's expulsion of Claimants from KaR-Tel, depriving Claimants of all the benefits and enjoyment of their investments as well as access to documents to defend themselves;

- the Working Group's treatment of Claimants' investment was also in breach of Respondent's same obligation since it was unreasonable, arbitrary, grossly unfair, unjust;

- the decisions of Respondent's judiciary were unreasonable, arbitrary and grossly unfair;

- the sole purpose of the Investment Committee's purported termination of the Investment Contract was to give Telecom Invest a basis to undermine the legal foundation of Claimants' investment;

- all following actions of Respondent were clearly intended to collude with the foreign investor's local partner. Respondent's actions were discriminatory. They were even more so discriminatory on the part of the judiciary and other organs to have evicted Claimants and then deprived Claimants of their shares on this basis as it is the local partner that had the lobbying obligations with respect to the Investment Committee, and irrespective of these obligations had the duty of assistance as shareholder;

- moreover, Respondent took such actions in favor of Claimants' local partner and to the detriment of Claimants as foreign investors despite Telecom Invest's own failure to fulfill its obligations in KaR-Tel. Indeed, pursuant to the Foundation Agreement, Telecom Invest assumed the obligation of assuring relations with the

Investment Committee; it shared the responsibility of the operations and management of KaR-Tel. Yet, Respondent's Investment Committee and Judiciary failed equally to take all of those elements into consideration;

- the fact that Claimants had no access to documents at KaR-Tel after their eviction is also plainly discriminatory;

- finally, the institution of criminal proceedings against only Turkish employees (save for one local secretary who was the secretary of Mr. Agilönü) for the alleged theft of petty cash worth a few hundred euros is discriminatory, particularly since a few thousand dollars were paid for years to employees forced on KaR-Tel by the local partner who did not even show up for work but were paid anyway upon Mr. Kulibayev's instructions.

## 2.     Respondent's position

### a)     The standard

677. Respondent accepts the definition of unreasonable, arbitrary and discriminatory treatment stated by the authorities cited by Claimants. According to Respondent, in accordance with the proper interpretation of the fair and equitable treatment obligation, the standard of protection to be afforded is low. Further, any purportedly unreasonable, arbitrary or discriminatory conduct is capable of justification if it is proportionate and for a public purpose.

### b)     Application to the facts of the case

678. According to Respondent, Claimants have not demonstrated a *prima facie* case of any arbitrary or unreasonable or discriminatory conduct by any person or entity whose actions are attributable to Respondent.

## 3.     Decision of the Arbitral Tribunal

### a)     The Standard

679. As we have noted, the parties agree with the interpretation of the standard. As the Arbitral Tribunal appropriately determined in *Saluka*, the standard of "reasonableness"

has no different meaning than the "fair and equitable treatment" standard *"with which it is associated."*[62]   Reasonableness therefore requires that the State's conduct *"bears a reasonable relationship to some rational policy, whereas the standard of "non-discrimination" requires a rational justification of any differential treatment of a foreign investor."*[63]

680.   Similarly, the Arbitral Tribunal in the *CMS* award stated that the standard of protection against discrimination *"is related to that of fair and equitable treatment.  Any measure that might involve ... discrimination is in itself contrary to fair and equitable treatment.*[64] *The standard is next related to impairment."*[65]   A measure is discriminatory when it provides *"the foreign investment with a treatment less favorable than domestic investment."*[66]

### b)        Application to the facts of the case

681.   The Arbitral Tribunal notes that the violations alleged by Claimants and allegedly constituting unreasonable, arbitrary or discriminatory measures, have also been invoked by Claimants as constituting a violation of the fair and equitable treatment principle.  The Arbitral Tribunal considers that these violations are better qualified and dealt with as issues falling under the fair and equitable treatment standard, which also includes in its generality the principle of no-unreasonable, arbitrary or discriminatory measures.  Reference is therefore made to the Tribunal's decision at paragraphs 609 to 619, above.

---

[62]    *Saluka v. Czech Republic,* Partial Award of March 17, 2006, para. 460.

[63]    *Ibidem.*

[64]    *CMS*, Award of 12 May 2005, para. 290. See also *Saluka,* Partial Award of March 17, 2006, para. 460.

[65]    *CMS*, Award of May 12, 2005, para. 290.

[66]    *ELSI,* Judgment of July 20, 1989, para. 128.

**F.     Expropriation**

**1.     Claimants' position**

*a)     The standard*

682. Both the BIT and the FIL prohibit the host State from expropriating directly or indirectly, or subjecting to measures of similar effect, any foreign investment, if certain specific conditions are not met.  The circumstances under which a State may lawfully expropriate a foreign investment are limited to expropriations that are done:

- for a public purpose;
- in a non-discriminatory manner;
- in accordance with due process of law;
- upon payment of prompt, adequate, and effective compensation.

683. Moreover, it is generally accepted that a State can expropriate an investment in a number of ways, including through acts of harassment.  One of the methods is when a State forces an alien to dispose of his property at a price representing only a fraction of what it would have been had not the alien's use of its property been subjected to interference by the State.

684. An expropriation may also be '*creeping*', *i.e.* a form of indirect expropriation with a distinctive temporal quality in the sense that it encapsulates the situation whereby a series of acts which are attributable to the State over a period of time culminate in the expropriatory taking of such property.[67]

685. A distinction is indeed made in public international law between two types of expropriation: either a direct and deliberate formal act of taking, such as an outright nationalization, or an indirect taking that substantially deprives the investor of the use or enjoyment of its investment, including deprivation of the whole or a significant part of the economic benefit of property.

---

[67] *Generation Ukraine, Inc. v. Ukraine* (ICSID Case No. ARB/00/9), Award of September 16, 2003, para. 20.22 [hereinafter *Generation Ukraine*].

686. Claimants further allege that although the intent of the State may play a role, such intention is not decisive. In essence, the standard for determining whether a State's conduct amounts to an expropriation is the actual effect of the measures on the investor's property.

687. Claimants finally allege that an expropriation does not have to be for the benefit of the host State for it to be unlawful. Indeed, as confirmed in *Metalclad* and *Tecmed*,[68] a State can expropriate an investment, or take measures equivalent to an expropriation in connection with an investment, for the benefit of a third party. Similarly, the *Tecmed* tribunal[69] commented that the term "expropriation" covered situations where the State actions *"transfer assets to third parties different from the expropriating State."*

### b)    Application to the facts of the case

688. According to Claimants, in the present case, there can be no doubt that Respondent has expropriated Claimants' investment. Each of the acts and omissions described above, individually and collectively, constitute an expropriation:

- the termination of the Investment Contract in violation of its terms was the triggering event;
- subsequently, the decision of Respondent's Courts to rubber stamp, without more, Telecom Invest's request for injunctive relief, and to replace KaR-Tel's General Manager by Mr. Yerimbetov, amounted to a de facto expropriation;
- Claimants were thus physically ousted from KaR-Tel's premises but were also excluded from the management, enjoyment, and use of their investment as such;
- Respondent's Courts subsequently expropriated Claimants' title for the further benefit of Telecom Invest, ordering the compulsory redemption of Claimants' shares in KaR-Tel;

---

[68]    *Metalclad*, Award of August 30, 2000, para. 103; and *Tecmed*, Award of May 29, 2003.

[69]    *Id.,* para. 113.

- Respondent's unlawful expropriation culminated in the October 2003 decision of the Kazakhstan Supreme Court, in which the compulsory redemption decision was affirmed and Claimants' 60% combined stake in KaR-Tel was valued at a mere USD 3,000.

689. In reality, according to Claimants, the parties do not dispute that Claimants' investment was expropriated. Respondent's objection that Claimant's expropriation was justified is irrelevant as Claimants are not seeking restitution or specific performance but adequate compensation. In this respect, Claimants allege that the USD 3,000 valuation of KaR-Tel by Respondent's judiciary is a defiant mockery of justice. Respondent itself recognized this fact as is evidenced by its offer, via Altel, to purchase Claimants' shares for USD 20 million.

690. Given the foregoing, Claimants submit that none of the elements of lawful expropriation has been satisfied.

## 2. Respondent's position

### a) The standard

691. Respondent accepts that the conditions for lawful expropriation are:

- that it should take place for a public purpose;
- in a non-discriminatory manner;
- in accordance with due process of law;
- upon payment of prompt, adequate and effective compensation.

692. Respondent also accepts that expropriation can be direct or indirect and take place in a single action or a series of actions. However, Respondent submits that the intention of the State is highly relevant, although admittedly not determinative of whether or not there has in fact been an expropriation.

693. Respondent further accepts that expropriation can exist despite there being no obvious benefit to the State concerned, albeit this kind of case is exceptional.

694. Respondent finally points out that in order for an act to be an unlawful expropriation, it must have had a significant impact upon the enjoyment of the investment and must have been initiated by an act attributable to Respondent.

### b) *Application to the facts of the case*

695. Respondent denies that it has expropriated Claimants' investment. In any case, the difficulty in which Claimants find themselves is that expropriation requires the taking of an asset belonging to the person making the claim. Claimants did not in fact make any investment, therefore, there was nothing to expropriate.

696. Additionally, the real Claimant is the Turkish State. The sums that Claimants are in fact seeking to recover are the losses that the Turkish State itself, and not Rumeli or Telsim, have suffered as a result of the collapse of the Uzan family's bank and the settlement of the ICSID claim brought against the Turkish State by Motorola.

697. Respondent further sets forth that a transfer to a third party is only an expropriation if that transfer was instigated by the State. In this respect, it is Respondent's position that Claimants have not adduced any evidence to suggest that Respondent instigated the compulsory redemption of their shares in KaR-Tel. The plain truth is that it was Telecom Invest, a private Kazakh entity, the actions of which are not attributable to Respondent, which in fact instigated that process.

### 3. Decision of the Arbitral Tribunal

### a) *The Standard*

698. Article III of the BIT provides that -

> "1. Investment shall not be expropriated, nationalized or subject directly
> or indirectly, to measures of similar effect expect for a public purpose, in
> a non-discriminatory manner, upon payment of prompt, adequate and
> effective compensation, and in accordance with due process of law and the
> general principles of treatment provided for in Article II of this
> Agreement.

*2. Compensation shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known. Compensation shall be paid without delay and be freely transferable as described in para. 2 Article 4."*

699. The FIL provides that -

*"1. Foreign investments may not be nationalised, expropriated or subjected to any measures which have the same consequences as nationalization and expropriation (henceforth, expropriation), except for the cases where such expropriation is carried out for public interests in compliance with the appropriate legal procedures and carried out without discrimination with the payment of immediate, adequate and efficient compensation.*

*2. The compensation must be equal to the fair market value of the expropriated investments at the moment when the investor learnt of the expropriation."*

700. The parties agree that expropriation can be direct, that is, resulting from a deliberate formal act of taking, or indirect, that is, resulting from a series of acts which are attributable to the State over a period of time and culminate in the expropriatory taking of the relevant property.[70] The intention or purpose of the State organ is not mentioned in Article III of the BIT and the parties agree that the intent of the State is relevant to, but is not decisive of the question whether there has been an expropriation:

*"The intent of the government is less important than the effects of the measures on the owner, and the form of the measures of control or interference is less important than the reality of their impact.... Therefore, the Tribunal need not determine the intent of the Government of Iran...."*[71]

701. The parties also agree that expropriation can exist despite there being no obvious benefit to the State concerned:

---

[70] *Generation Ukraine v. Ukraine*, Award of September 16, 2003, paras. 20-22.

[71] Georges H. Aldrich, *What Constitutes a Compensable Taking of Property? The Decisions of the Iran-United States Claims Tribunal,* 1994, 88 American Journal of International Law, p. 603; and *Phillips Petroleum Co. Iran v. The Islamic Republic of Iran*, Case No. 39, Chamber Two, Award No. 425-39-2 of June 29, 1989, 1989 WL663903, para. 97.

*"Although formally an expropriation means a forcible taking by the Government of tangible or intangible property by means of administrative or legislative action to that effect, the term also covers a number of situations described as de facto expropriation, where such actions or laws transfer assets to third parties different from the expropriating State or where such laws or actions deprive persons of their ownership over such assets, without allocating such assets to third parties or to the Government."* [72]

This is supported by a footnote referring to the following passage in *Metalclad*:

*"Thus, expropriation... includes not only open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favour of the host State, but also covert or incidental interference with the use of property which has the effect of depriving the owner, in whole or significant part, of the use or reasonably to be expected economic benefit of property even if not necessarily to the obvious benefit of the host State."* [73]

702. Whereas most cases of expropriation result from action by the executive or legislative arm of a State, a taking by the judicial arm of the State may also amount to an expropriation.  In the *Oil Field of Texas* case the Tribunal held that:

*"It is well established in international law that the decision of a court in fact depriving an owner of the use and benefit of his property may amount to an expropriation of such property that is attributable to the state of that court.  As the French-Italian Commission held in its decision No. 136 of 25 June 1952, concerning a dispute over Italian property in Tunisia:*

*'La sentence rendue par l'autorité judiciaire est une émanation d'un organe de l'Etat, tout comme la loi promulguée par l'autorité législative, ou la décision prise par l'autorité exécutive.  La non-observance d'une règle internationale, de la part d'un tribunal, crée la responsabilité internationale de la collective dont le tribunal est un organe, même si le tribunal a appliqué un droit interne conforme au droit international.'"* [74]

---

[72]  *Tecmed*, Award of May 29, 2003, para. 113.

[73]  *Metalclad*, Award of August 30, 2000, para. 103.

[74]  *Oil Field of Texas Inc. v. The Government of the Islamic Republic of Iran*, Iran-US Claims Tribunal, Award in Case No. 43 (258-43-1) of October 8, 1986, Yearbook of Commercial Arbitration, Vol. XII

703. The Tribunal notes also the provisions of Article 4(1) of the ILC Articles (see paragraph 577 above).[75]

704. It is a characteristic of judicial expropriation that it is usually instigated by a private party for his own benefit, and not that of the State. This is no doubt a relevant consideration, although not in itself decisive, as has already been observed. The Tribunal considers however, and Respondent indeed accepted in paragraph 259 of its Rejoinder, that a transfer to a third party may amount to an expropriation attributable to the State if the judicial process was instigated by the State.

### b) Application to the facts of this case.

705. The final act of 'taking' as regards Claimants' investment (i.e. their shares in Kar-Tel) was the decision of the Presidium of the Supreme Court affirming the compulsory redemption of those shares. The Tribunal is satisfied that this decision was made "for a public purpose," namely the administration of justice and the execution of the laws of the host State. Moreover, despite the fact that the valuation of the shares was, unusually, made by the Presidium rather than by either of the inferior tribunals, there was no evidence that it was not made "in accordance with due process of law."

706. Nevertheless, for reasons which the Tribunal will discuss under the heading "Calculation Of Damages And Quantum," the valuation placed on Claimants' shares was manifestly and grossly inadequate compared to the compensation which the Tribunal there holds to be necessary in order to afford adequate compensation under the BIT and the FIL. The Tribunal accordingly holds that the expropriation by the Presidium was unlawful.

---

(1987), at pp. 287-291 [hereinafter *Oil Field of Texas v. Iran*]. *See* also *CCL v. Republic of Kazakhstan, SCC Case 122/2001,* Stockholm International Arbitration Review 2005:1, pp. 174-5 [hereinafter *CCL v. Kazakhstan*].

[75] *See also* the observation of Professor Christopher J. Greenwood, *State Responsibility for the Decisions of National Courts,* in *Issues of State Responsibility before International Juridical Institutions*, ed. Fitzmaurice and Sarooshi 2004, p. 57, that "the decisions of a court - at whatever level of the judicial hierarchy - are plainly imputable to the State."

707. The Tribunal further holds that the fact that the expropriation was not directly for the benefit of the State but for the benefit of Telecom Invest does not affect this conclusion, since, as the parties agree, expropriation can exist despite there being no obvious benefit to the State concerned. In this connection the Tribunal does however consider that it is relevant that the court process which culminated in the expropriation was instigated by the decision of the State, acting through the Investment Committee, to terminate the Investment Contract. This decision was taken on March 25, 2002: the following day Telcom Invest sent its notice to Kar-Tel and to Claimants calling for an Extraordinary General Meeting of shareholders of Kar-Tel to consider the harm to Kar-Tel and the compulsory redemption of Claimants' shares. This notice was sent without the decision of the Investment Committee having been communicated to Kar-Tel. In the judgment of the Tribunal, the only possible conclusion from these circumstances is that Telcom Invest and its shareholders were privy to the decision and that Kar-Tel and Claimants were not, and that this was the result of collusion between the Investment Committee on the one hand and Telcom Invest and its shareholders on the other. The Tribunal is unable to conclude with confidence that the Investment Committee foresaw or intended the court proceedings which resulted from this, although such court proceedings were, if not actually foreseen, at least reasonably foreseeable. The Tribunal is left in no doubt, however, that the court process which resulted in the expropriation of Claimants' shares was brought about through improper collusion between the State, acting through the Investment Committee, and Telcom Invest. The fact that the result may not have been intended by the Investment Committee is not decisive of the issue of expropriation. Moreover, it is beyond doubt that expropriation *was* the intended consequence of the court orders for compulsory redemption of Claimants' shares.

708. In summary, the conclusion of the Tribunal is that this was a case of 'creeping' expropriation, instigated by the decision of the Investment Committee which was then collusively and improperly communicated to Telcom Invest and its shareholders before Claimants were made aware of it, and which proceeded via a series of court decisions, culminating in the final decision of the Presidium of the Supreme Court. The decision of

the Investment Committee was moreover unfair and inequitable in itself, as the Tribunal has found.

709. Claimants, however, advanced a very much broader case than this, founded on an allegation that the entire process leading to the expropriation of their shares in Kar-Tel was brought about by a conspiracy between the shareholders of Telcom Invest, the Investment Committee, and the judges of the courts who heard the various stages of the legal proceedings, to bring about a result which benefited members of the family of the President of the Republic of Kazakhstan, and thereby indirectly the President himself. The evidence for this was mainly, if not wholly circumstantial, but it is in the nature of such an allegation that direct evidence of a conspiracy is unlikely to be available. The Tribunal has therefore considered the evidence with particular care, reminding itself that an allegation such as this must, if it is to be supported only by circumstantial evidence, be proved by evidence which leads clearly and convincingly to the inference that a conspiracy has occurred.

710. The Tribunal has before it a number of documents, mostly in the form of press reports, which tend to establish that the whole country, the whole political system and the whole economy of Kazakhstan are controlled by President Nurabayev and his family, including an article by the International Eurasian Institute for Economic and Political Research. The Tribunal was also shown a report by the UN Economic and Social Council which indicates that the judiciary is not independent and is prone to allegations of bribery, and another by the Bureau of Democracy noting that human rights are not respected and that "the constitution concentrates power in the hands of the presidency, permitting the president to control regional and local governments and to exercise significant influence over the legislature and judiciary ..."

711. It is also clear that the President's family played a role, at least behind the scenes, in relation to Kar-Tel. Investel, the first partner of Claimants in Kar-Tel, was owned to the extent of 51% by Almex. The majority owners of Almex were Timur Kulibaev and his wife Dina Kulibaeva, the President's second daughter. Almex is a major company: it is

also the major shareholder of Halik Bank, with a participation of 80.92%. Investel was later replaced by Telecom Invest whose founders were Almex (87.5%) and Mrs. Helena Goutova (12.5%).

712. The Tribunal notes that the role of the local partner was to "obtain necessary permissions and licenses from official bodies of Kazakhstan Republic (Government Investment Committee, Kazakhtelcom, etc.)." In this connection, the Tribunal recalls that in August 2002, Mr. Hakin Uzan offered to sell Claimants' shares to Telecom Invest for USD 20 million. That offer was rejected by Mr. Karibjanov, who represented Telecom Invest, and Mr. Uzan then offered to buy Telecom Invest's shares for USD 12 million. Subsequently, Telecom Invest accepted the offer and a Share Purchase Agreement was negotiated and the parties initialled it on October 13, 2002. Claimants however never proceeded to transfer the required funds. The draft Stock Purchase Agreement provided in its Article 6.2 that "the seller shall either obtain on behalf of the Company a valid investment incentive certificate, which was previously cancelled by the Investment Committee on 19 April 2002, or shall procure that the Investment Committee will have rescinded its cancellation of 19 April 2002. It is the full responsibility of the seller that the Company will have obtained the new and valid investment incentive certificate or the Investment Committee will have rescinded its cancellation of 19 April 202. The seller shall obtain the new investment incentive certificate or shall procure the rescission of the cancellation of 19 April 2002 to the full satisfaction of the Buyer within four months after the closing. The seller shall ensure in the new investment incentive certificate or in the rescission of the cancellation of 19 April 2002 that the Company and the Buyer shall enjoy exactly the same benefits as originally granted by the Investment Committee when the Company was established as if there had been no cancellation on 19 April 2002." The Stock Purchase Agreement further provided that if the seller failed to obtain the certificate or the rescission of the cancellation, Claimants would obtain a reduction of price. This clearly indicates that Telecom Invest had grounds for believing that it was able to influence the decisions of the Investment Committee. Mr. Kulibaev was indeed a former member of the Investment Committee.

713. According to Claimants, in August 2004 Altel (together with Orlon) indicated to Claimants that they were willing to purchase their 60% share for USD 20 million. Respondent disputes this and states that the meeting had another purpose. The Tribunal is unable to say which version of events is correct. One of the founders of Altel was represented by Ms. A. N. Nazarbayeva, apparently the youngest daughter of the President. Claimants also allege, but without any concrete evidence, that Orlon is owned by another daughter of the President.

714. The Tribunal further takes into account the fact that once the Investment Contract was terminated the local partner took no steps - and nor did Kar-Tel - to challenge the decision of the Investment Committee or to reinstate the Contract.

715. In these circumstances it is not in the least surprising that Claimants harbour the gravest suspicions that they are the victims of a conspiracy for the benefit of the President and his family. Indeed the material summarised above is consistent with and positively supports the Tribunal's finding that there was improper collusion between the Investment Committee and Telcom Invest with regard to the decision to terminate the Contract, although it is not necessary to decide whether this involved Mr. Kulibaev directly, which he denied, or some other means. Despite this, the Tribunal is unable on this material to conclude with the necessary degree of conviction that there was a wider conspiracy involving the President, or for his direct or indirect benefit. Nor is the Tribunal able to conclude that any of the other participants in the investment acted in such a way as to engage the international responsibility of the Republic of Kazakhstan. In particular, the Tribunal observes that in January 2003 Telcom Invest was sold to Mr. Seysembayev, who was not alleged to have any family relationship to the President, and that a number of key elements in the process leading to the expropriation took place after this date.

# CHAPTER VI.    COMPENSATION AND DAMAGES

## I.    PRELIMINARY REMARKS ON CLAIMANTS' CLAIM FOR DAMAGES

### A.    Respondent's position

716. According to Respondent, in the light of the foregoing, it is unnecessary for the Tribunal to consider the issue of damages.  Claimants have failed to establish any breach by Respondent of its international law obligations.  In any case, if it is found that the cancellation of the Investment Contract constituted a breach of Respondent's international obligation, no compensation can be awarded to Claimants because:

-   first, Claimants did not make investments in the amount or the nature alleged so that they cannot claim damages for the alleged expropriation of non-existent investments;
-   second, for reasons of public policy, the Tribunal should not allow Claimants to recover alleged losses connected with their fraud on KaR-Tel;
-   third, in any case, it is obvious that Claimants' fraud would have been detected and used to justify the acts complained of by Claimants.  Accordingly, Claimants are unable to show any damages flowing from the acts complained of against Respondent;
-   finally, the reports filed in the Kazakh proceedings indicate that KaR-Tel was insolvent.  Any valuation must take this fact into consideration.

### B.    Claimants' position

717. According to Claimants, none of these arguments is convincing:

-   Claimants made a substantial multi-million dollar financial investment and contributed know-how and training so as to build a successful and growing KaR-Tel as the second GSM licensed operator in Kazakhstan;
-   the manner in which the Uzan family may or may not have conducted the business of its companies in Turkey is irrelevant;

- even if Claimants' alleged fraud in Turkey "would have been detected," this does not in any way justify or somehow change anything in Respondent's wrongful conduct in breach of international law. Respondent's obligation is independent of any conduct that Respondent might seek to attribute to Claimants;

- Claimants dispute that KaR-Tel, with the only second-issued GSM license in Kazakhstan, was in any way an insolvent entity. The report filed before the Kazakhstan Courts and the Courts' conclusion in this regard form part of the denial of justice that Claimants suffered due to the Courts' blatant misapplication of Kazakhstan law. In any event, this argument cannot be sustained in the light of the fact that a year after the valuation of Claimants' shares by the Courts, Respondent offered – through Altel – to purchase Claimants' rights for USD 20 million and Vimpelcom purchased KaR-Tel for more than USD 350 million.

## II. GENERAL PRINCIPLES

### A. <u>The compensation in international law</u>

#### 1. Claimants' position

718. According to Claimants, with respect to expropriation, the BIT and the FIL both require that the investor be compensated for its expropriated investment. The Bilateral Investment Treaty establishes that "*Compensation shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known.*" Beside the case of expropriation, the BIT does not define the manner in which damages should be calculated in case of treaty violations other than expropriation. Therefore, it is Claimants' position that reparation should be determined in accordance with general principles of international law. Such principles are set forth in the ILC Articles. Article 31 of the ILC Articles enunciates the principle of full reparation, a principle which is confirmed by the *Chorzow Factory* decision.[76]

---

[76] *Case Concerning Certain German Interests in Polish Upper Silesia (Germany v Poland),* 1928 P.C.I.J. (Ser. A) No. 17, at 40 [hereinafter *Chorzów Factory*].

719. This principle of full reparation is equally applicable to calculate damages for non-expropriation breaches of treaty obligations when there has been no finding of expropriation. Since the Bilateral Investment Treaty does not define the manner in which damages should be calculated in case of treaty violations other than expropriation, an arbitral tribunal "*must accordingly exercise its discretion to identify the standard best attending to the nature of the breaches found*."[77]

### 2. Respondent's position

720. Respondent points out that the *Chorzow Factory* decision requires the restoration of the *status quo ante*, or compensation of the same effect. The *status quo ante* in this case would be for Claimants to hold 60% of the equity of a heavily insolvent partnership whose major creditor was actively pursuing repayment of over USD 100 million.

721. According to Respondent, if the Tribunal is minded to award damages to Claimants, it is Respondent's case that:

- the proper valuation standard is the fair market value of Claimants' investment in April 2002;
- the Analysys Report is so seriously flawed as to be worthless to the Tribunal in assessing the proper measure of compensation;
- the Navigant Report is eminently preferable to the Analysys Report, and provides clear and compelling evidence that the fair market value of Claimants' investment in April 2002 was zero.

### B. <u>Valuation standards</u>

### 1. Claimants' position

722. According to Claimants, when assessing the compensation due following an expropriation, the Tribunal should determine the fair market value of the foreign investment so as to give full effect to the principle of full reparation set forth in *Chorzow*

---

[77] *CMS*, Award of May 12, 2005, para. 409.

*Factory*. This principle of full reparation is equally applicable to calculate damages for non-expropriatory breaches of treaty obligations. In this respect, Claimants point out that, while some tribunals have favored the guiding principle set forth in *Chorzow Factory*, other tribunals, such as in *CMS*, have preferred the fair market value approach.

723. According to Claimants, in the instant case, the "*cumulative nature*" of Respondent's breaches of its treaty obligations (other than expropriation) have resulted in the irreversible deprivation of Claimants' entire investment for which Claimants should be compensated at full market value.

724. Claimants submit that in determining the value of KaR-Tel, its expert, Analysys, rightly applied a discounted cash flow ("*DCF*") approach as this is the most "*widely accepted and highly regarded methodology used to calculate the value of cashflows being generated by a business.*" Analysys dismissed the net book value approach ("*NBV*") as "*particularly inappropriate in the case of a mobile operator, where the business model is one of heavy investment to establish an asset base (network) that can be used to generate returns over an extended period of time.*"

725. Therefore, Mr. Wright of Analysys used the DCF to determine the value of KaR-Tel as of two alternative valuation dates, namely April 23, 2002 (the date of expulsion of Claimants from KaR-Tel) and October 30, 2003 (the date of the unappealable decision of Respondent's Supreme Court ordering the compulsory redemption of Claimants' shares).

726. Respondent's damage expert, Mr. Kaczmarek of Navigant Consulting, did not dispute that the DCF approach is a traditional method for valuing companies. He argued only that the DCF approach was inapplicable in the instant case because, in his view, KaR-Tel was insolvent and could thus not be treated as a going concern as of April 2002. However, Mr. Kaczmarek did not address the question of solvency of KaR-Tel as of October 2003.

727. Claimants further point out that, contrary to Mr. Kaczmarek's opinion, Mr. Wright rightly explained that "*[T]his was never in doubt, that it was a going concern…This was a fully*

*operational company…They couldn't fund the financing, or they couldn't repay the Motorola Loan, that is balance sheet insolvent, but they were an ongoing business…."*

728. According to Claimants, the facts and circumstances clearly support Mr. Wright's view:

   - KaR-Tel was and is a going concern; it continues in active existence today and is a highly profitable company. It would be contrary to the principles of full restitution to reject use of the DCF method on grounds of insolvency when KaR-Tel has not been liquidated, had valuable assets, including one of the two GSM licenses in a large and emerging oil-rich country;

   - Motorola could not push KaR-Tel into bankruptcy for so long as the Telsim guarantee remained in place;

   - as evidenced in the PWC report, KaR-Tel generated positive EBITDA margins in both 2001 and early 2002;

   - although Mr. Wright acknowledged that the restructuring of the debt would restore solvency, he rightly argued that "*it's valuable even before you solved it [the restructuring of the debt], just the knowledge that it can be solved means the thing is valuable, and it is demonstrated when you solve it*;"

   - the Vimpelcom transaction for USD 350 million, less than a year following the Supreme Court's valuation of Claimants' shares, gives the Tribunal the benefit of an objective and fully independent valuation. As noted by Analysys, it is simply inconceivable that in a short period of time KaR-Tel's value could increase to that extraordinary extent.

### 2. Respondent's position

729. According to Respondent, the only loss for which Claimants claim is the *de facto* or indirect expropriation of their shareholding in KaR-Tel. A number of ICSID awards have accepted a measure of compensation based upon fair market value as appropriate for treaty breaches not amounting to expropriation. Moreover:

- the BIT provides that "*compensation shall be equivalent to the real value of the expropriated investment;*"

- Article 7(2) of the FIL, on which Claimants rely, provides that compensation shall be equivalent to the fair market value of the asset expropriated;

- the Kuwait-Kazakhstan BIT specifies that compensation shall be assessed "*in accordance with internationally recognized principles of valuation on the basis of the fair market value.*"

730. Therefore, according to Respondent, the standard of compensation should be assessed by reference to internationally recognized principles of valuation on the basis of the fair market value. The best statement of the internationally recognized principles referred to are the World Bank Guidelines of 1992. These provide that "*without implying the exclusive validity of a single standard for the fairness by which compensation is to be determined and as an illustration of the reasonable determination by a State of the market value of the investment…, such determination will be deemed reasonable if conducted as follows: for a going concern with a proven record of profitability on the basis of the discounted cash flow value (DCF); for an enterprise which, not being a proven going concern demonstrates lack of profitability, on the basis of the liquidation value.*"

731. According to Respondent, there can be no doubt that KaR-Tel was heavily insolvent in April 2002. The Navigant Report is clear that KaR-Tel satisfied each of the possible tests for insolvency. In addition:

- KaR-Tel had missed nearly all of the targets in its own business plan;

- the total equity investment made had only been USD 10,000;

- KaR-Tel had dramatically underinvested in capital equipment in particular;

- KaR-Tel had never made a profit;

- KaR-Tel was increasingly underperforming its only rival, K-Cell;

- KaR-Tel had been capitalized using short-term debt, on which it was in default.

732. Deloitte & Touche's auditor's statement dated July 15, 2002 was unambiguous: "*there is substantial doubt that the Company will be able to continue as a going concern.*" Even Mr. Wright from Analysys accepted in cross-examination that KaR-Tel was balance sheet insolvent.

733. The best Claimants can do is say that it is not correct to say that KaR-Tel was insolvent since it did in fact continue to survive and eventually prosper. That, however, only serves to highlight precisely why using hindsight is inappropriate. No one looking at KaR-Tel as it stood in April 2002 would have thought that it had a realistic chance of survival.

734. Accordingly, Respondent alleges that, in the present case, as confirmed by the Navigant Consulting Report, the best approach is liquidation value. However, even if KaR-Tel is valued as a going concern, the Navigant Report confirms that KaR-Tel's shares were worthless in April 2002.

735. Respondent further alleges that damages reflecting lost profits or future earnings are only recoverable where the entity is a going concern with a history of actual operations. In April 2002, KaR-Tel was not a going concern in any sense of the word. It was clearly insolvent.

736. In the same vein, it is Respondent's position that arbitral tribunals do not accept claims for speculative, uncertain or contingent damages. Indeed, in cases where lost profits have been awarded, this measure has been based upon a long history of operations. In the present circumstances, KaR-Tel's financial status in April 2002 was such that any assessment of lost profits would be speculative and uncertain in the extreme.

## C. The valuation date

### 1. Claimants' position

737. Claimants point out that with respect to unlawful expropriation, the relevant date for purposes of assessing damages is respectively defined by the BIT and the FIL as the moment "*before the expropriatory action was taken or became known*" and "*the moment when the investor learnt of the expropriation.*" However, neither provides any guidelines

as to how such date of expropriation should be ascertained. In case of creeping expropriation such as this one, the precise date of expropriation is difficult to ascertain since various events can be deemed expropriatory in nature. Arbitral tribunals have considered that, in cases of creeping expropriation, the date of expropriation is not necessarily the date of the first or of the last expropriatory event, but can be any point in time within that range when the owner has been irreversibly deprived of its property. The exact date on which this moment is deemed to have occurred is left to the discretion of the Arbitral Tribunal.

738. According to Claimants, the moment of valuation should be, as pointed out by Messrs. Reisman and Sloane, "*the date on which assessing the fair market value of a foreign investment for purposes of calculating compensation will enable a tribunal to give full effect to the principle of full reparation.*"[78] This is the approach that was retained in the *ADC* case, where the tribunal, confronted to a case where the value of the investment after the date of expropriation had risen considerably held that the application of the *Chorzow Factory* standard required that the "*date of valuation should be the date of the Award and not the date of expropriation, since this is what is necessary to put the Claimants in the same position as if the expropriation had not been committed.*"[79]

739. Moreover, arbitral tribunals, as in *Amco II,* have held that, since the purpose of the compensation is full restitution, it is neither necessary nor appropriate to exclude from consideration in value calculations information which became available after the date of expropriation.[80]

740. Claimants point out that the same approach is applicable to calculate damages for non-expropriatory breaches.

---

[78] Michael Reisman and Robert Sloane, *Indirect Expropriation and Its Valuation in the BIT Generation,* 74 the British Yearbook of International Law, 115, 150.

[79] *ADC*, Award of October 2, 2006, paras. 484-494.

[80] *Amco II*, Award in the Resubmitted Case of June 5, 1990.

741. Claimants therefore instructed Analysys to determine the value of Claimants' investment at two different moments in the timeline of Respondent's creeping expropriation: (1) on April 23, 2002, when Claimants were physically ousted from KaR-Tel by Respondent's enforcement authorities and on the basis of an injunction issued by Respondent's Courts and were never permitted to return, such that their investment was *de facto* expropriated on such date; and (2) on October 30, 2003, when the final and unappealable decision of Kazakhstan Supreme Court effectuated the compulsory sale of Claimants' shares for a price of only USD 3,000, thereby irreversibly depriving Claimants of their investment.

## 2.    Respondent's position

742. According to Respondent, the only possible relevant date for valuation should be 23 April 2002.    As decided in the *Chorzow Factory* case, the reparations should, insofar as possible, place claimant in the position in which it would have been had the expropriation not occurred.    The appropriate date for valuation of Claimants' shareholding in KaR-Tel would, therefore, be as at April 2002.    Indeed, April 2002 was the last time that Claimants or their appointees played any role in KaR-Tel.    From that point onwards, Claimants did not invest or otherwise provide any funding to KaR-Tel, nor did they or their appointees participate in any way in the operations of KaR-Tel.    If, therefore, as Claimants allege, the injunction marked the beginning of the continuum of expropriation, this makes April 23, 2002 the most appropriate date for valuation purposes.

743. Respondent notes that Claimants refer to the approach taken by the *ADC* tribunal which adopted the date of the award as the valuation date.    However, Respondent draws the Tribunal's attention to the very different circumstances leading to the adoption of that approach:

- the ADC tribunal itself referred to the unique nature of the case;
- the claimant in the ADC case had a contract with the host government itself for the provision of airport management services;
- by the time of the expropriation, that contract had been in operation for six years and had been very successful financially;

- had the benefit of the contract not been expropriated, the claimant would not have had to implement significant changes to its operations;

- the claim for lost profits was therefore reasonably certain;

- the only way in which the claimant could be put into the position it would have been without the expropriation, was to award the lost profits.

744. According to Respondent, *ADC* was therefore a case concerning the award of lost profits and it relied upon the same principles, especially that of a "*going concern*." Respondent alleges that the contrast with the facts of this arbitration could not be more pronounced since KaR-Tel failed to make any profit in its first four years, was insolvent and it is only as a result of Mr. Yerimbetov's management skills and change of direction that KaR-Tel eventually became successful.

### D.    Causation

745. According to Claimants, Respondent's wrongful conduct in breach of the Bilateral Investment Treaty and of international law has resulted in the total loss of Claimants' considerable investment. The causal nexus between the wrongful acts and the damage is obvious. This is because it is the unlawful termination of the Investment Contract that triggered and served as the justification for the process that ultimately led to the expropriation of Claimants' 60% shares in KaR-Tel by Respondent as it is on the termination of the Investment Contract that the local partner and Respondent's judiciary relied to evict Claimants.

746. According to Respondent, the principles governing international law require the wrongdoer to compensate the victim for the loss it has suffered which was directly caused by the wrongful acts. In other words, if the Tribunal finds Respondent liable to make reparations to Claimants, such reparations may only extend to that which is necessary to compensate Claimants for losses directly caused by the international wrong attributed to Respondent.

747. In this respect, Respondent submits that if the Tribunal were to find that the cancellation of the Investment Contract was procedurally unlawful, or even substantively unlawful, this would not have caused any loss to Claimants.

748. Indeed, even if there had been no procedural irregularities – and Respondent alleges that there were none – the Investment Committee would still have cancelled the Investment Contract. Even if some procedural irregularities were established, they could not have had any effect on the termination of the Investment Contract. It is the cancellation of the Contract, not the alleged procedural irregularities, which is the proximate cause of Claimants' loss.

749. Even if the Tribunal were to find that the Investment Contract ought to have been suspended prior to its cancellation, that did not cause Claimants any loss. Indeed, it would not have been possible for KaR-Tel, under Claimants' control, to remedy the multiple breaches of the Investment Contract's terms even if there had been a suspension.

750. Claimants' reliance upon the *Amco II* award as support for its position that procedural defects can make a substantively valid cancellation unlawful in international law, is unjustified. According to Respondent:

- the facts of both cases are different;
- the Amco award is not binding upon the Tribunal;
- it conflicts on this issue with all the leading authorities including the International Court of Justice.

751. Consequently, it is Respondent's position that if the Tribunal finds either that the cancellation of the Investment Contract was substantively valid or that other valid substantive grounds for its cancellation existed, the causal nexus between the alleged procedural defects and the losses allegedly suffered would not be present. From the moment the cancellation was the ultimate cause of the compulsory redemption of Claimants' shares, the loss suffered by Claimants has not been caused by a wrongful act of Respondent, which, therefore, does not have to make any reparation.

### III. CALCULATION OF DAMAGES AND QUANTUM

#### 1. Claimants' position

##### a) *The position developed in Claimants' Memorials*

752. According to Claimants, the market value upon which the compensation should be based should be ascertained against the background of the existing contemporaneous evidence, namely the sale by Telecom Invest in September 2004 of 100% of KaR-Tel to VimpelCom for the sum of USD 350 million.

753. In this regard, Claimants dispute Respondent's allegation that this sale price was achieved only as a result of two years of Mr. Yerimbetov's "*considerable efforts*" and that KaR-Tel was allegedly insolvent at the time that Claimants were ousted in April 2002.

754. Claimants submit that:

- KaR-Tel was not insolvent. It was not generating large profits in the short term, like most telecommunications companies, but this fact alone cannot serve as a basis to conclude that KaR-Tel was insolvent, particularly with KaR-Tel holding the second GSM license ever issued in Kazakhstan, with over 138,000 subscribers and a national network;

- rather, at the time Claimants were ousted, KaR-Tel was worth several hundreds of millions of dollars;

- in any event, no evidence is – or can be – adduced that KaR-Tel's management at the time would not have undertaken its own restructuring of KaR-Tel and further increased the value of the company. In fact, any other investor to which Claimants could have sold their investment at the time would have provided similar, if not more, considerable "*efforts*." Had the company not been expropriated nor consequently been subject to Rumeli's and Telsim's claims, there is no reason why KaR-Tel could not have been sold for more than USD 350 million in 2003.

755. According to Claimants, based on the elements identified and detailed in its report, Analysys first established a "*Base Case*" evaluation of KaR-Tel as of April 23, 2002, which consisted of two elements: (1) the Net Present Value ("*NPV*") of KaR-Tel over the period of 2002-2013 equal to over USD 345 million; and (2) the Terminal Value ("*TV*") of KaR-Tel – which takes into account revenues and costs generated upon the renewal of the License – equal to over USD 221 million. The Base Case value of 100% of KaR-Tel is thus approximately USD 567 million, with Claimants' combined 60% stake in KaR-Tel being valued at USD 340 million.

756. Claimants further note that Analysys took into account "*certain market data…that would not have been available in 2002, namely the actual penetration rates for mobile telephony in Kazakhstan between 2002 and 2006*" so as to ensure the "*maximum accuracy of the model in establishing a valuation that reflects the likely impact of actual market developments and market events.*"

757. According to Claimants, to ensure the comprehensiveness of its Report, Analysys made an alternative calculation, on the basis of information that was known and predicted in 2002. The effect of this scenario is to reduce the NPV by USD 151 million and the TV by USD 85 million, resulting in a total valuation of USD 331 million, and of approximately USD 199 million for Claimants' combined 60% stake in KaR-Tel. However, it is Claimants' position that the Tribunal should not rely on this more conservative approach to the detriment of a more accurate approach based on actual market developments and relevant market events.

758. Taking into consideration the date of October 30, 2003 for the valuation, Analysys has estimated that the NPV would have increased by USD 131 million and the TV by USD 66 million, for a total valuation of KaR-Tel of USD 763 million. Claimants' stake therein is thus valued at approximately USD 458 million.

759. Consequently, Claimants consider that they are entitled to USD 458 million, corresponding to the value of their stake on October 30, 2003, and alternatively, that they

are entitled to an amount of USD 340 million, corresponding to the value of their stake on April 23, 2002.

### b) The position developed in Claimants' Post-Hearing Memorial

760. In their Post-Hearing Memorial, Claimants point out that, as discussed at the hearing, Analysys had to revise its initial model. In developing its "*Base Case*" DCF Model, Analysys collected and verified public forecasts of mobile subscribers in Kazakhstan to forecast the addressable market. It then developed forecasts of Average Revenue Per User (ARPU) based on income distribution, GDP growth, and reported market ARPU's.

761. According to Claimants, Analysys had to revise its initial model because a key input relating to ARPU in the model had been misleadingly identified by Vimpelcom in its 2005 Annual Report. Upon reading Vimpelcom's 2006 Annual Report, which was not available at the time Analysys' model was first constructed, Analysys realized that Vimpelcom was including interconnect revenues in what was defined as "*services revenues*," although this had not been identified in Vimpelcom's earlier definition of "*service revenues*." Analysys thus reran its model to take this difference into account.

762. Analysys' methodology is described in more detail in Analysys' quantum opinion of February 26, 2007 and in Analysys' PowerPoint presentation of October 26, 2007. In this respect, Claimants point out that the entire amount of the outstanding Motorola Loan was fully accounted for in Analysys' model, and was deducted from the value of KaR-Tel and by consequence from the value of Claimants' 60% shares in KaR-Tel.

763. On the basis of this DCF methodology, Analysys concluded that the real value of Claimants' 60% stake in KaR-Tel under the "*Base Case*" scenario was USD 162,000,000 on April 23, 2002 and was USD 227,000,000 on October 30, 2003.

764. Contrary to Respondent's allegation, it is Claimants' position that, in this valuation, it is legitimate to take into account the development occurring in the market and the business after the date of the expropriation. Indeed, Claimants' investments could have benefited

from the expanding Kazakhstan telecom market. To ignore what actually happened in the Kazakhstan telecom market would not reestablish the situation which would have existed, had Respondent's expropriation not been committed.

765. Nevertheless, for the benefit of the Tribunal, if it were to rule that no data subsequent to Respondent's expropriation should be used to calculate the "*real value*" of Claimants' losses, Analysys has run further scenarios based on forecasts from 2002/2003, *i.e.*, contemporary forecasts that underestimated actual growth in the Kazakh mobile communications market. Without using any hindsight, and ignoring the actual growth in the Kazakh mobile communications market, Analysys has determined that Claimants' 60% stake in KaR-Tel should be valued at USD 111,000,000 (without 3G investments) or USD 54,600,000 (with 3G investments), respectively, on April 23, 2002.

766. On the final day of the hearing, the Tribunal requested that Analysys provide further valuations of KaR-Tel based on the assumption that the licenses would terminate in 2013 and not be extended (so that no terminal value should be accounted for in the model). Analysys' expert immediately noted that "*I don't know any cases where there hasn't been continuity beyond the end of a license.*" The presumption used in valuating telecom companies is that there would be a renewal of the license. This is further confirmed by the fact that there are renewal provisions contained in KaR-Tel's GSM license. Claimants thus strongly object to the valuation of KaR-Tel based on the assumption that the license would not be renewed.

767. Nevertheless, on October 30, 2007, Analysys provided the breakdown requested by the Tribunal of the valuation of KaR-Tel based on the non-renewal of the license.[81] Analysys noted that, in reality, there would always be a terminal value since "*we would expect KaR-Tel to derive some value from the assets and from selling the subscriber contracts to another operator.*" Analysys added that in this scenario, the cost item for the purchase of a 3G spectrum in 2010 should be removed from the model, since the company would have bought a 3G spectrum only if it knew it had continuity.

---

[81]    *See* Exhibit 30 to the Analysys' Quantum Opinion.

768. In any case, Claimants allege that Analysys' original "*Base Case*" scenario most accurately reflects the real value as specified in Article III of the Bilateral Investment Treaty. Based on the foregoing, Claimants are entitled to compensation of USD 227,000,000 corresponding to the real value of their 60% stake in KaR-Tel as of October 30, 2003. Alternatively, Claimants take the position that they are entitled to the amount of USD 162,000,000 corresponding to the real value of their 60% stake in KaR-Tel as of April 23, 2002.

769. As for the interest, the most appropriate standard which will satisfactorily compensate Claimants is the 6 month average LIBOR plus 2 per cent per year for each year during which amounts are owed. Interest should be compounded semi-annually as reflected by the recent practice of ICSID tribunals. Finally, interest should start running at the date of the expropriation until payment of the award.

## 2. Respondent's position

770. For their valuation, Claimants rely on the difference between the compensation awarded to them by the Presidium of the Supreme Court and the price paid by VimpelCom. However, the difference between the two numbers is easy to explain:

- the Presidium was valuing 60% and not 100% of the shares;
- the Presidium was valuing KaR-Tel as of April 2002 whereas Vimpelcom did bid for KaR-Tel in August 2004;
- the Presidium was bound by the formula agreed by Claimants and Telecom Invest in KaR-Tel's Foundation Agreement;
- the Presidium made its valuation on the basis of a number of independent expert audit reports, all but one of which concluded that KaR-Tel was insolvent, whereas VimpelCom was bidding for a company with significantly lower debt levels, profitable operations, four times the number of subscribers and a great deal of new equipment;
- the Navigant Report demonstrates that the Presidium's valuation of KaR-Tel and VimpelCom's implicit valuation are in fact entirely compatible.

771. According to Respondent, it is untenable to suggest, as Claimants do, that no evidence is adduced that KaR-Tel's management at the time would not have undertaken its own restructuring of KaR-Tel and further increased the value of the company. Indeed, by April 2002, Claimants had been in control of KaR-Tel's management for four years and during that period:

- they had saddled KaR-Tel with over USD 100 million of debt to Motorola alone;

- KaR-Tel did not make a single payment towards the Motorola Loan;

- Motorola had begun to threaten KaR-Tel with legal proceedings;

- between 1999 and 2001, KaR-Tel had been unprofitable;

- notwithstanding this situation, Claimants did not show any willingness to inject any equity into KaR-Tel;

- Motorola had filed fraud and racketeering claims in the New York Courts against Claimants' owners;

- there was no possibility open to Claimants to renegotiate the Motorola Loan since Motorola would not accept to discuss any settlement of its claim until the Uzans were no longer involved in KaR-Tel;

- ultimately, whether or not some other party could have achieved the same results is irrelevant from a valuation standpoint since, as Mr. Kaczmarek of Navigant pointed out in his testimony, it does not alter the fact that no external investor would have paid more than an extremely token amount for the equity in KaR-Tel at that time. Any investor proposing to come into the business would have had to either pay off Motorola or put sufficient funds into KaR-Tel to enable it to do it itself. No rational investor would do either of those things without demanding the issue of new shares for that equity, which would have left the existing shareholders diluted so that they owned less than 1% of the company.

772. Claimants also miss the point when they allege that KaR-Tel was not insolvent in April 2002 because it is not uncommon for mobile telecom operators to generate losses during the early years of operations. Indeed, KaR-Tel's insolvency was not directly tied to its

ability to generate profits. It was insolvent because it had failed to make a single payment of interest or principal on the Motorola Loan.

773. Moreover, according to Respondent, Claimants' statement that "*it is not uncommon for mobile telecom operators to generate losses during the early years of operations*" must be compared against the performance of KaR-Tel's only competitor in the Kazakh market, K-Cell. They received their licenses within a month of each other. However, as early as 2001, K-Cell was generating short-term profits. The comparison with K-Cell is illustrative of the fact that Claimants appear to have viewed KaR-Tel simply as another vehicle for their worldwide fraud.

774. Respondent further considers that the Report prepared by Analysys and submitted on behalf of Claimants is unreliable. There are two indicators which reveal immediately that the Analysys valuation is incorrect:

- Analysys's April 2002 valuation gives an enterprise value per subscriber (EVPS) of over USD 4,450, whereas the enterprise value per subscriber for comparable companies at the same time was between USD 500 and USD 600;
- Analysys's valuation of KaR-Tel as of September 2004 (USD 928 million) is almost three times the value paid by VimpelCom at the time (USD 350 million).

775. Claimants' counsel opened the hearing before the Tribunal on the basis of the figures in the Analysys Report. It was extraordinary, therefore, when, in the middle of the hearing, Analysys informed Respondent that they had got it dramatically wrong. In fact, Analysys provided new figures which reduced their valuations by 50%. If, as is its usual role, Analysys had been advising a company on the purchase of KaR-Tel, that company would have paid more than the double of what Analysys now believes the company to have been worth.

776. Further, Respondent alleges that what is particularly troubling is the lateness of this admission. Analysys has had Navigant's Report since May 2007, which made clear that there must have been a significant error by Analysys.

777. Moreover, the new valuation by Analysys is still hopelessly overstated. It continues to fail to treat KaR-Tel as insolvent, which means its entire report adopts the wrong methodology, applying a valuation method for solvent companies to an insolvent company.

778. Respondent further submits that it is unacceptable as a matter of valuation theory, to use historical data when producing a fair market valuation. Only knowledge and expectations at the time are relevant. And in this context, in 2002, no analyst or investor appears to have foreseen the exponential growth that would occur in the Kazakh mobile telephony market between 2002 and 2006.

779. According to Respondent, the reason why Claimants have sought to rely on a different basis than fair market value is that fair market valuations are not permitted to rely on hindsight and must value the investment on the basis of the information that was known to the market at the relevant time. In April 2002, which is the appropriate time for valuation, it is quite clear that the market did not expect the growth in Kazakhstan mobile telephony which in fact occurred. Analysys acknowledged contemporaneous forecasts were not available for Kazakhstan in 2002. Moreover, a review of Analysys' own exhibit containing contemporaneous forecasts of mobile penetration for comparable countries in Central Asia and East Europe confirms that there is compelling evidence that the mobile markets in all these countries grew much faster than was forecast in 2002.

780. According to Respondent, the Tribunal should take into account the following:

- the BIT itself provides that "*compensation shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken.*" This implicitly recognizes that what is to be valuated is the investment as it stood in April 2002, not what someone in 2007 would pay for it if they could go back in time with subsequent knowledge;

- Analysys have not disclosed any authority for the proposition that real value means something different from fair market value and that it permits the use of hindsight in valuation. Navigant have, on the contrary, provided the Tribunal

with a wide range of ICSID awards demonstrating that fair market value is the appropriate standard and that it is not permissible to use hindsight in arriving at a fair market valuation.

781. Respondent finally alleges that further evidence that even Analysys' second attempt at a valuation is inaccurate is provided by a comparison of the actual data we now know for KaR-Tel with the figures that their model generates. As Navigant Slide 60 demonstrates, Analysys' net income figures for KaR-Tel for 2005 and 2006 are, respectively, 12 times and almost 5 times higher than the actual results posted by KaR-Tel – differences of over USD 25 million and over USD 70 million respectively.

782. The clearest way to see the absurdity of Analysys' figures is to do the arithmetic. In the course of his evidence to the Tribunal, Mr. Wright was asked about the fact that even his revised calculations led to a notional enterprise value per subscriber for KaR-Tel of USD 2,554.4 which looked rather high compared with the average actual enterprise value per subscriber of USD 746 achieved on the sale of KaR-Tel's only rival K-Cell in February 2002. Mr. Wright maintained that his figures were correct and were unsurprising. He stated that the disparity was explained by the fact that less developed mobile phone operators with smaller subscriber numbers were "*earlier in the curve*" so attracted a greater EVPS than more established operators like K-Cell. According to Respondent, these arguments are hopeless. The effect of Mr. Wright's evidence is that an informed buyer in April 2002 would have paid more for KaR-Tel than for K-Cell.

783. According to Respondent, its Navigant Report is to be preferred. It concludes that the fair market value of KaR-Tel was zero, even if it is evaluated on a going concern perspective.

784. Therefore, Claimants are not able to make out their case for the damages they claim. Respondent submits that the Tribunal should not award them a different or lesser sum.

### IV. DECISION OF THE ARBITRAL TRIBUNAL

#### A. <u>The principles of compensation</u>

785.   For expropriation, Article III of the BIT provides that "(c)ompensation shall be equivalent to the real value of the expropriated investment before the expropriatory action was taken or became known." Article 7(2) of the FIL provides that "(t)he compensation must be equal to the fair market value of the expropriated investments at the moment when the investor learnt of the expropriation."

786.   The expression "fair market value" may in certain contexts have a specific technical meaning for the valuation of assets.  In the context of the FIL, however, the expression must be taken to have a non-technical meaning and to convey a measure of value which can be applied whether or not a "fair market value" in a technical sense can be ascertained in the particular case.  For present purposes, the Tribunal considers that no relevant distinction can be drawn between the expressions "real value" and "fair market value."  The Tribunal should apply the method or methods of valuation which will most closely reflect the value of the expropriated investment to the investor at the relevant time.

787.   Under Article 7(2) of the FIL the relevant time, i.e. the moment when the investor learnt of the expropriation, must necessarily be later than the expropriation itself.  Article III of the BIT, on the other hand, does not indicate whether the Tribunal should apply the moment before the expropriatory action was taken, or the moment when it became known.  For present purposes, the Tribunal considers that it can treat both moments as having occurred at the same time, since every step in the events leading up to the decision of the Presidium of the Supreme Court was known at once or almost at once to Claimants.

788.   The moment at which the expropriation took place is not to be determined by any principle of international law, but is a question of fact to be determined by the Tribunal in the particular circumstances of the case.  In some cases the moment of expropriation may be clearly established by a single expropriatory act.  In other cases, such as the present

case, the expropriation may be gradual or "creeping," or it may be indirect rather than direct, so that to determine the moment of expropriation may be a matter of judgment rather than of direct and clear evidence. Given that both the BIT and the FIL refer, in similar language, to the moment when the expropriation became known to the investor, the Tribunal may legitimately have regard to the question whether any initial expropriatory act was known to be irrevocable, or whether there remained any possibility that it might be reversed.

789. For claims for breaches other than expropriation, neither the BIT nor the FIL offer any guidance for evaluating the damages arising from such breaches. Under Article 1 of the ILC Articles, every 'internationally wrongful act' of a State entails the 'international responsibility' of that State. An 'internationally wrongful act' is defined under Article 2 as an act which is (i) attributable to the State under international law and (ii) a breach of an international obligation of the State.

790. Under Article 28 of the ILC Articles, the international responsibility of a State which is entailed by an internationally wrongful act involves the legal consequences set out in part II of the ILC Articles. These include, under Article 32 (Reparation), an obligation to make "*full reparation for the injury caused by the internationally wrongful act.*" Injury is defined as including "*any damage, whether material or moral, caused by the internationally wrongful act*." Article 34 sets out the three forms of reparation which may be claimed individually or in combination: (i) restitution; (ii) compensation; (iii) satisfaction.

791. Under Article 36, when restitution cannot be made, as in the present case, the State is under an obligation to compensate for the damage caused. Such compensation is to cover "*any financially assessable damage including the loss of profits insofar as it is established.*"

792. In assessing compensation for internationally wrongful acts other than expropriation, the Tribunal considers that it should apply the principle of the *Factory at Chorzow* case, according to which any award should "as far as possible wipe out all the consequences of

the illegal act and reestablish the situation which would in all probability have existed if that act had not been committed."[82]

793.   In the present case, the loss which Claimants maintain that they have suffered is in fact the expropriation of their shares in Kar-Tel, whether or not this is characterised as an expropriation calling for compensation under the BIT, or merely as the consequence of some other internationally wrongful act, such as a breach of the obligation of fair and equitable treatment.  In either case, the Tribunal considers that the correct approach is to award such compensation as will give back to Claimants the value to them of their shares at the time when the expropriation took place.  This requires the Tribunal to take account only of the value which the shares would probably have had in the hands of Claimants if the shares had not been expropriated, and therefore to leave out of account any increase (or decrease) in the value of the shares which Claimants would probably not have enjoyed (or suffered) if the shares had remained in their hands.

### B.      The calculation of the compensation and its amount

794.   As the Tribunal has just stated, it considers that, regardless of the nature of the breach which has been established, the correct approach in this case is to award such compensation as will give back to Claimants the value to them of their shares at the time when the expropriation took place.

795.   The valuation date was a matter of controversy between the parties.   Respondent maintained that the expropriation took place on April 23, 2002, which was the date of the injunction which excluded Claimants from the premises of Kar-Tel and was the last date on which Claimants played any part in the operations of Kar-Tel.  Claimants on the other hand maintain that the expropriation did not take place until October 30, 2003, the date of the decision of the Presidium ordering the compulsory redemption of Claimants' shares. Having regard to what is said in paragraph 768, the Tribunal considers that it is appropriate to take into account the fact that until the unappealable decision of the Presidium on October 30, 2003 it could not reasonably be known by Claimants that their

---

[82]      *Chorzów Factory,* 1928 PCIJ, Series A No. 17, p. 47.

exclusion from the premises of Kar-Tel would irrevocably lead to the loss of their shares. The injunction was challenged by Claimants, and did not become irrevocable until the decision of the Presidium in August 2002. Even then, the shares themselves remained in the ownership of Claimants, and the injunction could and would have been reversed if Claimants had succeeded on the merits by defeating the claim for compulsory redemption. It was not until June 6, 2003 that an order was made by the Almaty City Court for the compulsory redemption of the shares. That decision was also challenged on appeal, and it did not become irreversible until the decision of the Presidium on October 30, 2003.

796. The Tribunal considers that at no time until that date could it be said that there had been, to the knowledge of Claimants, an expropriation which had taken definite and irrevocable effect. The fact that successive decisions of the lower court were appealed to the Supreme Court is cogent evidence that Claimants considered that there was at least some prospect that they might retain their shares and resume control of the operations of Kar-Tel. For these reasons the Tribunal considers that it should assess the value of the shares to Claimants at October 30, 2003, and not at any earlier date.

797. The Tribunal has given consideration to the question whether the valuation of the shares by the Presidium is relevant or even conclusive as to the value of the shares to the Claimant. In the Tribunal's opinion, this valuation is neither relevant nor conclusive, for two reasons. First, to the extent that the decision of the courts that the shares should be compulsorily redeemed resulted from the internationally wrongful acts of the Investment Committee, the task of the Tribunal is to make an award which will restore Claimants to the position which would probably have prevailed if those wrongful acts had not taken place. That involves assuming a hypothetical state of affairs, in which the train of events which led to the valuation by the Presidium would not have taken place. That valuation is irrelevant to the hypothesis on which the Tribunal must make its own award, because on that hypothesis the valuation would not have occurred, and should not have occurred. Second, to the extent that the Tribunal determines that this was a case of expropriation requiring compensation under the BIT, it is axiomatic that such compensation must be

assessed by the Tribunal seized of the question whether, *under international law*, the compensation is "prompt, adequate and effective." That is a question which cannot be foreclosed by a decision of the State, including its courts, even if the decision is unimpeachable under the law of the host State. That is clearly so where as here, the decision of the court of the host State was a decision under the law of that State, and not under international law or under the BIT. In principle, however, the position would be the same even if the Presidium had purported to make its decision as if it were a valuation for the purpose of the BIT and under international law.

798. On the assessment of compensation itself, the discussion above of the respective positions of the parties discloses fundamental disagreements both as to the method of valuation and as to the result. In summary form the differences can be stated as follows.

799. Claimants for their part invite the Tribunal to adopt the DCF method of valuation, which on adjusted figures produces a valuation of Claimants' 60% shareholding, as at October 30, 2003, of USD 227 million. This valuation was based on forecasts of future growth which would have been available at that date (although not on April 23, 2002), so it does not rely on hindsight, which was a criticism made by Respondent of the figures for the earlier date, but only of those figures. Claimants maintain that the figure of USD 227 million compares well with the price paid by Vimpelcom in August 2004, of USD 350 million (of which 60% would have been USD 210 million).

800. Respondent on the other hand maintains that it is wrong in principle to use the DCF method to value a company which is not solvent and is therefore not a going concern, as they maintain was true of Kar-Tel in April 2002 and would have remained true in October 2003 if Claimants had remained in control. They maintain that the DCF method, as applied by Claimants' expert, leads to a valuation which is grossly out of line with the price paid in comparable transactions involving mobile phone licences, and that if the values implicit in those transactions are taken into account, the value of Kar-Tel's licence was insufficient to repay Kar-Tel's indebtedness to Motorola. In other words, Claimants' shares were valueless.

801. The Tribunal has considered in this connection the World Bank Guidelines on the Treatment of Foreign Direct Investment, 1992. Guideline IV contains the following remarks:

> *"3. Compensation will be deemed "adequate" if it is based on the full market value of the taken asset ...*
>
> *5. ... the fair market value will be deemed acceptable if determined by the State according to reasonable criteria related to the market value of the investment, i.e., in an amount that a willing buyer would normally pay to a willing seller after taking into account the nature of the investment, the circumstances in which it would operate in the future and its specific characteristics, including the period in which it would operate in the future and its specific characteristics, including the period in which it has been in existence, the proportion of tangible assets in the total investment and other relevant factors pertinent to the specific circumstances of each case."*

802. The Tribunal notes that this attaches to "fair market value" a meaning which does not presuppose the existence of a market in which investments of the class in question can be freely traded (there being no such market in the present case) but assumes a transaction between a willing buyer and a willing seller. The Tribunal also notes that the Guidelines do not state that there is no other way of arriving at a "fair market value." Nevertheless the Tribunal considers that these sections of the Guidelines set out concisely and accurately the approach to valuation of Claimants' shares which is appropriate in the circumstances of the present case, and that this is so even though the BIT refers to "real value" rather than "fair market value."

803. Section 6 of Guideline IV sets out the following guidelines for determining the market value of an investment:

> *"6. Without implying the exclusive validity of a single standard for the fairness by which compensation is to be determined as an illustration of the reasonable determination by a State of the market value of the investment under Section 5 above, such determination will be deemed reasonable if conducted as follows:*
>
> > *(i) for a going concern with a proven record of profitability, on the basis of the discounted cash flow value;*

*(ii)  for an enterprise which, not being a proven going concern, demonstrates lack of profitability, on the basis of the liquidation value;*

*(iii)  for other assets ....  [Omitted as not relevant to the present case.]*

*For the purposes of this provision:*

*-a 'going concern' means an enterprise consisting of income producing assets which has been in operation for a sufficient period of time to generate the data required for the calculation of future income and which could have been expected with reasonable certainty, if the taking had not occurred, to continue producing legitimate income over the course of its economic life in the general circumstances following the taking by the State;*

*-'discounted cash flow value' means the cash receipts realistically expected from the enterprise in each future year of its economic life as reasonably projected minus that year's expected cash expenditure, after discounting this net cash flow for each year by a factor which reflects the time value of money, expected inflation, and the risk associated with such cash flow under reasonable circumstances.  Such discount may be measured by examining the rate of return available in the same market on alternative investments of comparable risk on the basis of their present value;*

*-'liquidation value' means the amounts at which individual assets comprising the enterprise or the entire assets of the enterprise could be sold under conditions of liquidation to a willing buyer less any liabilities which the enterprise has to meet;*

*[The definitions of 'replacement value' and 'book value' are omitted as not relevant to the present case.]*

804.  The Tribunal adopts these provisions of Guideline IV as a valuable starting point for assessing compensation in the present case, while reminding itself (a) that they do not imply the exclusive validity of a single standard, (b) that the guidelines are described as "an illustration" and (c) that the overriding object is to ascertain the "fair market value" as defined in section 5.  There is, as the Tribunal is aware, an extensive body of awards and other writings concerning the proper approach to the assessment of compensation for expropriation.  In other cases it might be necessary to refer to such writings to resolve

particular issues, but the parties have not invited the Tribunal to embark on such an exercise, and the Tribunal considers that these sections of Guideline IV represent a widely recognised and well respected statement of the modern practice in such matters, which the Tribunal should follow so far as they are appropriate to the circumstances of this case.

805. With these observations in mind the Tribunal turns to consider the fair market value to Claimants of their shares on October 30, 2003. For this purpose the assumption must be made that Claimants had not been removed from the premises of Kar-Tel in April 2002 and that they had remained in continuous control of the operations of Kar-Tel from then until October 30, 2003, and indeed thereafter. On this assumption Respondent maintains that Kar-Tel was not a 'going concern' in April 2002, and that it would not have been a 'going concern' at October 30, 2003 if Claimants had remained in control of its operations.

806. In support of this Respondent relies on the facts set out in paragraph 731, above, as showing that Kar-Tel was insolvent in April 2002. The Tribunal accepts that on the basis of these matters Kar-Tel was probably insolvent at that date, at least as regards its balance sheet. Whether it would likewise have been insolvent as at October 30, 2003 if it had remained in the hands of Claimants is a matter of speculation. No doubt, given the financial strength of Rumeli's affiliate Telsim, funds could have been found to keep Kar-Tel in being and even, if it had proved absolutely unavoidable, to repay the Motorola Loan. Nevertheless the past history of the company under Claimants' management indicates that it would have continued to be starved of funds to make the necessary capital investment to turn the fortunes of the company around, particularly if it had become necessary to repay the Motorola loan. No doubt the fact that Claimants would have provided 100% of the capital but held only 60% of the shares (of which only 15% were held by Telsim) would have been a disincentive to any large scale investment. There is moreover no evidence to suggest the likelihood of any improvement in the quality of the management of Kar-Tel under Claimants' control. The strong likelihood is that its market share would at best have remained static and might even have continued to

shrink, that it would have remained chronically undercapitalised, and that it would have continued to miss its performance targets. It would also have remained under threat from the bankruptcy proceedings begun in Kazakhstan in August 2002.

807. According to Respondent the fact that Kar-Tel did not cease to carry on business was due to the new management brought in after Claimants were removed in April 2002, in the person of Mr. Yerimbetov, who gave evidence at the hearing. Mr. Yerimbetov was able to renegotiate the Motorola Loan down from over USD 100 million to USD 35 million and to borrow the funds necessary to repay the renegotiated amount. But this was not until after October 2003 (in fact in April 2004), and it had no impact on the availability of capital for day to day operations. That was achieved by Mr. Yerimbetov negotiating an allowance of credit from two large banks in the Kazakhstan market in the form of bank guarantees in the amount of USD 25 million. This enabled to buy new up-to date top of the range equipment from Alcatel, and thereby substantially to improve Kar-Tel's network coverage. Mr. Yerimbetov also purchased a new billing platform and re-branded the prepay card system, and he attributed the fact that subscribers increased to over 600,000 people and sales to over USD 100 million a year, to the activities which he described.

808. For the present it is sufficient for the Tribunal to find that if Kar-Tel had remained in the hands of Claimants it is likely that there would have been little or no improvement in its management or its financial position between April 2002 and October 2003, and that the impressive improvement in the fortunes of Kar-Tel after April 2002 would not have taken place.

809. Respondent's expert, as has been mentioned, considered that the DCF value is entirely inappropriate for Kar-Tel, because at October 30, 2003 it would still not have been a going concern. That is perhaps correct if one has regard to the definition of 'going concern' in the World Bank Guideline IV, section 6, which assumes predictable future profits based on historical data. It is also no doubt correct that in those circumstances the Guideline would allow the use of 'liquidation value' as a reasonable method for assessing

the fair market value of the investment. The Guideline does not however require the use of either the DCF or the liquidation value as the only correct method for assessing value. The overriding objective, as the Tribunal has already observed, to establish the "market value" of the investment, i.e. the amount that a willing buyer would normally pay to a willing seller, taking into account the matters referred to in section 5 of Guideline IV.

810. In the opinion of the Tribunal a DCF valuation would likely have formed one of the measures which would have informed a discussion between a willing seller and a willing buyer in October 2003, and it would have been equally appropriate to use the DCF method as a basis for discussion, whether the transaction was to involve a sale of the shares or a sale of the licence and other assets on their own. But the discussion would certainly not have ended there. It is well known that DCF values are to a greater or lesser extent sensitive to the validity of the data on which they are based, such as the inflation rate, the discount rate, the assumptions underlying the predicted cash flows. Claimants' expert's report contains a number of sensitivity analyses which demonstrate that quite small changes in input can materially affect the outcome. For example, the expert's original value of USD 567 million could, depending on various alternative assumptions which might reasonably have been made, have been as much as USD 753 million or as little as USD 451 million. The Tribunal is aware that the sensitivity analyses are used as a cross check on the figure adopted by the expert, and not to invalidate the figure. Nevertheless, they demonstrate that the method must be understood as an approximation which is dependent on the validity of the assumptions, and not as a mechanical calculation which will yield a value whose validity is not open to question.

811. This is particularly relevant in a case such as this, where even in October 2003 the enterprise had not been in existence for long enough to have generated the data required for the calculation of future income. This would mean that the enterprise would not be treated as a going concern under the World Bank Guidelines, and would therefore be more suitable for the 'liquidation value' rather than the DCF method of valuation. Kar-Tel would in October 2003 still have been in a relatively immature stage of development, with no established and stable track record of past income from which to predict future

income. This would have given rise to considerable doubt about the reliability of the DCF method. Despite this, the application of the 'liquidation value' still makes it necessary to ascribe a value to Kar-Tel's only asset of real value, namely its licence to operate the mobile telecommunication network. On any view that clearly had a value in October 2003 far in excess of its book value. Since the value of that asset was directly linked to its potential to produce future income, there is no realistic alternative to using the DCF method to ascribe a value to it. It is however necessary to recognise the limitations of the DCF method, including the limited reliability of the method without adequate historical data. This is strikingly illustrated by the fact that the DCF valuation by Claimants' expert as at April 2002 produced a revised valuation which implied an enterprise value ('EV') per subscriber of USD 2,500, whereas, according to Respondent's expert the EV for a sale and purchase of a 40% stake in Kar-Tel's competitor KCell in February 2002 resulted in an EV between USD 722 and USD 770: analysts at the time produced their own EV's of between USD 500 and USD 600, from which they concluded that the price was on the high side. The discrepancy between the DCF valuation and the EV values is very striking.

812. A potential buyer in October 2003 would for its part have been likely to take account of other matters which tended to increase the risk of purchasing the shares or the licence. These would have included the fact that, assuming continued control by Claimants until October 2003, Kar-Tel would not have regained market share lost to its principal competitor, that it would not have benefited from any substantial injection of capital, and that there would have been doubts about the quality of the equipment which Kar-Tel had acquired. On the other hand, these matters might be said to have afforded opportunities for new managers with access to adequate capital resources to turn Kar-Tel around.

813. In the absence of any more reliable method of valuation, the Tribunal takes as its starting point the base case DCF valuation by Claimants' expert as at October 30, 2003 of USD 227 million for Claimants' 60% stake in Kar-Tel, after repaying the Motorola Loan. This figure assumes historical data derived in part from the period between April 2002 and October 2003, when Kar-Tel was under new management and adequately capitalised.

During this period, Kar-Tel had improved its technical base, introduced new billing systems and begun to recover market share. It is not obvious to the Tribunal that Claimants would have undertaken such initiatives had they retained control of Kar-Tel. Moreover, the figure of USD 227 is to be compared with the price paid by Vimpelcom in August 2004, of which 60% is USD 210 million. This is substantially lower than the valuation of USD 227 as at October 30, 2003, despite the fact that the growth in mobile phone usage in Kazakhstan had continued in the intervening period, and had in fact accelerated.

814. Taking into account all the circumstances described above, the Tribunal concludes that an award of USD 125 million will adequately compensate Claimants for the expropriation of their shares and will give them full reparation for the injury caused by the internationally wrongful acts which the Tribunal has found to have been committed by Respondent. The Tribunal therefore orders Respondent to pay this amount of USD 125 million to Claimants.

815. In reaching this conclusion, the Tribunal has taken note of the evidence (some of which was contested) as to various negotiations which are said to have taken place with regard to the shares in Kar-Tel.

816. Two of these negotiations are said to have involved offers to buy Claimants' shares which were rejected: see paragraphs 138, and 541-547. Since these took place at a time when Claimants had been or were likely to be deprived of the shares, and the offers were rejected by Claimants, the Tribunal does not regard them as relevant to the market value of the shares in October 2003.

817. The third negotiation concerned the sale by Telcom Invest of its 40% stake in Kar-Tel to Claimants in the autumn of 2002: see paragraphs 134-135, 401-403, and 506-510. This reached the stage of a draft agreement for the sale of Telcom Invest's 40% shareholding for USD 12 million. In the end the transaction fell through, but if Telcom Invest was willing to sell its 40% stake for USD 12 million, it can certainly be asked why Claimants' 60% stake should have been worth more than USD 18 million. A number of explanations

are possible, the most likely of which is that Telcom Invest and its backers had at that time little or no real knowledge of the mobile telecommunications business and had failed to appreciate the potential value of the licence. The Tribunal does not consider that this evidence can be used as a safe guide to the fair market value of Claimants' shareholding, beyond indicating that the true value of the licence was less obvious in 2002 than it later became: at that time the very rapid growth in the market which began in 2003 had not become established.

818. As far as interest is concerned, the Arbitral Tribunal orders Respondent to pay Claimants compound interest at the rate of 6-month average Libor plus 2 percent per year, compounded semi-annually, on the amount of USD 125 million from October 30, 2003 until the date of the payment of the Award.

## V. COSTS

819. Finally, the Tribunal turns to costs. To obtain justice, Claimants had no option but to bring this arbitration forward and to incur the related costs. Although they have prevailed on the substance of the dispute, they have failed on a number of their allegations and the amount of damages awarded is less than the one claimed. On this basis, the Tribunal considers fair that each party bear 50% of the costs of the arbitration proceeding (advances to ICSID) and that Respondent be condemned to pay 50% of Claimants' legal costs and fees as detailed in Claimants' letter of January 25, 2008 (with appendices under tab 1 to 5), with the exception of the costs of the arbitration (lodging fee and advances to ICSID).

# AWARD

1.　Respondent breached its obligation to accord the investor the fair and equitable treatment imposed on Respondent by virtue of the Most Favourable Nation Clause contained in Article II(1) of the Bilateral Investment Treaty;

2.　Respondent has expropriated Claimants' investment without complying with the conditions set forth in Article III(1) of the Bilateral Investment Treaty;

3.　Respondent shall pay Claimants compensation in the amount of USD 125 million;

4.　Respondent shall pay Claimants compound interest at a rate of 6-month average Libor plus 2 percent per year, compounded semi-annually, on the amount of USD 125 million from 30 October 2003 until the date of the payment of the Award;

5.　Respondent shall pay 50% of Claimants' legal fees and costs as detailed in Claimants' letter of January 25, 2008 with details under tab 1 to 6;

6.　Respondent shall pay Claimants compound interest on the Claimants' legal fees and as awarded under No. 5 at the rate indicated above at No. 4, from the date of this Award until the date of full payment;

7.　All other claims are dismissed.

### THE ARBITRAL TRIBUNAL

_____
**Stewart BOYD**
**Arbitrator**
Date: 2.1.08

_____
**Marc LALONDE**
**Arbitrator**
Date:

_____
**Bernard HANOTIAU**
**President of the Tribunal**
Date: 17 July 2008