```
               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK




----------------------------X
                            :
IN RE: ALPENE, LTD.,        :
                            :   21-MC-2547 (MKB)(RML)
                            :
                            :   January 11, 2022
                            :
                            :   Brooklyn, New York
                            :
                            :
                            :
                            :
                            :
----------------------------X


          TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
             BEFORE THE HONORABLE ROBERT M. LEVY
                UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:             STEVE DAVIDSON, ESQ.
                               Steptoe & Johnson LLP
                               1114 Avenue of the Americas
                               New York, NY 10036


For the Defendant:             MICHAEL KEATS, ESQ.
                               Fried, Frank, Harris,
                               Shriver & Jacobson LLP
                               One New York Plaza
                               New York, NY 10004


Court Transcriber:             ARIA SERVICES, INC.
                               c/o Elizabeth Barron
                               274 Hovey Road
                               Milo, ME 04463
                               Aria@leinen.net



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

1            THE COURT:  This is Judge Levy.  Good

2    morning again.  We're here on docket number 21-MC-2547,

3    In Re: Alpene, A-l-p-e-n-e.

4            Will counsel please state their appearances

5    for the record?

6            MR. DAVIDSON:  This is Steven Davidson from

7    Steptoe & Johnson on behalf of Alpene.  With me is one

8    of my colleagues from D.C., Teddy Baldwin, and two New

9    York colleagues, Evan Glassman and Niati Ahu (ph).

10           THE COURT:  Thank you.

11           MR. KEATS:  Good morning, your Honor.  It's

12   Michael Keats from Fried, Frank for the respondent,

13   Elizabeth McCaul.  With me are a few individuals I need

14   to introduce.  Stacey Blaustein (ph) and Joy Willing

15   (ph) are both in-house lawyers at IBM and they cover

16   Promontory Financial.  You can understand why they are

17   involved in this with Promontory all over the papers.

18           THE COURT:  Good.

19           MR. KEATS:  And my colleague, Justin

20   Santolli from Fried Frank as well.

21           THE COURT:  Who is going to be speaking for

22   the movant and who is going to be speaking for the

23   respondent?

24           MR. KEATS:  This is Michael Keats.  I'll be

25   speaking for the movant.

1          MR. DAVIDSON:  Your Honor, it's Steven

2    Davidson speaking on behalf of Alpene.

3          THE COURT:  All right.  Mr. Keats, do you

4    want to go first?

5          MR. KEATS:  Sure, sure.  Good morning and

6    thank you for hearing us on this motion.  I know you've

7    gotten a pile of paper from both sides so I'm not going

8    to repeat everything you've read.  The procedural

9    posture is, we have moved for a protective order.  The

10   applicant Alpene is seeking discovery pursuant to

11   Section 1782 in connection with a treaty arbitration

12   that they have filed against the government of Malta.

13          Elizabeth McCaul, my client, at the time of

14   the underlying events worked for Promontory.  She was

15   the CEO.  Promontory has been an advisor/consultant to

16   the Malta Financial Services Authority, the MFSA, for

17   many years going back to at least 2012.  We have come

18   before you and we're seeking this relief for all the

19   reasons we've put forward, but I want to kind of

20   highlight a couple of things.  When I first got this

21   paper, their motion papers, I thought I understood what

22   was going on, but I did a Google search and found that

23   there had been a prior proceeding basically by the same

24   parties in interest that had been filed in the District

25   of New Hampshire because there's a gentleman named

1    Laurence Conell (ph), who had served when Ali Sader

2    (ph) -- there are a lot of names here, forgive me --

3    was arrested in the U.S. for alleged money laundering,

4    among other things.  The MFSA made the decision to put

5    the bank that he owned and he was the chairman of, and

6    he's to my knowledge the sole owner of that bank, into

7    administration upon learning that Mr. Sader had been

8    arrested and detained in the United States.

9           My client's role, and that's Elizabeth

10   McCaul, appears to be she gave the name of Laurence

11   Conell among others to the MFSA as potential candidates

12   to serve as what's known as a competent person who

13   effectively administers the bank instead of its

14   shareholders, its board of directors.  That's sort of

15   at a very high level the background.  The MFSA's

16   decision to do that is something that Pilatus (ph) Bank

17   and Ali Sader have been challenging through litigation

18   against various parties, the MFSA, the European Central

19   Bank, for some years, and now they brought a claim

20   against the government of Malta.  So very high-level

21   background.

22          The specific reasons -- look, we were -- I

23   was surprised, candidly, that the prior Conell

24   litigation was not mentioned at all in the application.

25   And even now, I think Alpene has tried to disown it as

 1   sort of, it was filed by their lawyers, it's a

 2   different party, but the fact of the matter is, Ali

 3   Sader is and Pilatus Bank and Alpene are all the same

 4   and they're run by the same people.  The firm here,

 5   Steptoe & Johnson, representing the applicant is the

 6   same firm that defended Ali Sader in his criminal case,

 7   and they filed a letter in support of the Conell

 8   application in New Hampshire.  So they were fully aware

 9   of it, they participated in it, and the question of

10   course is, why wouldn't you disclose something so

11   obvious as a prior proceeding where they were seeking

12   essentially much of the same information from Mr.

13   Conell and his role as the competent person, why

14   wouldn't you disclose that?

15          Here, where you're talking about someone,

16   Elizabeth McCaul, who is many steps removed, did not

17   have a role in the administration of Pilatus Bank, and

18   a lot of the argument and rationale -- the answer is

19   simple.  I think the judge did a pretty good job of

20   explaining why the discovery being sought against Mr.

21   Conell, which should apply with greater force here, was

22   inappropriate.  So we have filed that motion and I'm

23   happy to take the Court through our arguments.

24          One thing I also want to flag is, subsequent

25   to the application, the Supreme Court has taken cert.

1    on a couple of issues that are relevant to this

2    petition, one of which will address the question of

3    whether international arbitrations, commercial

4    arbitrations qualify as foreign proceedings that are

5    part of -- part of the statute.   In addition, the

6    Supreme Court took cert. in connection with that case

7    on a treaty arbitration.   It's the Alex Partners case,

8    where they will address the issue of whether or not

9    treaty arbitrations, investor treaty arbitrations

10   between countries, which look a lot like private

11   arbitration -- they're private arbitrators, they're

12   private bodies -- are within the statute's ambit.

13           So, you know, while I'm happy to argue all

14   of our positions, it occurs to me, out of efficiency,

15   out of just trying to narrow the issues, the

16   arbitration in my understanding in Malta has not really

17   commenced.   There's no panel, they haven't done

18   anything.   There's no schedule.   The Supreme Court is

19   hearing that case this term, those cases this term.

20   They will decide obviously by June.   It occurs to me

21   that one might consider it makes sense to stay this

22   entire proceeding pending the outcome of that because

23   if this -- the proceeding here is under the investment

24   treaty between Malta and China, which is pretty similar

25   to the proceeding at issue in the Alex Partners case,

1  which I think involves Lithuania, and it would resolve

2  the issue entirely.

3          I will note that the Solicitor General

4  really pushed to have the court hear that companion

5  case, the treaty arbitration, because it raises

6  fundamental issue of comity among countries that, when

7  they've been doing investor treaties in recent years,

8  probably did not realize that the full panoply of U.S.

9  discovery might very well be pulled into those

10  proceedings, which is kind of what's at issue here.

11  But that's sort of, you know, to kind of lay the

12  framework.  And, again, I'm happy to go into the

13  substance but I do want to raise that as a concern.

14          You know, the other thing that's hanging

15  over the papers is, why is Alpene seeking testimony

16  that pretty clearly is far removed from the claims

17  against Malta?  The claims are for expropriation and

18  disproportionate treatment.  By the way, those are some

19  of the same claims that Pilatus Bank brought against

20  the ECB in their nullification proceeding.  They're

21  very similar.  It's kind of interesting because if you

22  look at Judge DiClerico's (ph) decision on the Conell

23  case, he actually concluded very clearly that the

24  discovery, among other things -- he had many

25  conclusions in that opinion, but one of them was that

1  the discovery that they were seeking as to Conell was

2  far removed from any of those kinds of claims.  It was

3  not relevant and therefore, it was hard to see how it

4  could be used in a foreign proceeding, another

5  mandatory requirement of the statute.  And I can point

6  the Court to the relevant pages but for the record,

7  I'll just read it.

8          They say, "Pilatus has not shown how the

9  discovery it seeks from Conell is relevant to the

10  claims brought in the annulment action."  I'll skip

11  over the cite.  "The eleven claims are brought against

12  the ECB but the information Pilatus seeks from Conell

13  focuses on the MFSA's actions and motives, Conell's

14  qualifications for appointment as competent person by

15  the MFSA, instructions from the MFSA, and his actions

16  as competent person.  Pilatus makes no effort to show

17  how the information it seeks from Conell is relevant to

18  specific claims or issues in the annulment action

19  against ECB and Conell denies any relevance."

20          That really is the circumstance we find

21  ourselves in.  Ms. McCaul did not -- was not the

22  competent person.  She did not pick the competent

23  person.  Apparently, it was picked by the MFSA.  I know

24  Alpene has tried to blur that.  I don't know why but I

25  also don't know why they didn't disclose this prior

1    case, either, other than, you know, it's kind of a

2    sharp practice where they're trying desperately to get

3    something here that I can only speculate about.  But

4    when I see, your Honor, Promontory featured all over

5    the pleadings, including the arbitration demand that

6    was filed and some of the supporting documents, making

7    completely unsupported accusations against Promontory.

8    One has to wonder whether this is all about getting

9    pre-dispute discovery, which plainly is not a proper

10   purpose for Section 1782 discovery.

11            I would also note that, you know, there has

12   been an indictment in Malta against Pilatus Bank and I

13   think the person who was the chief compliance officer,

14   and I read this week that an arrest warrant had been

15   issued back in March of last year for the arrest of Mr.

16   Sader.  So I don't know what the ultimate -- what the

17   ultimate goal of any of these proceedings may be, but

18   my understanding is Mr. Sader is in the U.S.  And in

19   theory, if the Maltese government proceeds against him,

20   they will probably seek to extradite him.  One ground

21   for avoiding extradition in the treaty between Malta

22   and the U.S. is a political fight, which expropriation

23   certainly might fit that.

24            So we are worried that the plaintiffs have

25   -- sorry, that Alpene has not been transparent about

1  what's going on here, including by the fact that they

2  didn't mention the District of New Hampshire case,

3  including the way they've been misrepresenting our

4  client's role in it.  We don't know why they're doing

5  this but it is far removed.  It does not meet, in our

6  view, the mandatory statutory requirements, let alone

7  the discretionary requirements.  But why don't I pause

8  there because I've been monologueing a little bit, and

9  I'm happy to answer any questions.

10          THE COURT:  May I hear from opposing

11  counsel, and then I'll have some questions.

12          MR. KEATS:  Sure.

13          MR. DAVISON:  Sure, your Honor, thank you,

14  your Honor.  Again, this is Steven Davidson on behalf

15  of Alpene, the party in the arbitration and the party

16  here seeking discovery.

17          On a big-picture level, the factual pattern

18  that was communicated to you is somewhat accurate, but

19  there are obviously many disagreements we have with

20  what you heard.  Alpene is a claimant in an

21  international arbitration against Malta, and it's

22  important for one of the points, that is the pending

23  Supreme Court case, that this is before the World Bank

24  Center for the resolution of investment disputes, a

25  quasi-government agency, and Alpene is the owner of the

1  bank, the indirect and ultimate owner of the bank that

2  was seized by Malta.

3          Your Honor, I think it's important to

4  remember the fundamental allegations that we have made

5  in the investment treaty case, which we believe will be

6  proven by the facts and evidence of our arbitration.

7  The wrongful measures taken by the Maltese government

8  include dissipating the assets of the bank, depriving

9  Alpene of any indirect shareholding rights of ownership

10  control of the bank and transferring all of the assets

11  of the bank to the Maltese government.

12          Essentially, your Honor, we're saying that

13  this was a political act, trumped-up actions by the

14  Maltese government to strip Alpene of its ownership

15  interest and rights in the bank.  In trying to prove

16  our case, we need evidence, and some of this evidence

17  is unavailable through the treaty sources, that is the

18  ICSID panel that has actually been convened.  The full

19  panel has been put together and we're scheduled to have

20  a procedural conference sometime in February, so that

21  case is moving along.

22          And one of the pieces of evidence that we

23  need is, how did this competent person, Mr. Conell, end

24  up being put essentially in charge of this bank, and

25  that those actions at the very beginning of the

1   takeover of the bank are fundamental to our case

2   because, although the bank had been cleanly regulated,

3   shown to be a sufficient depository institution through

4   various reviews, Mr. Sader was indicted for charges

5   unrelated to the bank and was immediately removed from

6   the bank.  And Promontory and its allies at the MFSA

7   immediately moved in, just on the basis of this

8   indictment, to take over the bank.  That's fundamental

9   to part of our case, your Honor, because eventually, as

10  you've seen from the papers, the conviction was thrown

11  out and exculpatory evidence was withheld, such that

12  Judge Nathan concluded that if this evidence had been

13  presented, it's highly probably that no case could have

14  ever been brought, and the case was dismissed with

15  prejudice.

16          In terms of what we seek here and why we

17  seek it, McCaul was the primary point of contact with

18  Promontory.  She submitted a declaration which we would

19  respectfully suggest that your Honor read.  She admits

20  a fair amount of what we've suggested and has claimed

21  privilege while at the same time putting in this

22  declaration, which we think is classic sword-and-shield

23  and also amounts to a waiver of any banking privilege

24  that she would claim, which we would submit is not

25  sustainable.

1            But as the evidence we presented to your

2    Honor we believe proves, McCaul was a primary point of

3    contact with Promontory, with Conell.  She briefed him

4    for several hours with respect to his work at the bank

5    before he began his assignment.  She appears to have

6    selected two other Promontory persons to work with

7    Conell.  She appears to have directed Conell and the

8    Promontory persons that were purportedly managing the

9    bank and at least in one instance that we found, and

10   this is just on the information we've been able to

11   ascertain, was involved in activities months later

12   involving know-your-customer reviews that were

13   undertaken six or seven months after Conell was

14   appointed.

15            Fundamental to our case, your Honor, are the

16   actions taken at the outset of this action by Malta in

17   taking over the bank and dissipating the assets of the

18   bank.  These events started with the identification of

19   Conell and discussions with Conell about his position

20   managing at the bank.  Your Honor, we don't have to

21   rely on speculation as to that.  Mr. Conell testified

22   in an arbitration proceeding in Malta, not our case but

23   in a different case that was brought by board members

24   of the bank as against the MFSA.  Our client, Mr.

25   Sader, who we did represent in the criminal case, was

1    not a party to that and is not a party to the ECJ case

2    also pending.  In that Maltese arbitration, Mr. Conell

3    testified, and we've exhibited his testimony to the

4    Baldwin declaration of Exhibit 20, the second Baldwin

5    declaration that was submitted, your Honor.

6           That is important for a couple of reasons:

7    One, as to the decision in New Hampshire, the principal

8    reason why the judge there rejected the application

9    made to have testimony taken by Mr. Conell was that he

10   had been deposed and his evidence had been available.

11   And secondly, the judge there concluded, as you can see

12   from the reported decision, that there was likely no

13   more evidence to be taken in the case -- the foreign

14   proceeding, the support with which was the 1782

15   application was made.  Finally, he concluded that as

16   you heard from the excerpt read by Mr. Keats, the

17   evidence was really sought in a different proceeding.

18          Your Honor, that's not the situation here,

19   and the reason why the Conell case wasn't highlighted

20   by us is that that was a case brought by different

21   parties, not by Alpene, and the reasoning and

22   resolution of that case is far different from here

23   because Mr. Conell had testified already.  Ms. McCaul

24   had not, other than in the declaration she submitted.

25          Your Honor, with respect to the legal issue

1    on the foreign tribunal, as you know, as part of 1782,

2    one of the requirements is that the proceeding is

3    before a foreign or international tribunal.  The law of

4    the Second Circuit is quite clear, your Honor, as made

5    most recently in the Alexa Partners case, that an

6    investment treaty arbitration like this one qualifies

7    as a foreign or international tribunal.  Now, cert. was

8    granted in that case but the issue to be resolved by

9    the Supreme Court really does not -- will not dispose

10   of this issue.

11           The longstanding debate in the law over

12   investment -- international arbitration and 1782 is

13   whether 1782 is a available to private, commercial

14   arbitrations, that is not investor state cases but

15   private cases that have no governmental aspect to it.

16   The law is split on that.  The Second Circuit for

17   example does not allow 1782 examinations in that

18   context whereas other circuit like the Sixth Circuit

19   do.  But with respect to investment treaty arbitration,

20   as best we can tell, your Honor, there is no case from

21   a circuit that says 1782 is not allowed in investment

22   treaty arbitration.

23           In our case, it's even closer and stronger

24   to there being no doubt about 1782 being allowed

25   because in our case, the arbitration is connected -- is

1    done under the auspices of the World Bank's ICSID

2    division, and that shows that it's a quasi-government

3    agency, which to us fully satisfies the requirements

4    set forth in the Gwyo (ph) case, which is another

5    Second Circuit case dealing with this 1782 question.

6    In that case, the Second Circuit ruled that 1782 was

7    not available because it was essentially a private

8    arbitration.  Here, it is a case against the state in

9    which a quasi-government is involved.

10          So, your Honor, we would submit that this

11   case will not be decided or impacted by the issue

12   that's before the Supreme Court because the issue that

13   cert. was granted on is whether an ad hoc arbitration

14   to resolve a commercial dispute between two parties is

15   a foreign or international tribunal under 1782, where

16   the arbitral panel does not exercise any governmental

17   or quasi-governmental authority.  That's the issue on

18   which cert. was granted.  Here, it's not an ad hoc

19   arbitration, it's an arbitration pursuant to ICSID, and

20   the arbitral body does have governmental or quasi-

21   governmental authority.

22          So we would submit, your Honor, there's no

23   reason to delay the resolution of this pending the

24   outcome of that case, and it would be prejudicial to

25   Alpene to delay this discovery.  As I said, there will

1  be a procedural conference in February.  We'll likely

2  have submission of evidence by the spring or summer,

3  probably May or June, so we would want to have the

4  testimony of Ms. McCaul.  And as you can see from our

5  request, it's limited to five topics, two requests for

6  production of documents.  This is not burdensome.  It

7  can be done quickly, and we would submit it should be

8  done and is allowable under the law.  Thank you, your

9  Honor.

10         THE COURT:  Any response from Ms. McCaul's

11  counsel?

12         MR. DAVISON:  Yes, please, thank you.  I

13  appreciate it, your Honor.  So let me talk about the

14  foreign proceeding piece.  I think that the Supreme

15  Court's grant on this issue is something they reached

16  out for, particularly on the foreign arbitration piece.

17  I think if you look at the foreign treaties, the treaty

18  arbitrations, they always involve a government setting

19  it up.  That's the whole point.  The Gwyo test I

20  suspect will be hotly contested and debated in the

21  Supreme Court as to what falls on the side of a private

22  arbitration versus what falls on the side of a

23  government-sponsored one.  So I actually disagree

24  respectfully that that issue is not going to be

25  addressed and resolved.  It's an important issue

1   because we're talking about sovereign nations and

2   whether or not they had a reason to expect U.S.

3   discovery in their proceedings.

4           As for the -- let me talk about the breadth

5   of the request.  They didn't list out their request the

6   way they did in the New Hampshire case, where there's

7   20 or 30 requests for information.  But what they in

8   the deposition notice, if you look, the last request is

9   information regarding the allegations made by Alpene in

10  its ICSID proceeding against the Republic of Malta.

11  That's everything.

12          So I think it's just artful drafting that

13  they recognized the last time around Judge DiClerico

14  listed out all those requests to show how burdensome

15  they were.  But all they've done here is just put a

16  catchall that covers the same ground.  It's pretty

17  clear from the presentation you heard here today that

18  they intend to cover all that ground, so I don't think

19  it's that narrow or unintrusive.  I think that's a

20  mischaracterization.

21          And I still haven't heard any good reason

22  for not talking about the decision, other than it's a

23  bad decision for them and they're just trying to get

24  through Ms. McCaul what they couldn't get from Conell.

25  I think it's notable that nobody appealed the Conell

1  decision.  I think it's notable that nobody's gone

2  back, you know, because I think they probably

3  recognized that that judge has made up his mind, so

4  they're taking a shot at someone who is further removed

5  and it's just -- as I said, one can question what this

6  is all about, what the real reasons are here given how

7  tangential what they're seeking is to the ultimate

8  issues at hand.  What Ms. McCaul has to say about the

9  proposal to use Mr. Conell has no real bearing on an

10 expropriation claim.  It's hard to even say it with a

11 straight face, frankly.

12        And as for her, you know -- I think if you

13 look at the documents that were submitted -- they seem

14 to have a lot of emails by the way.  Notably, not one

15 single email has Ms. McCaul in it, not a single email

16 is copying Ms. McCaul, is from Ms. McCaul, and they've

17 clearly have had discovery and email from other sources

18 elsewhere, and there's nothing.  The allegation that

19 she was directing this is unsupported; it is false.

20 The reference to an email about a KYC, where they're so

21 surprised someone is doing KYC in a bank, this is a

22 bank that was -- whose assets were frozen.  Assume when

23 a bank's assets are frozen the depositors want their

24 money back.  Before you give money back to someone who

25 might be a criminal, which is why you do KYC, you do

1  due diligence to figure out who they are before you

2  release that money.  That's what they're doing.  She

3  wasn't directing it.

4        I will simply say and I have told -- we and

5  Alpene tried to talk through these issues before.  She

6  was dealing with a personnel issue of someone who was

7  having a dispute working for Mr. Conell, who did not

8  want to continue, and she persuaded him to finish his

9  job, but she did not direct the traffic.  It is also

10  true to get Mr. Conell's -- this happened very quickly,

11  right?  Mr. Sader was arrested on March 18th, 2018 or

12  March 19th, one of those two days.  I apologize, I might

13  be off a day.  The Maltese regulators really had little

14  choice but to remove him, who was -- you know, it took

15  two years.  This isn't something that got resolved

16  overnight.

17        For two years, Mr. Sader was fighting these

18  charges.  I have no comment on the proceedings.

19  Obviously, it speaks for itself that the charges were

20  dismissed but you have to evaluate the MFSA's actions

21  in real time, what they knew, when they knew it.  The

22  notion that somehow -- I think in part of the

23  presentation, they suggested that Promontory was

24  involved in seizing the bank.  I mean, that's just

25  ludicrous.  We obviously -- we recommended someone who

1  we knew, who had a long history publicly -- it's all in

2  the record -- of being a bank regulator himself, and he

3  was asked to a difficult job in a very short time

4  frame, and we agreed to give personnel to get him set

5  up for the first week or so of his office, which we

6  did, which we were paid for but we were not -- we were

7  not directing what he did.  He was taking his direction

8  from the MSFA.

9         Frankly, if they want to get -- they're

10  going to be litigating these issues.  They will be able

11  to get in their proceeding the precise reasons why

12  Malta seized the bank.  They will have the discovery

13  they want in that proceeding, and there's just no basis

14  or reason for going to someone who is very far removed,

15  who was not involved, when they actually did try to go

16  to the person who was and failed, you can't just get

17  through the back what you couldn't get through the

18  front.  That I submit respectfully is what they're

19  trying to do here.  Thank you.

20         THE COURT:  All right.  Well, this is

21  obviously a complex case, both factually and legally.

22  I do have a few questions.  I think you may have

23  answered some of them already so let's start with the

24  last one, which is, can the substance of the

25  information that's sought from Ms. McCaul be requested

```
1   directly from Malta or the MFSA through the
2   arbitration?  In other words, is there another source
3   of the information that they're looking for from Ms.
4   McCaul.  Let me start with Alpene.
5          MR. DAVISON:  Yes, your Honor, thank you.
6   The short answer to your question is no.  Discovery in
7   these investment treaty arbitrations is largely
8   voluntary.  There's certainly information we can get
9   from Malta through a request for production and things
10  like that.  We will get emails that they have on their
11  end.  We will not be able to take Ms. McCaul's
12  deposition, nor will we have free reign like in an
13  American case over which Maltese representative we can
14  take discovery of.
15          There's ICSID rule 34, which says that the
16  tribunal may call upon the parties to produce
17  documents, witnesses, and experts, but the ICSID has no
18  compulsory power to compel the attendance of witnesses
19  like your Honor would.  There's the ability to obtain
20  documentary evidence from Malta, but the ability to
21  obtain witnesses is largely based on who Malta presents
22  to us.  In other words, if they present witnesses at a
23  hearing or present a witness statement, we could cross-
24  examine and examine that witness.  If they don't
25  present that witness or bring that witness, we have no
```

1   real means to compel that witness to attend.  We have

2   no ability to get the information we seek from Ms.

3   McCaul through the arbitral process.  Discovery is

4   famously limited and often classified as not American-

5   style discovery and as a result, our ability to get

6   this information through the arbitral process is

7   essentially very limited if it exists at all, which is

8   why we are here, your Honor.

9           THE COURT:  And if you were to take Ms.

10  McCaul's deposition, how long would it take?  How much

11  time are you looking for?

12          MR. DAVISON:  I would say it's just a few

13  hours.  I mean, we really want to know what happened

14  when Mr. Conell was appointed.  He says in his

15  deposition that she was the primary point of contact

16  for him at Promontory and that she briefed him for

17  several -- she and others from Promontory briefed him

18  for several hours.  And as the record shows, there was

19  involvement, sporadic involvement thereafter by Ms.

20  McCaul, including this know-your-customer email from

21  September of 2018, in which the employee says he

22  promised Ms. McCaul he would finish the review of the

23  customers' KYC.

24          So we are -- we don't want to burden her

25  unduly.  We're certainly willing to do this deposition

1  remotely, via Zoom, whatever is a limited intrusion on

2  her.  We can limit it to a few hours.  We really have

3  just key questions about this beginning and what

4  happened because as you've seen from our request for

5  arbitration and my discussion today, your Honor, what

6  happened at the beginning and how these assets were

7  taken and why is really critical to our case, and the

8  Promontory and Ms. McCaul aspect of this on the front

9  end is very important.  Thank you, your Honor.

10         THE COURT:  So if you were to write up or

11  explain what your dream testimony would be, the most

12  helpful testimony you could get from Ms. McCaul, what

13  would it be, if you were to fill in the blanks as to

14  what it is that would be most useful to you?

15         MR. DAVISON:  It would be the contact she

16  had with MFSA, that is the Maltese financial

17  regulators, on why they reached out to her for this,

18  what she said to them, what she briefed Conell about,

19  what the instructions Conell received were, and how

20  they went about their business, and what considerations

21  if any did they give to the shareholder Alpene during

22  this process.  And then over the -- and what role if

23  any did she have after the appointment of Conell in

24  either advising him, continuing discussions with him,

25  or continued discussions with MFSA about Alpene.

1              THE COURT:  What would be the most probative

2    for you as an answer to those questions?

3              MR. DAVISON:  That the actions were -- that

4    there wasn't a regard to the Alpene shareholder

5    interest in taking this over, that there were no other

6    regulatory issues with respect to the bank, and that

7    this -- that the assets of the bank were seized solely

8    based on this indictment of Mr. Sader, and that the

9    bank was otherwise in good order and good shape, and

10   that the MFSA essentially directed them to take over

11   the bank given the state of affairs.

12             To us, that would be very probative of our

13   claims of expropriation and unfair and discriminatory

14   treatment as a foreign investor, which is the basis for

15   these claims, that is the foreign investor is treated

16   in an unfair and discriminatory way vis a vis a Maltese

17   investor, so that we would want to ask how -- what they

18   thought of Alpene, how they came to their conclusions,

19   and how -- if Ms. McCaul had any information from MSFA

20   about why they did this and why they didn't give any

21   process to Alpene through this takeover of the bank.

22             Remember, your Honor, when this happened,

23   all the shareholder rights, all the rights and all the

24   deposits were seized.  I mean, the deposits which

25   belong to others were seized and are in the possession

1   of the Maltese government.  You know, what information

2   does she have about that?  How did this come about?

3   Was that part of the mandate that they were to exercise

4   because that's what Conell ended up doing as the

5   competent person essentially running the bank.

6              THE COURT:  And her putting forth Conell's

7   name, what is it that you hope to get from her

8   deposition with respect to that?  You know, Ms. McCaul

9   says it wasn't her decision, she just gave some names.

10  Are you looking for her to somehow say that she

11  instructed Conell what to do or that she knew that he

12  would fit the agenda that the Maltese government had?

13  What is it you're looking for her to say there?

14             MR. DAVISON:  Yes, your Honor.  I mean,

15  we're trying to find out whether that was -- whether

16  that was the objective.  This would be a discovery

17  deposition in which we would be seeking to prove that

18  part of our claim and to ascertain as to the motive of

19  MFSA and what was communicated to Ms. McCaul through

20  that, and why Conell was picked and what his mandate

21  was.

22             THE COURT:  Would any of the evidence that

23  you hope to collect from Ms. McCaul be obtained in the

24  ICSID and if so, how would it be used?

25             MR. DAVISON:  I'm sorry, would it be

1    obtained in what proceeding?

2              THE COURT:  Would it be admissible in the

3    proceeding --

4              MR. DAVISON:  Would we be able to use it in

5    our arbitration?

6              THE COURT:  Can you use it or is it merely

7    just to give background and help you frame your

8    arguments?

9              MR. DAVISON:  It would be information that

10   we would hope to use in our arbitration.  We would

11   certainly think it to be relevant and admissible in the

12   arbitration.  It is an effort to obtain evidence that

13   we would use in that arbitration because if the

14   evidence is what we suspect it to be, she would -- that

15   evidence would be probative of our claims of

16   expropriation and unfair treatment.  So it's not -- I

17   say it's discovery in the sense we don't know the

18   answers to the questions, but the ultimate objective is

19   to use this evidence in the arbitration.  It's not a

20   "fishing expedition," it's a very carefully tailored

21   search for evidence that we would use in the

22   arbitration.

23             THE COURT:  And you believe it would be

24   admissible?

25             MR. DAVISON:  Yes, we do, your Honor.

```
1              THE COURT:  Okay.

2              MR. KEATS:  Your Honor?

3              THE COURT:  I just have a couple of other

4  questions and then I'll get to you.

5              MR. KEATS:  Sure, sorry.

6              THE COURT:  Remind me what the status is of

7  the arbitration at this point.

8              MR. DAVISON:  The arbitration was filed over

9  the summer.  It was registered by ICSID, which means it

10 was accepted.  There's a somewhat laborious process to

11 pick the arbitrators.  We now have -- each side

12 nominated an arbitrator, and then the parties

13 collaborated on picking a president.  That process was

14 included in December so that we have a president and

15 two arbitrators, so the three-person panel has been put

16 together.  ICSID just communicated with us about the

17 initial procedural conference, which they suggested

18 some dates in late February.

19              At that conference, a schedule will be put

20 together, and as typical in these cases, it would

21 require us to submit our initial what they call

22 memorial, a sort of opening brief with evidence,

23 probably in May or June or so, with the other side's

24 response probably three months after that, and then a

25 hearing hopefully before the end of the year or
```

1  sometime early next year.  The critical date for us is

2  likely to be requirement to submit our memorial with

3  evidence by May or June would be my estimate, your

4  Honor.

5           THE COURT:  And if the Court were to stay

6  its decision on this pending the Supreme Court's

7  ruling, how would that affect your position in the

8  arbitration?  I assume you could request a sixty-day

9  extension or whatever, a brief extension?

10           MR. DAVISON:  If your Honor did that and the

11  court rules on its issue, it would announce its

12  decision I assume by June of this year, that is the

13  Supreme Court.  I don't know whether the arbitral panel

14  would allow us to delay our submission pending the

15  outcome of that.  We might be precluded from using her

16  or if the issue goes the way I suspect it will, it

17  won't impact your Honor's decision.  And at that point,

18  we'd be seeking to have her deposition sometime over

19  the summer, I would suspect, as opposed to over the

20  spring, which would be our desired outcome so we could

21  use it in our likely upcoming submission.

22           THE COURT:  But if there were newly-

23  discovered evidence that was provided, is there some

24  provision to either request time in the scheduling to

25  supplement your memorial or how does that work?

```
1              MR. DAVISON:  We could certainly ask, your
2    Honor.  I mean, what would likely happen is, let's say
3    there was a schedule set and there was additional
4    evidence we obtained.  We would need to delay the
5    schedule, probably move off the hearing, which is an
6    issue because with these busy arbitrators and lawyers,
7    once you have a hearing scheduled, if you want to
8    reschedule it, it often takes quite a while to get back
9    on to everyone's docket.  So that if this decision were
10   delayed, it would likely impact a delay on the schedule
11   of the ICSID case, and we would be at our own peril
12   about whether the panel would allow itself to have
13   later discovered evidence submitted, and then the other
14   side would get a chance to respond to that as well.
15             But without rehashing, your Honor, as I
16   stated in my argument, I think the Second Circuit law
17   is clear and I think the issue that the Supreme Court
18   is going to decide is not -- will not impact the issue
19   before you, but that's another issue.  But as to your
20   question, I think a delay would impact our schedule,
21   would potentially preclude us from using this evidence,
22   but frankly more likely would result in a delay of the
23   schedule, which would be to our detriment to push this
24   off farther.
25             THE COURT:  Okay, thank you.
```

```
 1              Can I hear from Ms. McCaul's counsel?
 2              MR. KEATS:  Yes, thank you.  So let me talk
 3   about -- I'm going to go in reverse order because
 4   that's just the way it worked out.  You know, the fact
 5   is, there's no schedule right now.  They know now that
 6   this is an issue.  They can build this into their
 7   schedule.  Nobody is pushing to have this thing.  This
 8   thing is not going to be heard before June or July.
 9   They have made the decision to seek this testimony.
10   Everybody knows about it.  The government of Malta
11   knows about it.  They can simply do their schedule in
12   accordance with what they understand, which is it's
13   already January, the parties in the underlying Supreme
14   Court cases will brief their arguments the next few
15   months, and there will certainly be decisions by June,
16   if not earlier.  It's hard to see any prejudice but I
17   can see a lot of wasted time and resources because,
18   frankly, there might be further proceedings here that
19   delay things anyway depending on how things come out
20   for either side.  So that's just by the by.
21              Let me talk a little bit about -- your Honor
22   was asking what their ideal testimony was.  I have to
23   say two things:  One, the notion that their entire
24   expropriation/differential treatment/discriminatory
25   claim turns on Elizabeth McCaul and her conversations
```

1    to bring Lawrence Conell over, having recommended by

2    the way, the record will show, many people, not just

3    him, is hard to swallow.  Their whole case cannot

4    possibly turn on that.  They're making it all about a

5    very short series of interactions and conversations.

6           And, again, they're treating it as if

7    Promontory or Elizabeth somehow decided to put this

8    bank in administration, which they did not.  Frankly, I

9    understand the complaints that Alpene is lodging but a

10   bank that has a chairman and a sole shareholder who has

11   been arrested for money laundering in the United

12   States, any reasonable banking regulator would conclude

13   that you have to put the bank in administration.  It is

14   not a particularly shocking action on facts like that,

15   but they can litigate that.  That's their right.

16           But to that point because I think -- I'm

17   certainly struggling and I think we're all struggling

18   to understand how any of this has any bearing on the

19   claims.  I'll just put you point back to Judge

20   DiClerico's case.  If you look again in his opinion,

21   they had many of the same claims.  One of them was a

22   claim that the principle of proportionality was

23   infringed.  One of them is that the principle of equal

24   treatment and non-discrimination was infringed.  It's

25   the same claims and, again, the judge concluded that

1    the testimony they sought from Conell, who actually did

2    the work, right, who has the knowledge of what the MFSA

3    directed him and didn't direct him to do, even there

4    they concluded it had no bearing on those claims, and I

5    still think that that is absolutely the right decision.

6              There's one other issue that's lurking in

7    this that we haven't talked about today, which is,

8    we're talking about a bank regulator and their

9    consultant.  So in the U.S. -- we're all more familiar

10   with it -- government agencies use consultants all the

11   time.  It is not -- generally speaking, the

12   communications between an agency and their consultant

13   in this country are not discoverable.  They are part of

14   the deliberative process privilege and you may have

15   heard the phrase the consultant's corollary to the

16   deliberative process privilege, which basically means

17   that that deliberative process privilege would usually

18   apply to a consultant.

19             Malta has written to us, and it's in the

20   record and it's attached to my declaration, that

21   Elizabeth worked as a consultant to the MFSA.

22   Remember, she was never retained by the bank.

23   Promontory was never retained by Pilatus Bank.

24   Promontory's only client was the MFSA, and all their

25   work going back to 2012, which by the way, these

1   plaintiffs intend to explore in their deposition --

2   they say it in their brief.  It's footnote 2, page 4 of

3   their brief, in which they say, "Ms. McCaul's assertion

4   is that she has been involved with the MFSA since at

5   least 2012," which by way is a mischaracterization and

6   we'll come back to that, is one of the topics of her

7   subpoena.  "Alpene requests to inquire as to the extent

8   of her previous relationship with the MFSA chairman and

9   deputies and agents."

10          So far from being narrow discovery, and

11   you've heard that as you asked him what are they going

12   to ask about, it kept getting broader and broader.

13   We're talking about 2012 to the present, okay?  We're

14   talking about, according to their notice, anything

15   that's alleged in the arbitration demand against Malta.

16   This is the ultimate fishing expedition.  It's clearly

17   a fishing expedition.

18          I will simply say, I notice they haven't

19   denied what I said at the outset, which is, boy, this

20   sounds a lot more like pre-suit discovery against

21   Promontory, which is not a proper purpose for a 1782

22   petition.  And I'm sorry, the lack of transparency

23   throughout makes me pause.  They have not denied it.  I

24   don't care if they deny it now but they have not denied

25   it.  That is what I'm worried about.  That is why I

1    have two Promontory -- IBM lawyers.  Promontory is a

2    division of IBM -- on the phone with me because that --

3    they have made every sound but that's really what this

4    is about, and they shouldn't be allowed to get away

5    with it.

6          Let me talk about the Supreme Court

7    proceeding for a second.  I don't bet on what the

8    Supreme Court does.  Those are bets you lose.  All I

9    can say is, this is a court that reached out for an

10   issue that was not before it.  The Solicitor General

11   urged them to do so.  They took up the issue.  It

12   raises huge, huge comity issues with our allies and

13   other foreign nations to allow this kind of discovery

14   out of respect for the sovereignty of the government of

15   Malta, frankly, I think we all owe it to let the

16   Supreme Court decide if this discovery is appropriate

17   on these circumstances because it's intrusive.

18         And we're talking about now a consultant to

19   a regulator, who we're about to let ask -- a party that

20   was subject to their regulatory scheme.  We're about to

21   let them ask about communications between that

22   regulator and their consultant, and that is a big,

23   significant issue.  It shouldn't be -- it's not one

24   that should be taken lightly because it's going to

25   create issues throughout that we're going to have to

1  decide whether or not a question is or is not in

2  bounds.  They have couched it -- it's all about the

3  relationship and on its face, it's not appropriate.  In

4  any event, we ought to give the Supreme Court a chance

5  to see whether they think is even within the ambit of

6  the statute.  Thank you.

7           THE COURT:  Okay, thank you.  I agree with

8  you, I'm not going to try to predict what the Supreme

9  Court is going to do, even if I understand why they

10  took cert.  Okay, I think I've heard all I need to

11  hear.  I am seriously considering that it may well make

12  sense to stay this case until we hear -- we get

13  guidance from the Supreme Court, because if the Supreme

14  Court finds that 1782 does not apply to commercial or

15  investment treaty arbitrations, then it appears the

16  litigants would not be permitted to use U.S. district

17  courts if they wish to compel discovery from a witness

18  located in the U.S., and this petition would be moot.

19  So predicting what the outcome would be or how nuanced

20  it would be is something that I wouldn't even presume

21  to do at this point.

22           So unless there's anything else that anyone

23  wants to add at this point, I thank you for your well-

24  briefed submissions and your intelligent arguments.

25  Anything else from Alpene?

1          MR. DAVISON:  Your Honor, the only thing I

2    would add in parting is that we don't believe the issue

3    that's in front of you is actually in front of the

4    Supreme Court because the issue that was granted cert.

5    on is where the arbitral panel does not exercise any

6    governmental or quasi-governmental authority.  Again,

7    your Honor, I take your point that we can't predict

8    exactly what the Supreme Court will do for sure, but

9    that the issue -- the case that it's front of it does

10   not involved an arbitral panel that has quasi-

11   governmental authority like the one we have, which

12   involves the World Bank, which is clearly a quasi-

13   governmental authority.  That's the only thing I would

14   add, your Honor, as you think about whether to grant a

15   stay or not.

16          THE COURT:  Okay.  But the court granted

17   cert. on the question of whether the phase "foreign or

18   international tribunal" in 28 U.S. Code 1782A would

19   include international arbitral tribunals constituted

20   pursuant to a treaty signed by two or more sovereign

21   states.  That is what the Court is going to be looking

22   at, correct?

23          MR. DAVISON:  I believe there's a clause in

24   there, too, that says where the arbitral panel does not

25   exercise any government or quasi-governmental

1     authority.

2              THE COURT:  Okay.

3              MR. DAVISON:  That I think with that

4     qualifier is the precise issue in front of the Court,

5     your Honor.

6              THE COURT:  Okay, great.  That qualifier

7     that you inserted, is that critical and does that

8     change the way I should look at this?

9              MR. DAVISON:  I think so, your Honor,

10    because in the case that the Supreme Court took from

11    the Second Circuit, the panel there was an ad hoc

12    panel, which means it was not constituted pursuant to a

13    governmental agency.  Here, the panel is the World Bank

14    ICSID panel -- ICSID agency, which does have such

15    power, so we would submit that that's the difference,

16    your Honor, that our case is further removed from what

17    the Supreme Court is considering from the Alexa

18    Partners case, the Second Circuit case.

19             THE COURT:  And what about the ZF Automotive

20    case that was consolidated with it?  Does that --

21             MR. DAVISON:  That's a purely private

22    arbitration.  The Supreme Court will undoubtedly

23    resolve the question about whether -- that currently

24    has the Second Circuit split about whether in a purely

25    private arbitration, 1782 is available.  In the Second

1    Circuit, a purely private arbitration that is not

2    involving a government or an investment treaty cannot

3    use discovery, 1782 discovery.  Other circuits like the

4    Sixth Circuit say you can, and that's the case that

5    that issue will be decided.  The court took this

6    additional case, that is the Second Circuit case, to

7    decide the question of an investment treaty

8    arbitration, in which the panel does not exercise any

9    governmental or quasi-governmental authority, is 1782

10   available there?

11                   THE COURT:  Okay.

12                   MR. KEATS:  Your Honor, if I could just

13   respond.  Ingrafted in the Second Circuit decision is

14   the Gwyo test, which is I'll call it a sliding-scale

15   test.  I believe that test will be very much examined

16   by the Supreme Court, and the question of whether or

17   not the factors that were just described tips the

18   balance and what degree of control is required will

19   almost certainly be addressed by the court.  So I just

20   respectfully disagree.

21                   THE COURT:  Okay, all right.  Well, I guess

22   we'll all be listening to the argument regardless of

23   what happens.  Okay, thank you all.

24                   MR. DAVISON:  Thank you, your Honor.

25                   THE COURT:  That concludes this argument.

1              MR. KEATS:  Thank you, your Honor.  I

2    appreciate it.

3                      *  *  *  *  *  *  *

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18        I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22

23

24

25   ELIZABETH BARRON                    January 14, 2022
```